UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x
STEVEN MALASKY, On Behalf of Himself :   Civil Action No. 04-cv-7447
and All Others Similarly Situated, :
  :
                Plaintiff, :   <u>CLASS ACTION</u>
  :
  :   COMPLAINT FOR VIOLATIONS OF THE
      vs. :   FEDERAL SECURITIES LAWS
  :
IAC/INTERACTIVECORP, BARRY :
DILLER, DARA KHOSROWSHAHI, JULIUS :
GENACHOWSKI, RICHARD N. BARTON :
and VICTOR A. KAUFMAN, :
  :
             Defendants. :
  :   <u>DEMAND FOR JURY TRIAL</u>
—————————————————————— x

        This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

        No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports or news articles quoted within this work.

        Copyright© 2004 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

        All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

## INTRODUCTION

1.      This is a securities fraud class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of IAC/InterActiveCorp (also known during the Class Period as "Interactive Corporation" and "USA Interactive Corporation") (hereinafter "IAC" or the "Company") between March 19, 2003 and August 4, 2004 (the "Class Period"), against IAC, its CEO and Chairman, its CFO, its Executive Vice President of Business Operations, a member of its Board of Directors and the Vice Chairman of its Board of Directors, for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's operations, business model, financial results and growth prospects.

2.      Rather than selling its own products or services, IAC largely acts as intermediary between suppliers and consumers, aggregating large blocks of consumer goods and services (primarily travel-related products such as hotel rooms and airline tickets) from suppliers and selling them to consumers over the Internet.  IAC currently has eight operating segments, including Travel (Expedia, Hotels.com, Hotwire, Interval International, and TV Travel Shop), Electronic Retailing (HSN, a home shopping service), Ticketing (Ticketmaster and ReserveAmerica), Personals (Match.com), Financial Services and Real Estate (LendingTree.com), Teleservices (Precision Response Corporation), Local and Media Services (Citysearch, Evite, Entertainment Publications, Inc. and TripAdvisor, Inc.) and Interactive Development (ZeroDegrees).  But its Travel segment provides the lion's share of its income, such that during the first six months of 2004, approximately 70% of the Company's net income was derived from its Travel segment.  In fiscal 2003, IAC sold over $10 billion in travel services, making IAC the fifth largest travel company in the world.

3.      The Travel segment's business model was built on the ability of the Company's majority-owned subsidiaries, Expedia, Inc. and Hotels.com, to contract with the major hotel chains for non-exclusive rights to sell hotel room bookings for the major hotel chains in exchange for a fee.

- 1 -

Hotel.com's customers would pay Hotels.com for a hotel room on its Web site, and then Hotels.com would pay the pre-negotiated price to the hotel chain for the room, withholding its fee in the form of a commission for handling the booking. Conversely, Expedia would buy rooms at a wholesale price and mark them up for sale at retail prices, retaining the difference as its fee.

4.     Online travel companies – such as Hotels.com and Expedia.com – became popular because online shoppers could compare prices at various hotels on one Web site and could conduct secure Internet credit card transactions at those Web sites. Hotels.com grabbed a large share of the discount online travel booking business by advertising that it would use its volume buying power to get volume discounts that in turn would be passed on to its online customers.

5.     IAC grew through acquisitions. The Company purchased a controlling interest in Ticketmaster in July 1997. On May 10, 1999, the Company acquired substantially all of the assets of the two entities which operated Hotels.com's Web sites from their founders. In February 2000, IAC sold 6.2 million shares of its then wholly-owned subsidiary, Hotels.com, in an initial public offering, leaving it the majority shareholder. On February 4, 2002, the Company acquired a controlling interest in Expedia.

6.     On June 3, 2002, the Company announced its intention to repurchase the minority interests in its three publicly traded subsidiaries, Expedia, Hotels.com and Ticketmaster, through the issuance of its own common shares. However, Expedia's CEO and Chairman, Richard N. Barton, and Hotels.com's founders, David Litman and Robert Deiner, opposed the buyout and sought a bigger premium from IAC for their interests. The market reacted negatively, complaining it could not value the combined entity, and IAC's stock price declined. On October 10, 2002, Diller reported that IAC had completed the stock-for-stock acquisition of the minority interest in Ticketmaster, but that it was stopping its attempts to repurchase the minority interests in Hotels.com and Expedia "for

business reasons."  At the October 10, 2002 press conference announcing the completion of the

Ticketmaster acquisition, Diller stated emphatically that IAC would not be reacquiring the minority

interests in Expedia and Hotels.com:

> Q8. (Safra Rafge (phonetic), Piper Jaffrey) The decision not to pursue
> acquisition of Expedia and Hotels.com--How is this position new from what you had
> before, as you are saying there is an eventuality they will come inside? ***Travel is an
> extremely hot growth space and a core focus, so why not pay the premium and
> bring them in as well?***
>
> A. (Barry Diller) ***We really have stopped the process. There were no
> grounds for making a transaction with either of them, and there are no current
> grounds for doing so. There is a range of other things that could come up, but
> we've stopped the process***. It was enervating and confusing the markets at a time. We
> were sick of the drag of this as an unfinished question. What else we've learned is
> that Hotels.com and the hotel portion of Expedia directly compete with one another.
> But this competition is extremely healthy and that helped tell us to leave this alone
> right now. We became convinced we could knit together what needs to be knitted
> together. This process was stopping us from doing this. Things will now be clearer to
> us, to the marketplace and those involved in the operations of these companies. I'd
> like it more if we had one currency and we're completely consolidated. But it is not
> going to happen right now. We're properly energized now for going forward.

7.      However, Diller kept his sights aimed on building IAC into the single, integrated

Internet travel giant it now is.  Beginning in early 2003, as discussions between Diller's IAC and

Barton's Expedia and Diener's and Litman's Hotels.com advanced, defendants began to artificially

inflate the price of the Company's common stock in order to decrease the amount of stock IAC

would ultimately have to issue to acquire all of the outstanding shares of Expedia and Hotels.com

that it did not already own.  This in turn would permit IAC to use inflated IAC stock as acquisition

currency to repurchase all of the publicly traded shares of Expedia and Hotels.com under terms that

would not further dilute defendants' own interests in IAC.  Throughout the Class Period, defendants

also caused IAC to spend over $1.5 billion to repurchase over 47 million shares of its own common

stock on the open market to further prop-up the Company's stock price.

8.      At the start of the Class Period on March 19, 2003, IAC owned approximately 54% of the outstanding shares of Expedia stock but controlled approximately 94.9% of the combined voting power of Expedia.  On March 19, 2003, the Company announced that it would acquire the rest of the shares of Expedia that it did not already own by issuing approximately 92.5 million basic shares of IAC common stock (124.9 million shares on a fully diluted, treasury-method basis), then valued at just over $2 billion, and exchanging each of the minority-held shares of Expedia for approximately 1.94 shares of IAC stock.  The market responded positively to defendants' statements about the deal synergies and the Company's plans to be the online travel leader, and by the time the acquisition was consummated on August 11, 2003, the Company's stock price had increased 32% and the stock that was issued to Expedia's shareholders had a market value of almost $3 billion.  Barton, Expedia's founder and CEO, had announced his resignation on February 5, 2003, and subsequently sold 1,256,350 shares of IAC common stock, over 60% of which had been received in connection with his termination and the acquisition of Expedia by IAC, during the Class Period for over $40 million in proceeds.

9.      IAC also owned approximately 68% of the outstanding stock of Hotels.com but controlled 97% of its voting rights.  On April 10, 2003, the Company announced it would acquire the 32% minority interest in Hotels.com it did not already own, issuing approximately 43 million basic shares of IAC common stock (45.2 million shares on a fully diluted, treasury-method basis), then valued at approximately $1.163 billion, and exchanging each minority share of Hotels.com stock for 2.4 shares of IAC stock.  As a result of defendants' positive statements concerning the deal synergies and improvements to the Company's business model, the Company's stock price had increased by 30% and when the deal was finally consummated on June 23, 2003, and the stock the Company

issued had a market value of approximately $1.640 billion.  Hotels.com founders Diener and Litman retained their control of Hotels.com, which was to be run as a separate division within IAC.

10.     On May 5, 2003, the Company announced that it would acquire all of the outstanding shares of LendingTree Inc., issuing approximately 18.3 million basic shares of IAC stock (21 million total shares on a fully diluted, treasury-method basis) and exchanging each share of LendingTree stock for approximately 0.62 shares of IAC stock, in a deal then valued at approximately $534 million based on the trading price of IAC stock on May 5th.  That transaction was completed on August 11, 2003, and with the run-up in the Company's stock price in the interim, the Company ultimately issued stock with an approximate market value of $657 million to LendingTree's shareholders.

11.     Defendants' statements made in connection with the announcement of these acquisitions and with the Company's financial reports and other statements made throughout the Class Period were materially false and misleading because they did not disclose that:

(a)     Certain of the Company's online customers were being double-billed for hotel rooms purchased on the Company's Web sites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were again being charged the room rates that the Company had already collected, leading to great customer dissatisfaction.

(b)     Certain hotel chains were contesting the Company's slow payment for hotel room sales made on its Web site and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether.

(c)     Certain of the Company's Web site customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount,

the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites.

(d)     Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its Web sites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether.

(e)     The Company had previously been selling a large number of hotel rooms and airline seats through more than 24,000 affiliate Web sites, such as Web sites operated by the travel industry in certain cities, but since October 2002, many of these Web sites were either privately threatening and/or actually pursuing litigation against the Company, alleging among other things copyright infringement and predatory advertising, claiming that Hotels.com was using special software to deprive these affiliate Web sites of the portion of its fee that it had promised to pay them and that as a result, certain of the affiliate Web sites had refuted their otherwise exclusive, multi-year contracts with the Company and certain of these affiliate Web sites were instead transacting their purchases of hotel rooms directly with the hotel chains.

(f)     One substantial business partner of Hotels.com, Metroguide, had commenced a lawsuit against Hotels.com and Diener alleging violations of federal copyright law and unfair business practices in January 2003 in the Southern District of Florida.  Defendants did not disclose the pendency of this litigation or the rift with what Diener had described in October 2002 as one of Hotels.com's "larger affiliates, proving [Hotels.com] a great deal of traffic."

(g)     The Company was under-reporting its state and local sales tax expenses for some locations because defendants were paying state and local occupancy taxes based on the

wholesale rate at which they rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers.

(h)     Certain hotels and airlines were decreasing the Company's allotment of rooms and seats because of the Company's bad business practices.

12.     Suddenly, on August 4, 2004, the Company issued its second quarter 2004 earnings release disclosing that its Q2 2004 net income fell 24% from the same quarter in 2003 and that it was cutting its forecast for full-year operating profits, admitting that it was being provided less airline seats and hotel rooms to sell.  Defendants blamed the decrease in revenue on a change in accounting whereby the Company would start recognizing online hotel room sales revenues only on the fees it earned (whether through commissions or mark-ups), rather than recognizing the entire price customers paid IAC for the rooms.  The Company's net income dropped 24% to $73.2 million from $96.2 million per share in Q2 2003, based in large part on a 35% increase in advertising expenses. The Company lowered its operating income expectations for 2004 to $430 million from the "$415 to $615 million" range it had estimated in May 2004, while the acquisitions of the minority interests in Expedia, Hotels.com and LendingTree were still pending.  Defendants also disclosed that for the first quarter in its history as a publicly traded company, IAC's travel bookings had actually decreased in Q2 2004.

13.     On this news the Company's stock plummeted on extremely high volume of almost 90 million shares, more than 18 times the average daily trading volume for this stock.  The Company's stock price precipitously dropped from its Class Period high of $42.74 per share on July 7, 2003 to close at $22.80 per share on August 4, 2004, erasing over $10 billion in market capitalization.  Deusche Bank and other analysts cut the Company's stock ratings.

14.     In an August 5, 2004 email sent to IAC employees, Diller conceded he had overstated the Company's then-existing business operations and status in earlier statements and gave too-bullish guidance at an investor and analyst conference in November 2003, which he admitted misled investors:

From: Barry Diller

Sent: Thursday, August 05, 2004 7:34 PM

To: All IAC

Subject: IAC

I think it's appropriate to review the last days....

We released our earnings with an attendant conference call with analysts and our stock is down severely as a result...that you all surely know. We said on the call that it was a good quarter, and it was. **What wasn't good is that we, your management, raised expectations too high at our Investor Day last November and are now paying the price.** Added to that, and I do believe inappropriately, I was far too defensive in replying to analysts' questions, showing my exasperation from pointed queries about the fundamentals of our businesses, particularly Travel. I could say the factors for my lame performance were that the call went on too long, that I felt it necessary with so much querulous pounding to strongly assert the health and prospects I so clearly believe in, and that I felt an overreaction brewing that required the most vigorous defense. **All of these are true but the higher truth is we did disappoint the estimates for growth set by our own hands and by not lowering them earlier in the year as the strain became clear we mightily exacerbated the problem. That, and the extremely jittery markets of the last months did the rest, with the result that our shareholders and analysts were caught in the breech...so the responsibility for this, allowing the bar to be set unreasonably high, and then not having the proper patient focus on our conference call, is fully mine.**

15.     On August 16, 2004, Sabre Holdings, the Southlake, Texas-based owner of Travelocity.com, a major competitor of Expedia.com and Hotels.com, posted a ten-fold increase in its own Q2 2004 net income compared to its Q2 2003 quarter, causing its stock price to increase. Compared to IAC's common stock price, which declined by 32% between January 1, 2004 and August 16, 2004 alone, Sabre's stock had increased 9.8 % during that same period.

16.     Then, on August 16, 2004, InterContinental Hotels Group Plc ("InterContinental"), the world's largest hotel operator by rooms, announced it ended its agreement to promote its hotels through Expedia.com and Hotels.com because the online travel sites owned by IAC did not meet its standards. InterContinental, whose chains include Holiday Inn and Crown Plaza among others, stated that Travelocity would be the only authorized online promoter of its hotel rooms because Travelocity's sales practices met its standards. InterContinental disclosed that the conflict between it and IAC, Expedia.com and Hotels.com had been waging since at least April 2004 when InterContinental stated it would no longer work with a Web site that did not show customers the commissions they were being charged and fax bookings made directly to hotels, rather than reporting them through an automation system. InterContinental also objected to Expedia.com's and Hotels.com's Web sites indicating InterContinental's rooms were sold out merely because the Web sites had exhausted their allocation of discount rooms.

17.     Throughout the Class Period, while IAC's stock price was driven up on defendants' positive statements, reaching a Class Period high of over $42 per share on July 7, 2003, certain Company insiders, including each of the Individual Defendants, illegally profited on their own personal sales of the Company's common stock, selling over 7.7 million shares of their own IAC stock at inflated prices for over $258.9 million in proceeds and registering 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering. The Company's stock declined to below $22 per share on news of the Company's dismal Q2 2004 performance, analyst downgrades, and news of InterContinental's decision, erasing billions of dollars in market capitalization.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

19.     Venue is proper here pursuant to §27 of the 1934 Act.  Acts and transactions giving rise to the violations of law complained of occurred here.

## THE PARTIES

20.     Plaintiff Steven Malasky purchased IAC publicly traded securities as detailed in the attached certification and was damaged thereby.

21.     Defendant IAC is a Delaware corporation headquartered in New York City.  As of July 26, 2004, the Company had 631,416,327 shares of its Class A Common stock traded on the Nasdaq National Market and 64,629,996 shares of Class B Common stock outstanding (for which there is no public market), for a total of 696,046,323 shares outstanding.

22.     Defendant Barry Diller ("Diller") is the CEO and Chairman of the Company.  During the Class Period, defendant Diller was in possession of confidential adverse information concerning IAC.  During the Class Period defendant Diller sold 5,329,000 shares of IAC common stock for total proceeds of approximately $177.6 million.

23.     Defendant Dara Khosrowshahi ("Khosrowshahi") is CFO and Executive Vice President of the Company.  During the Class Period, defendant Khosrowshahi was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Khosrowshahi sold 120,514 shares of IAC common stock for total proceeds of over $4.1 million.

24.     Defendant Julius Genachowski ("Genachowski") is the Company's Executive Vice President and Chief of Business Operations.  During the Class Period, defendant Genachowski was in possession of confidential adverse information concerning IAC.  During the Class Period,

defendant Genachowski sold 237,500 shares of IAC common stock for total proceeds of over $8.2 million.

25.     Defendant Richard N. Barton ("Barton") is a director of IAC.  Barton has been a director of IAC since February 2003.  Barton founded Expedia and served as the President and CEO and as a director of Expedia from September 1999 through March 2003.  During the Class Period, defendant Barton was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Barton sold 1,256,350 shares of IAC common stock for total proceeds of over $40.6 million.  Defendant Barton purportedly entered into a 10b5-1 sales plan on May 30, 2003, but at this point in time Barton was already in possession of material, non-public information concerning the adverse information described herein.

26.     Defendant Victor A. Kaufman ("Kaufman") is Vice Chairman of the IAC Board of Directors.  Kaufman previously served both in the role of Chairman of the Company and as its CFO.  During the Class Period, defendant Kaufman was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Kaufman sold 842,862 shares of IAC common stock for total proceeds of over $28.3 million.

27.     Defendants are liable for the false statements pleaded herein at ¶¶28-36, 38-39 and 41-42, as those statements were each "group-published" information for which they are responsible.  By reason of their stock ownership and positions with IAC, the Individual Defendants were controlling persons of IAC.  IAC in turn controlled the Individual Defendants.  The Individual Defendants and IAC are liable under §20(a) of the 1934 Act.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

28.     On March 19, 2003, the Company and Expedia issued a press release entitled "USA Interactive and Expedia Announce Merger Agreement; USA to Acquire the Expedia Shares It Does

Not Already Own in a $3.3 Billion Transaction; USA Announces Board Authorization of Stock

Repurchase Plan."  The press release stated in relevant part:

> USA Interactive and Expedia, Inc. announced today that they have entered into an agreement by which USA, already the majority owner of Expedia, would acquire the Expedia shares it does not currently own in a stock-for-stock transaction that is generally tax-free to Expedia shareholders.  The transaction is valued at $3.3 billion, based on the closing price of USA common stock on March 18, 2003.  The transaction allows USA to further simplify its corporate structure.  The Expedia Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Expedia Board.

> Under the agreement, Expedia shareholders would receive 1.93875 shares of USA common stock for each share of Expedia stock that they own, which represents approximately a 30% premium, based on the closing price of USA stock and Expedia stock on March 18, 2003.  In the transaction, USA would issue to Expedia public shareholders approximately 92.5 million basic shares and 124.9 million shares on a fully diluted, treasury method basis.  In connection with the merger, Expedia warrants and options will be converted into warrants and options to acquire USA common stock.  The transaction is expected to be slightly dilutive to USA's adjusted earnings per share ("EPS") for 2003, however, due to expected over-performance by Expedia and USA's other businesses, USA believes that it will meet its current 2003 budgeted adjusted EPS of $0.75 per share.  In addition, USA expects Q1 2003 EBITA to very significantly exceed last year's Q1 EBITA and to beat its Q1 2003 EBITA budgeted amount, and expects to meet or exceed its Q1 2003 adjusted EPS budget.  Please note that USA's projections are based on the expectation of a short conflict in Iraq without any other significant geopolitical disruptions during the year.

> USA also announced that its Board of Directors has authorized the repurchase of up to 30 million shares of USA common stock.  USA may purchase shares from time to time on the open market or through private transactions, depending on market conditions, share price and other factors.

> Barry Diller, Chairman and CEO of USA Interactive, said, "The timing in relation to world events is an accident – as often happens with transactions, they take the time they take to reach conclusion – however, we were of course mindful of events beyond our own – and our decision to acquire the balance of Expedia under these circumstances does dramatically underscore our great belief in the robust growth and long term value of online travel.  Travel may be affected by this or that event, for a day or a month or whatever, but if there is life then there is travel – we bet on the latter."

> "We all have so much respect for Rich Barton, Erik Blachford and the superb group they have assembled that has executed so flawlessly building Expedia into a leadership position in online travel – we hope by this consolidation of ownership at

USA that this great Expedia group will play an ever expanding role across all our 14 Divisions."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger creates significant value for Expedia's minority shareholders," said Jay Hoag, Chairman of the Special Committee of Expedia's Board of Directors. "Expedia shareholders have an opportunity to participate in the significant upside potential of USA, which is further enhanced by its full ownership of Expedia."

"This transaction gives us the opportunity to accelerate our work of building a great travel company," said Erik Blachford, incoming President and CEO of Expedia. "We are looking forward to working with USA and its other entities in a more integrated fashion, and believe there is substantial value to be created in the process."

USA currently owns approximately 54% of the outstanding Expedia stock and controls approximately 94.9% of the combined voting power of the outstanding Expedia shares. USA has agreed to vote all of its Expedia shares in favor of the merger at the Expedia stockholders meeting relating to the merger. USA shareholders holding a majority of the voting power of USA have acted by written consent to approve the transaction. An information statement will be mailed to USA shareholders and a proxy statement/prospectus will be mailed to Expedia shareholders. The transaction, which is subject to customary conditions, is expected to be completed in the summer of 2003. The transaction is not subject to any material adverse effect conditions (including the possible effects of war).

29.     On April 10, 2003, IAC and Hotels.com issued a press release entitled "USA Interactive and Hotels.Com Announce Merger Agreement; USA to Acquire the Hotels.Com Shares It Does Not Already Own in a $1.1 Billion Transaction; Transaction Completes USA Corporate Restructuring."  The press release stated in relevant part:

USA Interactive and Hotels.com announced today that they have entered into an agreement by which USA, already the majority owner of Hotels.com, would acquire the Hotels.com shares it does not currently own in a tax-free, stock-for-stock transaction. The transaction is valued at approximately $1.1 billion based on the closing price of USA common stock on April 9, 2003.

The transaction would represent the final step in USA's efforts, begun in June 2002, to simplify its corporate structure by buying in its public subsidiaries. As a result of these transactions, all of USA's interests will be indivisible inside USA's public security.

The transaction would not change the current operating structure of Hotels.com, and USA's intention is for Hotels.com and Expedia to continue to be

operated separately.  Travel is, however, its own sector and USA would continue to review strategy and over time may decide to make changes.

The Hotels.com transaction is expected to be slightly accretive to USA's budgeted adjusted earnings per share for 2003.

The Hotels.com Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Hotels.com Board.  Under the agreement, Hotels.com shareholders will receive 2.4 shares of USA common stock for each share of Hotels.com stock that they own. This represents approximately a 20% premium based on the closing price of USA stock and Hotels.com stock on March 18th, 2003, the day prior to the announcement of USA's merger with Expedia.  In the transaction, USA would issue to Hotels.com public shareholders approximately 43.0 million basic shares and 45.2 million shares on a fully diluted, treasury method basis.

Barry Diller, Chairman and CEO of USA Interactive, said, "David Litman and Bob Diener, in classic entrepreneurial fashion, have created a great company. We were lucky enough to know that at an early stage, so we've watched their determination and fierce dedication in building up the enterprise…and we believe all that will continue because the incentives are all in place and our interests completely aligned for the future."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger is in the best interests of Hotels.com's minority shareholders," said Elan Blutinger, Chairman of the Special Committee of Hotels.com's Board of Directors.  "Hotels.com's shareholders have an opportunity to participate in the continued growth potential of USA, which is further enhanced by its full ownership of Hotels.com."

David Litman, Chairman and CEO of Hotels.com, commented, "Bob Diener and I are thrilled at the opportunity for Hotels.com to participate on a broader scale in the future success of USA Interactive.  We are convinced that this merger will enhance the growth prospects for Hotels.com, and we are more determined than ever to achieve our company goals through this exciting combination with USA.  Bob and I would like to thank the more than 1,200 employees of Hotels.com that have helped to make this possible and we look forward to an exciting future."

In connection with the merger, Hotels.com options would be converted into options to acquire USA common stock, and Hotels.com warrants would be converted into warrants to acquire, or exercisable for, USA common stock.  David Litman, Chairman and CEO, and Bob Diener, President, will continue in their current positions, and the new USA shares they receive in the transaction in respect of their Hotels.com shares that are currently subject to transfer restrictions will be subject to those same transfer restrictions.  The transfer restrictions remain in effect until March 2004.

- 14 -

USA currently owns approximately 68% of the outstanding Hotels.com stock and controls approximately 97% of the combined voting power of the outstanding Hotels.com shares. USA, as the holder of a majority of the voting power of Hotels.com has acted by written consent to approve the transaction. An Information Statement will be mailed to Hotels.com shareholders in connection with the transaction. No separate USA shareholder approval is required. The transaction, which is subject to customary conditions, is expected to be completed in the summer of 2003. The transaction is not subject to any material adverse effect conditions (including the possible effects of war).

30.    On May 1, 2003, the Company issued a press release entitled "USA Interactive Releases Chairman and CEO Barry Diller's Letter to Shareholders Accompanying USA's 2002 Annual Report." The letter stated in relevant part:

To Our Shareholders

While it's my experience that it never seems so living through it, the last year was a whirlwind...the best way to review the year though isn't on a calendar basis, but instead using the start date of May 7th, since this was the date the contribution of our entertainment assets to Vivendi Universal Entertainment closed. On that date we went from a media, entertainment company with ecommerce interests to an interactive transaction company. From that moment, we were a company transformed – ending the material veto rights held by other parties, and eliminating the LLC structure under which we'd operated with such complexity and contradiction for almost all the years of our short life.

Through the recently announced buy-ins of the minority interests of Expedia and Hotels.com, and the previously completed acquisition of the outstanding minority interest in Ticketmaster, we have virtually completed the evolutionary process of simplifying our corporate structure. Recently, I resigned my position as CEO of Vivendi Universal Entertainment – which clarified with great punctuation where my work would be concentrated. The cumulative effect of these actions has eliminated any lingering question about whether we're a holding company or an operating company. Clearly, we're now properly viewed as an operating company and judged against our theoretical peers – namely the Tier One companies in interactivity – eBay, Yahoo, and Amazon.

In this arena of Tier One interactive companies, from a financial standpoint, we compare quite favorably. We lead in Sales, EBITA, and Free Cash Flow – and we're second only to eBay in Gross Transaction Value. Market valuations in the internet sector certainly have a short and sharp roller coaster history...our equity securities are certainly not currently, or thank God in historical terms, valued at the high multiples of the other leaders in the sector – but, to us, that's entirely besides [sic] the point. Our perspective is long term, and our focus is not on multiples but on

creating real and lasting value for our shareholders.  We're happy to have our performance speak for itself and have our stock follow, rather than the reverse.

These financial yardsticks are consistent with our goal to be the largest, most profitable interactive commerce company in the world – by pursuing a multi-brand strategy.  Even though we have leadership today, we want to expand on that lead and create a company in which the power of our brands allows us to create an "unwalled" garden where our customers can benefit through discounts, membership, dynamic pricing and all methods to link and unite our great total audience of our combined users.

From a structural standpoint, there's only one lingering piece of the puzzle that needs final resolution...our VUE securities.  We've been clear on our intentions...this set of securities is worth the equivalent of cash to us and we intend, over the next 6-12 months, to either indirectly monetize this value (through the issuance of USA securities that mirror the economics of our VUE Preferred Stock) or exchange all our VUE securities into something else of substantially greater value. Our primary motivation is to turn a relatively "passive" asset on our books into the equivalent of cash, which we can then use either to acquire new businesses, invest in our current ones, or shrink our capitalization.

*As we've said before, we are very committed to transparency and clarity when it comes to financial reporting.  We've changed our format for presenting our quarterly numbers to further emphasize the relevant metrics and other important financial information relating to our operations*.  We will continue to give more and more information, trying in every way we can to do so in a clear and concise manner.  The evolving accounting rules (such as those relating to giving equal prominence to GAAP measures along non-GAAP [sic] measures like EBITA and Adjusted EPS) sometimes make this challenging.  *But this type of challenge only reinforces for us our basic principles – namely, that investors are entitled to see all relevant information and to make their own judgment about which parts of our disclosed information are most important to them*.  Also, we're aware that our focus on providing detailed information and full explanation has spawned quite a number of footnotes in our earnings releases and other public filings – sometimes it may seem like there's more footnotes than text.  This isn't something we're proud of, and over time we'd like to see our footnotes steadily shrink...but, what we won't do is dot one less "i" in the pursuit of full and complete disclosure, providing whatever analysis and commentary we can in having our shareholders understand our company exactly as we do.

*In our annual reporting and earnings releases, we'll give our views about the way in which we look at our results, the ways in which we operate internally and how to best look at our future prospects*.  But, be assured that whatever financial metrics you may find most compelling, we'll continue to try and be ahead of your thought process.  This means that we'll present good news in a balanced way *and we'll fairly disclose any anticipation of material bad news and bad trends very early to the extent that we can identify them.  Openness is a mantra to us– and*

*we're committed to talking to the investing community in a way that's totally consistent with the way in which we discuss our company among ourselves*.  We want investors who take a long-term view and are not swayed by short-term results – whichever way they may fall.

And, we want our employee incentives aligned with this philosophy.  One of the most important decisions we made this year was deciding to begin our transition away from issuing stock options to granting restricted stock units.  We believe that stock options encourage aggressive behavior and a get rich quick mentality that unfortunately dominated much of the "bubble" economy.  While this has been an understandable shock to many of our employees as they transition out of the "option way of life," we believe it of paramount importance to perfectly align our employee equity incentives with the interests of our shareholders and we can't think of a better answer than restricted stock units.  An equally important component of our equity plan is to extend the average vesting period of our grants – we believe USA equity is dear and we are only interested in people who want to be with us for the long term.  While anyone can own our stock for a minute or a decade, we're only going to make decisions for the company with a long-term view.

Given our start in owning television stations, and my own history in entertainment, we certainly didn't get to where we are by design...what we had was a real curiosity about interactivity and the great good luck to have it just prior to the development of the internet.  We proceeded step by step, constantly re-evaluating our position, delving into the areas we found interesting, and jumping on opportunities with total focus, speed and aggression.  After seven short years, we are firmly convinced that our distinct approach to this interactive world – that of multiple brands as opposed to one totalitarian brand– is a great way to create value.

While we are certain that the business arena we inhabit is at its earliest stage of development, and that there will be lots of twists and turns along the way, we are committed to making decisions with an absolute view of the value over the long term for our shareholders, and with a highly critical view of our own weaknesses and vulnerabilities.  Our great challenge is to continue to execute in our multiple lines of businesses.  We are mindful every day of the consistent operating discipline necessary to achieve the goals we have set...however, with our stable of brands, each with such great growth ahead and their enormous potential to integrate and create new products and services, we believe we can sustain a competitive advantage far into the future.

All my experience in the entertainment business taught me very few people made the decisions that really counted, that were the determinants of success and failure...every single experience I have had in this new world of interactivity tells me exactly the opposite...it is the expertise and the enterprise of a great many talented people working at every level of the organization that makes for success...we are so very lucky to have so very many engaged in what I deeply believe can be one of this century's great enterprises.  I am at the earliest stage (though I hope growing quickly) in learning how to manage an organization such as this...part of that is

- 17 -

knowing just how much I need to thank its members, together with our wise and engaged Board of Directors for their work this year past, and for their vigorous and challenging support in the work ahead.

Sincerely,

/s/Barry Diller

Barry Diller
Chairman and Chief Executive Officer

31.    On May 1, 2003, the Company also issued a press release, entitled "USA Reports Excellent First Quarter," which stated in relevant part that the Company's adjusted EPS had grown 155% to $0.16 (with GAAP EPS of $(0.23)), that its EBITA had grown 120% to $173 million, that its operating income had grown 236% to $93 million, and that its free cash flow and net cash provided by operating activities exceeded $400 million.

32.    On May 5, 2003, IAC and LendingTree issued a press release entitled "USA Interactive and LendingTree Announce Merger Agreement; Entry into the Financial Services and Real Estate Verticals Gives USA Access to 75% of Total Interactive Commerce (U.S.)."  The press release stated in relevant part:

> USA Interactive and LendingTree, Inc. announced today that they have entered into an agreement by which USA would acquire all of the outstanding capital stock of LendingTree in a stock-for-stock transaction.
>
> The transaction would represent USA's entry into the large and attractive financial services and real estate verticals, both of which are at an early stage of online migration.  LendingTree is the leading lending exchange with more than 200 participant lenders; the Company has facilitated nearly $48 billion in closed loans since inception and has recently entered the real estate sector with excellent early results.
>
> With this transaction, USA now has a presence in seven key areas of interactive commerce that represent approximately 75% of total interactive commerce (U.S.) – Travel, Ticketing, Goods, Personals, Local/Classified Advertising, Financial Services and Real Estate.  The acquisition of LendingTree adds another powerful brand and profitable interactive business to the USA family, and furthers USA's goal of being the largest, most profitable interactive commerce company in the world.  LendingTree will have access to USA's existing base of

nearly 40 million unique monthly Internet users who increasingly are provided opportunities to become customers of more than one USA property through cross-promotion, integration and the use of special offers or discounts.

The acquisition of LendingTree will be neutral to USA on an accretion/dilution basis and USA anticipates that LendingTree's long-term growth metrics will be consistent with those of USA's fastest growing businesses.

Under the agreement, LendingTree shareholders will receive 0.6199 of a share of USA common stock for each share of LendingTree common stock that they own, and LendingTree preferred stockholders will receive the same merger consideration, on an as-converted basis. In the transaction, USA would issue to LendingTree shareholders approximately 18.3 million basic shares and 21 million total shares on a fully diluted, treasury method basis. The transaction is generally expected to be tax-free to LendingTree shareholders. Based on closing prices of USA common stock between April 28, 2003 and May 2, 2003, the transaction is valued in a range of $626 million to $734 million.

Barry Diller, Chairman and CEO of USA Interactive, said, "For several years now we have been saying, in answer to investor and media questions about what's the next area of investment for our Company, that the most exciting sector is in both financial services and real estate – now, with this singular acquisition we enter both, with an excellent Company, having built a fine brand, and with great and deep management strength – we waited appropriately long enough to find the perfect solution – LendingTree."

In connection with the merger, LendingTree options will be converted into options to acquire USA common stock, and LendingTree warrants will be converted into warrants exercisable for USA common stock.

The transaction is subject to LendingTree shareholder approval. The LendingTree Board of Directors has approved the acquisition by unanimous vote and unanimously recommends that LendingTree shareholders vote to approve the merger agreement and related matters at the special meeting to be called for consideration of the transaction. USA has received binding voting agreements to support the transaction from LendingTree shareholders representing approximately 31.5% of the as-converted-to common vote. The transaction has been approved by the Board of Directors of USA and no separate USA shareholder approval is required. The merger, which is subject to other customary closing conditions, is expected to be completed in late summer.

Doug Lebda, Founder and CEO, and Tom Reddin, President and COO, will continue in their current positions, as will other key members of the senior management team. LendingTree's senior management team will have a significant ongoing economic interest in the upside of LendingTree, after USA recovers its acquisition costs with a rate of return, which is designed to incent and retain LendingTree's strong management team over the long term.

Doug Lebda said, "We believe that the merger with USA creates significant value for our shareholders, not only because of the transaction itself but also because of the opportunity to participate in USA's tremendous future as a leader in interactive commerce."

Mr. Lebda continued, "This will create the opportunity for us to accelerate our growth in the consumer lending and real estate verticals, leveraging our scalable business model and leading brand with USA's capital, management expertise and synergies with other USA businesses, particularly those that help penetrate local markets. Working together we can add significant value to consumers, lenders and REALTORS®, while producing impressive growth and financial returns for shareholders. On a personal level, I am excited to join the USA family, and for the opportunities this will provide for all of LendingTree's employees and business partners."

33.     On June 23, 2003, the Company issued a press release entitled "InterActiveCorp Completes Acquisition of Hotels.Com New York," which stated in relevant part that IAC had completed the acquisition of the outstanding shares of Hotels.com that it did not already own. In the transaction, IAC issued to Hotels.com public shareholders approximately 44.3 million basic shares and 47.2 million shares on a fully diluted, treasury-method basis.

34.     On August 5, 2003, the Company issued a press release entitled "IAC Reports Q2 2003 Results," which stated in relevant part that the Company's Q2 2003 revenue was $1.5 billion, up 38%, its GAAP diluted EPS from continuing operations were $0.09, its adjusted EPS were $0.18, and its year-to-date net cash provided by operating activities was $939 million.

35.     On August 8, 2003, the Company issued a press release entitled "IAC Completes Acquisition of Expedia, Inc.," which stated in relevant part that the Company had completed the acquisition of the outstanding shares of Expedia that it did not already own and that IAC had issued to Expedia's public shareholders approximately 100.8 million basic shares of IAC common stock and 133.3 million shares on a fully diluted, treasury-method basis.

36.     On August 8, 2003, the Company also issued a press release entitled "IAC Completes Acquisition of Lending Tree," stating in relevant part that the Company had completed its

acquisition of LendingTree and that, as a result of the acquisition, IAC would issue to LendingTree shareholders approximately 18.8 basic shares and 21.1 shares on a fully diluted, treasury-method basis.

37.    On August 10, 2003, *The New York Times* ran a story entitled "Financial Disclosure, the Barry Diller Way," which stated in relevant part:

> WHEN the titans of media and finance met last month in Sun Valley, Idaho, for the annual conference held by the investment banker Herbert Allen, the chatter was not limited to wheeling and dealing.  Corporate governance was also a topic of discussion.  Three company chairmen – Warren E. Buffett of Berkshire Hathaway, Howard Stringer of Sony and Barry Diller of InterActiveCorp. – even participated in a panel on the subject for the lustrous crowd.

> To some investors, Mr. Diller's inclusion on such a panel may seem incongruous.  For while many companies have spent the past year making their financial reports simpler and more transparent, those from InterActive, an Internet commerce conglomerate whose businesses include the Home Shopping Network, Expedia Inc. and Hotels.com, are still maddeningly complex.

> Investors perusing the company's quarterly earnings release from last Tuesday, for example, encountered a thicket of pro forma figures, used by InterActive to put the best spin on its results.  Of course, the company also presented results according to generally accepted accounting principles, as regulators require.  But pro forma figures – which calculate results excluding certain items – dominated the release.

> Perhaps more troubling, profits at InterActive's two big Internet travel sites, Expedia and Hotels.com, the company's growth engines, may be inflated.  The problem is that the sites may be paying less in hotel occupancy taxes than government authorities think is owed.  And a disclosure in a recent regulatory filing, saying that the company could be forced to pay back taxes to state or local authorities and pay more taxes in the future, was minimal at best.

> Moreover, nowhere in its documents does InterActive tell investors how much its earnings could be hurt if tax authorities require it to alter its practices.

> In a telephone interview last Wednesday, Mr. Diller bristled at the notion that his company's financial statements were purposefully complex.  "I would say strongly that we go to extraordinary lengths to be transparent and to write it in plain English," he said.

> "Our goal is to simplify the capital structure of the company," he said.  "We've made acquisitions, we have pro forma issues, issues of amortization, and our

- 21 -

shareholders want to look at the company in ways other than GAAP, and we provide supplemental information that we hope is clear. By doing what we did this quarter, which was to essentially not obfuscate anything, was, I think, a fine step."

Dara Khosrowshahi, InterActive's chief financial officer, rejected the contention that the company's stance on the hotel occupancy tax was aggressive. "This tax issue is not a big deal in general," he said. "We have been advised on these issues by multiple experts in the area. They have advised us that we have a completely sound position as far as taxes go."

With InterActive, Mr. Diller intends to build the world's largest and most profitable e-commerce company. To that end, he has been dumping broadcasting and entertainment assets and replacing them with Internet commerce concerns.

In the past 12 months, InterActive has paid almost $8 billion to acquire Hotels.com; Ticketmaster; uDate.com, an Internet dating service; Entertainment Publications Inc.; Expedia; and the Interval Acquisition Corporation, a real estate services company; and LendingTree Inc., an online financial services concern. Most of the acquisitions were made using InterActive's highflying stock.

InterActive's second-quarter results showed the success of the strategy. Revenue rose 38 percent, while operating income jumped to $112 million from $25.4 million in the corresponding period last year. The biggest contributor to the growth was InterActive's online travel business, especially the bookings at Expedia, which sells airline tickets and hotel rooms on the Web. Revenue in the travel services unit, which includes Expedia and Hotels.com, grew 72 percent, and operating income doubled, to $88.7 million.

Like most Internet stocks, InterActive's shares have been incendiary, rising as high as $42.74 last month, up 86 percent for the year. But management's disclosure last week that net income for the rest of the year would be lower than forecast helped push down the stock to $34.71 at Friday's close. That gives InterActive a market value of $1.94 billion and a price-to-earnings ratio of 41 – and reduces its stock gain this year to 51 percent.

STILL, profits at InterActive's online travel units, as good as they look now, may be more vulnerable than some investors appreciate. If the company soon has to pay more in hotel occupancy taxes, its profits would be cut substantially.

InterActive's hotel booking subsidiaries, Hotels.com and Expedia, interact with their customers in one of two ways. They can act as agents, letting a customer reserve a room using a credit card, which the traveler uses to pay the hotel bill at checkout. In these circumstances, an Internet customer is typically advised that taxes may or may not be included in the total cost listed on the site.

But the sites make far more money in their capacity as merchants, buying blocks of rooms at wholesale prices from a hotel and selling them to consumers at higher prices. When Expedia acts as a merchant, the rooms often carry an "Expedia

special rate" and appear atop a list of available rooms for a given destination. It is here that the taxes paid by InterActive can come into question.

In its financial filings, InterActive acknowledges that it remits taxes to government authorities based on the wholesale cost of the rooms that it buys and resells, not on the amount it charges to consumers who book rooms on its sites. The company does not make this disclosure to consumers shopping on its Web sites.

InterActive often charges its customers what it identifies as "taxes and fees" for several popular travel destinations. To a traveler accustomed to paying steep hotel occupancy taxes, the amount may look mainly like a tax, with a small fee added. But because the tax paid by the company is based on the wholesale, not the retail, room rate, the fee portion is much larger than it might seem. On each transaction, the companies appear to pocket as profit an amount that some taxing authorities may end up contending is theirs.

Because Hotels.com and Expedia lump together what they charge in taxes and fees, consumers do not know how much they are paying for each. Expedia's airline booking system, by contrast, clearly differentiates what its customers pay in taxes and what they pay in booking fees. Mr. Khosrowshahi said the company did not break out taxes and fees on hotel rooms because doing so would alert other online booking services to deals that Hotels.com or Expedia have made with lodging chains.

Occupancy taxes vary across the country. New York City, the top destination for Hotels.com customers, charges state and city hotel occupancy taxes of 13.625 percent – an 8.625 percent state tax and a 5 percent city tax – and a state fee of $2 a room.

A check of New York City room prices on Hotels.com and Expedia indicates that taxes and fees charged by the sites can total 18 percent of the room rate. On Expedia, a room for two at the Milford Plaza in Midtown Manhattan later this month cost $109 a night, plus taxes and service fees of $19.04, or 17.5 percent. On Hotels.com, a room for two at that hotel on the same night cost $91.75, plus $16.75, or 18.3 percent, in taxes and service fees.

Neither Expedia nor Hotels.com discloses the amount paid to the operator of the Milford Plaza for the room. But assuming that its markup is 25 percent, which is standard in the industry, that would put Expedia's wholesale price for the room at about $87 and Hotels.com's at about $81.

Taxes due to New York State and New York City on those rates would be $13.85 at Expedia and $13.03 at Hotels.com. So by charging $19.04 in taxes and service fees, Expedia's profits could be $5.19 on the room, or 6 percent of its cost. By charging $16.75 in taxes and fees, Hotels.com's profits could be $3.72, or 5 percent of the room's cost.

If Expedia and Hotels.com paid taxes to the city and state based on what they charge customers, their profits would be much lower.  The $19.04 that Expedia charges for taxes and fees would generate a profit of only $2.19, or 2.5 percent of the room's wholesale cost.  The $16.75 in taxes and fees charged by Hotels.com would produce profits of $2.25, or 2.4 percent of the room's cost.

WHEN asked about the taxpaying practices of Internet hotel sites, Tom Bergin, spokesman for New York's taxation and finance department, said: "Our audit and enforcement divisions are currently moving to address these and other sales tax issues."

Orlando, Fla., in Orange County, is another big destination for customers of Hotels.com and Expedia.  Martha Haynie, comptroller of Orange County, which charges a resort tax of 5 percent on its hotel rooms, said: "It is our position that the tax is due on the gross room rate because it appears they are charging the customer tax on that room rate, and if they are collecting tax and not remitting it we are going to want that."

These receipts are attractive, Ms. Haynie said, because tax collections for the first five months of this year are down from last year.  "I'm beginning to wonder how much impact this dot-com business may be having" on the decline, she said.

Dave Bruns, spokesman for Florida's revenue department, said it expected to advise companies later this month whether they must remit the 6.5 percent sales tax on the amount they charge customers for a room.

Texas law already states that a company that buys a block of rooms, marks them up, sells them over the Internet and has its own cancellation policy must collect and remit hotel taxes on the amount a customer pays.

Texas state occupancy taxes are 6 percent; Dallas levies an added city hotel tax of 9 percent.  A recent search on Expedia and Hotels.com for a room at the Holiday Inn Aristocrat in Dallas for later this month indicated taxes and fees of 17 percent to 18 percent of the room rate.

Mr. Khosrowshahi dismissed the threat that tax authorities might present to the company's earnings.  He said InterActive's practices were standard in the online travel industry.

But InterActive notes in its government filings that it may be vulnerable to additional or back taxes.  "A successful assertion by one or more states or local taxing jurisdictions that we should collect sales or occupancy taxes on the sale of hotel rooms could result in substantial tax liabilities for past sales, decrease our ability to compete with other Internet travel companies not subjected to collecting sales and occupancy taxes and otherwise harm our business," a recent regulatory filing stated.

- 24 -

How much could InterActive's earnings be hurt if state authorities forced it to pay additional taxes?

Mr. Khosrowshahi said: "We don't think it is a significant liability at all.  We are in discussions with a number of states' tax authorities, and the discussions have been productive and encouraging."  He said the company had set aside a reserve of less than $10 million to cover potential tax bills.

But financial filings and news releases from Expedia and Hotels.com before they were absorbed into InterActive allow for a rough estimate of how the company's earnings could decline if tax authorities disagreed with Mr. Khosrowshahi's assessment.  Based on that information, the shortfall could be substantial.

From the start of 2001 until the end of March 2003, Hotels.com and Expedia reported how many rooms they had sold each quarter as merchants rather than as agents.  By analyzing the companies' cost of goods sold, one can estimate what the companies pay to hotel companies for rooms they buy and, therefore, what they remit in taxes.

For example, in the first quarter of 2003, the average cost per room paid by Hotels.com was around $84, including taxes.  Assuming an occupancy tax of 13 percent – a rough hybrid of taxes in the companies' major hotel markets – Hotels.com would have paid $11 in taxes per room.

According to the company, customers pay $120, on average, for a room.  At a tax rate of 13 percent, that would mean a tax of a little more than $16 per room night.  Because Hotels.com paid $11 in taxes on the room per night and received taxes and fees of $16, that would translate into a profit of around $5.

In the quarter, Hotels.com recorded 2.3 million room nights, generating operating profit of $27.2 million.  If local tax officials had taken the $5-a-room-night difference, operating earnings would have fallen by $11.5 million, or 42 percent of the amount the company recorded.

At Expedia during the same quarter, the company booked 2.8 million merchant hotel room nights and showed income from operations of $42 million.  At around $4 per room, the difference between what Expedia pays in taxes and what it receives could have been $11.3 million, or 27 percent of operating profits.

Applying these figures to InterActive's operating profit indicates that in the first quarter, the tax profit per room night at Hotels.com and Expedia could have accounted for 24 percent of InterActive's operating profit.

Of course, these figures are rough estimates, and the actual numbers could be less or more.

- 25 -

Mr. Khosrowshahi declined to comment on the estimates, saying that it was wrong to assume that additional taxes would be collected at all and that any attempt to quantify the potential hit to earnings was invalid.

Consumers are starting to notice the tax issue. A lawsuit filed in a state district court in Duval County, Tex., last June by Nora J. Olvera contends that Hotels.com charged excess taxes on hotel accommodations "that were not owed or remitted to taxing authorities and that in equity and good conscience belong to plaintiff."

Deborah Roth, a spokeswoman for InterActive, said the company does not comment on pending litigation.

Even if state tax authorities choose not to pursue InterActive for past or future taxes, consumers may not appreciate paying an amount that they believe covers a tax but that instead is profit for InterActive.

38.    In response to *The New York Times* piece, the Company issued a press release entitled

"Letter From IAC/InterActiveCorp to The New York Times," which quoted a letter from Diller

stating in relevant part:

- We object to the entire premise of the articles to the extent they question the sufficiency of IAC/InterActiveCorp's public disclosures. IAC has been a leader on disclosure. We publicly release our budget. We were one of the first companies to stop providing quarterly "guidance." We are a prolific filer of information under Regulation FD to ensure that our shareholders have all up-to-date information that is important and relevant to them. Not many companies include their Principles of Financial Reporting so that investors can see *with precision* a detailed explanation for each of our actions. It is irresponsible to present a one-sided, ill-informed article that does not at a minimum note the company's consistent policy of open disclosure. We are also mystified by the characterization of our use of pro formas as "spin." As reflected in our various public documents, we use pro formas only to clarify and to add information – and we have done so even when their use makes our results look less favorable.

- The main article states that some government authorities are considering whether Hotels.com and Expedia are required to collect and remit room occupancy taxes on the amount of the customers' payment that is retained by Hotels.com and Expedia. Unfortunately, the article then recklessly jumps to the conclusion that if such occupancy taxes were found to be owed on *all* of the companies' revenue, from *all* jurisdictions, the companies' liability could be substantial. But while a limited number of jurisdictions have raised this issue (and the companies are engaged in ongoing dialogue with those jurisdictions), there is simply no basis for the supposition that the companies

will face liability in all jurisdictions. The applicable tax provisions vary among the jurisdictions, and many of the jurisdictions, including certain high-revenue states, limit the obligation to collect occupancy taxes to businesses that are hotel "operators" (or similar language), a category that we do not believe includes Expedia and Hotels.com. While statutes in some jurisdictions do not specifically limit occupancy tax collection responsibilities to hotel operators, the companies believe they have sound additional arguments as to why they are not required to collect and remit occupancy taxes in those jurisdictions (the companies do not presently collect or remit taxes on the portion of the customer payment that they retain). We are engaged in what we believe are productive discussions with the tax authorities in various jurisdictions to resolve this issue. The company has disclosed this issue in its prior public filings and has taken appropriate reserves (less than $10 million) in accordance with applicable accounting rules.

(Emphasis in original.)

39.     On November 5, 2003, the Company issued a press release entitled "IAC Reports Q3 2003 Results," which stated in relevant part that the Company's Q3 2003 revenue was $1.6 billion, up 36%, its GAAP net income was $19 million or $0.02 per diluted share, its adjusted net income was $130 million or $0.17 per share, up 136%, and its year-to-date net cash provided by operating activities was $1.1 billion, up from $624 million. The press release also disclosed that the Company had repurchased 20 million shares of IAC common stock during the quarter for $717 million and announced a new 50 million share repurchase authorization.

40.     On November 11, 2003, the Company conducted an "Investors Day" conference and stated it expected 30% growth in long-term sales.

41.     On February 9, 2004, the Company issued a press release entitled "IAC Reports Q4 2003 Results," which stated in relevant part that the Company had reported that Q4 2003 revenue had grown 36% over the prior year to $1.8 billion and operating income had grown 142% to $179 million. The release stated that GAAP net income was $153 million versus $145 million in the prior year and GAAP EPS was $0.20 versus $0.30 in the prior year, attributing the decrease in GAAP EPS largely to higher amortization of intangibles, non-cash compensation and higher shares outstanding

in Q4 2003.  For the full year 2003, GAAP EPS were $0.23 versus $4.54 in the prior year.  Q4 2003 operating income before amortization ("OIBA") had grown 131% to $292 million.  Adjusted net income was $228 million versus $169 million in the prior year and adjusted EPS were $0.29 versus $0.24 in the prior year.  For the full year 2003, adjusted EPS were $0.81 versus $0.33 in the prior year.  The release stated that the Travel segment increased revenues by 41% to $677 million, operating income by 119% to $108 million and OIBA by 111% to $150 million, driven by growth in its merchant hotel, packages and international businesses.  Finally, the release disclosed that during the Q4 2003 quarter, IAC repurchased 19 million shares for total consideration of $591 million.

42.     On May 3, 2004, the Company issued a press release entitled "IAC Reports Q1 2004 Results," which stated in relevant part that the Company's revenue had grown to $1.5 billion, "up 23% over the prior year on a comparable net basis and up 6% as reported," that its operating income decreased 57% "as a result of non-cash compensation and amortization of intangibles recorded primarily as a result of the buy-ins of IAC's formerly public subsidiaries, as well as higher selling and marketing expenses," that GAAP net income was $38 million versus a loss of $110 million in the prior year and GAAP diluted EPS was $0.05 versus ($0.23) in the prior year.  The release also stated that the Travel segment "increased revenues on a comparable net basis by 41% to $494 million, operating income by 21% to $85 million and Operating Income Before Amortization by 23% to $128 million, driven by growth in its merchant hotel, packages and international businesses."

43.     On August 3, 2004, the Company issued a press release entitled "IAC Reports Q2 2004 Results," which stated in relevant part:

> IAC/InterActiveCorp reported Q2 2004 results today.  Revenue was $1.5 billion, operating income decreased 1% to $110 million, net income decreased 25% to $70 million, and GAAP Diluted EPS decreased to $0.09 from $0.16.  2004 GAAP results were impacted by increased amortization of non-cash expenses and increased shares outstanding related to the buy-ins of [Interactive]'s formerly public subsidiaries.

Operating Income Before Amortization grew by 23% to $250 million. Adjusted Net Income grew 24% to $174 million and Adjusted EPS was $0.22 versus $0.18 in the prior year....

IAC Travel ("IACT") increased revenue on a comparable net basis by 34% to $556 million, operating income by 46% to $129 million and Operating Income Before Amortization by 29% to $171 million .... HSN U.S. grew revenue, operating income and Operating Income Before Amortization by 8%, 2% and 4%, respectively. Ticketing grew revenue, operating income and Operating Income Before Amortization by 4%, 43% and 29%, respectively, despite relative weakness in industry-wide concert sales.

*IAC repurchased 8.1 million shares during Q2.*

## CLASS ACTION ALLEGATIONS

44.    This is a class action on behalf of purchasers of IAC publicly traded securities between March 19, 2003 and August 4, 2004, excluding defendants (the "Class").  Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants.  Class members are so numerous that joinder of them is impracticable.

45.    Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the prices of IAC's publicly traded securities and the extent of and appropriate measure of damages.

46.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF

47.    Defendants violated §10(b) and Rule 10b-5 by:

(a)    Employing devices, schemes and artifices to defraud;

- 29 -

(b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of IAC publicly traded securities.

48.     Class members were damaged, as they paid artificially inflated prices for IAC's publicly traded securities in reliance on the integrity of the market.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiff and other members of the Class damages together with interest thereon;

C.     Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  September 20, 2004

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR–7957)
DAVID A. ROSENFELD (DR-7564)

_____
      /s/ David A. Rosenfeld
      DAVID A. ROSENFELD

200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt IAC Interactive.doc