UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ─────────────────────────── x | | |
| In re IAC/INTERACTIVECORP. SECURITIES LITIGATION | : | Master File No. 04-CV-7447 |
| ─────────────────────────── | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : | CONSOLIDATED AMENDED |
| | : | COMPLAINT FOR VIOLATION OF THE |
| ALL ACTIONS. | : | FEDERAL SECURITIES LAWS |
| ─────────────────────────── x | : | |

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of IAC/InterActiveCorp (also known during the Class Period as "Interactive Corporation" and "USA Interactive Corporation") (hereinafter "IAC" or the "Company") between March 31, 2003 and August 3, 2004 (the "Class Period"), including those who acquired their shares pursuant to IAC's acquisitions, including the acquisitions of Expedia and LendingTree, against IAC and certain of its officers and directors, for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's operations, business model, financial results and growth prospects.

2.      IAC's strategy was, at least during the Class Period, to become a multi-brand interactive commerce company.  IAC consisted of the following segments:  IAC Travel, which included Expedia, Hotels.com, Hotwire.com, Interval International, and TV Travel Shop; HSN, a home shopping service; Ticketmaster, which oversees ReserveAmerica; Match.com; LendingTree; Precision Response Corporation; IAC Local and Media Services, which includes Citysearch, Evite, Entertainment Publications, Inc. and TripAdvisor, Inc.; and IAC Interactive Development, which includes ZeroDegrees.

3.      During the Class Period, defendants made false statements about IAC's travel business and the agreements IAC had with airlines and hotel chains, affirmatively misrepresenting and concealing that (i) IAC lacked long-term contracts with airlines; (ii) the supply of hotel rooms for IAC was being reduced due to disputes with hotel chains, the hotel chains' improved on-line offerings and the hotel chains' increasing ability to fill rooms; and (iii) customer demand for IAC's hotel rooms was shrinking because of overbilling disputes and the ability to get the same rates by going directly to the hotel chains' sites.

- 1 -

4.      As a result of these false statements, IAC's stock traded at artificially inflated levels. As a result of this inflated value, IAC was able to complete numerous acquisitions using its shares as currency, therefore issuing far fewer shares than it would have otherwise needed to issue. Defendants individually took advantage of this inflation, selling 7.78 million shares of their IAC stock for proceeds of $258.9 million.  At the same time, defendants were causing IAC to repurchase 62 million shares of its stock on the open market.

5.      Then, on August 3, 2004, the Company issued its second quarter 2004 earnings release disclosing that its Q2 2004 net income fell 24% ($23 million) from the same quarter in 2003, admitting that it was being provided less airline seats and hotel rooms to sell.

6.      On this news the Company's stock plummeted on extremely high volume of almost 90 million shares, more than 18 times the average daily trading volume for this stock.  The Company's stock price dropped precipitously $4.23 per share or 16% from $27.03 on August 3, 2004, to close at $22.80 per share on August 4, 2004, erasing billions of dollars in market capitalization overnight – and over $10 billion in market capitalization from its Class Period high of $42.74 per share on July 7, 2003.

7.      In an August 5, 2004 email sent to IAC employees, Diller conceded he had overstated the Company's then-existing business operations and status in earlier statements and gave too-bullish guidance at an investor and analyst conference in November 2003, which he admitted misled investors:

From: Barry Diller

Sent: Thursday, August 05, 2004 7:34 PM

To: All IAC

Subject: IAC

I think it's appropriate to review the last days....

- 2 -

We released our earnings with an attendant conference call with analysts and our stock is down severely as a result...that you all surely know. We said on the call that it was a good quarter, and it was. ***What wasn't good is that we, your management, raised expectations too high at our Investor Day last November and are now paying the price.*** Added to that, and I do believe inappropriately, ***I was far too defensive in replying to analysts' questions, showing my exasperation from pointed queries about the fundamentals of our businesses, particularly Travel***. I could say the factors for my lame performance were that the call went on too long, that I felt it necessary with so much querulous pounding to strongly assert the health and prospects I so clearly believe in, and that ***I felt an overreaction brewing that required the most vigorous defense***. ***All of these are true but the higher truth is we did disappoint the estimates for growth set by our own hands and by not lowering them earlier in the year as the strain became clear we mightily exacerbated the problem.*** That, and the extremely jittery markets of the last months did the rest, with the result that our shareholders and analysts were caught in the breech...***so the responsibility for this, allowing the bar to be set unreasonably high, and then not having the proper patient focus on our conference call, is fully mine.***

8.      Later, on August 16, 2004, InterContinental Hotels Group Plc ("InterContinental"), the world's largest hotel operator by rooms, announced it ended its agreement to promote its hotels through Expedia.com and Hotels.com because the online travel sites owned by IAC did not meet its standards.  InterContinental, whose chains include Holiday Inn and Crowne Plaza among others, stated that Travelocity would be the only authorized online promoter of its hotel rooms because Travelocity's sales practices met its standards.  InterContinental disclosed that the conflict between it and IAC, Expedia.com and Hotels.com had been waging since at least April 2004, when InterContinental stated it would no longer work with a Web site that did not show customers the commissions they were being charged and that faxed bookings made directly to hotels, rather than reporting them through an automated system.  InterContinental also objected to Expedia.com's and Hotels.com's Web sites indicating InterContinental's rooms were sold out merely because the Web sites had exhausted their allocation of discount rooms.

9.      Defendants' statements made in connection with the announcement of IAC's acquisitions and with the Company's financial reports and other statements made throughout the Class Period were materially false and misleading because they did not disclose that:

(a)     The Company's entire travel sector was in jeopardy and experiencing multiple negative trends that were clearly contrary to defendants' statements about the direction of the business, including that the Company had engaged in bad business practices as described by former IAC employees that adversely affected its relationships with its suppliers and customers while inflating its current results, including:

(i)     Certain of the Company's online customers were being double-billed for hotel rooms purchased on the Company's Web sites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were again being charged the room rates that the Company had already collected, leading to great customer dissatisfaction.

(ii)     Certain hotel chains were contesting the Company's slow payment for hotel room sales made on its Web sites and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether.

(iii)     Certain of the Company's Web site customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites.

(iv)     Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its Web sites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of

diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether.

    (v)        There were large numbers of unhappy consumers who felt they had been overbilled in one way or another.  There were three ways to book rooms – on-line, by telephone and by fax.  The complaints frequently came in by fax.  These errors always were to the consumers' detriment.

    (vi)       For telephone reservations, some 30% of any given month's sales figures would result in cancellations, usually occurring in the month after the reservation was booked.   In the third month of a quarter, this would result in quarterly sales figures being inflated, since the cancellation would not be recorded until the next quarter.  The loss rate for telephone sales for overbilling refunds (10%-15%) and cancellations (30%) totaled 40%-45%.

    (vii)      These practices were causing hotel chains to be increasingly unhappy with IAC and causing IAC to lose market share to the competition, including Travelocity, which did not engage in such practices.

    (viii)     The dynamics of Hotels.com's business was changing in 2003 due to animosity on the part of hotel operators resentful of having to pay Hotels.com for the benefit of using the Hotels.com on-line registration system.  The animosity was due in part to the contracts the chains had entered with Hotels.com and in 2003 many chains were establishing their own registration offerings, which employees at the Company believed would likely impact the Company.

    (b)      To conceal deterioration in the hotel business, after the acquisitions of Expedia and Hotels.com, IAC began to provide only three data points on the business:   total

revenues, OIBA (Operating Income Before Amortization, which excluded numerous expenses – later criticized as an "iffy" accounting practice by *Fortune* magazine) and operating profits, which reporting made it possible for IAC to distort this important segment's results.

(c)     IAC's cash position was not nearly as strong as represented but was overstated by the Company's practice of holding up payments to hotel chains that it otherwise owed, thereby eroding any remaining goodwill between the Company and its suppliers, as described by former employees as part of plaintiffs' counsel's investigation.

(d)     Former employees also indicate that refunds to customers for overbilling took as long as two months, and such refunds represented 10%-15% of telephone sales figures.  IAC's cash position was overstated by this practice as well.

(e)     IAC was seeing disappointing international bookings, particularly in the Spring of 2004, due to its cut-back in marketing spending, as described by analysts subsequent to the Class Period.

(f)     The Company had previously been selling a large number of hotel rooms and airline seats through more than 24,000 affiliate Web sites, such as those operated by the travel industry in certain cities, but since October 2002, many of these Web sites were either privately threatening and/or actually pursuing litigation against the Company, alleging among other things copyright infringement and predatory advertising, claiming that Hotels.com was using special software to deprive these affiliate Web sites of the portion of its fee that it had promised to pay them and that as a result, certain of the affiliate Web sites had refuted their otherwise exclusive, multi-year contracts with the Company and certain of these affiliate Web sites were instead transacting their purchases of hotel rooms directly with the hotel chains, as noted in media reports and litigation files.

- 6 -

(g)     As described by former employees, Hotels.com manipulated its results by overstating its accounts receivables.  Specifically, Hotels.com would either accidentally or deliberately overbook customers for hotel rooms.  For instance, if a customer first said they wanted to stay a week at a hotel, but then said they only wanted to stay three nights, Hotels.com would nonetheless charge the customer for the full week.  Hotels.com would also pay the hotel for the full week's stay.  Hotels.com booked revenue on the full week that the customer had been billed for, but once the discrepancy was detected they would have to refund the money back to the customer.  At the same time, though, Hotels.com would claim that the hotel also owed Hotels.com a refund for the amount that Hotels.com had refunded back to the customer. The trick Hotels.com employed, though, is that they would have initially reported revenue on the full week's stay, but when they refunded the money back to the customer they would have generated income with an associated receivable for that amount.  While Hotels.com was sometimes able to collect the money supposedly owed by hotels, the Company's internal controls and systems were so insufficient that potentially tens of millions of dollars of such purportedly owed refunds receivables were in danger of being uncollectible.

(h)     Hotels were vastly improving their own online capabilities, which in conjunction with hotels' increasing unwillingness to provide discounted rooms to IAC, meant that many consumers were using IAC travel Web sites to check for the lowest room rates and then going directly to the hotels' Web sites to book the rooms, as confirmed by analysis and media coverage after the Class Period.

(i)     One substantial business partner of Hotels.com, Metroguide, had commenced a lawsuit against Hotels.com and its founder Robert Diener, alleging violations of federal copyright law and unfair business practices in January 2003 in the Southern District of Florida.  Defendants did

not disclose the pendency of this litigation or the rift with what Diener had described in October

2002 as one of Hotels.com's "larger affiliates, providing [Hotels.com] a great deal of traffic."

(j)       Hotels.com had extremely poor controls and systems which made accounting

manipulations not only possible but also likely.  For example, as former employees described,

payments of at least $1.5 million were made to various foreign hotels utilizing the personal

American Express card of one of the officers.  This was reflective of how Hotels.com had grown

much faster than its infrastructure.  Reconciling these payments was problematic.  Hotels.com had

claimed they were owed something like $1.5 million worth of refunds from the hotels (which had

also been reported as receivables on the balance sheet and had been reported on the Income

Statements), but were never going to be able to collect it.  However, Hotels.com management knew

they needed to write off this $1.5 million in receivables supposedly owed by the foreign hotels, but

did not do so until after the Company's stock had fallen in August 2004.

(k)       Hotwire did not have long-term agreements with airlines, and when airlines

began liquidating their investments in Hotwire it would have an adverse effect on IAC, as noted in

statements by IAC and analysts at the end of the Class Period.

(l)       The Company was under-reporting its state and local sales tax expenses for

some locations because defendants were paying state and local occupancy taxes based on the

wholesale rate at which they rented blocks of rooms from hotel operators, rather than the higher

retail rates charged customers.  This issue was a much bigger problem than represented by IAC as it

was a problem in each of the four biggest states in the U.S., as well as other states.  Litigation about

this issue has only increased and become more serious since the Class Period ended.

(m)       IAC's minority interests reported on its balance sheet as of December 31,

2003 were understated.  Instead of the $110.8 million reported by the Company in February 2004,

the minority interest as of December 31, 2003 was actually $211.7 million.  IAC subsequently restated its financial results to correct this misstatement.

(n)   IAC's purportedly strong Home Shopping Network results were in fact boosted by the Company's increasing use of its Flexpay program by which customers of certain products were not charged on their credit cards for several months.  The increasing use of this program was not disclosed until IAC filed its Form 10-K for 2003 in March 2004.

(o)   IAC's businesses were not growing, but the Company was able to report overall growth through numerous acquisitions, such that its future was not nearly as bright as represented by defendants, as noted by financial analysts at the end of the Class Period.

10.   Throughout the Class Period, while IAC's stock price was driven up by defendants' positive statements, reaching a Class Period high of over $42 per share on July 7, 2003, certain Company insiders, including each of the Individual Defendants (except Erik Blachford), illegally profited on their own personal sales of the Company's common stock, selling over 7.78 million shares of their own IAC stock at inflated prices for over $258.9 million in proceeds.  The Company's stock declined to below $22 per share on news of the Company's dismal Q2 2004 performance, analyst downgrades, and news of InterContinental's decision, erasing billions of dollars in market capitalization.



11.   The Company has subsequently announced it will spin-off its travel business. Hotels.com no longer focuses on discount rooms, but on offering "reviews" of various hotels.

### JURISDICTION AND VENUE

12.   The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa, and §§11 and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§77k and 77o.

13.   Venue is proper here pursuant to §27 of the 1934 Act and §22 of the 1933 Act.  Acts and transactions giving rise to the violations of law complained of herein occurred here.

- 10 -

## THE PARTIES

14.     Lead Plaintiff Cement Masons and Plasterers Retirement Trust purchased IAC publicly traded securities as detailed in the certification previously filed with the Court and was damaged thereby.

15.     Lead Plaintiff Edward Fein purchased IAC publicly traded securities as detailed in the certification previously filed with the Court and was damaged thereby.

16.     Plaintiff Susan Rapp acquired shares of IAC pursuant to IAC's merger with Expedia in August 2003 as detailed in the attached certification and was damaged thereby.

17.     Plaintiff Toros Avikan acquired shares of IAC pursuant to IAC's merger with LendingTree in August 2003 as detailed in the attached certification and was damaged thereby.

18.     Plaintiff Sanford Berman acquired shares of IAC pursuant to IAC's merger with LendingTree in August 2003 as detailed in the attached certification and was damaged thereby.

19.     Plaintiffs Pamela and Arthur Melanson acquired shares of IAC pursuant to IAC's merger with Expedia in August 2003 and were damaged thereby.

20.     Defendant IAC is a Delaware corporation headquartered in New York City.  As of July 26, 2004, the Company had 631,416,327 shares of its Class A common stock traded on the Nasdaq National Market and 64,629,996 shares of Class B common stock outstanding (for which there is no public market), for a total of 696,046,323 shares outstanding.

21.     Defendant Barry Diller ("Diller") is the CEO and Chairman of the Company.  During the Class Period, defendant Diller was in possession of confidential adverse information concerning IAC.  During the Class Period defendant Diller sold 5,329,000 shares of IAC common stock for total proceeds of approximately $177.6 million.  Nothwithstanding IAC's problems in 2004, Diller was the second highest compensated CEO for Fortune 500 companies, with compensation of $156

million in 2004.  Diller signed the false and misleading registration statements, including the registration statement issued pursuant to the issuance of shares for the remaining interest in Expedia.

22.     Defendant Dara Khosrowshahi ("Khosrowshahi") is CFO and Executive Vice President of the Company.  During the Class Period, defendant Khosrowshahi was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Khosrowshahi sold 120,514 shares of IAC common stock for total proceeds of over $4.1 million.  Khosrowshahi signed the false and misleading Registration Statements, including the registration statement issued pursuant to the issuance of shares for the remaining interest in Expedia.

23.     Defendant Julius Genachowski ("Genachowski") is the Company's Executive Vice President and Chief of Business Operations.  During the Class Period, defendant Genachowski was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Genachowski sold 237,500 shares of IAC common stock for total proceeds of over $8.2 million.

24.     Defendant Richard N. Barton ("Barton") is a director of IAC.  Barton has been a director of IAC since February 2003.  Barton founded Expedia and served as the President and CEO and as a director of Expedia from September 1999 through March 2003.  During the Class Period, defendant Barton was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Barton sold 1,256,350 shares of IAC common stock for total proceeds of over $40.6 million.  Defendant Barton purportedly entered into a 10b5-1 sales plan on May 30, 2003, but at this point in time Barton was already in possession of material, non-public information concerning the adverse information described herein.  Barton signed the false and misleading Registration Statements, including the registration statement issued pursuant to the issuance of shares for the remaining interest in Expedia.

25.     Defendant Erik C. Blachford ("Blachford") was President and CEO of IAC Travel until January 1, 2005.  He was formerly CEO of Expedia and was named CEO of IAC Travel in September 2003.  Blachford engineered the granting of numerous Expedia stock options to himself right before IAC acquired Expedia, resulting in a windfall to Blachford of $3 million.

26.     Defendant Victor A. Kaufman ("Kaufman") is Vice Chairman of the IAC Board of Directors.  Kaufman previously served both in the role of Chairman of the Company and as its CFO.  During the Class Period, defendant Kaufman was in possession of confidential adverse information concerning IAC.  During the Class Period, defendant Kaufman sold 842,862 shares of IAC common stock for total proceeds of over $28.3 million.  Kaufman signed the false and misleading Registration Statements, including the registration statement issued pursuant to the issuance of shares for the remaining interest in Expedia.

27.     The defendants listed in ¶¶21-26 above are hereinafter described as the "Individual Defendants."

28.     The Individual Defendants and IAC are liable for the false statements pleaded herein as those statements were each "group-published" information for which they are responsible.  By reason of their stock ownership and positions with IAC, the Individual Defendants were controlling persons of IAC.  IAC in turn controlled the Individual Defendants.  The Individual Defendants and IAC are liable under §20(a) of the 1934 Act.

29.     Defendants took advantage of the inflation in IAC's stock price, selling 7.78 million shares of their IAC stock for proceeds of $258.9 million:

| Name | Shares | Proceeds |
|------|--------|----------|
| BARTON RICHARD | 1,256,350 | $ 40,626,787 |
| DILLER BARRY | 5,329,000 | $177,649,570 |
| GENACHOWSKI JULIUS | 237,499 | $ 8,230,235 |
| KAUFMAN VICTOR | 842,862 | $ 28,328,785 |
| KHOSROWSHAHI DARA | 120,514 | $ 4,159,267 |
| **TOTAL** | **7,786,225** | **$258,994,644** |

30.     Defendants Robert R. Bennett, Edgar Bronfman, Jr., Donald R. Keough, Marie-Josee Kravis, John C. Malone, Gen. H. Norman Schwarzkopf, Alan Spoon and Diane Von Furstenberg were directors of IAC at the time of the acquisitions and signed the false and misleading Registration Statements pursuant to the acquisitions, including the acquisition of Expedia.  These defendants are referred to herein as the "Director Defendants" and are liable under §11 of the 1933 Act.

31.     Defendants Diller, Khosrowshahi, Barton and Kaufman are also liable under §11 of the 1933 Act as they each signed the false and misleading Registration Statements.

### BACKGROUND AND OVERVIEW OF THE SCHEME

32.     Rather than selling its own products or services, IAC largely acts as intermediary between suppliers and consumers, aggregating large blocks of consumer goods and services (primarily travel-related products such as hotel rooms and airline tickets) from suppliers and selling them to consumers over the Internet.  IAC currently has eight operating segments, including Travel (Expedia, Hotels.com, Hotwire, Interval International, and TV Travel Shop), Electronic Retailing (HSN, a home shopping service), Ticketing (Ticketmaster and ReserveAmerica), Personals

(Match.com), Financial Services and Real Estate (LendingTree.com), Teleservices (Precision Response Corporation), Local and Media Services (Citysearch, Evite, Entertainment Publications, Inc. and TripAdvisor, Inc.) and Interactive Development (ZeroDegrees).  But its Travel segment provides the lion's share of its income, such that during the first six months of 2004, approximately 70% of the Company's net income was derived from its Travel segment.  In fiscal 2003, IAC sold over $10 billion in travel services, making IAC the fifth largest travel company in the world.

33.     The Travel segment's business model was built on the ability of the Company's majority-owned subsidiaries, Expedia, Inc. and Hotels.com, to contract with the major hotel chains for non-exclusive rights to sell hotel room bookings for the major hotel chains in exchange for a fee.  Similarly, the Travel segment business model depended on the ability to obtain a favorable supply of seats on airlines.  Hotels.com's customers would pay Hotels.com for a hotel room on its Web site, and then Hotels.com would pay the pre-negotiated price to the hotel chain for the room, withholding its fee in the form of a commission for handling the booking.  Conversely, Expedia would buy rooms at a wholesale price and mark them up for sale at retail prices, retaining the difference as its fee.

34.     Online travel companies – such as Hotels.com and Expedia.com – became popular because online shoppers could compare prices at various hotels and on various airlines on one Web site and could conduct secure Internet credit card transactions at those Web sites.  Hotels.com grabbed a large share of the discount online travel booking business by advertising that it would use its volume buying power to get volume discounts that in turn would be passed on to its online customers.

35.     IAC grew through acquisitions.  The Company purchased a controlling interest in Ticketmaster in July 1997.  On May 10, 1999, the Company acquired substantially all of the assets of the two entities which operated Hotels.com's Web sites from their founders.  In February 2000,

IAC sold 6.2 million shares of its then wholly-owned subsidiary, Hotels.com, in an initial public offering, leaving it the majority shareholder.  On February 4, 2002, the Company acquired a controlling interest in Expedia.

36.     On June 3, 2002, the Company announced its intention to repurchase the minority interests in its three publicly traded subsidiaries, Expedia, Hotels.com and Ticketmaster, through the issuance of its own common shares.  However, Expedia's CEO and Chairman, defendant Barton, and Hotels.com's founders, David Litman and Robert Deiner, opposed the buyout and sought a bigger premium from IAC for their interests.  The market reacted negatively, with analysts complaining that they could not value the combined entity, and IAC's stock price declined.  On October 10, 2002, Diller reported that IAC had completed the stock-for-stock acquisition of the minority interest in Ticketmaster, but that it was stopping its attempts to repurchase the minority interests in Hotels.com and Expedia "for business reasons."  At the October 10, 2002 press conference announcing the completion of the Ticketmaster acquisition, Diller stated emphatically that IAC would not be reacquiring the minority interests in Expedia and Hotels.com:

> Q8. (Safra Rafge (phonetic), Piper Jaffrey) The decision not to pursue acquisition of Expedia and Hotels.com--How is this position new from what you had before, as you are saying there is an eventuality they will come inside? ***Travel is an extremely hot growth space and a core focus, so why not pay the premium and bring them in as well?***
>
> A. (Barry Diller) ***We really have stopped the process. There were no grounds for making a transaction with either of them, and there are no current grounds for doing so. There is a range of other things that could come up, but we've stopped the process.*** It was enervating and confusing the markets at a time. We were sick of the drag of this as an unfinished question. What else we've learned is that Hotels.com and the hotel portion of Expedia directly compete with one another. But this competition is extremely healthy and that helped tell us to leave this alone right now. We became convinced we could knit together what needs to be knitted together. This process was stopping us from doing this. Things will now be clearer to us, to the marketplace and those involved in the operations of these companies. I'd like it more if we had one currency and we're completely consolidated. But it is not going to happen right now. We're properly energized now for going forward.

37.     As of March 19, 2003, IAC owned approximately 54% of the outstanding shares of Expedia stock but controlled approximately 94.9% of the combined voting power of Expedia.  On March 19, 2003, the Company announced that it would acquire the rest of the shares of Expedia that it did not already own by issuing approximately 92.5 million basic shares of IAC common stock (124.9 million shares on a fully diluted, treasury-method basis), then valued at just over $2 billion, and exchanging each of the minority-held shares of Expedia for approximately 1.94 shares of IAC stock.  The market responded positively to defendants' statements about the deal synergies and the Company's plans to be the online travel leader, and by the time the acquisition was consummated on August 11, 2003, the Company's stock price had increased 32% and the stock that was issued to Expedia's shareholders had a market value of almost $3 billion.  Barton, Expedia's founder and CEO, had announced his resignation on February 5, 2003, and subsequently sold 1,256,350 shares of IAC common stock during the Class Period, over 60% of which had been received in connection with the acquisition of Expedia by IAC, for over $40 million in proceeds.

38.     IAC also owned approximately 68% of the outstanding stock of Hotels.com but controlled 97% of its voting rights.  On April 10, 2003, the Company announced it would acquire the 32% minority interest in Hotels.com it did not already own, issuing approximately 43 million basic shares of IAC common stock (45.2 million shares on a fully diluted, treasury-method basis), then valued at approximately $1.163 billion, and exchanging each minority share of Hotels.com stock for 2.4 shares of IAC stock.  As a result of defendants' positive statements concerning the deal synergies and improvements to the Company's business model, the Company's stock price had increased by 30% when the deal was finally consummated on June 23, 2003, and the stock the Company issued had a market value of approximately $1.640 billion.  Hotels.com founders Diener and Litman retained their control of Hotels.com, which was to be run as a separate division within IAC.

39.     On March 13, 2003, a joint press release was issued by Expedia and Six Continents

Hotels (later named InterContinental) which stated:

> Expedia, Inc. and Six Continents Hotels today announced the two companies have entered into a mutually beneficial merchant agreement, which provides consumers with greater access to the more than 3,300 hotels in the Six Continents Hotels network, including premier brands such as InterContinental Hotels & Resorts, Crowne Plaza Hotels and Resorts, Holiday Inn and Holiday Inn Express.

> Under the terms of the agreement, Six Continents Hotels joins the Expedia Special Rate (ESR) program, in which Expedia works closely with hoteliers to increase room night productivity and to provide incremental demand for their hotels. *Six Continents Hotels has the flexibility to determine the wholesale rates for their inventory, and the room prices and inventory can be changed at any time to address the dynamic business needs of each hotelier*.

> Based on this access to Six Continents Hotels' inventory, Expedia.com can then offer great value on hotel rooms and hotel packages – which also include flights and/or car rentals - to the 18 million customers shopping on the site each month. More than 8,000 hotels worldwide participate in the ESR program.

> *Also contained in the agreement, Expedia is working towards seamlessly connecting to Six Continents Hotels central reservation system, the HolidexPlus network*.

> "At Six Continents Hotels, we continually look for innovative ways to reach travelers, and participating in the Expedia Special Rate program is a natural fit because Expedia is the largest seller of online hotel rooms," said Jim Young, vice president, global distribution, Six Continents Hotels. "With the increase of online bookings, *it's our priority to ensure our hotels are available to customers on the right shelf, at the right price, at the right time*. We look forward to the value that Six Continents Hotels and Expedia can provide to each other, and, ultimately, to travelers."

> By providing ESRs to Expedia, Six Continents Hotels can benefit from award winning technology tools as well as promotional and merchandising features that help generate demand for their properties. For example, in 2002, Expedia announced property display innovations including 360 degree virtual tours, neighborhood maps and descriptions, and expanded photo displays - all aimed at enabling *hoteliers to showcase their properties like never before. Also last year, hoteliers began to take advantage of Expedia's dynamic rate rules, which empower ESR participants to apply promotions and variable pricing based on parameters such as the day of the week and length of stay*.

> With Expedia's dynamic packaging technology, ESR hotels can be booked with flights and/or car rentals at a single price. By building these customized trips on

- 18 -

Expedia.com, travelers can often find tremendous cost savings that protect the rate integrity of the suppliers.

"The Six Continents Hotels network includes some of the most respected travel brands in the industry and among our customers,: said Lloyd Frink, vice president of hotels and packages at Expedia, Inc.  "As an ESR provider, Six Continents Hotels will benefit from added exposure on Expedia.com and also from the hands-on help of Expedia's market managers, who work closely with the hoteliers to determine ways they can maximize their REVPAR (revenue per available room) by offering deals their target customers want."

40.    On March 19, 2003, the Company and Expedia issued a press release entitled "USA Interactive and Expedia Announce Merger Agreement; USA to Acquire the Expedia Shares It Does Not Already Own in a $3.3 Billion Transaction; USA Announces Board Authorization of Stock Repurchase Plan."  The press release stated in relevant part:

USA Interactive and Expedia, Inc. announced today that they have entered into an agreement by which USA, already the majority owner of Expedia, would acquire the Expedia shares it does not currently own in a stock-for-stock transaction that is generally tax-free to Expedia shareholders.  The transaction is valued at $3.3 billion, based on the closing price of USA common stock on March 18, 2003.  The transaction allows USA to further simplify its corporate structure.  The Expedia Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Expedia Board.

Under the agreement, Expedia shareholders would receive 1.93875 shares of USA common stock for each share of Expedia stock that they own, which represents approximately a 30% premium, based on the closing price of USA stock and Expedia stock on March 18, 2003.  In the transaction, USA would issue to Expedia public shareholders approximately 92.5 million basic shares and 124.9 million shares on a fully diluted, treasury method basis.  In connection with the merger, Expedia warrants and options will be converted into warrants and options to acquire USA common stock.  The transaction is expected to be slightly dilutive to USA's adjusted earnings per share ("EPS") for 2003, however, due to expected over-performance by Expedia and USA's other businesses, USA believes that it will meet its current 2003 budgeted adjusted EPS of $0.75 per share.  In addition, USA expects Q1 2003 EBITA to very significantly exceed last year's Q1 EBITA and to beat its Q1 2003 EBITA budgeted amount, and expects to meet or exceed its Q1 2003 adjusted EPS budget.  Please note that USA's projections are based on the expectation of a short conflict in Iraq without any other significant geopolitical disruptions during the year.

Barry Diller, Chairman and CEO of USA Interactive, said, "The timing in relation to world events is an accident – as often happens with transactions, they take

the time they take to reach conclusion – however, we were of course mindful of events beyond our own – and our decision to acquire the balance of Expedia under these circumstances does dramatically underscore our great belief in the robust growth and long term value of online travel.  Travel may be affected by this or that event, for a day or a month or whatever, but if there is life then there is travel – we bet on the latter."

"We all have so much respect for Rich Barton, Erik Blachford and the superb group they have assembled that has executed so flawlessly building Expedia into a leadership position in online travel – we hope by this consolidation of ownership at USA that this great Expedia group will play an ever expanding role across all our 14 Divisions."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger creates significant value for Expedia's minority shareholders," said Jay Hoag, Chairman of the Special Committee of Expedia's Board of Directors.  "Expedia shareholders have an opportunity to participate in the significant upside potential of USA, which is further enhanced by its full ownership of Expedia."

"This transaction gives us the opportunity to accelerate our work of building a great travel company," said Erik Blachford, incoming President and CEO of Expedia. "We are looking forward to working with USA and its other entities in a more integrated fashion, and believe there is substantial value to be created in the process."

41.     In early 2003, prior to the Class Period, the Company's stock was trading in the low

$20 per share range. As a result of defendants' false statements, the stock would reach above $40 per

share during the Class Period.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

42.     On March 31, 2003, IAC filed its Form 10-K for the year ended December 31, 2002.

In discussing the Company's businesses, the 10-K represented the following with respect to

Hotels.com:

Hotels.com is a leading specialized provider of discount lodging reservation services worldwide, providing these services worldwide, providing these services through its own websites, its toll-free call centers, and third-party marketing and distribution agreements, to travelers in hundreds of cities in North America, Europe, Asia, the Caribbean, South America, Africa and Australia.

Hotels.com markets its lodging accommodations primarily over the Internet through its own websites, including hotels.com, hoteldiscount.com, and travelnow.com, through its telephone call centers, and through marketing and distribution agreements with third parties. Hotels.com has negotiated marketing and distribution agreements with numerous leading travel-related companies, including Travelocity, Continental Airlines, Delta Air Lines, Northwest Airlines and America West Airlines.

Hotels.com has room supply relationships with a wide range of independent hotel operators and lodging properties, as well as hotels associated with national chains, including Hilton, Sheraton, Wyndham, Hyatt, Radisson, Best Western, Loews, Doubletree, La Quinta, Courtyard by Marriott and Hampton Inn. Hotels.com believes that these suppliers view it as an efficient distribution channel to help maximize their overall revenues and occupancy levels. *Although Hotels.com contracts in advance for volume room commitments, its supply contracts often allow it to return unsold rooms without penalty within a specified period of time. In addition, because Hotels.com contracts to purchase rooms in advance, it is able to manage billing procedures for the rooms it sells and thereby maintain direct relationships with its customers. Hotels.com has developed proprietary revenue management and reservation systems software that is integrated with its websites and call center operations. These systems and software enable Hotels.com to accurately monitor its room inventory and provide prompt, efficient customer service. Hotels.com believes that its supply contracts and revenue management capabilities differentiate it from retail travel agencies and other commission-based resellers of accommodations*.

43.     Also, as described below, Hotels.com's systems were not nearly as sophisticated as represented, as Hotels.com's relationships with hotel chains were deteriorating due to Hotels.com's improper practices. Hotels.com's supply agreements with hotel chains were only as good as the travel economy was bad. As hotel chains were able to fill up rooms themselves, Hotels.com would suffer supply and pricing problems. Ultimately, Hotels.com would move away from its discount method to offering hotel reviews. Moreover, Hotels.com's results were misstated due to the Company's manipulations of revenues and cash flows as described herein. For example:

(a)     Certain of the Company's online customers were being double-billed for hotel rooms purchased on the Company's Web sites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were again

being charged the room rates that the Company had already collected, leading to great customer dissatisfaction.

(b)     Certain hotel chains were contesting the Company's slow payment for hotel room sales made on its Web sites and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether.

(c)     Certain of the Company's Web site customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites.

(d)     Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its Web sites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether.

(e)     There were large numbers of unhappy consumers who felt they had been overbilled in one way or another.  There were three ways to book rooms – on-line, by telephone and by fax.  The complaints frequently came in by fax.  These errors always were to the consumers' detriment.

(f)     For telephone reservations, some 30% of any given month's sales figures would result in cancellations, usually occurring in the month after the reservation was booked.  In the third month of a quarter, this would result in quarterly sales figures being inflated, since the cancellation would not be recorded until the next quarter.  The loss rate for telephone sales for overbilling refunds (10%-15%) and cancellations (30%) totaled 40%-45%.

- 22 -

(g)     These practices were causing hotel chains to be increasingly unhappy with IAC and causing IAC to lose market share to the competition, including Travelocity, which did not engage in such practices.

(h)     The dynamics of Hotels.com's business was changing in 2003 due to animosity on the part of hotel operators resentful of having to pay Hotels.com for the benefit of using the Hotels.com on-line registration system.  The animosity was due in part to the contracts the chains had entered with Hotels.com and in 2003 many chains were establishing their own registration offerings, which employees at the Company believed would likely impact the Company.

(i)     IAC's cash position was not nearly as strong as represented but was overstated by the Company's practice of holding up payments to hotel chains that it otherwise owed, thereby eroding any remaining goodwill between the Company and its suppliers, as described by former employees as part of plaintiffs' counsel's investigation.

44.     On April 10, 2003, IAC and Hotels.com issued a press release entitled "USA Interactive and Hotels.Com Announce Merger Agreement; USA to Acquire the Hotels.Com Shares It Does Not Already Own in a $1.1 Billion Transaction; Transaction Completes USA Corporate Restructuring."  The press release stated in relevant part:

> USA Interactive and Hotels.com announced today that they have entered into an agreement by which USA, already the majority owner of Hotels.com, would acquire the Hotels.com shares it does not currently own in a tax-free, stock-for-stock transaction.  The transaction is valued at approximately $1.1 billion based on the closing price of USA common stock on April 9, 2003.
>
> The transaction would represent the final step in USA's efforts, begun in June 2002, to simplify its corporate structure by buying in its public subsidiaries.  As a result of these transactions, all of USA's interests will be indivisible inside USA's public security.
>
> The transaction would not change the current operating structure of Hotels.com, and USA's intention is for Hotels.com and Expedia to continue to be operated separately.  Travel is, however, its own sector and USA would continue to review strategy and over time may decide to make changes.

The Hotels.com transaction is expected to be slightly accretive to USA's budgeted adjusted earnings per share for 2003.

The Hotels.com Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Hotels.com Board.  Under the agreement, Hotels.com shareholders will receive 2.4 shares of USA common stock for each share of Hotels.com stock that they own. This represents approximately a 20% premium based on the closing price of USA stock and Hotels.com stock on March 18th, 2003, the day prior to the announcement of USA's merger with Expedia.  In the transaction, USA would issue to Hotels.com public shareholders approximately 43.0 million basic shares and 45.2 million shares on a fully diluted, treasury method basis.

Barry Diller, Chairman and CEO of USA Interactive, said, "David Litman and Bob Diener, in classic entrepreneurial fashion, have created a great company. We were lucky enough to know that at an early stage, so we've watched their determination and fierce dedication in building up the enterprise…and we believe all that will continue because the incentives are all in place and our interests completely aligned for the future."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger is in the best interests of Hotels.com's minority shareholders," said Elan Blutinger, Chairman of the Special Committee of Hotels.com's Board of Directors.  "Hotels.com's shareholders have an opportunity to participate in the continued growth potential of USA, which is further enhanced by its full ownership of Hotels.com."

David Litman, Chairman and CEO of Hotels.com, commented, "Bob Diener and I are thrilled at the opportunity for Hotels.com to participate on a broader scale in the future success of USA Interactive.  We are convinced that this merger will enhance the growth prospects for Hotels.com, and we are more determined than ever to achieve our company goals through this exciting combination with USA.  Bob and I would like to thank the more than 1,200 employees of Hotels.com that have helped to make this possible and we look forward to an exciting future."

45.    On May 1, 2003, the Company issued a press release entitled "USA Interactive Releases Chairman and CEO Barry Diller's Letter to Shareholders Accompanying USA's 2002 Annual Report."  The letter stated in relevant part:

To Our Shareholders

While it's my experience that it never seems so living through it, the last year was a whirlwind...the best way to review the year though isn't on a calendar basis, but instead using the start date of May 7th, since this was the date the contribution of our entertainment assets to Vivendi Universal Entertainment closed.  On that date we

went from a media, entertainment company with ecommerce interests to an interactive transaction company.  From that moment, we were a company transformed – ending the material veto rights held by other parties, and eliminating the LLC structure under which we'd operated with such complexity and contradiction for almost all the years of our short life.

Through the recently announced buy-ins of the minority interests of Expedia and Hotels.com, and the previously completed acquisition of the outstanding minority interest in Ticketmaster, we have virtually completed the evolutionary process of simplifying our corporate structure.  Recently, I resigned my position as CEO of Vivendi Universal Entertainment – which clarified with great punctuation where my work would be concentrated.  The cumulative effect of these actions has eliminated any lingering question about whether we're a holding company or an operating company.  Clearly, we're now properly viewed as an operating company and judged against our theoretical peers – namely the Tier One companies in interactivity – eBay, Yahoo, and Amazon.

In this arena of Tier One interactive companies, from a financial standpoint, we compare quite favorably.  We lead in Sales, EBITA, and Free Cash Flow – and we're second only to eBay in Gross Transaction Value.  Market valuations in the internet sector certainly have a short and sharp roller coaster history...our equity securities are certainly not currently, or thank God in historical terms, valued at the high multiples of the other leaders in the sector – but, to us, that's entirely besides [sic] the point.  Our perspective is long term, and our focus is not on multiples but on creating real and lasting value for our shareholders.  We're happy to have our performance speak for itself and have our stock follow, rather than the reverse.

These financial yardsticks are consistent with our goal to be the largest, most profitable interactive commerce company in the world – by pursuing a multi-brand strategy.  Even though we have leadership today, we want to expand on that lead and create a company in which the power of our brands allows us to create an "unwalled" garden where our customers can benefit through discounts, membership, dynamic pricing and all methods to link and unite our great total audience of our combined users.

*          *          *

***As we've said before, we are very committed to transparency and clarity when it comes to financial reporting.  We've changed our format for presenting our quarterly numbers to further emphasize the relevant metrics and other important financial information relating to our operations***.  We will continue to give more and more information, trying in every way we can to do so in a clear and concise manner.  The evolving accounting rules (such as those relating to giving equal prominence to GAAP measures along non-GAAP [sic] measures like EBITA and Adjusted EPS) sometimes make this challenging.  ***But this type of challenge only reinforces for us our basic principles – namely, that investors are entitled to see all relevant information and to make their own judgment about which parts of***

- 25 -

*our disclosed information are most important to them*.  Also, we're aware that our focus on providing detailed information and full explanation has spawned quite a number of footnotes in our earnings releases and other public filings – sometimes it may seem like there's more footnotes than text.  This isn't something we're proud of, and over time we'd like to see our footnotes steadily shrink...but, what we won't do is dot one less "i" in the pursuit of full and complete disclosure, providing whatever analysis and commentary we can in having our shareholders understand our company exactly as we do.

*In our annual reporting and earnings releases, we'll give our views about the way in which we look at our results, the ways in which we operate internally and how to best look at our future prospects*.  But, be assured that whatever financial metrics you may find most compelling, we'll continue to try and be ahead of your thought process.  This means that we'll present good news in a balanced way *and we'll fairly disclose any anticipation of material bad news and bad trends very early to the extent that we can identify them.  Openness is a mantra to us– and we're committed to talking to the investing community in a way that's totally consistent with the way in which we discuss our company among ourselves*.  We want investors who take a long-term view and are not swayed by short-term results – whichever way they may fall.

\*        \*        \*

All my experience in the entertainment business taught me very few people made the decisions that really counted, that were the determinants of success and failure...every single experience I have had in this new world of interactivity tells me exactly the opposite...it is the expertise and the enterprise of a great many talented people working at every level of the organization that makes for success...we are so very lucky to have so very many engaged in what I deeply believe can be one of this century's great enterprises.  I am at the earliest stage (though I hope growing quickly) in learning how to manage an organization such as this...part of that is knowing just how much I need to thank its members, together with our wise and engaged Board of Directors for their work this year past, and for their vigorous and challenging support in the work ahead.

Sincerely,

/s/Barry Diller

Barry Diller
Chairman and Chief Executive Officer

46.    On May 1, 2003, the Company also issued a press release, entitled "USA Reports

Excellent First Quarter," which stated in relevant part that the Company's adjusted EPS had grown

155% to $0.16 (with GAAP EPS of $(0.23)), that its EBITA had grown 120% to $173 million, that

- 26 -

its operating income had grown 236% to $93 million, and that its free cash flow and net cash provided by operating activities exceeded $400 million.

     47.    Subsequent to issuing the release, IAC hosted a conference call for investors, analysts and media representatives.  During the call defendants represented the following:

> [KAUFMAN]:  We're very cognizant to run our business on a true cash basis and obviously this deal is showing in our results.  It's possible, even though it's a stretch, and although we're not making any predictions, that we could achieve a billion dollars in free cash flow for this year.  And correspondingly, somewhat in excess of a billion two in net cash provided by operating activity, which is the GAAP measure for this year.  That becomes a nice goal for us, large round number, but achieving it would really show the true strength of our operating assets.  When you look at our cash flow from operations, as stated on a GAAP basis for the first quarter, in comparison to other companies, its potency is truly obvious.  We achieved a result two times E-bay, well in excess of 10 times Amazon, four times Yahoo, and two-thirds of Viacom, a company that's four times our size.  With that thought, we think that's a significant one, I'm going to ask Dara Khosrowshahi to run through with you some of the metrics that relate to the first quarter.

> . . . [KHOSROWSHAHI]:  As mentioned, we had a great quarter.  Travel revenue was up 93% and EBITDA for travel was up 86% over last year.  This is despite the war which affected bookings in March and early April.  Some of which will be recognized in our revenue in Q2 in addition to what was recognized in Q1.  Excluding interval and TVTS, travel revenues and EBITDA increased 74% and 56% respectively.  The decrease in EBITDA margin is mainly due to increased marketing spent for the hotels.com brand which now accounts for 36% of Hotels.com's bookings.  Expedia also grew dramatically on all measures, including international which increased its revenue 129%.  And revenue from packages which grew 137%.  Travel properties collectively generated more than $2.3 billion in gross bookings of 75% increase, including booking more than 5 million hotel room nights for the quarter.  That's an average of 55,000 room nights every day.

*     *     *

> [DILLER]:  This hyper growth, obviously reflects what is reflects.  I don't think there's nothing [sic] that is particularly extraordinary about it, other than its basics.  But we should not get ahead of ourselves.  Life is not built in a quarter.  I think in a sense, this is the accumulation of an awful lot of detail and it's also the obvious strength that you get when you look at all of our operations in one unified security.

     48.    On May 5, 2003, IAC and LendingTree issued a press release entitled "USA Interactive and LendingTree Announce Merger Agreement; Entry into the Financial Services and

Real Estate Verticals Gives USA Access to 75% of Total Interactive Commerce (U.S.)." The press release stated in relevant part:

> USA Interactive and LendingTree, Inc. announced today that they have entered into an agreement by which USA would acquire all of the outstanding capital stock of LendingTree in a stock-for-stock transaction.

> The transaction would represent USA's entry into the large and attractive financial services and real estate verticals, both of which are at an early stage of online migration. LendingTree is the leading lending exchange with more than 200 participant lenders; the Company has facilitated nearly $48 billion in closed loans since inception and has recently entered the real estate sector with excellent early results.

> With this transaction, USA now has a presence in seven key areas of interactive commerce that represent approximately 75% of total interactive commerce (U.S.) – Travel, Ticketing, Goods, Personals, Local/Classified Advertising, Financial Services and Real Estate. The acquisition of LendingTree adds another powerful brand and profitable interactive business to the USA family, and furthers USA's goal of being the largest, most profitable interactive commerce company in the world. LendingTree will have access to USA's existing base of nearly 40 million unique monthly Internet users who increasingly are provided opportunities to become customers of more than one USA property through cross-promotion, integration and the use of special offers or discounts.

> The acquisition of LendingTree will be neutral to USA on an accretion/dilution basis and USA anticipates that LendingTree's long-term growth metrics will be consistent with those of USA's fastest growing businesses.

> Under the agreement, LendingTree shareholders will receive 0.6199 of a share of USA common stock for each share of LendingTree common stock that they own, and LendingTree preferred stockholders will receive the same merger consideration, on an as-converted basis. In the transaction, USA will issue to LendingTree shareholders approximately 18.3 million basic shares and 21 million total shares on a fully diluted, treasury method basis. The transaction is generally expected to be tax-free to LendingTree shareholders. Based on closing prices of USA common stock between April 28, 2003 and May 2, 2003, the transaction is valued in a range of $626 million to $734 million.

> Barry Diller, Chairman and CEO of USA Interactive, said, "For several years now we have been saying, in answer to investor and media questions about what's the next area of investment for our Company, that the most exciting sector is in both financial services and real estate – now, with this singular acquisition we enter both, with an excellent Company, having built a fine brand, and with great and deep management strength – we waited appropriately long enough to find the perfect solution – LendingTree."

- 28 -

In connection with the merger, LendingTree options will be converted into options to acquire USA common stock, and LendingTree warrants will be converted into warrants exercisable for USA common stock.

The transaction is subject to LendingTree shareholder approval.   The LendingTree Board of Directors has approved the acquisition by unanimous vote and unanimously recommends that LendingTree shareholders vote to approve the merger agreement and related matters at the special meeting to be called for consideration of the transaction.   USA has received binding voting agreements to support the transaction from LendingTree shareholders representing approximately 31.5% of the as-converted-to common vote.   The transaction has been approved by the Board of Directors of USA and no separate USA shareholder approval is required.   The merger, which is subject to other customary closing conditions, is expected to be completed in late summer.

49.     On May 21, 2003, the Company filed a prospectus pursuant to the acquisition of Hotels.com.  Each former Hotels.com shareholder received 2.4 shares of USA Interactive, then valued at $33.33 per share.   The prospectus was false and misleading in that it concealed Hotels.com's improper practices in dealing with hotels as described herein.

50.     On May 21, 2003, IAC filed an amended S-4 with respect to the Hotels.com merger signed by the defendants, except for Blachford and Genachowski.  The amended Form S-4 indicated that the 2002 Form 10-K was incorporated by reference.

51.     On June 5, 2003, IAC filed an amended S-4 with respect to the LendingTree merger. The amended S-4 indicated that the 2002 Form 10-K was incorporated by reference, as well as other documents:

This proxy statement/prospectus incorporates by reference the documents set forth below that USA and LendingTree have previously filed with the SEC.  These documents contain important information about USA and LendingTree, as well as other information required to be disclosed or incorporated by reference into this proxy statement/prospectus.   You may obtain copies of the Form S-4 (and any amendments to the Form S-4), as well as the documents incorporated by reference into this proxy statement/prospectus, in the manner described above.

```
USA SEC Filings                      Period
-----------------------    -------------------------------
Annual Report on           Year ended December 31, 2002,
Form 10-K                  filed on March 31, 2003.
Definitive Proxy           Filed on March 25, 2002 and
```

- 29 -

```
Statements              April 30, 2003.
Quarterly Report on     Quarter ended March 31, 2003
Form 10-Q               (filed on May 15, 2003).
Current Reports on      Filed on January 21, 2003,
Form 8-K                February 7, 2003 (other than
                        information furnished under
                        Regulation FD), February 12,
                        2003 (two filings),
                        February 26, 2003 (two filings)
                        (other than information
                        furnished under Regulation FD),
                        March 19, 2003, March 25, 2003,
                        March 26, 2003, April 9, 2003,
                        April 10, 2003, April 15, 2003,
                        May 2, 2003 (other than
                        information furnished under
                        Regulation FD) and May 5, 2003.

LendingTree SEC Filings              Period
-----------------------      ------------------------------
Annual Report on        Year ended December 31, 2002,
Form 10-K               filed on March 12, 2003.
Definitive Proxy        Filed on March 14, 2003.
Statement
Quarterly Report on     Quarter ended March 31, 2003
Form 10-Q               (filed on May 14, 2003).
Current Reports on      Filed on February 4, 2003,
Form 8-K                March 11, 2003, March 12, 2003,
                        April 4, 2003, April 23, 2003
                        (other than information
                        furnished under Regulation FD)
                         and May 6, 2003.
```

USA and LendingTree also incorporate by reference into this proxy statement/prospectus additional documents that either may file with the SEC pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act between the date of this proxy statement/prospectus and (a) in the case of filings by USA, the earlier of the completion of the merger or the termination of the merger agreement, and (b) in the case of filings by LendingTree, the earlier of the date of the special meeting of LendingTree stockholders or the termination of the merger agreement.  These documents deemed incorporated by reference include periodic reports, such as Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K as well as proxy and information statements.

52.   As noted herein, the 2002 Form 10-K was materially false and misleading due to the false statements about Hotels.com and the concealment of important adverse information regarding Hotels.com, including its infrastructure problems and its deteriorating relationships with hotel chains.  Hotels.com's supply agreements with hotel chains were only as good as the travel economy was bad.  As hotel chains were able to fill up rooms themselves, Hotels.com would suffer supply and pricing problems.  Ultimately, Hotels.com would move away from its discount method to offering

hotel reviews.  Moreover, Hotels.com's results (as well as IAC's) were misstated due to the manipulations described herein at Hotels.com.  The Company was also understating its tax liabilities as described herein.

53.     On June 23, 2003, the Company issued a press release entitled "InterActiveCorp Completes Acquisition of Hotels.Com New York," which stated in relevant part that IAC had completed the acquisition of the outstanding shares of Hotels.com that it did not already own.  In the transaction, IAC issued to Hotels.com public shareholders approximately 44.3 million basic shares and 47.2 million shares on a fully diluted, treasury-method basis.

54.     On July 10, 2003, IAC filed an amended S-4 with respect to the Expedia merger signed by the defendants, except defendants Blachford and Genachowski. The S-4 indicated that the 2002 Form 10-K was incorporated by reference, as well as other documents:

> This proxy and information statement/prospectus incorporates by reference the documents set forth below that IAC, Expedia and Hotels.com have previously filed with the SEC.  These documents contain important information about IAC and Expedia, as well as other information required to be disclosed or incorporated by reference into this proxy and information statement/prospectus.  You may obtain copies of the Form S-4 (and any amendments to the Form S-4), as well as the documents incorporated by reference into this proxy and information statement/prospectus, in the manner described above.

| IAC SEC Filings | Period |
|---|---|
| Annual Report on Form 10-K | Year ended December 31, 2002, filed on March 31, 2003. |
| Quarterly Report on Form 10-Q | Quarter ended March 31, 2003, filed on May 15, 2003. |
| Definitive Proxy Statements | Filed on March 25, 2002 and April 30, 2003. |
| Current Reports on Form 8-K | Filed on January 21, 2003, February 7, 2003 (other than information furnished under Regulation FD), two on February 12, 2003, two on February 26, 2003, March 19, 2003, March 25, 2003, March 26, 2003, |

- 31 -

```
                                    April 9, 2003, April 10,
                                    2003, April 15, 2003,
                                    May 2, 2003, May 5, 2003,
                                    June 4, 2003, June 19, 2003
                                    and June 23, 2003 (other
                                    than information furnished
                                    under Regulation FD),
                                    respectively.



    Expedia SEC Filings                     Period
    ----------------------------    ----------------------------
    Annual Report on Form 10-K      Year ended December 31,
                                    2002, filed on March 31,
                                    2003 and on Form 10-K/A on
                                    April 30, 2003.


    Quarterly Report on Form        Quarter ended March 31,
    10-Q                            2003, filed on May 15,
                                    2003.


    Current Reports on Form 8-K     Filed on February 6, 2003,
                                    March 7, 2003, March 19,
                                    2003, April 30, 2003 and
                                    May 1, 2003, respectively
                                    (other than information
                                    furnished under Regulation
                                    FD).
    Hotels.com SEC Filings                  Period
    ----------------------------    ----------------------------
    Section entitled "Certain
    Relationships and Related       Year ended December 31,
    Party Transactions"             2002, filed on March 27,
    contained in Annual Report      2003 and on Form 10-K/A on
    on Form 10-K                    April 30, 2003.
```

All documents filed by IAC and Expedia pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act with the SEC from the date of this proxy and information statement/prospectus through the completion of the merger (or, if earlier, the date on which the merger agreement is terminated) are also deemed to be incorporated by reference into this proxy and information statement/prospectus. These include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy information statements.

55.    As noted herein, the 2002 Form 10-K was materially false and misleading due to the false statements about Hotels.com and the concealment of important adverse information regarding Hotels.com, including its infrastructure problems and its deteriorating relationships with hotel chains.  Moreover, Hotels.com's results (as well as IAC's) were misstated due to the manipulations

described herein at Hotels.com. The Company was also understating its tax liabilities as described herein.

56.     On August 5, 2003, the Company issued a press release entitled "IAC Reports Q2 2003 Results," which stated in relevant part that the Company's Q2 2003 revenue was $1.5 billion, up 38%, its GAAP diluted EPS from continuing operations were $0.09, its adjusted EPS were $0.18, and its year-to-date net cash provided by operating activities was $939 million.

57.     Subsequent to issuing the release, IAC hosted a conference call for investors, analysts and media representatives. During the call defendants represented the following:

> [KAUFMAN]:  Our quarter was really very strong, led by the travel and electronic retail. Travel continues to be our big growth engine. Our revenue in this sector grew 72 percent and operating income before amortization increased 92 percent over the comparable period last year. . . .
>
> . . . Now that the transactions will be completed over the next several weeks, we will be in a position to buy back stock under our already approved authorization. But as you know, we are extremely cautious in this area and we will be opportunistic about timing and price. We are well aware of our substantial cash and securities balance and it is a high priority for us to utilize those funds in the best way to create shareholder value. As you know, this can be achieved in a number of ways that we have already previously discussed, including through investments in our existing businesses, acquisitions and through the shrinking of our capital structure. . . .
>
> [KHOSROWSHAHI]:  As you mentioned, we reported excellent results across the board, especially in travel, despite the war, which affected revenue negatively in the early part of the quarter. The travel business has generated $2.6 billion in gross bookings, a 58 (ph) percent increase over last year, including 7.5 million hotel room nights sold. Overseas, Expedia and hotels.com both continued to grow aggressively with hotels.com launching 14 international versions of its web sites and Expedia international gross bookings growing 148 percent year-over-year ... (indiscernible), which wasn't included in our year ago numbers, contributed 21 percent of travel's revenue growth this quarter, and that is strong performance, despite the difficult travel environment. . . .
>
> . . . [DILLER]:  I think in this period, also, it seems that the trinity of Amazon and eBay and Yahoo has been extended by one to include us, so sometimes people call us now four horsemen or whatever. Whatever you can call us, it's nice that we're added to it. I think that one fact that when we realize, even surprises us that our relative strength in this sector, the sector that as we all know, has had such growth, in terms of its relative to almost any other business and given the Internet

and things.  But it is kind of remarkable that our cash flow to date is greater by a lot more than eBay, Amazon and Yahoo combined, and that is really to us the extraordinary fact.  I think it supports our strategy of becoming the largest and most profitable e-commerce business using multiple brands. They may not know IAC, but it is awfully hard to look at us relative to our peers, given the growth that we had and the fact that we do not lead in almost – I think it is almost every number that there is, I guess with the exception of gross bookings, gross transaction, where I think eBay leads by some amount.  Anyway, it has obviously been a good quarter.

58.      On August 8, 2003, the Company issued a press release entitled "IAC Completes Acquisition of Expedia, Inc.," which stated in relevant part that the Company had completed the acquisition of the outstanding shares of Expedia that it did not already own and that IAC had issued to Expedia's public shareholders approximately 100.8 million basic shares of IAC common stock and 133.3 million shares on a fully diluted, treasury-method basis.

59.      Also on August 8, 2003, the Company issued a press release entitled "IAC Completes Acquisition of LendingTree," stating in relevant part that the Company had completed its acquisition of LendingTree and that, as a result of the acquisition, IAC would issue to LendingTree shareholders approximately 18.8 million basic shares and 21.1 million shares on a fully diluted, treasury-method basis.

60.      On August 10, 2003, *The New York Times* ran a story entitled "Financial Disclosure, the Barry Diller Way," in which Diller and Khosrowshahi denied underpaying occupancy taxes. The article stated in relevant part:

> WHEN the titans of media and finance met last month in Sun Valley, Idaho, for the annual conference held by the investment banker Herbert Allen, the chatter was not limited to wheeling and dealing.  Corporate governance was also a topic of discussion.  Three company chairmen – Warren E. Buffett of Berkshire Hathaway, Howard Stringer of Sony and Barry Diller of InterActiveCorp. – even participated in a panel on the subject for the lustrous crowd.

> To some investors, Mr. Diller's inclusion on such a panel may seem incongruous.  For while many companies have spent the past year making their financial reports simpler and more transparent, those from InterActive, an Internet commerce conglomerate whose businesses include the Home Shopping Network, Expedia Inc. and Hotels.com, are still maddeningly complex.

- 34 -

*      *      *

Perhaps more troubling, profits at InterActive's two big Internet travel sites, Expedia and Hotels.com, the company's growth engines, may be inflated. The problem is that the sites may be paying less in hotel occupancy taxes than government authorities think is owed. And a disclosure in a recent regulatory filing, saying that the company could be forced to pay back taxes to state or local authorities and pay more taxes in the future, was minimal at best.

Moreover, nowhere in its documents does InterActive tell investors how much its earnings could be hurt if tax authorities require it to alter its practices.

In a telephone interview last Wednesday, Mr. Diller bristled at the notion that his company's financial statements were purposefully complex. "I would say strongly that we go to extraordinary lengths to be transparent and to write it in plain English," he said.

"Our goal is to simplify the capital structure of the company," he said. "We've made acquisitions, we have pro forma issues, issues of amortization, and our shareholders want to look at the company in ways other than GAAP, and we provide supplemental information that we hope is clear. By doing what we did this quarter, which was to essentially not obfuscate anything, was, I think, a fine step."

Dara Khosrowshahi, InterActive's chief financial officer, rejected the contention that the company's stance on the hotel occupancy tax was aggressive. "This tax issue is not a big deal in general," he said. "We have been advised on these issues by multiple experts in the area. They have advised us that we have a completely sound position as far as taxes go."

*      *      *

But the sites make far more money in their capacity as merchants, buying blocks of rooms at wholesale prices from a hotel and selling them to consumers at higher prices. When Expedia acts as a merchant, the rooms often carry an "Expedia special rate" and appear atop a list of available rooms for a given destination. It is here that the taxes paid by InterActive can come into question.

In its financial filings, InterActive acknowledges that it remits taxes to government authorities based on the wholesale cost of the rooms that it buys and resells, not on the amount it charges to consumers who book rooms on its sites. The company does not make this disclosure to consumers shopping on its Web sites.

InterActive often charges its customers what it identifies as "taxes and fees" for several popular travel destinations. To a traveler accustomed to paying steep hotel occupancy taxes, the amount may look mainly like a tax, with a small fee added. But because the tax paid by the company is based on the wholesale, not the retail, room rate, the fee portion is much larger than it might seem. On each

- 35 -

transaction, the companies appear to pocket as profit an amount that some taxing authorities may end up contending is theirs.

Because Hotels.com and Expedia lump together what they charge in taxes and fees, consumers do not know how much they are paying for each. Expedia's airline booking system, by contrast, clearly differentiates what its customers pay in taxes and what they pay in booking fees. Mr. Khosrowshahi said the company did not break out taxes and fees on hotel rooms because doing so would alert other online booking services to deals that Hotels.com or Expedia have made with lodging chains.

Occupancy taxes vary across the country. New York City, the top destination for Hotels.com customers, charges state and city hotel occupancy taxes of 13.625 percent – an 8.625 percent state tax and a 5 percent city tax – and a state fee of $2 a room.

A check of New York City room prices on Hotels.com and Expedia indicates that taxes and fees charged by the sites can total 18 percent of the room rate. On Expedia, a room for two at the Milford Plaza in Midtown Manhattan later this month cost $109 a night, plus taxes and service fees of $19.04, or 17.5 percent. On Hotels.com, a room for two at that hotel on the same night cost $91.75, plus $16.75, or 18.3 percent, in taxes and service fees.

Neither Expedia nor Hotels.com discloses the amount paid to the operator of the Milford Plaza for the room. But assuming that its markup is 25 percent, which is standard in the industry, that would put Expedia's wholesale price for the room at about $87 and Hotels.com's at about $81.

Taxes due to New York State and New York City on those rates would be $13.85 at Expedia and $13.03 at Hotels.com. So by charging $19.04 in taxes and service fees, Expedia's profits could be $5.19 on the room, or 6 percent of its cost. By charging $16.75 in taxes and fees, Hotels.com's profits could be $3.72, or 5 percent of the room's cost.

If Expedia and Hotels.com paid taxes to the city and state based on what they charge customers, their profits would be much lower. The $19.04 that Expedia charges for taxes and fees would generate a profit of only $2.19, or 2.5 percent of the room's wholesale cost. The $16.75 in taxes and fees charged by Hotels.com would produce profits of $2.25, or 2.4 percent of the room's cost.

WHEN asked about the taxpaying practices of Internet hotel sites, Tom Bergin, spokesman for New York's taxation and finance department, said: "Our audit and enforcement divisions are currently moving to address these and other sales tax issues."

Orlando, Fla., in Orange County, is another big destination for customers of Hotels.com and Expedia. Martha Haynie, comptroller of Orange County, which charges a resort tax of 5 percent on its hotel rooms, said: "It is our position that the

tax is due on the gross room rate because it appears they are charging the customer tax on that room rate, and if they are collecting tax and not remitting it we are going to want that."

These receipts are attractive, Ms. Haynie said, because tax collections for the first five months of this year are down from last year. "I'm beginning to wonder how much impact this dot-com business may be having" on the decline, she said.

Dave Bruns, spokesman for Florida's revenue department, said it expected to advise companies later this month whether they must remit the 6.5 percent sales tax on the amount they charge customers for a room.

Texas law already states that a company that buys a block of rooms, marks them up, sells them over the Internet and has its own cancellation policy must collect and remit hotel taxes on the amount a customer pays.

Texas state occupancy taxes are 6 percent; Dallas levies an added city hotel tax of 9 percent. A recent search on Expedia and Hotels.com for a room at the Holiday Inn Aristocrat in Dallas for later this month indicated taxes and fees of 17 percent to 18 percent of the room rate.

Mr. Khosrowshahi dismissed the threat that tax authorities might present to the company's earnings. He said InterActive's practices were standard in the online travel industry.

But InterActive notes in its government filings that it may be vulnerable to additional or back taxes. "A successful assertion by one or more states or local taxing jurisdictions that we should collect sales or occupancy taxes on the sale of hotel rooms could result in substantial tax liabilities for past sales, decrease our ability to compete with other Internet travel companies not subjected to collecting sales and occupancy taxes and otherwise harm our business," a recent regulatory filing stated.

How much could InterActive's earnings be hurt if state authorities forced it to pay additional taxes?

Mr. Khosrowshahi said: "We don't think it is a significant liability at all. We are in discussions with a number of states' tax authorities, and the discussions have been productive and encouraging." He said the company had set aside a reserve of less than $10 million to cover potential tax bills.

But financial filings and news releases from Expedia and Hotels.com before they were absorbed into InterActive allow for a rough estimate of how the company's earnings could decline if tax authorities disagreed with Mr. Khosrowshahi's assessment. Based on that information, the shortfall could be substantial.

From the start of 2001 until the end of March 2003, Hotels.com and Expedia reported how many rooms they had sold each quarter as merchants rather than as agents.  By analyzing the companies' cost of goods sold, one can estimate what the companies pay to hotel companies for rooms they buy and, therefore, what they remit in taxes.

For example, in the first quarter of 2003, the average cost per room paid by Hotels.com was around $84, including taxes.  Assuming an occupancy tax of 13 percent – a rough hybrid of taxes in the companies' major hotel markets – Hotels.com would have paid $11 in taxes per room.

According to the company, customers pay $120, on average, for a room.  At a tax rate of 13 percent, that would mean a tax of a little more than $16 per room night.  Because Hotels.com paid $11 in taxes on the room per night and received taxes and fees of $16, that would translate into a profit of around $5.

In the quarter, Hotels.com recorded 2.3 million room nights, generating operating profit of $27.2 million.  If local tax officials had taken the $5-a-room-night difference, operating earnings would have fallen by $11.5 million, or 42 percent of the amount the company recorded.

At Expedia during the same quarter, the company booked 2.8 million merchant hotel room nights and showed income from operations of $42 million.  At around $4 per room, the difference between what Expedia pays in taxes and what it receives could have been $11.3 million, or 27 percent of operating profits.

Applying these figures to InterActive's operating profit indicates that in the first quarter, the tax profit per room night at Hotels.com and Expedia could have accounted for 24 percent of InterActive's operating profit.

Of course, these figures are rough estimates, and the actual numbers could be less or more.

Mr. Khosrowshahi declined to comment on the estimates, saying that it was wrong to assume that additional taxes would be collected at all and that any attempt to quantify the potential hit to earnings was invalid.

Consumers are starting to notice the tax issue.  A lawsuit filed in a state district court in Duval County, Tex., last June by Nora J. Olvera contends that Hotels.com charged excess taxes on hotel accommodations "that were not owed or remitted to taxing authorities and that in equity and good conscience belong to plaintiff."

Deborah Roth, a spokeswoman for InterActive, said the company does not comment on pending litigation.

Even if state tax authorities choose not to pursue InterActive for past or future taxes, consumers may not appreciate paying an amount that they believe covers a tax but that instead is profit for InterActive.

61.     In response to *The New York Times* piece, the Company issued a press release entitled "Letter From IAC/InterActiveCorp to The New York Times," which quoted a letter from Diller stating in relevant part:

- We object to the entire premise of the articles to the extent they question the sufficiency of IAC/InterActiveCorp's public disclosures. IAC has been a leader on disclosure. We publicly release our budget. We were one of the first companies to stop providing quarterly "guidance." We are a prolific filer of information under Regulation FD to ensure that our shareholders have all up-to-date information that is important and relevant to them. Not many companies include their Principles of Financial Reporting so that investors can see *with precision* a detailed explanation for each of our actions. It is irresponsible to present a one-sided, ill-informed article that does not at a minimum note the company's consistent policy of open disclosure. We are also mystified by the characterization of our use of pro formas as "spin." As reflected in our various public documents, we use pro formas only to clarify and to add information – and we have done so even when their use makes our results look less favorable.

- The main article states that some government authorities are considering whether Hotels.com and Expedia are required to collect and remit room occupancy taxes on the amount of the customers' payment that is retained by Hotels.com and Expedia. Unfortunately, the article then recklessly jumps to the conclusion that if such occupancy taxes were found to be owed on *all* of the companies' revenue, from *all* jurisdictions, the companies' liability could be substantial. But while a limited number of jurisdictions have raised this issue (and the companies are engaged in ongoing dialogue with those jurisdictions), there is simply no basis for the supposition that the companies will face liability in all jurisdictions. The applicable tax provisions vary among the jurisdictions, and many of the jurisdictions, including certain high-revenue states, limit the obligation to collect occupancy taxes to businesses that are hotel "operators" (or similar language), a category that we do not believe includes Expedia and Hotels.com. While statutes in some jurisdictions do not specifically limit occupancy tax collection responsibilities to hotel operators, the companies believe they have sound additional arguments as to why they are not required to collect and remit occupancy taxes in those jurisdictions (the companies do not presently collect or remit taxes on the portion of the customer payment that they retain). We are engaged in what we believe are productive discussions with the tax authorities in various jurisdictions to resolve this issue. The company has disclosed this issue in its prior public

- 39 -

> filings and has taken appropriate reserves (less than $10 million) in
> accordance with applicable accounting rules.

(Emphasis in original.)

62.     The Company's rebuttal to the story was successful in that its stock did not drop on this news.

63.     Later, in a *Calgary Herald* article published on October 12, 2003, Diller stated the following with respect to the occupancy tax issue:

> The company "has investigated every aspect" of the tax issue, Diller said. "We've taken an appropriate reserve of $12 million.  We think that's adequate."

64.     In fact, the occupancy tax was a much more serious issue than defendants let on.  As opposed to the "limited number of jurisdictions" which IAC claimed had raised the issue, IAC was facing the issue nationally.  While the *New York Times* article mentioned the issue in New York and Texas, IAC's Expedia, Hotels.com and Hotwire would subsequently be sued by the City of Los Angeles and Expedia would be sued in Washington State Court for this same issue.  In the Spring of 2005, the Texas State Court actions were certified as a class and Hotels.com's motion to dismiss was denied.  Additional actions have also been filed in California.

65.     On September 22, 2003, IAC issued a press release which announced that it had entered into an agreement to acquire Hotwire.com for $665 million in cash plus the assumption of approximately $20 million of options and warrants.  The press release stated that "IAC estimates 2003 full year Gross Bookings for Hotwire of approximately $700 million and Net Revenue of approximately $110 million, and expects the transaction to be slightly accretive to 2004 adjusted EPS."

66.     Describing the operations of Hotwire, the press release stated:

Founded by Texas Pacific Group and airlines American, America West, Continental, Northwest, United and USAirways, Hotwire is an industry leader in opaque travel, a service that enables online consumers to see and choose a specific fare or rate

without knowing the brand of the supplier until after the item is purchased. This model enables Hotwire to offer discounts of up to 45 percent on airfares, and up to 75 percent on hotel rooms. Hotwire directly addresses the needs of a significant segment of the overall travel market: a recent report from Forrester Research notes that 19 percent of web travel bookers buy on price alone, without consideration of individual airline or hotel brands. . . . Hotwire President and CEO Karl Peterson added, "Hotwire consistently offers lower prices for leisure travelers because of our opaque model, and we have a significant advantage over other opaque offerings because we do not require consumers to engage in a bidding process. For suppliers, the value proposition is clear, they can drive incremental and profitable business by providing discounted inventory without harming their published prices or impacting their brands."

67.     Without an agreement by American Airlines, Continental Airlines, Northwest Airlines, United Airlines, US Airways Group and America West Airlines (Hotwire's joint venturers) to continue to provide an ample supply of deeply discounted seats, buying Hotwire was analogous to buying an empty box. This was particularly true since American Airlines, Continental Airlines, Northwest Airlines, United Airlines, and Delta Airlines operated Orbitz, a competing airline direct distribution Web site (which was established in June 2001).

68.     The September 22, 2003 press release was naturally misleading because it failed to disclose that Hotwire lacked enforceable agreements at guaranteed discount prices with the airlines, which was important to the market for the stock price drop and would later prove to be a significant reason at the end of the Class Period.

69.     On November 5, 2003, the Company issued a press release entitled "IAC Reports Q3 2003 Results," which stated in relevant part that the Company's Q3 2003 revenue was $1.6 billion, up 36%, its GAAP net income was $19 million or $0.02 per diluted share, its adjusted net income was $130 million or $0.17 per share, up 136%, and its year-to-date net cash provided by operating activities was $1.1 billion, up from $624 million. The press release also disclosed that the Company had repurchased 20 million shares of IAC common stock during the quarter for $717 million and announced a new 50 million share repurchase authorization.

70.     Subsequent to issuing the release, IAC hosted a conference call for investors, analysts

and media representatives.  During the call defendants represented the following:

> [KAUFMAN:]  We had a great quarter.  We hit our adjusted EPS budget number of 17 cents per share, 136% increase over the comparable period for last year.  This number would have been 18 cents per share, but for certain unforeseen charges we took in the third quarter, which have virtually no future effect on the results of our primary operating businesses. . . .

> [DILLER:] Here is what we will tell you.  First, we believe we will continue to have strong growth over the next years.  And, we do know at least enough about next year to tell you that our best guess is that our operating income, before amortization – I cannot say that word always, but forgive me, maybe some day I'll be able to – ought to be between $1 billion and $1.2 billion.  Secondly, we'll extensively discuss our overall strategy, the strategy of our operating businesses, their competitive positions, and all the details inside that, so long as they don't give any kind of advantage to our competitors.  We will also make every effort to inform you of unusual trends, movements, seasonality, elective investment spending, capital expenditures, et cetera, in all of our businesses. . . .

> Also, we've supplied today 21 pages of information, describing exactly how we get from point A to point B.  Some might criticize us for being long-winded.  We are striving to be thorough, transparent and clear.

> *      *      *

> We continue at IAC Travel to gain share against our competitors.  Our air volume is very solid, both here and internationally and we keep solidifying our lead in the merchant hotel business.

> *      *      *

[KHOSROWSHAHI:]  We're committed to grow our businesses over the short and long term, and have never been in a better position to do.

71.     During that call Daryl Smith, a J.P. Morgan analyst, asked the following question:

On the Hotwire side of the equation, [it] traditionally benefited from preferential pricing associated with their close connection with the airline suppliers. With airlines now liquidating their investment, when can we anticipate that their existing pricing contracts roll off and when do you think you'd expect the financial impact of that on the business?

72.     Diller responded by stating: "**[*Our] agreements with the airlines are long-term.*

*And, so, I don't think that it will have any effect.* . . . *[T]hat's the answer to that*.**"

- 42 -

73.     In fact, Hotwire did not have the long-term pricing arrangements represented and the subsequent decline in Hotwire's business would be a major contributing factor in IAC's declining travel prospects in 2004.

74.     On November 11, 2003, the Company conducted an "Investors Day" conference in New York and stated it expected 30% growth in long-term sales, among other favorable forecasts. Diller, Kaufman, Khosrowshahi and other IAC officers made presentations.   This was a very important conference for IAC and statements made by IAC executives during the conference were quoted in the media for months to come.

75.     *TotalTelecom* reported that:

InterActiveCorp chief executive Barry Diller sketched a bullish five-year plan at a company investors meeting on Tuesday, just a week after it trimmed 2003 financial targets. The New York-based Internet commerce conglomerate said it is targeting operating income to soar by 85 percent and revenue to grow 20 percent on a compounded annual growth rate on the back of strong boosts in nearly all of its business units.  "We are investing very aggressively into the growth of the business," said Diller, the one-time revered, but feared chief of Paramount Studios, who has since recast his career as an Internet commerce guru in recent years.  Top executives from the company's expansive portfolio of properties including travel site Expedia, event ticketing business Ticketmaster, online dating until Match.com and financial services business Lending Tree said growth in the ensuing decade would help drive earnings, revenue and free cash flow.

The company told investors it is hoping to post 2006 earnings per share of $1.40, according to generally accepted accounting practices, and $2.55 per share by 2008.  Excluding charges, it expects to post adjusted EPS of $1.70 in 2006 and $2.65 by 2008.  Revenues are expected to grow on a compounded annual growth rate of 20 percent to $11.6 billion by 2006 and $16.5 billion by 2008.  It also expects to accumulate approximately $10.9 billion in free cash flow over the next five years, said executives.  The company did not furnish 2004 or 2005 financial targets.  Bullish projections come less than a week after the company missed consensus earnings estimates for the third quarter.  It also trimmed full year 2003 adjusted earnings targets to a range of 72 cents to 75 cents, from an earlier target of 75 cents.

76.     After this conference, analysts issued very favorable reports about IAC:

(a)     Bear Stearns:

*Travel Business Had Competition, But Also Has Very Significant Growth Potential.*  The presentation was anchored by IACI's travel business, which accounts for nearly 60% of IACI's OIBA (Operating Income Before Amortization).  While the company acknowledged that travel will have competitors, the company feels it is truly the only global competitor and that growth from international, packaged travel and corporate travel are too significant to constrain IACI's Travel business, which expects 35% five-year OIBA growth.

*Getting to Know IACI's Other Businesses.*  During the investor day, the company highlighted other more recent purchases, including Entertainment Publications, Hotwire and Lending Tree.  The company also prominently featured its IACI Personals (Match.com business) business.  Mr. Diller also discussed IACI's continuing progress/struggle with making Citysearch a viable business.  Entertainment is expanding its horizons to the Internet, Citysearch is reinventing itself once more, Lending Tree is expanding into real estate sales and IACI Personals is adding new services to its site.  All will contribute to IACI's OIAB growth.

*Stock Repurchase for Real?*  In one presentation slide yesterday, the company suggested that it had essentially set aside $1.75 billion to repurchase 50 million shares (implying $35 per share).  We believe that this is a sign that the company is serious about shrinking its share base.  The company bought 20 million shares of stock for $35.85 on average in 3Q; the shares are 7% cheaper than that today.  It's not often investors can buy something at a better value than did the company; especially its own shares.

*Tuning in Valuation.*  In our recent note "A Whole New Ball Game?", which we published on November 6, 2003, we reduced our 4Q2003 and 2004 OIBA estimates by $35 million.  Given the basic math presented yesterday, which suggests average revenue and OIBA (operating income before amortization) growth of at least 20% and 30% respectively, our 2004 estimate may prove to be the low-end of the range [we are at $1.085 billion in OIBA relative to the company's range of $1.1 billion to $1.2 billion].

(b)    Deutsche Bank:

- IAC's Analyst meeting yesterday provided greater clarity as to how IAC will sustain growth as the largest interactive commerce company in the world.  By building branded leadership in several verticals, IAC is positioning itself to reap benefits of cross-business synergies in its next evolutionary stage.

- We expect online travel to remain the key growth driver for IAC. Buoyed by recent acquisitions, the company has assembled a portfolio of travel companies that comprehensively address all markets, products and eventually geographies.  As such, we believe

that IAC is best positioned to reap migration to online buying in the travel space.

*      *      *

■ We maintain our BUY rating and $45 target price (46x 2004E EPS). Meanwhile, we expect FCF to be boosted by favorable working capital trends in online travel.  Moreover, we think the company may be in the market re-purchasing the stock in the next several days/weeks, as it taps into its 57 mn share buyback program.

*      *      *

While each individual business segment executive presented details on market sizing, performance, strategy and growth drivers, to no surprise Victor Kaufman's presentation stole the show.  The Vice Chairman's summary towards the end of the day not only single-handedly picked up the stock price, but it also provided a perspective of where IAC is headed as a collective whole from a revenue, OIBA and earnings perspective.

(c)      Prudential Equity Group, Inc.:

• We attended Interactive's well-attended investor/analyst meeting held yesterday in NYC.  We walked away with our confidence bolstered that IAC is one of the most exciting growth stores in our coverage universe.

• In our view, the two most incremental takeaways from the meeting were that: 1) IAC's increase in 2004 marketing spending is an effort to create more of a barrier to entry against competitors rather than a reaction to them; and 2) management expects 5-year revenue growth of over 20%; EBITA and EPS growth of over 30%.  Cumulative FCF is expected to be $10.8 bil. over the same period.

• We strongly reiterate our Overweight rating.  While flat margins in the high growth businesses in 2004 is likely to keep out some momentum investors in the near term, we think this stock has very wide potential investor base as it should be attractive to value, GARP and growth investors alike.  We would also note that our cumulative FCF estimate is roughly in line with IAC's and implies a $43 target based on our valuation work.

(d)      Citigroup Smith Barney:

Yesterday, InterActiveCorp hosted an analyst day that provided strategic overview of its major businesses as well as their future growth

- 45 -

initiatives (with particular emphasis on the international expansion opportunity).  The overall tone of the presentation was upbeat, with the company providing long-term financial forecasts (2006 and 2008).

We highlight below the following major themes that came out of the meeting:

*Strong current liquidity position*.  IAC currently has a cash balance of $3.79 billion as of the end of the third quarter.  Assuming the max out of its existing 50 million share repurchase authorizations (at $35 per share for total cash outflow of $1.75 billion) leaves the company with roughly $2.04 billion of available cash.  Factoring out $1.5 – $2.0 of cash "cushion" (for working capital, growth, and acquisition needs), the company estimates it should have $40 million – $540 million of excess cash.  Adding in $2.2 billion for VUE securities, total excess cash and securities are $2.24 – $2.74 billion.

*Strong expected FCF generation should position company to be opportunistic about share repurchases longer-term*.  IAC expects to generate a cumulative total of nearly $11 billion of free cash flow from 2003 through 2008, of which the company noted that up to 50% could be allocated to stock buyback.

77.    On February 9, 2004, the Company issued a press release entitled "IAC Reports Q4 2003 Results," which stated in relevant part that the Company had reported that Q4 2003 revenue had grown 36% over the prior year to $1.8 billion and operating income had grown 142% to $179 million.  The release stated that GAAP net income was $153 million versus $145 million in the prior year and GAAP EPS was $0.20 versus $0.30 in the prior year, attributing the decrease in GAAP EPS largely to higher amortization of intangibles, non-cash compensation and higher shares outstanding in Q4 2003.  For the full year 2003, GAAP EPS were $0.23 versus $4.54 in the prior year.  Q4 2003 operating income before amortization ("OIBA") had grown 131% to $292 million.  Adjusted net income was $228 million versus $169 million in the prior year and adjusted EPS were $0.29 versus $0.24 in the prior year.  For the full year 2003, adjusted EPS were $0.81 versus $0.33 in the prior year.  The release stated that the Travel segment increased revenues by 41% to $677 million,

operating income by 119% to $108 million and OIBA by 111% to $150 million, driven by growth in its merchant hotel, packages and international businesses.

78.     Subsequent to issuing the release, IAC hosted a conference call for investors, analysts and media representatives.  During the call defendants represented the following:

[DILLER:]  This is such a great finish to such a tough year of transition.  It's a transition from seven years building up these assets into our first year as an operating company and our first year of real integration of these businesses.  We had said all last year that integration was going to be a bitch, and it did not disappoint.  So the fact that we performed so well during the year is a witness to both the strength of the businesses and the great people that are spread throughout our 26,000 employees.

The results, particularly the fourth quarter, where we had told you the last time we met in this kind of warm and cozy environment, was that we'd end the year at anywhere between 72 and 75 cents a share.  So to come in at 81 cents, or 77 cents not including certain items, so far beyond our internal projections underscores our ability to execute while carrying out a complex integration job.  We did think we had the strength to do it and reach specific milestones for each of the businesses.

*      *      *

Nevertheless, we think there are about four core questions in travel.  Those that we ask, and we get asked about all the time, so we thought we'd just answer them.  First, we are losing share to direct sites or will we long term?  Direct sites have an uptick in share but that is a reflection of their becoming much more active from a period of no activity at all.  We think that nothing can replace a broad travel site omnibus choice, convenience, and ability to sell packages and multiple components.  The fact is that the people who come to our sites are mostly brand agnostics particular, and the people who go to the direct branded supplier sites are kind of brand loyal.  The percentages might shift around a bit, but the essential dynamic won't.

Secondly, are we losing share to Travelocity or Orbitz?  We believe we can hold or build our overall share this year.  Our competitors can probably grow some lines of business at a higher percentage rate because they are certainly starting from a much lower base, but we've got greater resources and we can add a greater volume of bookings and therefore maintain or grow our share.  This is true in the United States but it's certainly true internationally.

Third, what is happening to raw margins?  While they're currently stable, on a blended average basis, we're prepared for them to come down modestly, maybe 1% this year, but please understand on this margin issue we aren't in denial.  We understand the skepticism but we can only tell you that visions of serious margin

- 47 -

deterioration are not, in our opinion, realistic.  In this last quarter, hotels.com gross profit margins and Expedia raw margins were essentially flat to last year.

The thing is that we believe that if the big chains sell aggressively through our channels that's going to bring our margins down somewhat but it will also increase our volumes.  If they choose to be less aggressive, our mix is going to shift to higher margin hotel product but probably at a lower overall volume, essentially we'll make up for any margin loss with greater volume.  We are starting multiple new businesses from international, Expedia Corporate Travel, and we're continuing to build the package business.

Fourth, what will happen to marketing?  What are we going to spend?  Well, we're going to lower our marketing spending as a percentage of revenue over time. This, we believe, this won't be true in every quarter and probably not in quarter 1 of this year versus last year when we had an unbelievably efficient marketing spend. But we think that we'll be close to equilibrium for the balance of the year.

Beyond the four questions you should all know that we believe we can go travel at our stated rates while being good partners to our suppliers and giving the best experience and service to our consumers.  It's really true that we being new customers to our suppliers.  And one of our big objectives this year is to have all of our supply partners realize that and for us to really work to smooth out every working relationship that we have.  We've announced an agreement with Marriott last week to distribute their hotels through our merchant program on both Expedia and hotels.com.  We now have deals with the five major hotel chains, as well as thousands of different independent hotels and smaller chain operators.

*     *     *

[KHOSROWSHAHI:]  Overall, as Barry mentioned, we had over a billion one in free cash flow in 2003 and $3.3 billion of cash and cash equivalents on our balance sheet not including our VUE securities.  We're in a great position to continue to make aggressive investments in our businesses, technology, marketing, international expansion and customer service all the while growing our bottom line. We've never been in a better position going forward.

*     *     *

[KAUFMAN:]  I also think that during this year, we're going to be able to show through various metrics and ways in which we operate how things fit together and how these businesses will really grow and sustain quite a huge business over time.

79.     Defendants knew and concealed that during 2003 there had developed serious deficiencies in IAC's connectivity to Six Continents Hotels' central reservation system and that IAC had been previously warned by InterContinental to cease its deceptive business practices.

- 48 -

80.     Also, defendants knew and concealed the fact that InterContinental would be curtailing its business with IAC during the second quarter of 2004 (resulting in decreased revenue and earnings), and thereafter completely terminating its business with IAC because IAC had refused and would continue to refuse to:

(a)     cease its confusing and potentially unclear marketing practices;

(b)     clearly present taxes and fees to consumers;

(c)     respect InterContinental's trademarks;

(d)     ensure that reservations were guaranteed through an automated and common confirmation process, not transmitted to the hotel via a fax or other process that then must be manually reentered into the hotel's reservation system;

(e)     cease listing hotels as "Sold Out" when that hotel actually has rooms to sell;

(f)     cease luring customers with the promise of huge discounts on recognized hotel brands, which may not exist in any meaningful quantity;

(g)     cease diverting customers searching for a specific hotel brand to another Web site without their knowledge or consent;

(h)     provide InterContinental hotels with the ability to set its room prices on IAC's Web sites, thereby permitting a hotel to ensure that it stays in compliance with InterContinental's "Lowest Internet Rate Guarantee;" and

(i)     enable hotel owners to make real time choices on controlling rooms available for sale, taking into account demand levels, customer buying patterns and channel costs.

81.     On April 29, 2004, IAC announced a new agreement with Hyatt hotels. On the same day, Oppenheimer issued a report on IAC based in part on statements by IAC management:

> InterActiveCorp announced today that its Expedia/Hotels.com unit signed a partner agreement with Hyatt. The agreement deepens Expedia's relationship with Hyatt and expands its access to room inventory. We fully expect that this deal lowers margins, but should enhance volume to at least offset the lesser margin. We view this as another positive. IACI, further expanding Expedia's scale and emphasizing its importance to suppliers. We continue to like IACI for its leading positions in growing spaces, efficient, debt-free business model, and expected 30% EBITA CAGR through 2008. Reiterate Buy rating.

- 49 -

82.   On May 3, 2004, the Company issued a press release entitled "IAC Reports Q1 2004 Results," which stated in relevant part that the Company's revenue had grown to $1.5 billion, "up 23% over the prior year on a comparable net basis and up 6% as reported," that its operating income decreased 57% "as a result of non-cash compensation and amortization of intangibles recorded primarily as a result of the buy-ins of IAC's formerly public subsidiaries, as well as higher selling and marketing expenses," that GAAP net income was $38 million versus a loss of $110 million in the prior year and GAAP diluted EPS was $0.05 versus ($0.23) in the prior year.  The release also stated that the Travel segment "increased revenues on a comparable net basis by 41% to $494 million, operating income by 21% to $85 million and Operating Income Before Amortization by 23% to $128 million, driven by growth in its merchant hotel, packages and international businesses."

83.   Subsequent to issuing the release, IAC hosted a conference call for investors, analysts and media representatives.  During the call defendants represented the following:

[DILLER:]  All of the key metrics which monitor and guide our operations and future strategy were stronger than we had anticipated.

\*       \*       \*

Travel gross bookings were very strong at $3.5 billion, 51% year on year and 44% sequentially.  Expedia and hotels.com bookings are up 48% and 44% year on year.

And we do listen.  We have expanded our disclosure, now providing gross bookings for Expedia and hotels.com, as well as for agency and merchant business line.

Our travel sites had over 23 million unduplicated unique users in March, and our overall share of the on-line travel audience was 37%, significantly higher than last quarter.  And we're talking about both agency and direct sites.  ***So it's worth repeating, we are back on track***.

\*       \*       \*

[KHOSROWSHAHI:]  Last time we spoke, we told you that our operating income before AMORT targets for the year was 1 billion to 1.2 billion and we're on track for that range.

84.     During the May 3, 2004 conference call, an analyst (Victor Miller) asked: "Could you give us a little more information on Hotwire's revenues in OIBA for the quarter?"  Khosrowshahi responded by stating: "We don't disclose the revenue or operating income before AMORT, *but it – it tracked very, very well.  We were happy with the quarter*, and it was solidly profitable, but it is not something that we break out."

85.     On August 3, 2004, IAC stock closed at $27.03 per share.

86.     Then, on August 3, 2004, after the market closed, the Company issued a press release entitled "IAC Reports Q2 2004 Results," which stated in relevant part:

> IAC/InterActiveCorp reported Q2 2004 results today.  Revenue was $1.5 billion, operating income decreased 1% to $110 million, net income decreased 25% to $70 million, and GAAP Diluted EPS decreased to $0.09 from $0.16.  2004 GAAP results were impacted by increased amortization of non-cash expenses and increased shares outstanding related to the buy-ins of [Interactive]'s formerly public subsidiaries.

> Operating Income Before Amortization grew by 23% to $250 million. Adjusted Net Income grew 24% to $174 million and Adjusted EPS was $0.22 versus $0.18 in the prior year....

> IAC Travel ("IACT") increased revenue on a comparable net basis by 34% to $556 million, operating income by 46% to $129 million and Operating Income Before Amortization by 29% to $171 million . . . HSN U.S. grew revenue, operating income and Operating Income Before Amortization by 8%, 2% and 4%, respectively. Ticketing grew revenue, operating income and Operating Income Before Amortization by 4%, 43% and 29%, respectively, despite relative weakness in industry-wide concert sales.

87.     Subsequently, Roger Clark (IAC VP-Investor Relations), during the August 3, 2004 conference call stated that Hotwire was a big part of the problem:

> I mean, if you look at these and if you dig deep into this of course, there are some supply issues, and, of course, the second quarter was probably the deepest cut of it. Certainly internationally where all travel was down and is beginning I think to rebound.  But other than that and other than Hotwire, which is definitely a significant issue, we don't think, again, it's structural.  We don't think it's long term.  We think that the supply issues that we have had that have given us a lesser discounts as the year progresses, we don't think it's going to come back fast, but we definitely think it will come back.

88.     This news, that the Company's revenues were well short of analyst expectations and had in fact dropped, making it evident that the defendants' prior statements that the Travel business was "on track" were false, caused the Company's stock to plummet by at least $4.23 per share on extremely high volume of almost 90 million shares, more than 18 times the average daily trading volume for this stock.

89.     Deusche Bank and other analysts cut the Company's stock ratings.  As *Bloomberg* news reported:

> Shares of IAC/InterActiveCorp, the Internet commerce and television-shopping company controlled by Barry Diller, dropped 16 percent after second-quarter revenue fell short of analysts' estimates.

> Revenue fell 1.7 percent and the New York-based company cut its forecast for 2004 profit excluding interest, taxes and other items.  IAC, the owner of travel Web sites including Expedia.com, Hotels.com and HotWire.com, said that hotel chains and airlines are providing fewer rooms and seats to sell.

> The hotel chains are spending more on their own Web sites to win customers, raising the risk they will minimize the role of independent Web sites.  At the same time, IAC is spending more on marketing to fend off competition from other online travel companies, including Orbitz Inc. and Sabre Holdings Corp.'s Travelocity.

> "The longer-term issues are that they are not getting extra inventory or discounted rates from the airlines" said Peter Mirsky, an analyst with Oppenheimer & Co. in New York, about IAC.  He has a "buy" rating on the shares and doesn't own any.

90.     Later, on August 16, 2004, InterContinental announced it had ended its agreement to promote its hotels through Expedia.com and Hotels.com because the sites did not meet its standards.  InterContinental, whose chains include Holiday Inn and Crowne Plaza among others, stated that Travelocity would be the only authorized online promoter of its hotel rooms because Travelocity's sales practices met its standards.  InterContinental disclosed that the conflict between it and IAC, Expedia.com and Hotels.com had been waging since at least April 2004, when InterContinental stated it would no longer work with a Web site that did not show customers the commissions they

were being charged and that faxed bookings made directly to hotels, rather than reporting them

through an automatied system.  InterContinental also objected to Expedia.com's and Hotels.com's

Web sites indicating InterContinental's rooms were sold out merely because the Web sites had

exhausted their allocation of discount rooms.  InterContinental objected to Expedia-related entities

buying up the names of InterContinental hotels on Internet search engines such that a search on

Yahoo! for "Hyatt" would first direct searches to Expedia rather than to Hyatt.  InterContinental's

complaint included:

> \*    *Customers who go to an online distributor's Web site to find a hotel may
> see a hotel listed as "Sold Out" when that hotel actually has rooms to sell*.

> \*    *Customers may be lured to a site with the promise of huge discounts on
> recognized hotel brands, which may not exist in any meaningful quantity*.

> \*    *Customers searching for a specific hotel brand can be diverted to another
> Web site without their knowledge or consent*.

91.    On August 17, 2004, the New York *Daily News* carried an article by Phyllis Furman

which stated:

> *InterContinental Hotels is checking out of Expedia*.

> *The world's largest hotel chain said it won't sell its swanky rooms on the
> travel Web site anymore because Expedia doesn't meet its customer standards*.

> *It's not just InterContinental that's ditching Expedia.  The hotel giant's
> other chains, including Holiday Inn and Crowne Plaza, will soon be no-shows on
> Expedia and Hotels.com, both owned by Barry Diller's InterActiveCorp*.

> \*       \*       \*

> *InterContinental said it will now offer its 535,000 rooms to Expedia rival
> Travelocity, owned by Sabre Holdings*.

> "We believe you have to treat customers the right way," InterContinental
> senior vice president Tom Seddon told reporters yesterday, adding the hotel giant
> doesn't want a partner that "doesn't have our same core values."

> InterContinental is flexing its muscles as the travel business continues to
> improve – while putting pressure on Internet travel agents like Expedia.

- 53 -

Yesterday, InterContinental execs said they have a number of beefs with Expedia. ***They claim to be bothered by the online giant's policy of saying a hotel's rooms are "sold out" when spots are still available through other venues like the hotel's own Web site***.

And InterContinental execs say Expedia doesn't do a good enough job explaining to customers the fees it collects on each transaction.

An Expedia spokesman said its customers do get the information on fees, though not in the initial stages of their online purchase.

While InterContinental came down hard on Expedia yesterday, not all of its franchisees are expected to pull out of the site, said Legg Mason analyst Thomas Underwood.

***But an InterContinental spokeswoman said the hotel giant's franchisees voted unanimously to support the pullout***.

92.     Throughout the Class Period, while IAC's stock price was driven up on defendants' positive statements, reaching a Class Period high of over $42 per share on July 7, 2003, certain Company insiders, including each of the Individual Defendants, illegally profited on their own personal sales of the Company's common stock, selling over 7.78 million shares of their own IAC stock at inflated prices for over $258.9 million in proceeds and registering 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering.  The Company's stock declined to below $22 per share on news of the Company's dismal Q2 2004 performance, analyst downgrades, and news of InterContinental's decision, erasing billions of dollars in market capitalization.

93.     The Company's stock price has not rebounded and is currently in the $23 range.  The Company's travel business is extremely disappointing and will be spun off.  In May 2005, Diller admitted that as to Hotels.com, "for a period of time it lost its supply advantage and its price advantage."

94.     On February 16, 2005, *TheStreet.com* wrote that:

- 54 -

IAC/InterActiveCorp's travel business is on a journey, but Wall Street is increasingly unsure about its final destination.

While $218 million in writedowns caught attention at Barry Diller's e-commerce giant in the fourth quarter, sell-side analysts appeared more concerned Wednesday about weaker-than-expected sales growth in IAC's travel operations. IAC is planning to spin those businesses off into a separate company later this year.

Additionally, IAC indicated that its Hotels.com lodging business, which disappointed investors with its performance in prior 2004 quarters, is in the midst of a fundamental repositioning.  In place of its tradition of presenting itself to consumers as a source for discounted hotel stays – a strategy that's increasingly difficult to follow through on given the challenges of competition and inventory acquisition – Hotels.com is now in the process of emphasizing its role as a trusted, objective adviser for travelers in the market for a hotel room.

## DEFENDANTS' INSIDER TRADING

95.    During the Class Period, while the Company's stock price was artificially inflated due to defendants' false and misleading statements, the following defendants sold 7.78 million shares of IAC stock for proceeds of $258.9 million while in possession of undisclosed adverse information:

| Name | Date | Price | Shares | Proceeds |
|---|---|---|---|---|
| BARTON RICHARD | 08/14/2003 | $35.7259 | 20,000 | $714,518 |
| | 08/21/2003 | $37.4231 | 20,000 | $748,462 |
| | 08/28/2003 | $36.4027 | 20,000 | $728,054 |
| | 09/04/2003 | $35.0816 | 20,000 | $701,632 |
| | 09/11/2003 | $33.9745 | 20,000 | $679,490 |
| | 09/18/2003 | $35.3970 | 20,000 | $707,940 |
| | 09/25/2003 | $35.4723 | 20,000 | $709,446 |
| | 10/02/2003 | $33.8830 | 20,000 | $677,660 |
| | 10/09/2003 | $38.3046 | 20,000 | $766,092 |
| | 10/16/2003 | $38.1061 | 20,000 | $762,122 |
| | 10/23/2003 | $37.1535 | 20,000 | $743,070 |
| | 10/30/2003 | $38.4966 | 20,000 | $769,932 |
| | 11/06/2003 | $32.6771 | 20,000 | $653,542 |
| | 11/13/2003 | $33.3596 | 20,000 | $667,192 |
| | 11/20/2003 | $31.3376 | 20,000 | $626,752 |
| | 11/26/2003 | $32.2896 | 20,000 | $645,792 |
| | 12/04/2003 | $30.3246 | 20,000 | $606,492 |
| | 12/11/2003 | $29.8909 | 20,000 | $597,818 |
| | 12/18/2003 | $31.8057 | 20,000 | $636,114 |
| | 12/24/2003 | $33.1532 | 20,000 | $663,064 |
| | 12/31/2003 | $33.9133 | 20,000 | $678,266 |
| | 01/08/2004 | $32.7267 | 20,000 | $654,534 |
| | 01/15/2004 | $34.0202 | 28,150 | $957,669 |
| | 01/22/2004 | $34.0514 | 28,150 | $958,547 |
| | 01/29/2004 | $31.7501 | 28,150 | $893,765 |
| | 02/05/2004 | $31.3414 | 28,150 | $882,260 |
| | 02/12/2004 | $32.5420 | 28,150 | $916,057 |
| | 02/19/2004 | $32.9212 | 28,150 | $926,732 |

| | | | | |
|---|---|---|---|---|
| | 02/26/2004 | $30.9255 | 28,150 | $870,553 |
| | 03/04/2004 | $32.4845 | 28,150 | $914,439 |
| | 03/11/2004 | $31.0259 | 28,150 | $873,379 |
| | 03/18/2004 | $29.8804 | 28,150 | $841,133 |
| | 03/25/2004 | $29.7252 | 28,150 | $836,764 |
| | 04/01/2004 | $32.8992 | 28,150 | $926,112 |
| | 04/08/2004 | $33.2400 | 28,150 | $935,706 |
| | 04/15/2004 | $32.0150 | 28,150 | $901,222 |
| | 04/22/2004 | $33.7516 | 28,150 | $950,108 |
| | 04/29/2004 | $32.9615 | 28,150 | $927,866 |
| | 05/06/2004 | $31.4628 | 4,794 | $150,833 |
| | 05/06/2004 | $31.4628 | 23,356 | $734,845 |
| | 05/13/2004 | $29.7606 | 20,935 | $623,038 |
| | 05/13/2004 | $29.7606 | 7,215 | $214,723 |
| | 05/20/2004 | $30.0128 | 28,150 | $844,860 |
| | 05/27/2004 | $31.4836 | 28,150 | $886,263 |
| | 06/03/2004 | $30.7364 | 28,150 | $865,230 |
| | 06/10/2004 | $30.2799 | 28,150 | $852,379 |
| | 06/17/2004 | $29.8950 | 11,871 | $354,884 |
| | 06/17/2004 | $29.8950 | 16,279 | $486,661 |
| | 06/24/2004 | $30.8612 | 28,150 | $868,743 |
| | 07/01/2004 | $29.9975 | 28,150 | $844,430 |
| | 07/08/2004 | $29.9762 | 28,150 | $843,830 |
| | 07/15/2004 | $29.2418 | 28,150 | $823,157 |
| | 07/22/2004 | $28.3643 | 28,150 | $798,455 |
| | 07/29/2004 | $27.8565 | 28,150 | $784,160 |
| | **TOTAL** | | **1,256,350** | **$40,626,787** |
| | | | | |
| DILLER BARRY | 05/07/2003 | $32.7223 | 4,500,000 | $147,250,350 |
| | 06/03/2003 | $37.0000 | 775,000 | $28,675,000 |
| | 02/13/2004 | $31.9300 | 54,000 | $1,724,220 |
| | **TOTAL** | | **5,329,000** | **$177,649,570** |
| | | | | |
| GENACHOWSKI JULIUS | 05/07/2003 | $34.0300 | 750 | $25,523 |
| | 05/07/2003 | $34.0200 | 12,500 | $425,250 |
| | 05/07/2003 | $34.0000 | 11,391 | $387,294 |
| | 05/07/2003 | $33.7500 | 22,609 | $763,054 |
| | 05/07/2003 | $33.7800 | 5,500 | $185,790 |
| | 05/07/2003 | $34.0100 | 9,250 | $314,593 |
| | 05/07/2003 | $34.0600 | 5,500 | $187,330 |
| | 05/07/2003 | $33.8500 | 5,000 | $169,250 |
| | 05/15/2003 | $35.5500 | 20,000 | $711,000 |
| | 05/16/2003 | $36.0000 | 20,000 | $720,000 |
| | 05/29/2003 | $37.7500 | 10,000 | $377,500 |
| | 05/29/2003 | $37.8000 | 10,000 | $378,000 |
| | 05/30/2003 | $37.5000 | 21,666 | $812,475 |
| | 12/18/2003 | $32.0000 | 5,000 | $160,000 |
| | 12/19/2003 | $32.0100 | 2,500 | $80,025 |
| | 12/19/2003 | $32.5000 | 1,000 | $32,500 |
| | 12/19/2003 | $33.0200 | 5,000 | $165,100 |
| | 12/19/2003 | $32.8500 | 1,500 | $49,275 |
| | 12/22/2003 | $33.0000 | 5,000 | $165,000 |
| | 12/22/2003 | $32.9900 | 1,398 | $46,120 |
| | 12/22/2003 | $32.9000 | 2,969 | $97,680 |
| | 12/22/2003 | $32.9100 | 633 | $20,832 |
| | 12/23/2003 | $33.5000 | 1,667 | $55,845 |
| | 12/23/2003 | $33.3000 | 1,666 | $55,478 |
| | 12/23/2003 | $33.7000 | 1,667 | $56,178 |
| | 12/24/2003 | $33.2000 | 1,667 | $55,344 |

|  | | | |
|---|---|---|---|
| 12/24/2003 | $33.1100 | 1,667 | $55,194 |
| 12/24/2003 | $33.4000 | 1,666 | $55,644 |
| 12/26/2003 | $33.2400 | 33 | $1,097 |
| 12/26/2003 | $33.2300 | 1,632 | $54,231 |
| 12/26/2003 | $33.0300 | 6,668 | $220,244 |
| 12/26/2003 | $33.2900 | 1,667 | $55,494 |
| 12/29/2003 | $32.9900 | 1,000 | $32,990 |
| 12/29/2003 | $32.8200 | 200 | $6,564 |
| 12/29/2003 | $32.9000 | 1,000 | $32,900 |
| 12/29/2003 | $33.1000 | 850 | $28,135 |
| 12/29/2003 | $33.3000 | 1,000 | $33,300 |
| 12/29/2003 | $33.0000 | 2,150 | $70,950 |
| 12/29/2003 | $33.2000 | 1,000 | $33,200 |
| 12/29/2003 | $32.6900 | 2,000 | $65,380 |
| 12/29/2003 | $32.8000 | 800 | $26,240 |
| 12/30/2003 | $33.6900 | 663 | $22,336 |
| 12/30/2003 | $33.4400 | 133 | $4,448 |
| 12/30/2003 | $33.6000 | 267 | $8,971 |
| 12/30/2003 | $33.4800 | 166 | $5,558 |
| 12/30/2003 | $33.4600 | 333 | $11,142 |
| 12/30/2003 | $33.6100 | 165 | $5,546 |
| 12/30/2003 | $33.4500 | 33 | $1,104 |
| 12/30/2003 | $33.6200 | 233 | $7,833 |
| 12/30/2003 | $33.8600 | 100 | $3,386 |
| 12/30/2003 | $33.5000 | 332 | $11,122 |
| 12/30/2003 | $33.6700 | 2,008 | $67,609 |
| 12/30/2003 | $33.8700 | 567 | $19,204 |
| 12/31/2003 | $33.8600 | 792 | $26,817 |
| 12/31/2003 | $34.2300 | 1,647 | $56,377 |
| 12/31/2003 | $34.2500 | 55 | $1,884 |
| 12/31/2003 | $34.0000 | 1,308 | $44,472 |
| 12/31/2003 | $34.0000 | 1,102 | $37,468 |
| 12/31/2003 | $34.1800 | 1,098 | $37,530 |
| 12/31/2003 | $34.1400 | 1,098 | $37,486 |
| 12/31/2003 | $33.8900 | 60 | $2,033 |
| 12/31/2003 | $33.7900 | 340 | $11,489 |
| 01/02/2004 | $34.0000 | 3,802 | $129,268 |
| 01/02/2004 | $34.0500 | 799 | $27,206 |
| 01/02/2004 | $34.2500 | 66 | $2,261 |
| 01/02/2004 | $34.0900 | 333 | $11,352 |
| 01/05/2004 | $34.0200 | 625 | $21,263 |
| 01/05/2004 | $34.0000 | 1,877 | $63,818 |
| 01/06/2004 | $34.0000 | 1,498 | $50,932 |
| 01/14/2004 | $34.0000 | 6,833 | $232,322 |
| **TOTAL** | | **237,499** | **$8,230,235** |
| | | | |
| KAUFMAN VICTOR | 05/07/2003 | $34.1800 | 41,200 | $1,408,216 |
| | 05/07/2003 | $34.0600 | 5,500 | $187,330 |
| | 05/07/2003 | $34.2600 | 1,000 | $34,260 |
| | 05/07/2003 | $33.7800 | 5,500 | $185,790 |
| | 05/07/2003 | $34.2300 | 14,500 | $496,335 |
| | 05/07/2003 | $33.5000 | 25,000 | $837,500 |
| | 05/07/2003 | $33.4800 | 25,000 | $837,000 |
| | 05/07/2003 | $33.6300 | 4,200 | $141,246 |
| | 05/07/2003 | $34.2700 | 100 | $3,427 |
| | 05/07/2003 | $33.7600 | 200 | $6,752 |
| | 05/07/2003 | $34.1700 | 100 | $3,417 |
| | 05/07/2003 | $34.2900 | 2,000 | $68,580 |
| | 05/07/2003 | $34.3000 | 25,000 | $857,500 |
| | 05/07/2003 | $34.2400 | 25,000 | $856,000 |

| | | | |
|---|---|---|---|
| 05/07/2003 | $34.0500 | 20,000 | $681,000 |
| 05/07/2003 | $34.2500 | 18,860 | $645,955 |
| 05/07/2003 | $33.7900 | 200 | $6,758 |
| 05/07/2003 | $33.6200 | 45,000 | $1,512,900 |
| 05/07/2003 | $34.1500 | 24,900 | $850,335 |
| 05/07/2003 | $34.0100 | 9,250 | $314,593 |
| 05/07/2003 | $34.0300 | 750 | $25,523 |
| 05/07/2003 | $34.0200 | 32,500 | $1,105,650 |
| 05/07/2003 | $33.7500 | 61,991 | $2,092,196 |
| 05/07/2003 | $34.1000 | 25,000 | $852,500 |
| 05/07/2003 | $34.3100 | 14,900 | $511,219 |
| 05/07/2003 | $34.0000 | 11,609 | $394,706 |
| 05/07/2003 | $33.8500 | 5,000 | $169,250 |
| 05/07/2003 | $33.5700 | 25,000 | $839,250 |
| 11/21/2003 | $32.0000 | 2,500 | $80,000 |
| 11/24/2003 | $32.1452 | 7,500 | $241,089 |
| 11/25/2003 | $32.4000 | 2,500 | $81,000 |
| 11/25/2003 | $32.7000 | 2,500 | $81,750 |
| 11/26/2003 | $32.6970 | 5,000 | $163,485 |
| 11/28/2003 | $32.6600 | 100 | $3,266 |
| 11/28/2003 | $32.6500 | 2,400 | $78,360 |
| 11/28/2003 | $32.3300 | 2,500 | $80,825 |
| 12/01/2003 | $32.5000 | 250 | $8,125 |
| 12/01/2003 | $32.9900 | 1,350 | $44,537 |
| 12/01/2003 | $33.0100 | 50 | $1,651 |
| 12/01/2003 | $32.4500 | 2,250 | $73,013 |
| 12/01/2003 | $33.0500 | 550 | $18,178 |
| 12/01/2003 | $32.3200 | 1,150 | $37,168 |
| 12/01/2003 | $33.0700 | 3,050 | $100,864 |
| 12/02/2003 | $32.3000 | 1,750 | $56,525 |
| 12/02/2003 | $32.2900 | 2,500 | $80,725 |
| 12/02/2003 | $32.4400 | 750 | $24,330 |
| 12/03/2003 | $32.0000 | 3,000 | $96,000 |
| 12/03/2003 | $32.1800 | 50 | $1,609 |
| 12/03/2003 | $32.2200 | 1,000 | $32,220 |
| 12/03/2003 | $32.1500 | 950 | $30,543 |
| 12/18/2003 | $32.0000 | 5,000 | $160,000 |
| 12/19/2003 | $32.0100 | 2,500 | $80,025 |
| 12/19/2003 | $32.8500 | 1,500 | $49,275 |
| 12/19/2003 | $32.5000 | 1,000 | $32,500 |
| 12/19/2003 | $33.0000 | 9,750 | $321,750 |
| 12/19/2003 | $33.0200 | 6,600 | $217,932 |
| 12/22/2003 | $32.9100 | 633 | $20,832 |
| 12/22/2003 | $32.9900 | 1,401 | $46,219 |
| 12/22/2003 | $33.0000 | 10,000 | $330,000 |
| 12/22/2003 | $32.9000 | 2,966 | $97,581 |
| 12/23/2003 | $33.7000 | 1,675 | $56,448 |
| 12/23/2003 | $33.9000 | 2,500 | $84,750 |
| 12/23/2003 | $33.5000 | 1,662 | $55,677 |
| 12/23/2003 | $33.3000 | 1,663 | $55,378 |
| 12/23/2003 | $33.4600 | 2,500 | $83,650 |
| 12/24/2003 | $33.1100 | 1,666 | $55,161 |
| 12/24/2003 | $33.2000 | 1,667 | $55,344 |
| 12/24/2003 | $33.4000 | 1,667 | $55,678 |
| 12/24/2003 | $33.0600 | 5,000 | $165,300 |
| 12/26/2003 | $33.0300 | 11,668 | $385,394 |
| 12/26/2003 | $33.2300 | 1,633 | $54,265 |
| 12/26/2003 | $33.2900 | 1,666 | $55,461 |
| 12/26/2003 | $33.2400 | 33 | $1,097 |
| 12/29/2003 | $32.8000 | 800 | $26,240 |
| 12/29/2003 | $33.1000 | 850 | $28,135 |

| | | | |
|---|---|---|---|
| 12/29/2003 | $32.9000 | 1,000 | $32,900 |
| 12/29/2003 | $32.9900 | 1,000 | $32,990 |
| 12/29/2003 | $32.6900 | 2,000 | $65,380 |
| 12/29/2003 | $33.0000 | 4,150 | $136,950 |
| 12/29/2003 | $32.8200 | 200 | $6,564 |
| 12/29/2003 | $33.2000 | 1,000 | $33,200 |
| 12/29/2003 | $33.3000 | 4,000 | $133,200 |
| 12/30/2003 | $33.4800 | 334 | $11,182 |
| 12/30/2003 | $33.4600 | 667 | $22,318 |
| 12/30/2003 | $33.8700 | 1,133 | $38,375 |
| 12/30/2003 | $33.8600 | 200 | $6,772 |
| 12/30/2003 | $33.4400 | 267 | $8,928 |
| 12/30/2003 | $33.6200 | 467 | $15,701 |
| 12/30/2003 | $33.6700 | 3,992 | $134,411 |
| 12/30/2003 | $33.5000 | 668 | $22,378 |
| 12/30/2003 | $33.6100 | 335 | $11,259 |
| 12/30/2003 | $33.6900 | 1,337 | $45,044 |
| 12/30/2003 | $33.6000 | 533 | $17,909 |
| 12/30/2003 | $33.4500 | 67 | $2,241 |
| 12/31/2003 | $34.2300 | 1,353 | $46,313 |
| 12/31/2003 | $34.2500 | 45 | $1,541 |
| 12/31/2003 | $33.7900 | 1,360 | $45,954 |
| 12/31/2003 | $34.1800 | 902 | $30,830 |
| 12/31/2003 | $34.1400 | 902 | $30,794 |
| 12/31/2003 | $33.8600 | 3,208 | $108,623 |
| 12/31/2003 | $34.0000 | 1,990 | $67,660 |
| 12/31/2003 | $33.8900 | 240 | $8,134 |
| 01/02/2004 | $34.0900 | 667 | $22,738 |
| 01/02/2004 | $33.5300 | 100 | $3,353 |
| 01/02/2004 | $33.3000 | 3,000 | $99,900 |
| 01/02/2004 | $33.6000 | 1,000 | $33,600 |
| 01/02/2004 | $33.5500 | 1,000 | $33,550 |
| 01/02/2004 | $33.8000 | 1,000 | $33,800 |
| 01/02/2004 | $34.2500 | 134 | $4,590 |
| 01/02/2004 | $33.9900 | 100 | $3,399 |
| 01/02/2004 | $34.0500 | 1,601 | $54,514 |
| 01/05/2004 | $33.8400 | 2 | $68 |
| 01/05/2004 | $33.7100 | 2,000 | $67,420 |
| 01/05/2004 | $34.0000 | 1,123 | $38,182 |
| 01/05/2004 | $33.7000 | 2,000 | $67,400 |
| 01/05/2004 | $33.8500 | 1,000 | $33,850 |
| 01/05/2004 | $33.8800 | 1,500 | $50,820 |
| 01/05/2004 | $33.6400 | 2,000 | $67,280 |
| 01/05/2004 | $34.0200 | 375 | $12,758 |
| 01/06/2004 | $34.0000 | 2,002 | $68,068 |
| 01/06/2004 | $33.3300 | 998 | $33,263 |
| 01/06/2004 | $33.1400 | 2,000 | $66,280 |
| 01/06/2004 | $33.2800 | 1,000 | $33,280 |
| 01/06/2004 | $33.3500 | 1,000 | $33,350 |
| 01/06/2004 | $33.3700 | 1,000 | $33,370 |
| 01/06/2004 | $33.3800 | 2,000 | $66,760 |
| 01/07/2004 | $33.1400 | 400 | $13,256 |
| 01/07/2004 | $33.0400 | 1,000 | $33,040 |
| 01/07/2004 | $33.0600 | 5,000 | $165,300 |
| 01/07/2004 | $33.1200 | 2,000 | $66,240 |
| 01/07/2004 | $33.0000 | 1,000 | $33,000 |
| 01/07/2004 | $33.1500 | 600 | $19,890 |
| 01/08/2004 | $33.2000 | 1,000 | $33,200 |
| 01/08/2004 | $33.0000 | 2,000 | $66,000 |
| 01/09/2004 | $32.4000 | 1,000 | $32,400 |
| 01/09/2004 | $32.5000 | 2,000 | $65,000 |

| | | | |
|---|---|---|---|
| 01/09/2004 | $32.3600 | 1,000 | $32,360 |
| 01/09/2004 | $32.6000 | 1,000 | $32,600 |
| 01/12/2004 | $32.0500 | 1,000 | $32,050 |
| 01/12/2004 | $32.7000 | 1,000 | $32,700 |
| 01/12/2004 | $32.2000 | 2,000 | $64,400 |
| 01/12/2004 | $32.4500 | 1,000 | $32,450 |
| 01/13/2004 | $32.9100 | 500 | $16,455 |
| 01/13/2004 | $32.4000 | 1,000 | $32,400 |
| 01/13/2004 | $32.9000 | 3,500 | $115,150 |
| 01/13/2004 | $33.0000 | 3,000 | $99,000 |
| 01/14/2004 | $32.9000 | 1,000 | $32,900 |
| 01/14/2004 | $32.6900 | 200 | $6,538 |
| 01/14/2004 | $33.1000 | 4,000 | $132,400 |
| 01/14/2004 | $33.9600 | 1,000 | $33,960 |
| 01/14/2004 | $32.8000 | 1,000 | $32,800 |
| 01/14/2004 | $33.2000 | 3,000 | $99,600 |
| 01/14/2004 | $33.4000 | 1,000 | $33,400 |
| 01/14/2004 | $32.7100 | 800 | $26,168 |
| 01/14/2004 | $32.9900 | 1,000 | $32,990 |
| 01/14/2004 | $33.6200 | 1,000 | $33,620 |
| 01/14/2004 | $33.8000 | 1,000 | $33,800 |
| 01/14/2004 | $32.7000 | 1,000 | $32,700 |
| 01/14/2004 | $33.9000 | 2,000 | $67,800 |
| 01/14/2004 | $33.5000 | 1,000 | $33,500 |
| 01/14/2004 | $33.0000 | 10,000 | $330,000 |
| 01/15/2004 | $34.2000 | 1,000 | $34,200 |
| 01/15/2004 | $33.5300 | 300 | $10,059 |
| 01/15/2004 | $33.5000 | 200 | $6,700 |
| 01/15/2004 | $34.5500 | 1,000 | $34,550 |
| 01/15/2004 | $34.3000 | 1,000 | $34,300 |
| 01/15/2004 | $33.7500 | 1,000 | $33,750 |
| 01/15/2004 | $34.1000 | 2,000 | $68,200 |
| 01/15/2004 | $34.0000 | 2,000 | $68,000 |
| 01/15/2004 | $33.5100 | 500 | $16,755 |
| 01/15/2004 | $34.4000 | 1,000 | $34,400 |
| 01/16/2004 | $34.8000 | 2,000 | $69,600 |
| 01/16/2004 | $34.7000 | 2,000 | $69,400 |
| 01/16/2004 | $34.6900 | 1,900 | $65,911 |
| 01/16/2004 | $34.4100 | 1,000 | $34,410 |
| 01/16/2004 | $34.7400 | 100 | $3,474 |
| 01/16/2004 | $34.5000 | 1,000 | $34,500 |
| 01/16/2004 | $34.0000 | 1,000 | $34,000 |
| 01/16/2004 | $34.4200 | 1,000 | $34,420 |
| 01/20/2004 | $34.4600 | 1,000 | $34,460 |
| 01/20/2004 | $34.4000 | 200 | $6,880 |
| 01/20/2004 | $34.3800 | 1,800 | $61,884 |
| 01/20/2004 | $34.9000 | 400 | $13,960 |
| 01/20/2004 | $34.4200 | 1,000 | $34,420 |
| 01/20/2004 | $34.8000 | 1,600 | $55,680 |
| 01/20/2004 | $34.6000 | 2,000 | $69,200 |
| 01/20/2004 | $34.8500 | 2,000 | $69,700 |
| 01/21/2004 | $33.6000 | 1,000 | $33,600 |
| 01/21/2004 | $34.0200 | 1,000 | $34,020 |
| 01/21/2004 | $34.2500 | 1,000 | $34,250 |
| 01/21/2004 | $33.5100 | 1,000 | $33,510 |
| 01/21/2004 | $33.9900 | 900 | $30,591 |
| 01/21/2004 | $34.4000 | 1,000 | $34,400 |
| 01/21/2004 | $34.0100 | 1,100 | $37,411 |
| 01/21/2004 | $33.9000 | 1,000 | $33,900 |
| 01/21/2004 | $34.0000 | 1,000 | $34,000 |
| 01/21/2004 | $34.0500 | 1,000 | $34,050 |

| | | | |
|---|---|---|---|
| 01/22/2004 | $34.2000 | 1,000 | $34,200 |
| 01/22/2004 | $34.4000 | 1,000 | $34,400 |
| 01/22/2004 | $34.1500 | 2,000 | $68,300 |
| 01/22/2004 | $34.0000 | 3,000 | $102,000 |
| 01/22/2004 | $34.3000 | 1,000 | $34,300 |
| 01/22/2004 | $34.1000 | 1,000 | $34,100 |
| 01/22/2004 | $34.3600 | 1,000 | $34,360 |
| 01/23/2004 | $34.0000 | 2,000 | $68,000 |
| 01/23/2004 | $34.3000 | 1,000 | $34,300 |
| 01/23/2004 | $34.0500 | 1,000 | $34,050 |
| 01/23/2004 | $33.9000 | 1,500 | $50,850 |
| 01/23/2004 | $34.5000 | 1,000 | $34,500 |
| 01/23/2004 | $33.7500 | 1,500 | $50,625 |
| 01/23/2004 | $34.2500 | 1,000 | $34,250 |
| 01/23/2004 | $33.8000 | 500 | $16,900 |
| 01/23/2004 | $33.8500 | 500 | $16,925 |
| 01/26/2004 | $33.4000 | 1,000 | $33,400 |
| 01/26/2004 | $33.3000 | 1,000 | $33,300 |
| 01/26/2004 | $33.8500 | 500 | $16,925 |
| 01/26/2004 | $34.0000 | 2,500 | $85,000 |
| 01/26/2004 | $33.8000 | 1,000 | $33,800 |
| 01/26/2004 | $33.9000 | 1,000 | $33,900 |
| 01/26/2004 | $33.7000 | 1,000 | $33,700 |
| 01/26/2004 | $33.5000 | 2,000 | $67,000 |
| 01/27/2004 | $33.3500 | 1,000 | $33,350 |
| 01/27/2004 | $33.4000 | 1,000 | $33,400 |
| 01/27/2004 | $33.2200 | 1,000 | $33,220 |
| 01/27/2004 | $33.0800 | 100 | $3,308 |
| 01/27/2004 | $33.3000 | 1,000 | $33,300 |
| 01/27/2004 | $33.5800 | 1,700 | $57,086 |
| 01/27/2004 | $33.0400 | 400 | $13,216 |
| 01/27/2004 | $33.5810 | 300 | $10,074 |
| 01/27/2004 | $33.1500 | 1,000 | $33,150 |
| 01/27/2004 | $33.1000 | 100 | $3,310 |
| 01/27/2004 | $33.0500 | 1,000 | $33,050 |
| 01/27/2004 | $34.1500 | 1,000 | $34,150 |
| 01/27/2004 | $33.0700 | 400 | $13,228 |
| 01/28/2004 | $33.0000 | 500 | $16,500 |
| 01/29/2004 | $32.0200 | 700 | $22,414 |
| 01/29/2004 | $32.0000 | 3,300 | $105,600 |
| 01/29/2004 | $32.0400 | 300 | $9,612 |
| 01/29/2004 | $32.0500 | 700 | $22,435 |
| 01/30/2004 | $32.0000 | 2,000 | $64,000 |
| 01/30/2004 | $32.2000 | 500 | $16,100 |
| 01/30/2004 | $32.5100 | 500 | $16,255 |
| 01/30/2004 | $32.2000 | 1,000 | $32,200 |
| 01/30/2004 | $32.1000 | 1,000 | $32,100 |
| 02/02/2004 | $32.1000 | 500 | $16,050 |
| 02/02/2004 | $32.2000 | 500 | $16,100 |
| 02/02/2004 | $32.0500 | 500 | $16,025 |
| 02/02/2004 | $32.0000 | 3,000 | $96,000 |
| 02/03/2004 | $32.1000 | 500 | $16,050 |
| 02/03/2004 | $32.0000 | 2,000 | $64,000 |
| 02/06/2004 | $32.0000 | 7,000 | $224,000 |
| 02/06/2004 | $32.0500 | 1,000 | $32,050 |
| 02/09/2004 | $34.0000 | 1,000 | $34,000 |
| 02/09/2004 | $33.0900 | 100 | $3,309 |
| 02/09/2004 | $33.1700 | 2,400 | $79,608 |
| 02/09/2004 | $33.5500 | 1,000 | $33,550 |
| 02/09/2004 | $33.1100 | 500 | $16,555 |
| 02/09/2004 | $33.6000 | 500 | $16,800 |

| | | | |
|---|---|---|---|
| | 02/09/2004 | $33.0000 | 4,000 | $132,000 |
| | 02/09/2004 | $33.1800 | 2,100 | $69,678 |
| | 02/09/2004 | $33.4000 | 1,000 | $33,400 |
| | 02/09/2004 | $33.2500 | 1,000 | $33,250 |
| | 02/09/2004 | $33.1000 | 100 | $3,310 |
| | 02/09/2004 | $33.0800 | 4,900 | $162,092 |
| | 02/09/2004 | $33.0200 | 900 | $29,718 |
| | 02/10/2004 | $33.2000 | 500 | $16,600 |
| | 02/10/2004 | $33.3700 | 500 | $16,685 |
| | 02/10/2004 | $33.0000 | 500 | $16,500 |
| | 02/10/2004 | $33.1500 | 1,000 | $33,150 |
| | 02/10/2004 | $33.4000 | 1,000 | $33,400 |
| | 02/10/2004 | $32.9200 | 1,000 | $32,920 |
| | 02/10/2004 | $33.0950 | 500 | $16,548 |
| | **TOTAL** | | **842,862** | **$28,328,785** |
| | | | | |
| KHOSROWSHAHI DARA | 05/29/2003 | $37.5600 | 4,600 | $172,776 |
| | 05/29/2003 | $37.0000 | 2,100 | $77,700 |
| | 05/29/2003 | $37.0200 | 5,000 | $185,100 |
| | 05/29/2003 | $37.6000 | 14,400 | $541,440 |
| | 05/29/2003 | $37.0800 | 10,000 | $370,800 |
| | 05/29/2003 | $37.1500 | 5,000 | $185,750 |
| | 05/29/2003 | $36.9600 | 2,600 | $96,096 |
| | 05/29/2003 | $37.5700 | 4,000 | $150,280 |
| | 05/29/2003 | $37.5800 | 800 | $30,064 |
| | 05/29/2003 | $37.5900 | 200 | $7,518 |
| | 05/29/2003 | $37.6600 | 1,000 | $37,660 |
| | 05/29/2003 | $36.9700 | 300 | $11,091 |
| | 11/20/2003 | $31.7400 | 200 | $6,348 |
| | 11/20/2003 | $31.7300 | 4,076 | $129,331 |
| | 11/20/2003 | $31.7100 | 724 | $22,958 |
| | 11/21/2003 | $31.4000 | 2,500 | $78,500 |
| | 11/21/2003 | $31.5300 | 2,500 | $78,825 |
| | 11/24/2003 | $32.0424 | 5,000 | $160,212 |
| | 11/25/2003 | $32.4000 | 2,500 | $81,000 |
| | 11/25/2003 | $32.7000 | 2,500 | $81,750 |
| | 11/25/2003 | $32.8800 | 2,500 | $82,200 |
| | 11/26/2003 | $32.6970 | 5,000 | $163,485 |
| | 11/28/2003 | $32.3300 | 2,500 | $80,825 |
| | 11/28/2003 | $32.6500 | 2,400 | $78,360 |
| | 11/28/2003 | $32.6600 | 100 | $3,266 |
| | 12/01/2003 | $32.5000 | 250 | $8,125 |
| | 12/01/2003 | $33.0700 | 3,050 | $100,864 |
| | 12/01/2003 | $33.0500 | 550 | $18,178 |
| | 12/01/2003 | $32.9900 | 1,350 | $44,537 |
| | 12/01/2003 | $33.0100 | 50 | $1,651 |
| | 12/01/2003 | $32.4500 | 2,250 | $73,013 |
| | 12/01/2003 | $32.3200 | 1,150 | $37,168 |
| | 12/02/2003 | $32.3000 | 1,750 | $56,525 |
| | 12/02/2003 | $32.2900 | 2,500 | $80,725 |
| | 12/02/2003 | $32.4400 | 750 | $24,330 |
| | 12/03/2003 | $32.0000 | 3,000 | $96,000 |
| | 12/03/2003 | $32.1500 | 950 | $30,543 |
| | 12/03/2003 | $32.1800 | 50 | $1,609 |
| | 12/03/2003 | $32.2200 | 1,000 | $32,220 |
| | 12/04/2003 | $30.7310 | 300 | $9,219 |
| | 12/04/2003 | $30.7220 | 214 | $6,575 |
| | 12/19/2003 | $32.8800 | 4,200 | $138,096 |
| | 12/19/2003 | $32.9000 | 800 | $26,320 |
| | 12/22/2003 | $32.9900 | 1,401 | $46,219 |

| | | | |
|---|---|---|---|
| 12/22/2003 | $32.9100 | 634 | $20,865 |
| 12/22/2003 | $32.9000 | 2,965 | $97,549 |
| 12/23/2003 | $33.3000 | 1,671 | $55,644 |
| 12/23/2003 | $33.7000 | 1,658 | $55,875 |
| 12/23/2003 | $33.5000 | 1,671 | $55,979 |
| 12/24/2003 | $33.4000 | 1,667 | $55,678 |
| 12/24/2003 | $33.2000 | 1,667 | $55,344 |
| 12/24/2003 | $33.1100 | 516 | $17,085 |
| **TOTAL** | | **120,514** | **$4,159,267** |

96.     While defendants were unloading 7.78 million shares of their IAC stock, they were also causing IAC to repurchase 49.5 million shares of its stock on the open market, including 41.3 million in 2003 and 8.2 million shares in Q2 2004.

97.     Defendants' statements made in connection with the announcement of these acquisitions and with the Company's financial reports and other statements made throughout the Class Period were materially false and misleading because they did not disclose that:

(a)     The Company's entire travel sector was in jeopardy and experiencing multiple negative trends that were clearly contrary to defendants' statements about the direction of the business, including that the Company had engaged in bad business practices as described by former IAC employees that adversely affected its relationships with its suppliers and customers while inflating its current results, including:

(i)     Certain of the Company's online customers were being double-billed for hotel rooms purchased on the Company's Web sites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were again being charged the room rates that the Company had already collected, leading to great customer dissatisfaction.

(ii)     Certain hotel chains were contesting the Company's slow payment for hotel room sales made on its Web sites and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether.

(iii)    Certain of the Company's Web site customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites.

(iv)    Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its Web sites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether.

(v)    There were large numbers of unhappy consumers who felt they had been overbilled in one way or another.  There were three ways to book rooms – on-line, by telephone and by fax.  The complaints frequently came in by fax.  These errors always were to the consumers' detriment.

(vi)    For telephone reservations, some 30% of any given month's sales figures would result in cancellations, usually occurring in the month after the reservation was booked.  In the third month of a quarter, this would result in quarterly sales figures being inflated, since the cancellation would not be recorded until the next quarter.  The loss rate for telephone sales for overbilling refunds (10%-15%) and cancellations (30%) totaled 40%-45%.

(vii)    These practices were causing hotel chains to be increasingly unhappy with IAC and causing IAC to lose market share to the competition, including Travelocity, which did not engage in such practices.

(viii)     The dynamics of Hotels.com's business was changing in 2003 due to animosity on the part of hotel operators resentful of having to pay Hotels.com for the benefit of using the Hotels.com on-line registration system.  The animosity was due in part to the contracts the chains had entered with Hotels.com and in 2003 many chains were establishing their own registration offerings, which employees at the Company believed would likely impact the Company.

(b)     To conceal deterioration in the hotel business, after the acquisitions of Expedia and Hotels.com, IAC began to provide only three data points on the business:  total revenues, OIBA (Operating Income Before Amortization, which excluded numerous expenses – later criticized as an "iffy" accounting practice by *Fortune* magazine) and operating profits, which reporting made it possible for IAC to distort this important segment's results.

(c)     IAC's cash position was not nearly as strong as represented but was overstated by the Company's practice of holding up payments to hotel chains that it otherwise owed, thereby eroding any remaining goodwill between the Company and its suppliers, as described by former employees as part of plaintiffs' counsel's investigation.

(d)     Former employees also indicate that refunds to customers for overbilling took as long as two months, and such refunds represented 10%-15% of telephone sales figures.  IAC's cash position was overstated by this practice as well.

(e)     IAC was seeing disappointing international bookings, particularly in the Spring of 2004, due to its cut-back in marketing spending, as described by analysts subsequent to the Class Period.

(f)     The Company had previously been selling a large number of hotel rooms and airline seats through more than 24,000 affiliate Web sites, such as those operated by the travel

industry in certain cities, but since October 2002, many of these Web sites were either privately threatening and/or actually pursuing litigation against the Company, alleging among other things copyright infringement and predatory advertising, claiming that Hotels.com was using special software to deprive these affiliate Web sites of the portion of its fee that it had promised to pay them and that as a result, certain of the affiliate Web sites had refuted their otherwise exclusive, multi-year contracts with the Company and certain of these affiliate Web sites were instead transacting their purchases of hotel rooms directly with the hotel chains, as noted in media reports and litigation files.

        (g)     As described by former employees, Hotels.com manipulated its results by overstating its accounts receivables. Specifically, Hotels.com would either accidentally or deliberately overbook customers for hotel rooms. For instance, if a customer first said they wanted to stay a week at a hotel, but then said they only wanted to stay three nights, Hotels.com would nonetheless charge the customer for the full week. Hotels.com would also pay the hotel for the full week's stay. Hotels.com booked revenue on the full week that the customer had been billed for, but once the discrepancy was detected they would have to refund the money back to the customer. At the same time, though, Hotels.com would claim that the hotel also owed Hotels.com a refund for the amount that Hotels.com had refunded back to the customer. The trick Hotels.com employed, though, is that they would have initially reported revenue on the full week's stay, but when they refunded the money back to the customer they would have generated income with an associated receivable for that amount. While Hotels.com was sometimes able to collect the money supposedly owed by hotels, the Company's internal controls and systems were so insufficient that potentially tens of millions of dollars of such purportedly owed refunds receivables were in danger of being uncollectible.

(h)     Hotels were vastly improving their own online capabilities, which in conjunction with hotels' increasing unwillingness to provide discounted rooms to IAC, meant that many consumers were using IAC travel Web sites to check for the lowest room rates and then going directly to the hotels' Web sites to book the rooms, as confirmed by analysis and media coverage after the Class Period.

(i)     One substantial business partner of Hotels.com, Metroguide, had commenced a lawsuit against Hotels.com and its founder Robert Diener, alleging violations of federal copyright law and unfair business practices in January 2003 in the Southern District of Florida.  Defendants did not disclose the pendency of this litigation or the rift with what Diener had described in October 2002 as one of Hotels.com's "larger affiliates, providing [Hotels.com] a great deal of traffic."

(j)     Hotels.com had extremely poor controls and systems which made accounting manipulations not only possible but also likely.  For example, as former employees described, payments of at least $1.5 million were made to various foreign hotels utilizing the personal American Express card of one of the officers.  This was reflective of how Hotels.com had grown much faster than its infrastructure.  Reconciling these payments was problematic.  Hotels.com had claimed they were owed something like $1.5 million worth of refunds from the hotels (which had also been reported as receivables on the balance sheet and had been reported on the Income Statements), but were never going to be able to collect it.  However, Hotels.com management knew they needed to write off this $1.5 million in receivables supposedly owed by the foreign hotels, but did not do so until after the Company's stock had fallen in August 2004.

(k)     Hotwire did not have long-term agreements with airlines, and when airlines began liquidating their investments in Hotwire it would have an adverse effect on IAC, as noted in statements by IAC and analysts at the end of the Class Period.

- 67 -

(l)     The Company was under-reporting its state and local sales tax expenses for some locations because defendants were paying state and local occupancy taxes based on the wholesale rate at which they rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers.  This issue was a much bigger problem than represented by IAC as it was a problem in each of the four biggest states in the U.S., as well as other states.  Litigation about this issue has only increased and become more serious since the Class Period ended.

(m)     IAC's minority interests reported on its balance sheet as of December 31, 2003 were understated.  Instead of the $110.8 million reported by the Company in February 2004, the minority interest as of December 31, 2003 was actually $211.7 million.  IAC subsequently restated its financial results to correct this misstatement.

(n)     IAC's purportedly strong Home Shopping Network results were in fact boosted by the Company's increasing use of its Flexpay program by which customers of certain products were not charged on their credit cards for several months.  The increasing use of this program was not disclosed until IAC filed its Form 10-K for 2003 in March 2004.

(o)     IAC's businesses were not growing, but the Company was able to report overall growth through numerous acquisitions, such that its future was not nearly as bright as represented by defendants, as noted by financial analysts at the end of the Class Period.

## CLASS ACTION ALLEGATIONS

98.     This is a class action on behalf of all persons who purchased or otherwise acquired IAC publicly traded securities between March 31, 2003 and August 3, 2004, excluding defendants (the "Class").  Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants.  Class members are so numerous that joinder of them is impracticable.

99.     Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act and the 1933 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the prices of IAC's publicly traded securities and the extent of and appropriate measure of damages.

100.     Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**LOSS CAUSATION/ECONOMIC LOSS**

101.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated IAC's stock price and operated as a fraud or deceit on persons who purchased or otherwise acquired IAC stock during the Class Period by misrepresenting the Company's financial results, business success and future business prospects.  Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting earnings.  During the Class Period, defendants improperly inflated IAC's reported results, minimized the significance of occupancy tax issues which were in the media during the Class Period and claimed that its Hotwire division had long-term agreements with airlines.  Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, IAC stock fell precipitously as the prior artificial inflation came out of IAC's stock price.  As a result of their purchases or acquisitons of IAC stock during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

102.     By improperly reporting IAC's financial results, the defendants presented a misleading picture of IAC's business and prospects.  Thus, instead of truthfully disclosing during the

Class Period that IAC's business was not as healthy as represented, defendants caused IAC to falsely report business and prospects. During the Class Period, defendants repeatedly emphasized IAC's strong growth in IAC's revenues and metrics.

103.     These claims caused and maintained the artificial inflation in IAC's stock price throughout the Class Period and until the truth was revealed to the market.

104.     Defendants' false and misleading statements had the intended effect and caused IAC stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $42.74 per share.

105.     On August 3, 2004, defendants were forced to publicly disclose that IAC's financial results would not be nearly as strong as prior representations, including that Hotwire was a significant part of the shortfall. The Company's problems with InterContinental, which contributed to the earnings shortfall also became public. These public revelations indicated that there had been prior falsification of the conditions in IAC's business and of IAC's prospects and that IAC had failed to achieve the operational efficiencies represented and thus the Company's prospects for business success and earnings growth for 2004 and beyond were severely diminished. As investors and the market became aware that IAC's business and actual business prospects, which had long been obfuscated by the scheme to inflate reported earnings and false statements regarding the Company's supposed operating efficiencies, were, in fact, poor, the prior artificial inflation came out of IAC's stock price, damaging investors.

106.     As a direct result of defendants' admissions and the public revelations regarding the truth about IAC's previously reported financial results and its actual business prospects going forward, IAC's stock price plummeted 16%, on unusually high volume, falling from $27.03 on August 3, 2004 to $22.80 per share on August 4, 2004, a one-day drop of $4.23 per share. This drop

removed the inflation from IAC's stock price, causing real economic loss to investors who had purchased or acquired the stock during the Class Period. Analysts following the Company were shocked by these adverse revelations, with one analyst reporting: "We are lowering our estimates for 2004 and 2005 to reflect the challenging situation in accessing hotel inventory at IAC, as well as weakness in the company's other operations (ticketing, electronic retailing and personals)." In sum, as the truth about defendants' fraud and IAC's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiffs and other members of the Class were damaged, suffering economic losses of up to $4.23 per share.

107.     The 16% decline in IAC's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of IAC's stock price declines negate any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which IAC's stock price fell 16% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate IAC's stock price and the subsequent significant decline in the value of IAC's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

### FIRST CLAIM FOR RELIEF

### Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against IAC and the Individual Defendants

108.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

109.    During the Class Period, IAC and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding IAC's business, operations, management and the intrinsic value of IAC common stock; (ii) enable IAC to complete the acquisitions of Hotels.com, Expedia, LendingTree and other acquisitions using inflated IAC shares as currency pursuant to false and misleading Registration Statements and Prospectuses; and (iii) enabled defendants to receive $258.9 million in insider trading proceeds.

110.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers/acquirers of the Company's publicly traded securities common stock in an effort to maintain artificially high market prices for IAC's securities in violation of §10(b) of the 1934 Act and Rule 10b-5. All these defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

111.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IAC as specified herein.

112.    These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IAC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the

statements made about IAC and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers/acquirers of IAC publicly traded securities during the Class Period.

113.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

114.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of concealing IAC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's

business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

115.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of IAC's publicly traded securities were artificially inflated during the Class Period.  In ignorance of the fact that the market prices of IAC's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired IAC publicly traded securities during the Class Period at artificially high prices and were damaged thereby.

116.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that IAC was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their IAC publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

117.    By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

118.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

### SECOND CLAIM FOR RELIEF

#### Violation of §20(a) of the 1934
#### Act Against IAC and the Individual Defendants

119.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

120.     The Individual Defendants acted as controlling persons of IAC within the meaning of §20(a) of the 1934 Act as alleged herein.  IAC controlled all of its employees and each of the Individual Defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

121.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

- 75 -

122.    As set forth above, IAC and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

**THIRD CLAIM FOR RELIEF**

**For Violation of §11 of the 1933 Act**
**Against IAC, Diller, Khosrowshahi, Barton, Kaufman**
**and the Director Defendants**

123.    Plaintiffs Susan Rapp, Toros Avikan, Sanford Berman and Pamela and Arthur Melanson (collectively, the "Section 11 Plaintiffs") repeat and reallege the allegations in ¶¶1-27, 30-64, 86-94, 97-100, as if fully set forth herein.  The Section 11 Plaintiffs, for purposes of this claim, disclaim any allegations of fraud.  This claim is brought on behalf of a Class of all those who acquired IAC common stock issued pursuant to IAC's merger Registration Statements and Prospectuses who were damaged thereby, seeking to pursue remedies under the 1933 Act against IAC, the issuer of the stock, and Diller, Khosrowshahi, Barton, Kaufman and the Director Defendants who were IAC's directors and/or signatories of the Registration Statements for the mergers, including the Expedia and LendingTree mergers.  IAC, as the issuer, and the defendants who signed the Registration Statements that contained untrue statements of material fact or omitted to state facts required to be stated therein or necessary to make the statements therein not misleading, are liable under §11(a)(1) and (2) of the 1933 Act.

124.    Each of the defendants named in this claim is liable under §11(a) because the Registration Statements, when they became effective, contained untrue statements of material fact or

- 76 -

omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

125.    IAC completed the Expedia and LendingTree acquisitions on August 8, 2003, pursuant to the Registration Statements filed and effective with the SEC, pursuant to which IAC issued 21 million shares of stock, then valued at $534 million for the LendingTree and for which IAC issued 100 million shares, then valued at $3.4 billion for Expedia.

126.    Defendants Diller, Khosrowshahi, Barton, Kaufman and the Director Defendants each signed the Registration Statements.   Because the Registration Statements contained untrue statements of material fact or omitted to state a material fact required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as a "person who signed the Registration Statement," under §11(a)(1) of the 1933 Act, 15 U.S.C. §77k(a)(1).

127.    Defendants Diller, Khosrowshahi, Barton, Kaufman and the Director Defendants were directors of IAC when the Registration Statements became effective.  Because the Registration Statements contained untrue statements of material fact or omitted to state material facts required to be stated therein or necessary to make the facts stated therein not misleading, each of these defendants is liable as a director under §11(a)(2) of the 1933 Act, 15 U.S.C. §77k(a)(2).

128.    The Section 11 Plaintiffs and other members of the Class acquired IAC common stock pursuant and traceable to the Registration Statements without knowledge of the untruths or omissions alleged herein, and sustained damages as a result.  The Section 11 Plaintiffs and the other members of the Class could not have reasonably discovered the nature of defendants' untruths and omissions.

129.     This action was brought within one year after the discovery of the untrue statements and omissions and less than three years after the stock offering.

## FOURTH CLAIM FOR RELIEF

### For Violation of §15 of the 1933 Act
### Against IAC, Diller, Khosrowshahi, Barton, Kaufman
### and the Director Defendants

130.     The Section 11 Plaintiffs repeat and reallege the allegations in ¶¶1-27, 30-64, 86-94, 97-100, 123-129, as if fully set forth herein.  The Section 11 Plaintiffs for purposes of this claim disclaim any allegations of fraud.

131.     These defendants, by reason of their positions with IAC and/or their stock ownership, were controlling persons of IAC and are liable under §15 of the 1933 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and on behalf of the Class, pray for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding plaintiffs and other members of the Class damages together with interest thereon;

C.     Awarding plaintiffs and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.     Awarding plaintiffs and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED:  May 20, 2005

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)


_____
SAMUEL H. RUDMAN

200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DAVID C. WALTON
401 B Street, Suite 1600
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)

SCHATZ & NOBEL, P.C.
ANDREW M. SCHATZ
JEFFREY S. NOBEL
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT  06103
Telephone:  860/493-6292
860/493-6290 (fax)

Co-Lead Counsel for Plaintiffs