UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                        )        Master File No. 04 CV 7447
In re IAC/INTERACTIVECORP.              )
SECURITIES LITIGATION                   )
_____)
                                        )
This Document Relates To:               )
                                        )
    BUTLER v. DILLER, et al.            )
    Civil Action No. 04 CV 9067    )
                                        )
    -and-                               )
                                        )
    GARBER v. DILLER, et al.            )
    Civil Action No. 05 CV 1145    )
_____)

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by their attorneys, submit this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit of nominal defendant IAC/InterActiveCorp, (also known during the relevant period as "InterActive Corporation" and "USA InterActive Corporation") ("IAC" or the "Company"), against certain of its officers and directors seeking to remedy defendants' breaches of fiduciary duties and other violations of law that occurred between March 2003 and the present (the "Relevant Period") and that have caused substantial losses to IAC and other damages, such as to its reputation and goodwill. This action arises out of defendants causing IAC to issue misleading statements during the Relevant period extolling the Company's growth strategy and rising earnings despite their knowledge of a number of undisclosed negative trends effecting the Company's business operations. Aware of such business trends, certain company executives and board members identified herein were given virtually unimpeded power to trade in the Company's common stock and sell, at inflated prices, an astonishing total of over 7.73 million shares of IAC stock, generating gross proceeds of $257.2 million.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein by plaintiff Lisa Butler pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff Lisa Butler and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.      This Court has jurisdiction over each defendant named herein by plaintiff Lisa Butler because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with New York so as to render the exercise of jurisdiction by this court permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to IAC occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5.      This Court has jurisdiction over all claims asserted herein by plaintiff Stuart Garber pursuant to the Notice of Removal filed by defendants on February 2, 2005 under 28 U.S.C. §1441, removing plaintiff Stuart Garber's action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York.  The Notice of Removal provides: ". . . since the claims asserted in the State Court Action arise under the Exchange Act, this Court not only has original federal question jurisdiction over the State Court Action (28 U.S.C. § 1331), but exclusive jurisdiction over the State Court Action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. . . ."

## SUMMARY OF THE ACTION

6.    Rather than selling its own products or services during the Relevant Period, IAC largely acted as an intermediary between suppliers and consumers, aggregating large blocks of consumer goods and services (primarily travel-related products such as hotel rooms and airline tickets) from suppliers and selling them to consumers over the Internet.  IAC consisted of the following operating segments: (1) IAC Travel (Expedia, Hotels.com, Hotwire, Interval International, and TV Travel Shop); (2) Electronic Retailing (HSN, a home shopping service); (3) Ticketing (Ticketmaster and ReserveAmerica); (4)  Personals (Match.com); (5) Financial Services and Real Estate (LendingTree.com); (6) Teleservices (Precision Response Corporation); (7)  Local and Media Services (Citysearch, Evite, Entertainment Publications, Inc. and TripAdvisor, Inc.); and (8) (InterActive Development (ZeroDegrees).  IAC's Travel segment, however,  provides the lion's share of its income, such that during the first six months of 2004, approximately 70% of the Company's net income was derived from its Travel segment.  In FY:03, IAC sold over $10 billion in travel services, making IAC the fifth largest travel company in the world.

7.    The Travel segment's business model was built on the ability of the Company's majority-owned subsidiaries, Expedia, Inc. and Hotels.com, to contract with the major hotel chains for non-exclusive rights to sell hotel room bookings for the major hotel chains in exchange for a fee.  Hotel.com's customers would pay Hotels.com for a hotel room on its Web site, and then Hotels.com would pay the pre-negotiated price to the hotel chain for the room, withholding its fee in the form of a commission for handling the booking.  Conversely, Expedia would buy rooms at a wholesale price and mark them up for sale at retail prices, retaining the difference as its fee.

8.    Online travel companies such as Hotels.com and Expedia.com became popular because online shoppers could compare prices at various hotels on one website and could conduct secure Internet credit card transactions at those websites.  Hotels.com grabbed a large share of the discount online travel booking business by advertising that it would use its volume buying power to get volume discounts that in turn would be passed on to its online customers.

9.    Made up of many different segments, IAC's business centered on providing diverse web-based consumer services.  Thus, the Company was engaged in a pronounced growth strategy

which entailed acquiring other businesses through use of its common stock. Accordingly, during the Relevant Period it was imperative for IAC to maintain a high price for its common stock in order to carry out its business objectives. IAC grew through its acquisitions. The Company purchased a controlling interest in Ticketmaster in July 1997. On May 10, 1999, the Company acquired substantially all of the assets of the two entities which operated Hotels.com's websites from their founders. In February 2000, IAC sold 6.2 million shares of its then wholly-owned subsidiary, Hotels.com, in an initial public offering, making it the majority shareholder. On February 4, 2002, the Company acquired a controlling interest in Expedia.

10.    On June 3, 2002, the defendants caused the Company to announce the repurchase of minority interests in three of the Company's publicly traded subsidiaries, Expedia, Hotels.com and Ticketmaster, through the issuance of IAC common shares. However, Expedia's CEO and Chairman, Richard N. Barton, and Hotels.com's founders, David Litman ("Litman") and Robert Deiner ("Deiner"), opposed the buyout and sought a bigger premium from IAC for their interests. The market reacted negatively, complaining it could not value the combined entity, and IAC's stock price declined. On October 10, 2002, Barry Diller ("Diller") reported that IAC had completed the stock-for-stock acquisition of the minority interest in Ticketmaster, but that it was stopping its attempts to repurchase the minority interests in Hotels.com and Expedia "for business reasons." At the October 10, 2002 press conference announcing the completion of the Ticketmaster acquisition, Diller stated emphatically that IAC would not be reacquiring the minority interests in Expedia and Hotels.com:

> Q8. (Safra Rafge (phonetic), Piper Jaffrey) The decision not to pursue acquisition of Expedia and Hotels.com--How is this position new from what you had before, as you are saying there is an eventuality they will come inside? Travel is an extremely hot growth space and a core focus, so why not pay the premium and bring them in as well?

> A. (Barry Diller) We really have stopped the process. There were no grounds for making a transaction with either of them, and there are no current grounds for doing so. There is a range of other things that could come up, but we've stopped the process. It was enervating and confusing the markets at a time. We were sick of the drag of this as an unfinished question. What else we've learned is that Hotels.com and the hotel portion of Expedia directly compete with one another. But this competition is extremely healthy and that helped tell us to leave this alone right now. We became convinced we could knit together what needs to be knitted together. This process was stopping us from doing this. Things will now be clearer to us, to the marketplace and

those involved in the operations of these companies. I'd like it more if we had one currency and we're completely consolidated. But it is not going to happen right now. We're properly energized now for going forward.

11.     However, Diller kept his sights aimed on building IAC into the single, integrated Internet travel giant it now is.  Beginning in early 2003, as discussions between Diller's IAC and Barton's Expedia and Diener's and Litman's Hotels.com advanced, defendants began to artificially inflate the price of the Company's common stock in order to decrease the amount of stock IAC would ultimately have to issue to acquire all of the outstanding shares of Expedia and Hotels.com that it did not already own.  This in turn would permit IAC to use inflated IAC stock as acquisition currency to repurchase all of the publicly traded shares of Expedia and Hotels.com under terms that would not further dilute defendants' own interests in IAC.  Throughout the Relevant Period, defendants also caused IAC to spend over $1.5 billion to repurchase over 47 million shares of its own common stock on the open market to further prop-up the Company's stock price.

12.     At the start of the Relevant Period on March 19, 2003, IAC owned approximately 54% of the outstanding shares of Expedia stock but controlled approximately 94.9% of the combined voting power of Expedia.  On March 19, 2003, the Company announced that it would acquire the rest of the shares of Expedia that it did not already own by issuing approximately 92.5 million basic shares of IAC common stock (124.9 million shares on a fully diluted, treasury-method basis), then valued at just over $2 billion, and exchanging each of the minority-held shares of Expedia for approximately 1.94 shares of IAC stock.  The market responded positively to defendants' statements about the deal synergies and the Company's plans to be the online travel leader, and by the time the acquisition was consummated on August 11, 2003, the Company's stock price had increased 32% and the stock that was issued to Expedia's shareholders had a market value of almost $3 billion.  Barton, Expedia's founder and CEO, had announced his resignation on February 5, 2003 and subsequently sold 1,256,350 shares of IAC common stock, over 60% of which had been received in connection with his termination and the acquisition of Expedia by IAC during the Relevant Period, for over $40 million in proceeds.

13.     IAC also owned approximately 68% of the outstanding stock of Hotels.com but controlled 97% of its voting rights.  On April 10, 2003, the Company announced it would acquire the

32% minority interest in Hotels.com it did not already own, issuing approximately 43 million basic shares of IAC common stock (45.2 million shares on a fully diluted, treasury-method basis), then valued at approximately $1.163 billion, and exchanging each minority share of Hotels.com stock for 2.4 shares of IAC stock.  As a result of defendants' positive statements concerning the deal synergies and improvements to the Company's business model, the Company's stock price had increased by 30% when the deal was finally consummated on June 23, 2003 and the stock the Company issued had a market value of approximately $1.640 billion.  Hotels.com founders Diener and Litman retained their control of Hotels.com, which was to be run as a separate division within IAC.

14.     On May 5, 2003, the defendants caused the Company to announce that it would acquire all of the outstanding shares of LendingTree Inc., causing the Company to issue approximately 18.3 million basic shares of IAC stock (21 million total shares on a fully diluted, treasury-method basis) and exchanging each share of LendingTree stock for approximately 0.62 shares of IAC stock, in a deal then valued at approximately $534 million based on the trading price of IAC stock on May 5th.  That transaction was completed on August 11, 2003, and with the run-up in the Company's stock price in the interim, the Company ultimately issued stock with an approximate market value of $657 million to LendingTree's shareholders.

15.     Defendants' statements made in connection with the announcement of these acquisitions and with the Company's financial reports and other statements made throughout the Relevant Period were materially false and misleading because they did not disclose that the Company's entire travel sector was in jeopardy and experiencing multiple negative trends that were clearly contrary to defendants' statements about the direction of the business, to wit: (a) the Company's Expedia and Hotels businesses were misrepresenting the non-availability of hotel reservations to potential customers when such reservations would result in lowered profits for the Company; (b) the Company was charging undisclosed service fees to consumers; (c) certain hotel chains and airlines had retaliated against the Company's policies by intentionally decreasing the number of rooms available to Expedia and Hotels customers; and (d) the Company's hotel and airline providers were starting their own direct booking sites which would by-pass the Company's

websites, thus seriously adversely effecting the Company's market share of Web-based travel services.

16.     On August 4, 2004, the defendants caused the Company to issue its second quarter 2004 earnings release disclosing that its Q2:04 net income fell 24% from the same quarter in 2003 and that it was cutting its forecast for full-year operating profits, admitting that it was being provided less airline seats and hotel rooms to sell.  Defendants blamed the decrease in revenue on a change in accounting whereby the Company would start recognizing online hotel room sales revenues only on the fees it earned (whether through commissions or mark-ups), rather than recognizing the entire price customers paid IAC for the rooms.  The Company's net income dropped 24% to $73.2 million from $96.2 million per share in Q2:03, based in large part on a 35% increase in advertising expenses. The Company lowered its operating income expectations for 2004 to $430 million from the "$415 to $615 million" range it had estimated in May 2004, while the acquisitions of the minority interests in Expedia, Hotels.com and LendingTree were still pending.  Defendants also disclosed that for the first quarter in its history as a publicly traded company, IAC's travel bookings had actually decreased in Q2:04.

17.     On this news the Company's stock plummeted on extremely high volume of almost 90 million shares, more than 18 times the average daily trading volume for this stock.  The Company's stock price precipitously dropped from its Relevant Period high of $42.74 per share on July 7, 2003 to close at $22.80 per share on August 4, 2004, erasing over $10 billion in market capitalization.  Deusche Bank and other analysts cut the Company's stock ratings.

18.     In an August 5, 2004 email sent to IAC employees, Diller conceded he had overstated the Company's then-existing business operations and status in earlier statements and gave too-bullish guidance at an investor and analyst conference in November 2003, which he admitted misled investors:

From: Barry Diller

Sent: Thursday, August 05, 2004 7:34 PM

To: All IAC

Subject: IAC

I think it's appropriate to review the last days....

We released our earnings with an attendant conference call with analysts and our stock is down severely as a result...that you all surely know. We said on the call that it was a good quarter, and it was. What wasn't good is that we, your management, raised expectations too high at our Investor Day last November and are now paying the price. Added to that, and I do believe inappropriately, I was far too defensive in replying to analysts' questions, showing my exasperation from pointed queries about the fundamentals of our businesses, particularly Travel. I could say the factors for my lame performance were that the call went on too long, that I felt it necessary with so much querulous pounding to strongly assert the health and prospects I so clearly believe in, and that I felt an overreaction brewing that required the most vigorous defense. All of these are true but the higher truth is we did disappoint the estimates for growth set by our own hands and by not lowering them earlier in the year as the strain became clear we mightily exacerbated the problem. That, and the extremely jittery markets of the last months did the rest, with the result that our shareholders and analysts were caught in the breech...so the responsibility for this, allowing the bar to be set unreasonably high, and then not having the proper patient focus on our conference call, is fully mine.

19.     On August 16, 2004, Sabre Holdings, the Southlake, Texas-based owner of Travelocity.com, a major competitor of Expedia.com and Hotels.com, posted a ten-fold increase in its own Q2:04 net income compared to its Q2:03 quarter, causing its stock price to increase. Compared to IAC's common stock price, which declined by 32% between January 1, 2004 and August 16, 2004 alone, Sabre's stock had increased 9.8 % during that same period.

20.     Then, on August 16, 2004, InterContinental Hotels Group Plc ("InterContinental"), the world's largest hotel operator by rooms, announced it ended its agreement to promote its hotels through Expedia.com and Hotels.com because the online travel sites owned by IAC did not meet its standards.  InterContinental, whose chains include Holiday Inn and Crown Plaza among others, stated that Travelocity would be the only authorized online promoter of its hotel rooms because Travelocity's sales practices met its standards.  InterContinental disclosed that the conflict between it and IAC, Expedia.com and Hotels.com had been waging since at least April 2004 when InterContinental stated it would no longer work with websites that do not show customers the commissions they charge and that fax bookings to hotels, rather than reporting them through an automated system.  Concerning its decision, an InterContinental representative reportedly stated "[w]e are taking a stand in the Wild West of the Internet world.."  InterContinental also objected to Expedia.com's and Hotels.com's Web sites indicating InterContinental's rooms were sold out merely because the Web sites had exhausted their allocation of discount rooms.

## THE PARTIES

21.    Plaintiff Lisa Butler is, and was at times relevant hereto, an owner and holder of IAC common stock.  Plaintiff Butler is a citizen of Pennsylvania.

22.    Plaintiff Stuart Garber is, and was at times relevant hereto, an owner and holder of IAC common stock.

23.    Nominal defendant IAC is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 152 West 57th Street, New York, New York.  IAC acts as an intermediary between suppliers and consumers, aggregating large blocks of consumer goods and services from suppliers and selling them to consumers over the internet.

24.    Defendant Diller is, and at all times relevant hereto was, Chairman, Chief Executive Officer ("CEO") and a director of IAC.  Because of Diller's positions, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' ("Board") meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Diller participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  For FY:03, IAC paid defendant Diller $5,219,299 in salary, bonus and other compensation.  For FY:04, the Company paid Diller $3,585,320 in salary, bonus and other compensation.  During the Relevant Period, Diller sold 5,275,000 shares of IAC stock for proceeds of approximately $175.9 million.  Defendant Diller is a citizen of Connecticut.

25.    Defendant Victor A. Kaufman ("Kaufman") is, and at all times relevant hereto was, Vice Chairman and a director of IAC.  Because of Kaufman's positions, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof via reports and other information provided to him in connection therewith.

During the Relevant Period, Kaufman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, IAC paid defendant Kaufman $3,656,000 in salary, bonus and other compensation, and granted him restricted stock awards worth approximately $2,777,913.   For FY:04, IAC paid defendant Kaufman salary, bonus and other compensation in the amount of $2,197,110 and granted him restricted stock awards worth approximately 1,985,760.  During the Relevant Period, Kaufman sold 842,862 shares of IAC stock for proceeds of approximately $28.3 million.  Defendant Kaufman is a citizen of New York.

26.     Defendant Dara Khosrowshahi ("Khosrowshahi") is, and at all times relevant hereto was, Executive President and Chief Financial Officer ("CFO") of IAC.  Because of Khosrowshahi's positions, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Khosrowshahi participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:03, IAC paid defendant Khosrowshahi $2,681,000, in salary, bonus and other compensation, and granted him restricted stock awards worth approximately $2,449,621.  For FY:04, IAC paid defendant salary, bonus and other compensation in the amount of $1,756,150 and granted him restricted stock awards worth approximately $1,985,760.   During the Relevant Period, Khosrowshahi sold 120,514 shares of IAC stock for proceeds of over $4.1 million.  Defendant Khosrowshahi is a citizen of New York.

27.     Defendant Julius Genachowski ("Genachowski") is, and at all times relevant hereto was, Executive Vice President and Chief of Business Operations of IAC.  Because of Genachowski's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection

therewith.  During the Relevant Period, Genachowski participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:03, IAC paid defendant Genachowski $2,014,025 in salary, bonus and other compensation, and granted him restricted stock options worth approximately $1,767,749.  For FY:04, IAC paid defendant salary, bonus and other compensation in the amount of $1,406,150.  During the Relevant Period, Genachowski sold 237,499 shares of IAC stock for proceeds of over $8.2 million.  Defendant Genachowski is a citizen of the District of Columbia.

28.     Defendant Richard N. Barton ("Barton") is, and at all times relevant hereto was, a director of IAC.  Because of Barton's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Barton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Barton sold 1,256,350 shares of IAC stock for proceeds of over $40.6 million.  Defendant Barton is a citizen of Washington.

29.     Defendant Edgar Bronfman ("Bronfman") is, and at all times relevant hereto was, a director of IAC.  Because of Bronfman's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bronfman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Bronfman is a citizen of New York.

30.     Defendant Donald R. Keough ("Keough") is, and at all times relevant hereto was, a director of IAC.  Because of Keough's position, he knew the adverse non public information about

the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Keough participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Keough is a citizen of Georgia.

31.     Defendant Marie-Josee Kravis ("Kravis") is, and at all times relevant hereto was, a director of IAC.  Because of Kravis's position, she knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Kravis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Kravis is a citizen of New York.

32.     Defendant H. Norman Schwarzkopf ("Schwarzkopf") is, and at all times relevant hereto was, a director of IAC.  Because of Schwarzkopf's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Schwarzkopf participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Schwarzkopf is a citizen of Florida.

33.     Defendant Alan Spoon ("Spoon") is, and at all times relevant hereto was, a director of IAC.  Because of  Spoon's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other

information provided to him in connection therewith.  During the Relevant Period, Spoon participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Spoon is a citizen of Massachusetts.

34.      Defendant Diane Von Furstenberg ("Furstenburg") is, and at all times relevant hereto was, a director of IAC.  Because of Furstenberg's position, she knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Furstenberg participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Furstenburg is a citizen of Connecticut.

35.      Defendant Steven Rattner ("Rattner") is a director of IAC and has been since April 2004.  Because of Rattner's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Rattner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Ratner is a citizen of New York.

36.      Defendant Anne M. Busquet ("Busquet") was a director of IAC at all times relevant hereto until May 2003.  Because of Busquet's position, she knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Busquet

participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Busquet is a citizen of New York.

37.   Defendant Robert R. Bennett ("Bennett") was a director of IAC at all times relevant hereto until September 2004.  Because of Bennett's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bennett participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Bennett is a citizen of Colorado.

38.   Defendant John C. Malone ("Malone") was a director of IAC at all times relevant hereto until September 2004.  Because of Malone's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Malone participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Malone is a citizen of Colorado.

39.   Defendant Jean-Renee Fourtou ("Fourtou") was a director of IAC at all times relevant hereto until June 2003.  Because of Fourtou's position, he knew the adverse non public information about the business of IAC, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Fourtou participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Fourtou is a citizen New York.

40.    The defendants identified in ¶¶23-24, 27-38 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶23, 25-26 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶23-27 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

41.    By reason of their positions as officers, directors and/or fiduciaries of IAC and because of their ability to control the business and corporate affairs of IAC, the Individual Defendants owed IAC and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage IAC in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of IAC and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

42.    Each director and officer of the Company owes to IAC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of IAC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with IAC, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of IAC.

44. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of IAC, and was at all times acting within the course and scope of such agency.

45. To discharge their duties, the officers and directors of IAC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of IAC were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) remain informed as to how IAC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

46. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of IAC, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of IAC's Board during the Relevant Period.

47.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, IAC has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

          (a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

          (b)     Costs incurred in investigating and defending IAC and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

48.     Moreover, these actions have irreparably damaged IAC's corporate image and goodwill. For at least the foreseeable future, IAC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that IAC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

50.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial prospects, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at IAC and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of IAC, regarding the Individual Defendants' management of IAC's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

51.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least March 2003 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that IAC was misrepresenting its financial prospects.  In addition, defendants also made other specific, false statements about IAC's financial performance and future business prospects, as alleged herein.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of IAC common stock so they could: (i) dispose of over $34.9 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; (iii) use the artificially inflated Company stock to

acquire companies in stock for stock transactions; and (iv) register 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering.

53.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial prospects.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her  overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

55.     Throughout the Relevant Period, while IAC's stock price was driven up on the Individual Defendants' positive statements, reaching a high of over $42 per share on July 7, 2003, certain Company insiders, including each of the Individual Defendants, illegally profited on their own personal sales of the Company's common stock, selling over 7.78 million shares of their own IAC stock at inflated prices for approximately $258.9 million in proceeds and registering 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering.  The Company's stock declined to below $22 per share on news of the Company's dismal Q2:04 performance, analyst downgrades, and news of InterContinental's decision, erasing billions of dollars in market capitalization.

## IMPROPER STATEMENTS

56.     On March 19, 2003, the Individual Defendants caused the Company to issue a press release along with Expedia entitled "USA InterActive and Expedia Announce Merger Agreement; USA to Acquire the Expedia Shares It Does Not Already Own in a $3.3 Billion Transaction; USA

Announces Board Authorization of Stock Repurchase Plan."  The press release stated in relevant

part:

> USA InterActive and Expedia, Inc. announced today that they have entered into an agreement by which USA, already the majority owner of Expedia, would acquire the Expedia shares it does not currently own in a stock for stock transaction that is generally tax free to Expedia shareholders.  The transaction is valued at $3.3 billion, based on the closing price of USA common stock on March 18, 2003.  The transaction allows USA to further simplify its corporate structure.  The Expedia Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Expedia Board.

> Under the agreement, Expedia shareholders would receive 1.93875 shares of USA common stock for each share of Expedia stock that they own, which represents approximately a 30% premium, based on the closing price of USA stock and Expedia stock on March 18, 2003.  In the transaction, USA would issue to Expedia public shareholders approximately 92.5 million basic shares and 124.9 million shares on a fully diluted, treasury method basis.  In connection with the merger, Expedia warrants and options will be converted into warrants and options to acquire USA common stock.  The transaction is expected to be slightly dilutive to USA's adjusted earnings per share ("EPS") for 2003, however, due to expected over performance by Expedia and USA's other businesses, USA believes that it will meet its current 2003 budgeted adjusted EPS of $0.75 per share.  In addition, USA expects Q1 2003 EBITA to very significantly exceed last year's Q1 EBITA and to beat its Q1 2003 EBITA budgeted amount, and expects to meet or exceed its Q1 2003 adjusted EPS budget.  Please note that USA's projections are based on the expectation of a short conflict in Iraq without any other significant geopolitical disruptions during the year.

> USA also announced that its Board of Directors has authorized the repurchase of up to 30 million shares of USA common stock.  USA may purchase shares from time to time on the open market or through private transactions, depending on market conditions, share price and other factors.

> Barry Diller, Chairman and CEO of USA InterActive, said, "The timing in relation to world events is an accident as often happens with transactions, they take the time they take to reach conclusion however, we were of course mindful of events beyond our own and our decision to acquire the balance of Expedia under these circumstances does dramatically underscore our great belief in the robust growth and long term value of online travel.  Travel may be affected by this or that event, for a day or a month or whatever, but if there is life then there is travel   we bet on the latter."

> "We all have so much respect for Rich Barton, Erik Blachford and the superb group they have assembled that has executed so flawlessly building Expedia into a leadership position in online travel   we hope by this consolidation of ownership at USA that this great Expedia group will play an ever expanding role across all our 14 Divisions."

> "The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger creates significant value for Expedia's minority shareholders," said Jay Hoag, Chairman of the Special Committee of Expedia's Board of Directors.  "Expedia shareholders have an

opportunity to participate in the significant upside potential of USA, which is further enhanced by its full ownership of Expedia."

"This transaction gives us the opportunity to accelerate our work of building a great travel company," said Erik Blachford, incoming President and CEO of Expedia. "We are looking forward to working with USA and its other entities in a more integrated fashion, and believe there is substantial value to be created in the process."

USA currently owns approximately 54% of the outstanding Expedia stock and controls approximately 94.9% of the combined voting power of the outstanding Expedia shares. USA has agreed to vote all of its Expedia shares in favor of the merger at the Expedia stockholders meeting relating to the merger. USA shareholders holding a majority of the voting power of USA have acted by written consent to approve the transaction. An information statement will be mailed to USA shareholders and a proxy statement/prospectus will be mailed to Expedia shareholders. The transaction, which is subject to customary conditions, is expected to be completed in the summer of 2003. The transaction is not subject to any material adverse effect conditions (including the possible effects of war).

57.    On March 31, 2003, IAC filed its Form 10-K for the year ended December 31, 2002.

In connection with the Company's businesses, the 10-K represented the following with respect to

Hotels.com:

Hotels.com is a leading provider of discount hotel and other lodging accommodations. Hotels.com contracts with lodging properties in advance for volume purchases and guaranteed availability of hotel rooms and vacation rentals at wholesale prices and sells these rooms to consumers, often at significant discounts to published rates. In addition, these supply relationships often allow Hotes.com to offer its customers accommodation alternatives for otherwise unavailable dates. At December 31, 2002, Hotels.com had room supply agreements with over 7,700 lodging properties in 325 major markets in North America, Europe, Asia, the Caribbean, South America, Africa and Australia. Hotels.com launched its new brand and website, hotels.com, in March 2002. In addition, Hotels.com offers its customers the ability to book hotel rooms at over 40,000 hotels (in addition to the hotels with which it has wholesale supply agreements) in over 5,000 cities, air travel on 300 airlines, and car rentals through over 60 car rental companies.

Hotels.com markets its lodging accommodations primarily over the Internet through its own websites, including hotels.com, hoteldiscount.com, and travelnow.com, through its telephone call centers, and through marketing and distribution agreements with third parties. Hotels.com has negotiated marketing and distribution agreements with numerous leading travel-related companies, including Travelocity, Continental Airlines, Delta Air Lines, Northwest Airlines and America West Airlines.

Hotels.com has room supply relationships with a wide range of independent hotel operators and lodging properties, as well as hotels associated with national chains, including Hilton, Sheraton, Wyndham, Hyatt, Radisson, Best Western, Loews, Doubletree, La Quinta, Courtyard by Marriott and Hampton Inn. Hotels.com believes that these suppliers view it as an efficient distribution channel to help maximize their overall revenues and occupancy levels. ***Although Hotels.com contracts in advance for volume room commitments, its supply contracts often allow it to return unsold rooms without penalty within a specified period of time. In addition, because Hotels.com contracts to purchase rooms in advance, it is able***

*to manage billing procedures for the rooms it sells and thereby maintain direct relationships with its customers.  Hotels.com has developed proprietary revenue management and reservation systems software that is integrated with its websites and call center operations.  These systems and software enable Hotels.com to accurately monitor its room inventory and provide prompt, efficient customer service.  Hotels.com believes that its supply contracts and revenue management capabilities differentiate it from retail travel agencies and other commission-based resellers of accommodations.*

58.     However, Hotels.com was not nearly as sophisticated and successful as it had been represented.  Namely, Hotels.com's relationships with hotel chains were weakening due to Hotels.com's improper practices and its supply agreements with hotel chains were dwindling  with the poor travel economy.  Furthermore, as hotel chains successfully booked reservations and filled rooms themselves, Hotels.com would suffer increasing supply and pricing problems.  Ultimately, Hotels.com would move from providing discount hotel room rates to offering hotel reviews. Moreover, Hotels.com's results were misstated due to the Company's manipulations of revenues and cash flows as described herein.  For example:

(a)     Company's online customers were being double-billed for hotel rooms purchased on the Company's websites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were again being charged the room rates that the Company had already collected, leading to great customer dissatisfaction;

(b)     Hotel chains were contesting the Company's slow payment for hotel room sales made on its websites and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether;

(c)     It has been alleged that IAC's cash position was not nearly as strong as represented but was overstated by the Company's practice of holding up payments to hotel chains that it otherwise owed, thereby eroding any remaining goodwill between the Company and its suppliers;

(d)     The Company's website customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was charging a premium for rooms, leading to further customer dissatisfaction and causing

customers to choose alternative online reservation providers or to buy directly from the hotel websites;

(e)     Certain IAC hotel customers were displeased with the Company's practice of indicating on its websites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out.  This practice served to divert potential sales to other hotels, allegedly causing certain hotel customers to threaten to stop doing business with the Company altogether;

(f)     It has been further alleged that approximately 30% of any month's sales figures from telephone reservations would result in cancellations during the month following the date the reservation was booked, resulting in inflated quarterly sales figures.  The loss rate for telephone sales for overbilling refunds (10%-15%) and cancellations (30%) reportedly totaled 40%-45%;

(g)     In sum, these practices caused hotel chains to become increasingly dissatisfied with IAC, which in turn, caused IAC to lose market share to the competition, including Travelocity, which did not engage in such practices;

(h)     Thus, the dynamics of Hotels.com's business was actually changing in 2003. In fact, having come to resent paying Hotels.com for the benefit of using its on-line registration system, many hotel chains were reportedly establishing their own direct booking sites which would by-pass the Company's websites;

59.     On April 10, 2003, the Individual Defendants caused the Company to issue a press release along with Hotels.com entitled "USA InterActive and Hotels.Com Announce Merger Agreement; USA To Acquire the Hotels.Com Shares It Does Not Already Own in a $1.1 Billion Transaction; Transaction Completes USA Corporate Restructuring."  The press release stated in relevant part:

> USA InterActive and Hotels.com announced today that they have entered into an agreement by which USA, already the majority owner of Hotels.com, would acquire the Hotels.com shares it does not currently own in a tax free, stock for stock transaction.  The transaction is valued at approximately $1.1 billion based on the closing price of USA common stock on April 9, 2003.
>
> The transaction would represent the final step in USA's efforts, begun in June 2002, to simplify its corporate structure by buying in its public subsidiaries.  As a result of these transactions, all of USA's interests will be indivisible inside USA's public security.

The transaction would not change the current operating structure of Hotels.com, and USA's intention is for Hotels.com and Expedia to continue to be operated separately. Travel is, however, its own sector and USA would continue to review strategy and over time may decide to make changes.

The Hotels.com transaction is expected to be slightly accretive to USA's budgeted adjusted earnings per share for 2003.

The Hotels.com Board of Directors approved the agreement following the unanimous recommendation and approval of an independent Special Committee of the Hotels.com Board.  Under the agreement, Hotels.com shareholders will receive 2.4 shares of USA common stock for each share of Hotels.com stock that they own. This represents approximately a 20% premium based on the closing price of USA stock and Hotels.com stock on March 18th, 2003, the day prior to the announcement of USA's merger with Expedia.  In the transaction, USA would issue to Hotels.com public shareholders approximately 43.0 million basic shares and 45.2 million shares on a fully diluted, treasury method basis.

Barry Diller, Chairman and CEO of USA InterActive, said, "David Litman and Bob Diener, in classic entrepreneurial fashion, have created a great company.  We were lucky enough to know that at an early stage, so we've watched their determination and fierce dedication in building up the enterpriseYand we believe all that will continue because the incentives are all in place and our interests completely aligned for the future."

"The Special Committee carefully reviewed the transaction in consultation with our financial and legal advisors and we believe that the merger is in the best interests of Hotels.com's minority shareholders," said Elan Blutinger, Chairman of the Special Committee of Hotels.com's Board of Directors.  "Hotels.com's shareholders have an opportunity to participate in the continued growth potential of USA, which is further enhanced by its full ownership of Hotels.com."

David Litman, Chairman and CEO of Hotels.com, commented, "Bob Diener and I are thrilled at the opportunity for Hotels.com to participate on a broader scale in the future success of USA InterActive.  We are convinced that this merger will enhance the growth prospects for Hotels.com, and we are more determined than ever to achieve our company goals through this exciting combination with USA.  Bob and I would like to thank the more than 1,200 employees of Hotels.com that have helped to make this possible and we look forward to an exciting future."

In connection with the merger, Hotels.com options would be converted into options to acquire USA common stock, and Hotels.com warrants would be converted into warrants to acquire, or exercisable for, USA common stock.  David Litman, Chairman and CEO, and Bob Diener, President, will continue in their current positions, and the new USA shares they receive in the transaction in respect of their Hotels.com shares that are currently subject to transfer restrictions will be subject to those same transfer restrictions.  The transfer restrictions remain in effect until March 2004.

USA currently owns approximately 68% of the outstanding Hotels.com stock and controls approximately 97% of the combined voting power of the outstanding Hotels.com shares.  USA, as the holder of a majority of the voting power of Hotels.com has acted by written consent to approve the transaction.  An Information Statement will be mailed to Hotels.com shareholders in connection with the transaction.  No separate USA shareholder approval is required.  The transaction,

which is subject to customary conditions, is expected to be completed in the summer of 2003.  The transaction is not subject to any material adverse effect conditions (including the possible effects of war).

60.     On May 1, 2003, the Individual Defendants caused the Company to issue a press release entitled "USA InterActive Releases Chairman and CEO Barry Diller's Letter to Shareholders Accompanying USA's 2002 Annual Report."  The letter stated in relevant part:

To Our Shareholders

While it's my experience that it never seems so living through it, the last year was a whirlwind...the best way to review the year though isn't on a calendar basis, but instead using the start date of May 7th, since this was the date the contribution of our entertainment assets to Vivendi Universal Entertainment closed.  On that date we went from a media, entertainment company with ecommerce interests to an interactive transaction company.  From that moment, we were a company transformed  ending the material veto rights held by other parties, and eliminating the LLC structure under which we'd operated with such complexity and contradiction for almost all the years of our short life.

Through the recently announced buy ins of the minority interests of Expedia and Hotels.com, and the previously completed acquisition of the outstanding minority interest in Ticketmaster, we have virtually completed the evolutionary process of simplifying our corporate structure.  Recently, I resigned my position as CEO of Vivendi Universal Entertainment  which clarified with great punctuation where my work would be concentrated.  The cumulative effect of these actions has eliminated any lingering question about whether we're a holding company or an operating company.  Clearly, we're now properly viewed as an operating company and judged against our theoretical peers  namely the Tier One companies in interactivity  eBay, Yahoo, and Amazon.

In this arena of Tier One interactive companies, from a financial standpoint, we compare quite favorably.  We lead in Sales, EBITA, and Free Cash Flow  and we're second only to eBay in Gross Transaction Value.  Market valuations in the internet sector certainly have a short and sharp roller coaster history...our equity securities are certainly not currently, or thank God in historical terms, valued at the high multiples of the other leaders in the sector  but, to us, that's entirely besides [sic] the point.  Our perspective is long term, and our focus is not on multiples but on creating real and lasting value for our shareholders.  We're happy to have our performance speak for itself and have our stock follow, rather than the reverse.

These financial yardsticks are consistent with our goal to be the largest, most profitable interactive commerce company in the world  by pursuing a multi brand strategy.  Even though we have leadership today, we want to expand on that lead and create a company in which the power of our brands allows us to create an "unwalled" garden where our customers can benefit through discounts, membership, dynamic pricing and all methods to link and unite our great total audience of our combined users.

From a structural standpoint, there's only one lingering piece of the puzzle that needs final resolution...our VUE securities.  We've been clear on our intentions...this set of securities is worth the equivalent of cash to us and we intend, over the next 6 12 months, to either indirectly monetize this value (through the issuance of USA

securities that mirror the economics of our VUE Preferred Stock) or exchange all our VUE securities into something else of substantially greater value.  Our primary motivation is to turn a relatively "passive" asset on our books into the equivalent of cash, which we can then use either to acquire new businesses, invest in our current ones, or shrink our capitalization.

***As we've said before, we are very committed to transparency and clarity when it comes to financial reporting.  We've changed our format for presenting our quarterly numbers to further emphasize the relevant metrics and other important financial information relating to our operations.***  We will continue to give more and more information, trying in every way we can to do so in a clear and concise manner.  The evolving accounting rules (such as those relating to giving equal prominence to GAAP measures along non GAAP [sic] measures like EBITA and Adjusted EPS) sometimes make this challenging.  ***But this type of challenge only reinforces for us our basic principles   namely, that investors are entitled to see all relevant information and to make their own judgment about which parts of our disclosed information are most important to them.***  Also, we're aware that our focus on providing detailed information and full explanation has spawned quite a number of footnotes in our earnings releases and other public filings   sometimes it may seem like there's more footnotes than text.  This isn't something we're proud of, and over time we'd like to see our footnotes steadily shrink...but, what we won't do is dot one less "i" in the pursuit of full and complete disclosure, providing whatever analysis and commentary we can in having our shareholders understand our company exactly as we do.

***In our annual reporting and earnings releases, we'll give our views about the way in which we look at our results, the ways in which we operate internally and how to best look at our future prospects.***  But, be assured that whatever financial metrics you may find most compelling, we'll continue to try and be ahead of your thought process.  This means that we'll present good news in a balanced way ***and we'll fairly disclose any anticipation of material bad news and bad trends very early to the extent that we can identify them.  Openness is a mantra to us   and we're committed to talking to the investing community in a way that's totally consistent with the way in which we discuss our company among ourselves.***  We want investors who take a long term view and are not swayed by short term results   whichever way they may fall.

And, we want our employee incentives aligned with this philosophy.  One of the most important decisions we made this year was deciding to begin our transition away from issuing stock options to granting restricted stock units.  We believe that stock options encourage aggressive behavior and a get rich quick mentality that unfortunately dominated much of the "bubble" economy.  While this has been an understandable shock to many of our employees as they transition out of the "option way of life," we believe it of paramount importance to perfectly align our employee equity incentives with the interests of our shareholders and we can't think of a better answer than restricted stock units.  An equally important component of our equity plan is to extend the average vesting period of our grants   we believe USA equity is dear and we are only interested in people who want to be with us for the long term.  While anyone can own our stock for a minute or a decade, we're only going to make decisions for the company with a long term view.

Given our start in owning television stations, and my own history in entertainment, we certainly didn't get to where we are by design...what we had was a real curiosity about interactivity and the great good luck to have it just prior to the development of the internet.  We proceeded step by step, constantly re evaluating our position,

delving into the areas we found interesting, and jumping on opportunities with total focus, speed and aggression.  After seven short years, we are firmly convinced that our distinct approach to this interactive world  that of multiple brands as opposed to one totalitarian brand  is a great way to create value.

While we are certain that the business arena we inhabit is at its earliest stage of development, and that there will be lots of twists and turns along the way, we are committed to making decisions with an absolute view of the value over the long term for our shareholders, and with a highly critical view of our own weaknesses and vulnerabilities. Our great challenge is to continue to execute in our multiple lines of businesses.  We are mindful every day of the consistent operating discipline necessary to achieve the goals we have set...however, with our stable of brands, each with such great growth ahead and their enormous potential to integrate and create new products and services, we believe we can sustain a competitive advantage far into the future.

All my experience in the entertainment business taught me very few people made the decisions that really counted, that were the determinants of success and failure...every single experience I have had in this new world of interactivity tells me exactly the opposite...it is the expertise and the enterprise of a great many talented people working at every level of the organization that makes for success...we are so very lucky to have so very many engaged in what I deeply believe can be one of this century's great enterprises.  I am at the earliest stage (though I hope growing quickly) in learning how to manage an organization such as this...part of that is knowing just how much I need to thank its members, together with our wise and engaged Board of Directors for their work this year past, and for their vigorous and challenging support in the work ahead.

Sincerely,
/s/Barry Diller
Barry Diller
Chairman and Chief Executive Officer

61.     On May 1, 2003, the Individual Defendants caused the Company to issue a press release entitled "USA Reports Excellent First Quarter," which stated in relevant part that the Company's adjusted EPS had grown 155% to $0.16 (with GAAP EPS of $(0.23)), that its EBITA had grown 120% to $173 million, that its operating income had grown 236% to $93 million and that its free cash flow and net cash provided by operating activities exceeded $400 million.

62.     After issuing the press release, IAC hosted a conference call for investors, analysts and media representatives, during which the individual defendants represented the following:

[KAUFMAN]: We're very cognizant to run our business on a true cash basis and obviously this deal is showing our results.  It's possible, even though it's a stretch, and although we're not making any predictions, that we could achieve a billion dollars in free cash flow this year.  And correspondingly, somewhat in excess of a billion two in net cash provided by operating activity, which is the GAAP measure for this year.  That becomes a nice goal for us, large round number, but achieving it would really show the true strength of our operating assets.  When you look at our cash flow from operations, as stated on a GAAP basis for the first quarter,

in comparison to other companies, its potency is truly obvious. We achieved a result two times E-bay, well in excess of 10 times Amazon, four times Yahoo, and two-thirds of Viacom, a company that's four times our size. With that thought, we think that's a significant one, I'm going to ask Dara Khosrowshani to run through with you some of the metrics that relate to the first quarter.

[KHOSROWSHANI]: As mentioned, we had a great quarter. Travel revenue was up 93% and EBITDA for travel was up 86% over last year. This is despite the war which affected bookings in March and early April. Some of which will be recognized in our revenue in Q2 in addition to what was recognized in Q1. Excluding interval and TVTS, travel revenues and EBITDA increased 74% and 56% respectively. The decrease in EBITDA margin is mainly due to increased marketing spent for the hotels.com brand which now accounts for 36% of Hotels.com's bookings. Expedia also grew dramatically on all measures, including international which increased its revenue 129%. And revenue from packages which grew 137%. Travel properties collectively generated more than $2.3 billion in gross bookings of 75% increase, including booking more than 5 million hotel room nights for the quarter. That's an average of 55,000 room nights every day.

* * *

[DILLER]: This hyper growth, obviously reflects what is reflects. I don't thing there's nothing [sic] that is particularly extraordinary about it, other than its basics. But we should not get ahead of ourselves. Life is not built in a quarter. I think in a sense, this is the accumulation of an awful lot of detail and it's also the obvious strength that you get when you look at all of our operations in one unified security.

63.     On May 5, 2003, the Individual Defendants caused the Company to issue a press release along with LendingTree entitled "USA InterActive and LendingTree Announce Merger Agreement; Entry into the Financial Services and Real Estate Verticals Gives USA Access to 75% of Total InterActive Commerce (U.S.)." The press release stated in relevant part:

USA InterActive and LendingTree, Inc. announced today that they have entered into an agreement by which USA would acquire all of the outstanding capital stock of LendingTree in a stock for stock transaction.

The transaction would represent USA's entry into the large and attractive financial services and real estate verticals, both of which are at an early stage of online migration. LendingTree is the leading lending exchange with more than 200 participant lenders; the Company has facilitated nearly $48 billion in closed loans since inception and has recently entered the real estate sector with excellent early results.

With this transaction, USA now has a presence in seven key areas of interactive commerce that represent approximately 75% of total interactive commerce (U.S.): Travel, Ticketing, Goods, Personals, Local/Classified Advertising, Financial Services and Real Estate. The acquisition of LendingTree adds another powerful brand and profitable interactive business to the USA family, and furthers USA's goal of being the largest, most profitable interactive commerce company in the world. LendingTree will have access to USA's existing base of nearly 40 million unique monthly Internet users who increasingly are provided opportunities to become customers of more than

-28-

one USA property through cross promotion, integration and the use of special offers or discounts.

The acquisition of LendingTree will be neutral to USA on an accretion/dilution basis and USA anticipates that LendingTree's long term growth metrics will be consistent with those of USA's fastest growing businesses.

Under the agreement, LendingTree shareholders will receive 0.6199 of a share of USA common stock for each share of LendingTree common stock that they own, and LendingTree preferred stockholders will receive the same merger consideration, on an as converted basis.   In the transaction, USA would issue to LendingTree shareholders approximately 18.3 million basic shares and 21 million total shares on a fully diluted, treasury method basis.  The transaction is generally expected to be tax free to LendingTree shareholders.  Based on closing prices of USA common stock between April 28, 2003 and May 2, 2003, the transaction is valued in a range of $626 million to $734 million.

Barry Diller, Chairman and CEO of USA InterActive, said, "For several years now we have been saying, in answer to investor and media questions about what's the next area of investment for our Company, that the most exciting sector is in both financial services and real estate   now, with this singular acquisition we enter both, with an excellent Company, having built a fine brand, and with great and deep management strength   we waited appropriately long enough to find the perfect solution   LendingTree."

In connection with the merger, LendingTree options will be converted into options to acquire USA common stock, and LendingTree warrants will be converted into warrants exercisable for USA common stock.

The transaction is subject to LendingTree shareholder approval.  The LendingTree Board of Directors has approved the acquisition by unanimous vote and unanimously recommends that LendingTree shareholders vote to approve the merger agreement and related matters at the special meeting to be called for consideration of the transaction.  USA has received binding voting agreements to support the transaction from LendingTree shareholders representing approximately 31.5% of the as converted to common vote.  The transaction has been approved by the Board of Directors of USA and no separate USA shareholder approval is required.  The merger, which is subject to other customary closing conditions, is expected to be completed in late summer.

Doug Lebda, Founder and CEO, and Tom Reddin, President and COO, will continue in their current positions, as will other key members of the senior management team. LendingTree's senior management team will have a significant ongoing economic interest in the upside of LendingTree, after USA recovers its acquisition costs with a rate of return, which is designed to incent and retain LendingTree's strong management team over the long term.

Doug Lebda said, "We believe that the merger with USA creates significant value for our shareholders, not only because of the transaction itself but also because of the opportunity to participate in USA's tremendous future as a leader in interactive commerce."

Mr. Lebda continued, "This will create the opportunity for us to accelerate our growth in the consumer lending and real estate verticals, leveraging our scalable business model and leading brand with USA's capital, management expertise and synergies

with other USA businesses, particularly those that help penetrate local markets. Working together we can add significant value to consumers, lenders and REALTORS 7, while producing impressive growth and financial returns for shareholders.  On a personal level, I am excited to join the USA family, and for the opportunities this will provide for all of LendingTree's employees and business partners."

64.    On May 21, 2003, the Company filed a prospectus concerning the acquisition of Hotels.com.  Each former Hotels.com shareholder received 2.4 shares of USA Interactive, then valued at $33.33 per share.   The prospectus was false and misleading in that it concealed Hotels.com's improper practices in dealing with hotels as described herein.

65.    Also on May 21, 2003, IAC filed with the SEC an amended Form S-4 regarding the Hotels.com merger.  The amended form S-4 was signed by all of the Individual Defendants, except for Genachowski and indicated that the 2002 Form 10-K was incorporated by reference.

66.    On June 5, 2003, IAC filed with the SEC an amended Form S-4 with respect to the LendingTree merger.  The amended S-4 indicated that the 2002 Form 10-K was incorporated by reference, as well as other documents.

This proxy statement/prospectus incorporates by reference the documents set forth below that USA and Lending Tree have previously filed with the SEC.  These documents contain important information about USA and LendingTree, as well as other information required to be disclosed or incorporated by reference into this proxy statement/prospectus.  You may obtain copies of the Form S-4 (and any amendments to the Form S-4), as well as the documents incorporated by reference into this proxy statement/prospectus, in the manner described above.

| USA SEC Filings | Period |
| --- | --- |
| Annual Report on Form 10-K | Year ended December 31, 2002, filed on March 31, 2003. |
| Definitive Proxy Statements | Filed on March 25, 2002 and April 30, 2003 |
| Quarterly Report on Form 10-Q | Quarter ended March 31, 2003 (filed on May 15, 2003). |
| Current Reports on Form 8-K | |
| | Filed on January 21, 2003, February 7, 2003 (other than information furnished under Regulation FD), February 12, 2003 (two filings), February 26, 2003 (two filings) (other than information furnished under Regulation FD), March 19, 2003, March 25, 2003, |

March 26, 2003, April 9, 2003,
April 10, 2003, April 15, 2003,
May 2, 2003 (other than
information furnished under
Regulation FD) and May 5, 2003.

| LendingTree SEC Filings | Period |
| --- | --- |
| Annual Report on Form 10-K | Year ended December 31, 2002, filed on March 12, 2003. |
| Definitive Proxy Statement | Filed on March 14, 2003 |
| Quarterly Report on Form 10-Q | Quarter ended March 31, 2003 (filed on May 14, 2003). |
| Current Reports on Form 8-K | Filed on February 4, 2003 March 11, 2003, March 12, 2003, April 4, 2003, April 23, 2003 (other than information furnished under Regulation FD) and May 6, 2003. |

USA and LendingTree also incorporate by reference into this proxy statement/prospectus additional documents that either may file with the SEC pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act between the date of this proxy statement/prospectus and (a) in the case of filings by USA, the earlier of the completion of the merger or the termination of the merger agreement, and (b) in the case of filings by LendingTree, the earlier of the date of the special meeting of LendingTree stockholders or the termination of the merger agreement.  These documents deemed incorporated by reference include periodic reports, such as Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, and Current Reports on Form 8-K as well as proxy and information statements.

 67. As described herein, the 2002 Form 10-K was materially false and misleading due to the false and misleading statements made by the Individual Defendants about Hotels.com and the concealment of important adverse information regarding Hotels.com, including its deteriorating relationships with hotel chains, the declining number of supply agreements, and general problems involving supply and pricing.  As a result, Hotels.com would ultimately transition from offering hotel rooms at discounted rates to merely offering hotel reviews.  Indeed, Hotels.com's results (as well as IAC's) were misstated due to the manipulations concerning Hotels.com's financial condition and business opportunities.  The Company was also understating its tax liabilities because the Individual Defendants were causing the Company to pay state and local occupancy taxes based on the

wholesale rate at which the Company rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers.

68.     On June 23, 2003, the Individual Defendants caused the Company to issue a press release entitled "InterActiveCorp Completes Acquisition of Hotels.Com," which stated in relevant part that IAC had completed the acquisition of the outstanding shares of Hotels.com that it did not already own.  "In the transaction, IAC issued to Hotels.com public shareholders approximately 44.3 million basic shares and 47.2 million shares on a fully diluted, treasury method basis."

69.     On July 10, 2003, IAC filed with the SEC an amended Form S-4 with respect to the Expedia merger which was signed by all of the Individual Defendants except Genachowski.  The S-4 indicated that the 2002 Form 10-K was incorporated by reference, as well as other documents:

> This proxy and information statement/prospectus incorporates by reference the documents set forth below that IAC, Expedia and Hotels.com have previously filed with the SEC.  These documents contain important information about IAC and Expedia, as well as other information required to be disclosed or incorporated by reference into this proxy and information statement/prospectus.  You may obtain copies of the Form S-4 (and any amendments to the Form S-4), as well as the documents incorporated by reference into this proxy and information statement/prospectus, in the manner described above.

| IAC SEC Filings | Period |
| --- | --- |
| Annual Report on Form 10-K | Year ended December 31, 2002, filed on March 31, 2003. |
| Quarterly Report on Form 10-Q | Quarter ended March 31, 2003, filed on May 15, 2003. |
| Definitive Proxy Statements | Filed on March 25, 2002 and April 30, 2003. |
| Current Reports on Form 8-K | Filed on January 21, 2003, February 7, 2003 (other than information furnished under Regulation FD), two on February 12, 2003, two on February 26, 2003, March 19, 2003, March 25, 2003, March 26, 2003, April 9, 2003, April 10, 2003, April 15, 2003, May 2, 2003, May 5, 2003, June 4, 2003, June 19, 2003 and June 23, 2003 (other than information furnished under Regulation FD), respectively. |

| Expedia SEC Filings | Period |
| --- | --- |
| Annual Report on Form 10-K | Year ended December 31, 2002, filed |

|  | on March 31, 2003 and on Form 10-K/A on April 30, 2003 |
|---|---|
| Quarterly Report on Form 10-Q | Quarter ended March 31, 2003, filed on May 15, 2003. |

| Expedia SEC Filings | Period |
|---|---|
| Current Reports on Form 8-K | Filed on February 6, 2003, March 7, 2003, March 19, 2003, April 30, 2003 and May 1, 2003, respectively (other than information furnished under Regulation FD). |

| Hotels.com SEC Filings | Period |
|---|---|
| Section entitled "Certain Relationships and Related Party Transactions" contained in Annual Report on Form 10-K | Year ended December 31, 2002, filed on March 27, 2003 and on Form 10-K/A on April 30, 2003. |

All documents filed by IAC and Expedia pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act with the SEC from the date of this proxy and information statement/prospectus through the completion of the merger (or, if earlier, the date on which the merger agreement is terminated) are also deemed to be incorporated by reference into this proxy and information statement/prospectus.  These include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy information statements.

70.     As described herein, the 2002 Form 10-K was materially false and misleading due to the false and misleading statements made by the Individual Defendants about Hotels.com and the concealment of important adverse information regarding Hotels.com, including its deteriorating relationships with hotel chains, the declining number of supply agreements, and general problems involving supply and pricing.  As a result, Hotels.com would ultimately transition from offering hotel rooms at discounted rates to merely offering hotel reviews.  Indeed, Hotels.com's results (as well as IAC's) were misstated due to the manipulations concerning Hotels.com's financial condition and business opportunities.  The Company was also understating its tax liabilities because the Individual Defendants were causing the Company to pay state and local occupancy taxes based on the wholesale rate at which the Company rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers.

71.     On August 5, 2003, the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q2 2003 Results," which stated in relevant part that the Company's Q2:03 revenue was $1.5 billion, up 38%, that its GAAP diluted EPS from continuing operations were

$0.09, that its adjusted EPS was $0.18, and its year to date net cash provided by operating activities was $939 million.

72.     After issuing the release, IAC hosted a conference call for investors, analysts and media representatives.  During the call the Individual Defendants stated the following:

> [KAUFMAN]: Our quarter was really very strong, led by the travel and electronic retail.  Travel continues to be our big growth engine.  Our revenue in this sector grew 72 percent and operating income before amortization increased 92 percent over the comparable period last year. . . .
>
> . . . Now that the transactions will be completed over the next several weeks, we will be in a position to buy back stock under our already approved authorization.  But as you know, we are extremely cautious in this area and we will be opportunistic about timing and price.  We are well aware of our substantial cash and securities balance and it is a high priority for us to utilize those funds in the best way to create shareholder value.  As you know, this can be achieved in a number of ways that we have already previously discussed, including through investments in our existing business, acquisitions and through the shrinking of our capital structure. . . .
>
> [KHOSROWSHAHI]: As you mentioned, we reported excellent results across the board, especially in travel, despite the war, which affected revenue negatively in the early part of the quarter.  The travel business has generated $2.6 billion in gross bookings, a 58 (ph) percent increase over last year, including 7.5 million hotel room nights sold.  Overseas, Expedia and hotels.com both continued to grow aggressively with hotels.com launching 14 international versions of its websites and Expedia international gross bookings growing 148 percent year-over-year . . . (indiscernible), which wasn't included in our year ago numbers, contributed 21 percent of travel's revenue growth this quarter, and that is strong performance, despite the difficult travel environment. . . .
>
> . . . [DILLER]: I think in this period, also, it seems that the trinity of Amazon and eBay and Yahoo has been extended to one to include us, so sometimes people call us now four horsemen or whatever.  Whatever you can call us, it's nice that we're added to it.  I think that one fact that when we realize, even surprises us that our relative strength in this sector, the sector that as we all know, has had such growth, in terms of its relative to almost any other business and given the Internet and things.  But it is kind of remarkable that our cash flow to date is greater by a lot more than eBay, Amazon and Yahoo combined, and that is really to us the extraordinary fact.  I think is supports our strategy of becoming the largest and most profitable e-commerce business using multiple brands.  They may not  know IAC, but it is awfully hard to look at us relative to our peers, given the growth that we had and the fact that we do not lead in almost–I think it is almost every number that there is, I guess with the exception of gross bookings, gross transaction, where I think eBay leads by some amount.  Anyway, it has obviously been a good quarter.

73.     On August 8, 2003, the Individual Defendants caused the Company to issue a press release entitled "IAC Completes Acquisition of Expedia, Inc.," which stated in relevant part that the Company had completed the acquisition of the outstanding shares of Expedia that it did not already

own and that IAC had issued to Expedia's public shareholders approximately 100.8 million basic shares of IAC common stock and 133.3 million shares on a fully diluted, treasury method basis.

74.    On August 8, 2003, the Individual Defendants caused the Company to also issue a press release entitled "IAC Completes Acquisition of Lending Tree," stating in relevant part that the Company had completed its acquisition of LendingTree and that, as a result of the acquisition, IAC would issue to LendingTree shareholders approximately 18.8 basic shares and 21.1 shares on a fully diluted, treasury method basis.

75.    On August 10, 2003, *The New York Times* ran a story entitled "Financial Disclosure, the Barry Diller Way," which stated in relevant part:

> WHEN the titans of media and finance met last month in Sun Valley, Idaho, for the annual conference held by the investment banker Herbert Allen, the chatter was not limited to wheeling and dealing.  Corporate governance was also a topic of discussion.  Three company chairmen--Warren E. Buffett of Berkshire Hathaway, Howard Stringer of Sony and Barry Diller of InterActiveCorp.--even participated in a panel on the subject for the lustrous crowd.
>
> To some investors, Mr. Diller's inclusion on such a panel may seem incongruous.  For while many companies have spent the past year making their financial reports simpler and more transparent, those from InterActive, an Internet commerce conglomerate whose businesses include the Home Shopping Network, Expedia Inc. and Hotels.com, are still maddeningly complex.
>
> Investors perusing the company's quarterly earnings release from last Tuesday, for example, encountered a thicket of pro forma figures, used by InterActive to put the best spin on its results.  Of course, the company also presented results according to generally accepted accounting principles, as regulators require.  But pro forma figures--which calculate results excluding certain items--dominated the release.
>
> Perhaps more troubling, profits at InterActive's two big Internet travel sites, Expedia and Hotels.com, the company's growth engines, may be inflated.  The problem is that the sites may be paying less in hotel occupancy taxes than government authorities think is owed.  And a disclosure in a recent regulatory filing, saying that the company could be forced to pay back taxes to state or local authorities and pay more taxes in the future, was minimal at best.
>
> Moreover, nowhere in its documents does InterActive tell investors how much its earnings could be hurt if tax authorities require it to alter its practices.
>
> In a telephone interview last Wednesday, Mr. Diller bristled at the notion that his company's financial statements were purposefully complex.  "I would say strongly that we go to extraordinary lengths to be transparent and to write it in plain English," he said.
>
> "Our goal is to simplify the capital structure of the company," he said.  "We've made acquisitions, we have pro forma issues, issues of amortization, and our shareholders want to look at the company in ways other than GAAP, and we provide supplemental

information that we hope is clear.  By doing what we did this quarter, which was to essentially not obfuscate anything, was, I think, a fine step."

Dara Khosrowshahi, InterActive's chief financial officer, rejected the contention that the company's stance on the hotel occupancy tax was aggressive.  "This tax issue is not a big deal in general," he said.  "We have been advised on these issues by multiple experts in the area.  They have advised us that we have a completely sound position as far as taxes go."

With InterActive, Mr. Diller intends to build the world's largest and most profitable e-commerce company.  To that end, he has been dumping broadcasting and entertainment assets and replacing them with Internet commerce concerns.

In the past 12 months, InterActive has paid almost $8 billion to acquire Hotels.com; Ticketmaster; uDate.com, an Internet dating service; Entertainment Publications Inc.; Expedia; and the Interval Acquisition Corporation, a real estate services company; and LendingTree Inc., an online financial services concern.  Most of the acquisitions were made using InterActive's highflying stock.

InterActive's second quarter results showed the success of the strategy.  Revenue rose 38 percent, while operating income jumped to $112 million from $25.4 million in the corresponding period last year.  The biggest contributor to the growth was InterActive's online travel business, especially the bookings at Expedia, which sells airline tickets and hotel rooms on the Web.  Revenue in the travel services unit, which includes Expedia and Hotels.com, grew 72 percent, and operating income doubled, to $88.7 million.

Like most Internet stocks, InterActive's shares have been incendiary, rising as high as $42.74 last month, up 86 percent for the year.  But management's disclosure last week that net income for the rest of the year would be lower than forecast helped push down the stock to $34.71 at Friday's close.  That gives InterActive a market value of $1.94 billion and a price to earnings ratio of 41--and reduces its stock gain this year to 51 percent.

STILL, profits at InterActive's online travel units, as good as they look now, may be more vulnerable than some investors appreciate.  If the company soon has to pay more in hotel occupancy taxes, its profits would be cut substantially.

InterActive's hotel booking subsidiaries, Hotels.com and Expedia, interact with their customers in one of two ways.  They can act as agents, letting a customer reserve a room using a credit card, which the traveler uses to pay the hotel bill at checkout.  In these circumstances, an Internet customer is typically advised that taxes may or may not be included in the total cost listed on the site.

But the sites make far more money in their capacity as merchants, buying blocks of rooms at wholesale prices from a hotel and selling them to consumers at higher prices.  When Expedia acts as a merchant, the rooms often carry an "Expedia special rate" and appear atop a list of available rooms for a given destination.  It is here that the taxes paid by InterActive can come into question.

In its financial filings, InterActive acknowledges that it remits taxes to government authorities based on the wholesale cost of the rooms that it buys and resells, not on the amount it charges to consumers who book rooms on its sites.  The company does not make this disclosure to consumers shopping on its Web sites.

InterActive often charges its customers what it identifies as "taxes and fees" for several popular travel destinations.  To a traveler accustomed to paying steep hotel occupancy taxes, the amount may look mainly like a tax, with a small fee added.  But because the tax paid by the company is based on the wholesale, not the retail, room rate, the fee portion is much larger than it might seem.  On each transaction, the companies appear to pocket as profit an amount that some taxing authorities may end up contending is theirs.

Because Hotels.com and Expedia lump together what they charge in taxes and fees, consumers do not know how much they are paying for each.  Expedia's airline booking system, by contrast, clearly differentiates what its customers pay in taxes and what they pay in booking fees.  Mr. Khosrowshahi said the company did not break out taxes and fees on hotel rooms because doing so would alert other online booking services to deals that Hotels.com or Expedia have made with lodging chains.

Occupancy taxes vary across the country.  New York City, the top destination for Hotels.com customers, charges state and city hotel occupancy taxes of 13.625 percent- -an 8.625 percent state tax and a 5 percent city tax--and a state fee of $2 a room.

A check of New York City room prices on Hotels.com and Expedia indicates that taxes and fees charged by the sites can total 18 percent of the room rate.  On Expedia, a room for two at the Milford Plaza in Midtown Manhattan later this month cost $109 a night, plus taxes and service fees of $19.04, or 17.5 percent.  On Hotels.com, a room for two at that hotel on the same night cost $91.75, plus $16.75, or 18.3 percent, in taxes and service fees.

Neither Expedia nor Hotels.com discloses the amount paid to the operator of the Milford Plaza for the room.  But assuming that its markup is 25 percent, which is standard in the industry, that would put Expedia's wholesale price for the room at about $87 and Hotels.com's at about $81.

Taxes due to New York State and New York City on those rates would be $13.85 at Expedia and $13.03 at Hotels.com.  So by charging $19.04 in taxes and service fees, Expedia's profits could be $5.19 on the room, or 6 percent of its cost.  By charging $16.75 in taxes and fees, Hotels.com's profits could be $3.72, or 5 percent of the room's cost.

If Expedia and Hotels.com paid taxes to the city and state based on what they charge customers, their profits would be much lower.  The $19.04 that Expedia charges for taxes and fees would generate a profit of only $2.19, or 2.5 percent of the room's wholesale cost.  The $16.75 in taxes and fees charged by Hotels.com would produce profits of $2.25, or 2.4 percent of the room's cost.

WHEN asked about the taxpaying practices of Internet hotel sites, Tom Bergin, spokesman for New York's taxation and finance department, said: "Our audit and enforcement divisions are currently moving to address these and other sales tax issues."

Orlando, Fla., in Orange County, is another big destination for customers of Hotels.com and Expedia.  Martha Haynie, comptroller of Orange County, which charges a resort tax of 5 percent on its hotel rooms, said: "It is our position that the tax is due on the gross room rate because it appears they are charging the customer tax on that room rate, and if they are collecting tax and not remitting it we are going to want that."

These receipts are attractive, Ms. Haynie said, because tax collections for the first five months of this year are down from last year.  "I'm beginning to wonder how much impact this dot com business may be having" on the decline, she said.

Dave Bruns, spokesman for Florida's revenue department, said it expected to advise companies later this month whether they must remit the 6.5 percent sales tax on the amount they charge customers for a room.

Texas law already states that a company that buys a block of rooms, marks them up, sells them over the Internet and has its own cancellation policy must collect and remit hotel taxes on the amount a customer pays.

Texas state occupancy taxes are 6 percent; Dallas levies an added city hotel tax of 9 percent.  A recent search on Expedia and Hotels.com for a room at the Holiday Inn Aristocrat in Dallas for later this month indicated taxes and fees of 17 percent to 18 percent of the room rate.

Mr. Khosrowshahi dismissed the threat that tax authorities might present to the company's earnings.  He said InterActive's practices were standard in the online travel industry.

But InterActive notes in its government filings that it may be vulnerable to additional or back taxes.  "A successful assertion by one or more states or local taxing jurisdictions that we should collect sales or occupancy taxes on the sale of hotel rooms could result in substantial tax liabilities for past sales, decrease our ability to compete with other Internet travel companies not subjected to collecting sales and occupancy taxes and otherwise harm our business," a recent regulatory filing stated.

How much could InterActive's earnings be hurt if state authorities forced it to pay additional taxes?

Mr. Khosrowshahi said: "We don't think it is a significant liability at all.  We are in discussions with a number of states' tax authorities, and the discussions have been productive and encouraging."  He said the company had set aside a reserve of less than $10 million to cover potential tax bills.

But financial filings and news releases from Expedia and Hotels.com before they were absorbed into InterActive allow for a rough estimate of how the company's earnings could decline if tax authorities disagreed with Mr. Khosrowshahi's assessment.  Based on that information, the shortfall could be substantial.

From the start of 2001 until the end of March 2003, Hotels.com and Expedia reported how many rooms they had sold each quarter as merchants rather than as agents.  By analyzing the companies' cost of goods sold, one can estimate what the companies pay to hotel companies for rooms they buy and, therefore, what they remit in taxes.

For example, in the first quarter of 2003, the average cost per room paid by Hotels.com was around $84, including taxes.  Assuming an occupancy tax of 13 percent  a rough hybrid of taxes in the companies' major hotel markets  Hotels.com would have paid $11 in taxes per room.

According to the company, customers pay $120, on average, for a room.  At a tax rate of 13 percent, that would mean a tax of a little more than $16 per room night.  Because Hotels.com paid $11 in taxes on the room per night and received taxes and fees of $16, that would translate into a profit of around $5.

In the quarter, Hotels.com recorded 2.3 million room nights, generating operating profit of $27.2 million.  If local tax officials had taken the $5 a room night difference, operating earnings would have fallen by $11.5 million, or 42 percent of the amount the company recorded.

At Expedia during the same quarter, the company booked 2.8 million merchant hotel room nights and showed income from operations of $42 million.  At around $4 per room, the difference between what Expedia pays in taxes and what it receives could have been $11.3 million, or 27 percent of operating profits.

Applying these figures to InterActive's operating profit indicates that in the first quarter, the tax profit per room night at Hotels.com and Expedia could have accounted for 24 percent of InterActive's operating profit.

Of course, these figures are rough estimates, and the actual numbers could be less or more.

Mr. Khosrowshahi declined to comment on the estimates, saying that it was wrong to assume that additional taxes would be collected at all and that any attempt to quantify the potential hit to earnings was invalid.

Consumers are starting to notice the tax issue.  A lawsuit filed in a state district court in Duval County, Tex., last June by Nora J. Olvera contends that Hotels.com charged excess taxes on hotel accommodations "that were not owed or remitted to taxing authorities and that in equity and good conscience belong to plaintiff."

Deborah Roth, a spokeswoman for InterActive, said the company does not comment on pending litigation.

Even if state tax authorities choose not to pursue InterActive for past or future taxes, consumers may not appreciate paying an amount that they believe covers a tax but that instead is profit for InterActive.

76.    In response to *The New York Times* piece, on August 11, 2003, the Individual Defendants caused the Company to issue a press release entitled "Letter From IAC/InterActiveCorp to *The New York Times*," which quoted a letter from Diller stating in relevant part:

– – We object to the entire premise of the articles to the extent they question the sufficiency of IAC/InterActiveCorp's public disclosures.  IAC has been a leader on disclosure.  We publicly release our budget.  We were one of the first companies to stop providing quarterly "guidance."  We are a prolific filer of information under Regulation FD to ensure that our shareholders have all up to date information that is important and relevant to them.  Not many companies include their Principles of Financial Reporting so that investors can see with precision a detailed explanation for each of our actions.  It is irresponsible to present a one sided, ill informed article that does not at a minimum note the company's consistent policy of open disclosure.  We are also mystified by the characterization of our use of pro formas as "spin."  As reflected in our various public documents, we use pro formas only to clarify and to add information--and we have done so even when their use makes our results look less favorable.

– – "The main article states that some government authorities are considering whether Hotels.com and Expedia are required to collect and remit room occupancy

taxes on the amount of the customers' payment that is retained by Hotels.com and Expedia. Unfortunately, the article then recklessly jumps to the conclusion that if such occupancy taxes were found to be owed on all of the companies' revenue, from all jurisdictions, the companies' liability could be substantial. But while a limited number of jurisdictions have raised this issue (and the companies are engaged in ongoing dialogue with those jurisdictions), there is simply no basis for the supposition that the companies will face liability in all jurisdictions. The applicable tax provisions vary among the jurisdictions, and many of the jurisdictions, including certain high revenue states, limit the obligation to collect occupancy taxes to businesses that are hotel "operators" (or similar language), a category that we do not believe includes Expedia and Hotels.com. While statutes in some jurisdictions do not specifically limit occupancy tax collection responsibilities to hotel operators, the companies believe they have sound additional arguments as to why they are not required to collect and remit occupancy taxes in those jurisdictions (the companies do not presently collect or remit taxes on the portion of the customer payment that they retain). We are engaged in what we believe are productive discussions with the tax authorities in various jurisdictions to resolve this issue. The company has disclosed this issue in its prior public filings and has taken appropriate reserves (less than $10 million) in accordance with applicable accounting rules.

77.     Later, in a *Calgary Herald* article published on October 12, 2003, Diller stated the following with respect to the occupancy tax issue:

> The company "has investigated every aspect" of the tax issue, Diller said. "We've taken an appropriate reserve of $12 million. We think that's adequate."

78.     On the contrary,  the occupancy tax issue was far more serious issue than defendants let on. Instead of the "limited number of jurisdictions" which IAC claimed had raised the issue, IAC was actually facing the issue nationally. While the *New York Times* article reported the problems which had arisen in New York and Texas, IAC's Expedia, Hotels.com and Hotwire would subsequently be sued by the City of Los Angeles and Expedia would be sued in Washington State Court for this same issue. In the Spring of 2005, the Texas State Court actions were certified as a class and Hotels.com's motion to dismiss was denied. Additional actions have also been filed in California.

79.     On September 22, 2003, IAC issued a press release  announcing that it had entered into an agreement to acquire Hotwire.com for $665 million in cash plus the assumption of approximately $20 million of options and warrants. The press release stated that "IAC estimates 2003 full year Gross Bookings for Hotwire of approximately $700 million and Net Revenue of approximately $110 million, and expects the transaction to be slightly accretive to 2004 adjusted EPS."

80.     Describing the operations of Hotwire, the press release stated:

Founded by Texas Pacific Group and airlines American, America West, Continental, Northwest, United and US Airways, Hotwire is an industry leader in opaque travel, a service that enables online consumers to see and choose a specific fare or rate without knowing the brand of the supplier until after the item is purchased. This model enables Hotwire to offer discounts of up to 45 percent on airfares, and up to 75 percent on hotel rooms. Hotwire directly addresses the needs of a significant segment of the overall travel market: a recent report from Forrester Research notes that 19 percent of web travel bookers buy on price alone, without consideration of individual airline or hotel brands. . . . Hotwire President and CEO Karl Peterson added, "Hotwire consistently offers lower prices for leisure travelers because of our opaque model, and we have a significant advantage over other opaque offerings because we do not require consumers to engage in a bidding process. For suppliers, the value proposition is clear, they can drive incremental and profitable business by providing discounted inventory without harming their published prices or impacting their brands."

81.     The September 22, 2003 press release was misleading because it failed to disclose that Hotwire lacked enforceable agreements at guaranteed discount prices with the airlines.

82.     Without an agreement by American Airlines, Continental Airlines, Northwest Airlines, United Airlines, US Airways Group and America West Airlines (Hotwire's joint venturers) to continue to provide an ample supply of deeply discounted seats, buying Hotwire was valueless. This was particularly true since American Airlines, Continental Airlines, Northwest Airlines, United Airlines, and Delta Airlines operated Orbitz, a competing airline direct distribution website (which was established in June 2001).

83.     On November 5, 2003, the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q3 2003 Results," which stated in relevant part that the Company's Q3 2003 revenue was $1.6 billion, up 36%, its GAAP net income was $19 million or $0.02 per diluted share, its Adjusted Net Income was $130 million or $0.17 per share, up 136%, and its year-to-date net cash provided by operating activities was $1.1 billion, up from $624 million. The press release also disclosed that the Company had repurchased 20 million shares of IAC common stock during the quarter for $717 million and announced a new 50 million share repurchase authorization.

84.     Subsequent to issuing the release, IAC hosted a conference call for investors, analysts and media representatives. During the call defendants represented the following:

[KAUFMAN:] We had a great quarter. We hit our adjusted EPS budget number of 17 cents per share, 136% increase over the comparable period for last year. This number would have been 18 cents per share, but for certain unforeseen charges we took in the third quarter, which have virtually no future effect on the results of our primary operating businesses. . . .

[DILLER:] Here is what we will tell you. First, we believe we will continue to have strong growth over the next years. And, we do know at least enough about next year to tell you that our best guess is that our operating income, before amortization – I cannot say that word always, but forgive me, maybe some day I'll be able to – ought to be between $1 billion and $1.2 billion. Secondly, we'll extensively discuss our overall strategy, the strategy of our operating businesses, their competitive positions, and all the details inside that, so long as they don't give any kind of advantage to our competitors. We will also make every effort to inform you of unusual trends, movements, seasonality, elective investment spending, capital expenditures, et cetera, in all of our businesses. . . .

Also, we've supplied today 21 pages of information, describing exactly how we get from point A to point B. Some might criticize us for being long-winded. We are striving to be thorough, transparent and clear.

\* \* \*

We continue at IAC Travel to gain share against our competitors. Our air volume is very solid, both here and internationally and we keep solidifying our lead in the merchant hotel business.

\* \* \*

[KHOSROWSHAHI:] We're committed to grow our businesses over the short and long term, and have never been in a better position to do.

85.     During that call Daryl Smith, a J.P. Morgan analyst, asked the following question:

On the Hotwire side of the equation, [it] traditionally benefitted from preferential pricing associated with their close connection with the airline suppliers. With airlines now liquidating their investment, when can we anticipate that their existing pricing contracts roll off and when do you think you'd expect the financial impact of that on the business?

86.     Diller responded by stating: "***[Our] agreements with the airlines are long-term. And, so, I don't think that it will have any effect. . . . [T]hat's the answer to that.***"

87.     In fact, Hotwire did not have the long-term pricing arrangements represented and the subsequent decline in Hotwire's business would be a major contributing factor in IAC's declining travel prospects in 2004.

88.     On November 11, 2003, the Individual Defendants caused the Company to conduct an "Investor Day" conference and stated that they expected 30% growth in long-term sales.

89.     *TotalTelecom* reported that:

InterActiveCorp chief executive Barry Diller sketched a bullish five-year plan at a company investors meeting on Tuesday, just a week after it trimmed 2003 financial targets. The New York-based Internet commerce conglomerate said it is targeting operating income to soar by 85 percent and revenue to grow 20 percent on a compounded annual growth rate on the back of strong boosts in nearly all of its business units. "We are investing very aggressively into the growth of the business," said Diller, the one-time revered, but feared chief of Paramount Studios, who has since recast his career as an Internet commerce guru in recent years. Top executives from the company's expansive portfolio of properties including travel site Expedia, event ticketing business Ticketmaster, online dating until Match.com and financial services business Lending Tree said growth in the ensuing decade would help drive earnings, revenue and free cash flow.

The company told investors it is hoping to post 2006 earnings per share of $1.40, according to generally accepted accounting practices, and $2.55 per share by 2008. Excluding charges, it expects to post adjusted EPS of $1.70 in 2006 and $2.65 by 2008. Revenues are expected to grow on a compounded annual growth rate of 20 percent to $11.6 billion by 2006 and $16.5 billion by 2008. It also expects to accumulate approximately $10.9 billion in free cash flow over the next five years, said executives. The company did not furnish 2004 or 2005 financial targets. Bullish projections come less than a week after the company missed consensus earnings estimates for the third quarter. It also trimmed full year 2003 adjusted earnings targets to a range of 72 cents to 75 cents, from an earlier target of 75 cents.

90.     After this conference, analysts issued very favorable reports about IAC:

(a)     Bear Stearns:

***Travel Business Had Competition, But Also Has Very Significant Growth Potential.*** The presentation was anchored by IACI's travel business, which accounts for nearly 60% of IACI's OIBA (Operating Income Before Amortization). While the company acknowledged that travel will have competitors, the company feels it is truly the only global competitor and that growth from international, packaged travel and corporate travel are too significant to constrain IACI's Travel business, which expects 35% five-year OIBA growth.

***Getting to Know IACI's Other Businesses.*** During the investor day, the company highlighted other more recent purchases, including Entertainment Publications, Hotwire and Lending Tree. The company also prominently featured its IACI Personals (Match.com business) business. Mr. Diller also discussed IACI's continuing progress/struggle with making Citysearch a viable business. Entertainment is expanding its horizons to the Internet, Citysearch is reinventing itself once more, Lending Tree is expanding into real estate sales and IACI Personals is adding new services to its site. All will contribute to IACI's OIAB growth.

***Stock Repurchase for Real?*** In one presentation slide yesterday, the company suggested that it had essentially set aside $1.75 billion to repurchase 50 million shares (implying $35 per share). We believe that this is a sign that the company is serious about shrinking its share base. The company bought 20 million shares of stock for $35.85 on average in 3Q; the shares are 7% cheaper than that today. It's not often investors can buy something at a better value than did the company; especially its own shares.

***Tuning in Valuation.*** In our recent note "A Whole New Ball Game?", which we published on November 6, 2003, we reduced our 4Q2003 and 2004 OIBA estimates by $35 million. Given the basic math presented yesterday, which suggests average revenue and OIBA (operating income before amortization) growth of at least 20% and 30% respectively, our 2004 estimate may prove to be the low-end of the range [we are at $1.085 billion in OIBA relative to the company's range of $1.1 billion to $1.2 billion].

(b)      Deutsche Bank:

- IAC's Analyst meeting yesterday provided greater clarity as to how IAC will sustain growth as the largest interactive commerce company in the world. By building branded leadership in several verticals, IAC is positioning itself to reap benefits of cross-business synergies in its next evolutionary stage.

- We expect online travel to remain the key growth driver for IAC. Buoyed by recent acquisitions, the company has assembled a portfolio of travel companies that comprehensively address all markets, products and eventually geographies. As such, we believe that IAC is best positioned to reap migration to online buying in the travel space.

                                   *      *      *

- We maintain our BUY rating and $45 target price (46x 2004E EPS). Meanwhile, we expect FCF to be boosted by favorable working capital trends in online travel. Moreover, we think the company may be in the market re-purchasing the stock in the next several days/weeks, as it taps into its 57 mn share buyback program.

                                   *      *      *

While each individual business segment executive presented details on market sizing, performance, strategy and growth drivers, to no surprise Victor Kaufman's presentation stole the show. The Vice Chairman's summary towards the end of the day not only single-handedly picked up the stock price, but it also provided a perspective of where IAC is headed as a collective whole from a revenue, OIBA and earnings perspective.

(c)      Prudential Equity Group, Inc.:

- We attended Interactive's well-attended investor/analyst meeting held yesterday in NYC. We walked away with our confidence bolstered that IAC is one of the most exciting growth stores in our coverage universe.

- In our view, the two most incremental takeaways from the meeting were that: 1) IAC's increase in 2004 marketing spending is an effort to create more of a barrier to entry against competitors rather than a reaction to them; and 2) management expects 5-year revenue growth of over 20%; EBITA and EPS growth of over 30%. Cumulative FCF is expected to be $10.8 bil. over the same period.

- We strongly reiterate our Overweight rating. While flat margins in the high growth businesses in 2004 is likely to keep out some momentum investors in the near term, we think this stock has very wide potential investor base as it should be attractive to value, GARP and growth investors alike. We would also note that our cumulative FCF estimate is roughly in line with IAC's and implies a $43 target based on our valuation work.

(d)     Citigroup Smith Barney:

Yesterday, InterActiveCorp hosted an analyst day that provided strategic overview of its major businesses as well as their future growth initiatives (with particular emphasis on the international expansion opportunity). The overall tone of the presentation was upbeat, with the company providing long-term financial forecasts (2006 and 2008).

We highlight below the following major themes that came out of the meeting:

**Strong current liquidity position.** IAC currently has a cash balance of $3.79 billion as of the end of the third quarter. Assuming the max out of its existing 50 million share repurchase authorizations (at $35 per share for total cash outflow of $1.75 billion) leaves the company with roughly $2.04 billion of available cash. Factoring out $1.5 – $2.0 of cash "cushion" (for working capital, growth, and acquisition needs), the company estimates it should have $40 million – $540 million of excess cash. Adding in $2.2 billion for VUE securities, total excess cash and securities are $2.24 – $2.74 billion.

**Strong expected FCF generation should position company to be opportunistic about share repurchases longer-term.** IAC expects to generate a cumulative total of nearly $11 billion of free cash flow from 2003 through 2008, of which the company noted that up to 50% could be allocated to stock buyback.

91.     On February 9, 2004, the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q4 2003 Results," which stated in relevant part that the Company had reported that Q4 2003 revenue had grown, "36% over the prior year to $1.8 billion and operating income had grown 142% to $179 million."  The release stated that, "GAAP net income was $153 million versus $145 million in the prior year and GAAP EPS was $0.20 versus $0.30 in the prior year," attributing to the decrease in GAAP EPS largely due to higher amortization of intangibles, non-cash compensation and higher shares outstanding in Q4 2003.  "For the full year 2003, GAAP EPS was $0.23 versus $4.54 in the prior year."  Q4 2003 Operating Income Before Amortization ("OIBA") had grown 131% to $292 million.  "Adjusted Net Income was $228 million versus $169 million in the prior year and adjusted EPS was $0.29 versus $0.24 in the prior year.  For the full year 2003, adjusted EPS was $0.81 versus $0.33 in the prior year."  The release stated that the Travel segment, "increased revenues by 41% to $677 million, operating income by 119% to $108 million

and OIBA by 111% to $150 million, driven by growth in its merchant hotel, packages and international businesses." Finally, the release disclosed that during the Q4 2003 quarter, IAC repurchased 19 million shares for total consideration of $591 million.

92. Subsequent to issuing the release, IAC hosted a conference call for investors, analysts and media representatives. During the call defendants represented the following:

[DILLER:] This is such a great finish to such a tough year of transition. It's a transition from seven years building up these assets into our first year as an operating company and our first year of real integration of these businesses. We had said all last year that integration was going to be a bitch, and it did not disappoint. So the fact that we performed so well during the year is a witness to both the strength of the businesses and the great people that are spread throughout our 26,000 employees.

The results, particularly the fourth quarter, where we had told you the last time we met in this kind of warm and cozy environment, was that we'd end the year at anywhere between 72 and 75 cents a share. So to come in at 81 cents, or 77 cents not including certain items, so far beyond our internal projections underscores our ability to execute while carrying out a complex integration job. We did think we had the strength to do it and reach specific milestones for each of the businesses.

\*   \*   \*

Nevertheless, we think there are about four core questions in travel. Those that we ask, and we get asked about all the time, so we thought we'd just answer them. First, we are losing share to direct sites or will we long term? Direct sites have an uptick in share but that is a reflection of their becoming much more active from a period of no activity at all. We think that nothing can replace a broad travel site omnibus choice, convenience, and ability to sell packages and multiple components. The fact is that the people who come to our sites are mostly brand agnostics particular, and the people who go to the direct branded supplier sites kind of brand loyal. The percentages might shift around a bit, but the essential dynamic won't.

Secondly, are we losing share to Travelocity or Orbitz? We believe we can hold or build our overall share this year. Our competitors can probably grow some lines of business at a higher percentage rate because they are certainly starting from a much lower base, but we've got greater resources and we can add a greater volume of bookings and therefore maintain or grow our share. This is true in the United States but it's certainly true internationally.

Third, what is happening to raw margins? While they're currently stable, on a blended average basis, we're prepared for them to come down modestly, maybe 1% this year, but please understand on this margin issue we aren't in denial. We understand the skepticism but we can only tell you that visions of serious margin deterioration are not, in our opinion, realistic. In this last quarter, hotels.com gross profit margins and Expedia raw margins were essentially flat to last year.

The thing is that we believe that if the big chains sell aggressively through our channels that's going to bring our margins down somewhat but it will also increase our volumes. If they choose to be less aggressive, our mix is going to shift to higher margin hotel product but probably at a lower overall volume, essentially we'll make

-46-

up for any margin loss with greater volume. We are starting multiple new businesses from international, Expedia Corporate Travel, and we're continuing to build the package business.

Fourth, what will happen to marketing? What are we going to spend? Well, we're going to lower our marketing spending as a percentage of revenue over time. This, we believe, this won't be true in every quarter and probably not in quarter 1 of this year versus last year when we had an unbelievably efficient marketing spend. But we think that we'll be close to equilibrium for the balance of the year.

Beyond the four questions you should all know that we believe we can go travel at our stated rates while being good partners to our suppliers and giving the best experience and service to our consumers. It's really true that we being new customers to our suppliers. And one of our big objectives this year is to have all of our supply partners realize that and for us to really work to smooth out every working relationship that we have. We've announced an agreement with Marriott last week to distribute their hotels through our merchant program on both Expedia and hotels.com. We now have deals with the five major hotel chains, as well as thousands of different independent hotels and smaller chain operators.

\*   \*   \*

[KHOSROWSHAHI:] Overall, as Barry mentioned, we had over a billion one in free cash flow in 2003 and $3.3 billion of cash and cash equivalents on our balance sheet not including our VUE securities. We're in a great position to continue to make aggressive investments in our businesses, technology, marketing, international expansion and customer service all the while growing our bottom line. We've never been in a better position going forward.

\*   \*   \*

[KAUFMAN:] I also think that during this year, we're going to be able to show through various metrics and ways in which we operate how things fit together and how these businesses will really grow and sustain quite a huge business over time.

93.     The Individual Defendants knew and failed to disclose that during 2003 serious deficiencies in IAC's connectivity to Six Continents Hotels' central reservation system had developed and that IAC had previously been warned by InterContinental to cease its deceptive business practices.

94.     Moreover, the Individual defendants knew and concealed the fact that InterContinental would be curtailing its business with IAC during the second quarter of 2004 (resulting in decreased revenue and earnings), and thereafter completely terminating its business with IAC because IAC had refused and would continue to refuse to:

      (a)     cease its confusing and potentially unclear marketing practices;

      (b)     clearly present taxes and fees to consumers;

(c)     respect InterContinental's trademarks;

(d)     ensure that reservations were guaranteed through an automated and common confirmation process, not transmitted to the hotel via a fax or other process that then must be manually reentered into the hotel's reservation system;

(e)     cease listing hotels as "Sold Out" when that hotel actually has rooms to sell;

(f)     cease luring customers with the promise of huge discounts on recognized hotel brands, which may not exist in any meaningful quantity;

(g)     cease diverting customers searching for a specific hotel brand to another Web site without their knowledge or consent;

(h)     provide InterContinental hotels with the ability to set its room prices on IAC's Web sites, thereby permitting a hotel to ensure that it stays in compliance with InterContinental's "Lowest Internet Rate Guarantee;" and

(i)     enable hotel owners to make real time choices on controlling rooms available for sale, taking into account demand levels, customer buying patterns and channel costs.

95.     On April 29, 2004, IAC announced a new agreement with Hyatt hotels. On the same day, Oppenheimer issued a report on IAC based in part on statements by IAC management:

> InterActiveCorp announced today that its Expedia/Hotels.com unit signed a partner agreement with Hyatt. The agreement deepens Expedia's relationship with Hyatt and expands its access to room inventory. We fully expect that this deal lowers margins, but should enhance volume to at least offset the lesser margin. We view this as another positive. IACI, further expanding Expedia's scale and emphasizing its importance to suppliers. We continue to like IACI for its leading positions in growing spaces, efficient, debt-free business model, and expected 30% EBITA CAGR through 2008. Reiterate Buy rating.

96.     On May 3, 2004,  the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q1 2004 Results," which stated in relevant part that the Company's revenue had grown to $1.5 billion, "up 23% over the prior year on a comparable net basis and up 6% as reported," that its operating income decreased 57% "as a result of non cash compensation and amortization of intangibles recorded primarily as a result of the buy ins of IAC's formerly public subsidiaries, as well as higher selling and marketing expenses," that GAAP net income was $38 million versus a loss of $110 million in the prior year and GAAP diluted EPS was $0.05 versus

($0.23) in the prior year.  The release also stated that the Travel segment "increased revenues on a comparable net basis by 41% to $494 million, operating income by 21% to $85 million and Operating Income Before Amortization by 23% to $128 million, driven by growth in its merchant hotel, packages and international businesses."

97.     After  issuing the press release, IAC hosted a conference call for investors, analysts and media representatives. During the call defendants stated the following:

> [DILLER:] All of the key metrics which monitor and guide our operations and future strategy were stronger than we had anticipated.
>
> \*     \*     \*
>
> Travel gross bookings were very strong at $3.5 billion, 51% year on year and 44% sequentially. Expedia and hotels.com bookings are up 48% and 44% year on year.
>
> And we do listen. We have expanded our disclosure, now providing gross bookings for Expedia and hotels.com, as well as for agency and merchant business line.
>
> Our travel sites had over 23 million unduplicated unique users in March, and our overall share of the on-line travel audience was 37%, significantly higher than last quarter. And we're talking about both agency and direct sites. So it's worth repeating, we are back on track.
>
> \*     \*     \*
>
> [KHOSROWSHAHI:] Last time we spoke, we told you that our operating income before AMORT targets for the year was 1 billion to 1.2 billion and we're on track for that range.

98.     During the May 3, 2004 conference call, an analyst (Victor Miller) asked: "Could you give us a little more information on Hotwire's revenues in OIBA for the quarter?" Khosrowshahi responded by stating: "We don't disclose the revenue or operating income before AMORT, *but it – it tracked very, very well. We were happy with the quarter*, and it was solidly profitable, but it is not something that we break out."

99.     On August 3, 2004, IAC stock closed at $27.03 per share.

100.     On August 3, 2004,  the Individual Defendants caused the Company to issue a press release entitled "IAC Reports Q2 2004 Results," which stated in relevant part:

> IAC/InterActiveCorp reported Q2:04 results today. Revenue was $1.5 billion, operating income decreased 1% to $110 million, net income decreased 25% to $70 million, and GAAP Diluted EPS decreased to $0.09 from $0.16.  2004 GAAP results

were impacted by increased amortization of non cash expenses and increased shares outstanding related to the buy ins of [InterActive]'s formerly public subsidiaries.

Operating Income Before Amortization grew by 23% to $250 million. Adjusted Net Income grew 24% to $174 million and Adjusted EPS was $0.22 versus $0.18 in the prior year....

IAC Travel ("IACT") increased revenue on a comparable net basis by 34% to $556 million, operating income by 46% to $129 million and Operating Income Before Amortization by 29% to $171 million .... HSN U.S. grew revenue, operating income and Operating Income Before Amortization by 8%, 2% and 4%, respectively. Ticketing grew revenue, operating income and Operating Income Before Amortization by 4%, 43% and 29%, respectively, despite relative weakness in industry wide concert sales.

**IAC repurchased 8.1 million shares during Q2.**

101.    After issuing the release, IAC hosted a conference call and Roger Clark (IAC VP-Investor Relations) stated that Hotwire was a big part of the problem:

I mean, if you look at these and if you dig deep into this of course, there are some supply issues, and, of course, the second quarter was probably the deepest cut of it. Certainly internationally where all travel was down and is beginning I think to rebound. But other than that and other than Hotwire, which is definitely a significant issue, we don't think, again, it's structural. We don't think it's long term. We think that the supply issues that we have had that have given us a lesser discounts as the year progresses, we don't think it's going to come back fast, but we definitely think it will come back.

102.    News that the Company's revenues were well short of analyst expectations and had in fact dropped made it clear that the Individual Defendants' prior statements that the Travel business was "on track" were false and caused the Company's stock to plummet by at least $4.23 per share on extremely high volume of almost 90 million shares, more than 18 times the average daily trading volume for this stock.

103.    Deusche Bank and other analysts cut the Company's stock ratings.  As *Bloomberg* news reported:

Shares of IAC/InterActiveCorp, the Internet commerce and television shopping company controlled by Barry Diller, dropped 16 percent after second quarter revenue fell short of analysts' estimates.

Revenue fell 1.7 percent and the New York-based company cut its forecast for 2004 profit excluding interest, taxes and other items. IAC, the owner of travel Web sites including Expedia.com, Hotels.com and HotWire.com, said that hotel chains and airlines are providing fewer rooms and seats to sell.

The hotel chains are spending more on their own Web sites to win customers, raising the risk they will minimize the role of independent Web sites. At the same

time, IAC is spending more on marketing to fend off competition from other online travel companies, including Orbitz Inc. and Sabre Holdings Corp.'s Travelocity. "The longer-term issues are that they are not getting extra inventory or discounted rates from the airlines" said Peter Mirsky, an analyst with Oppenheimer & Co. in New York, about IAC. He has a "buy" rating on the shares and doesn't own any.

104.    Later, on August 16, 2004, InterContinental announced it had ended its agreement to promote its hotels through Expedia.com and Hotels.com because the sites did not meet its standards. InterContinental, whose chains include Holiday Inn and Crowne Plaza among others, stated that Travelocity would be the only authorized online promoter of its hotel rooms because Travelocity's sales practices met its standards.  InterContinental disclosed that the conflict between it and IAC, Expedia.com and Hotels.com had been waging since at least April 2004, when InterContinental stated it would no longer work with a website that did not show customers the commissions they were being charged and that faxed bookings made directly to hotels, rather than reporting them through an automated system.  InterContinental also disapproved of Expedia.com's and Hotels.com's practice of indicating that InterContinental's rooms were sold out merely because the websites had exhausted their allocation of discount rooms. InterContinental further objected to Expedia-related entities buying up the names of InterContinental hotels on Internet search engines such that a search on Yahoo! for "Hyatt" would first direct searches to Expedia rather than to Hyatt. InterContinental's complaint included:

> *    *Customers who go to an online distributor's Web site to find a hotel may see a hotel listed as "Sold Out" when that hotel actually has rooms to sell.*
>
> *    *Customers may be lured to a site with the promise of huge discounts on recognized hotel brands, which may not exist in any meaningful quantity.*
>
> *    *Customers searching for a specific hotel brand can be diverted to another Web site without their knowledge or consent.*

105.    On August 17, 2004, the New York Daily News carried an article by Phyllis Furman which stated:

> *InterContinental Hotels is checking out of Expedia.*
>
> *The world's largest hotel chain said it won't sell its swanky rooms on the travel Web site anymore because Expedia doesn't meet its customer standards.*

*It's not just InterContinental that's ditching Expedia. The hotel giant's other chains, including Holiday Inn and Crowne Plaza, will soon be no-shows on Expedia and Hotels.com, both owned by Barry Diller's InterActiveCorp.*

\*   \*   \*

*InterContinental said it will now offer its 535,000 rooms to Expedia rival Travelocity, owned by Sabre Holdings.*

"We believe you have to treat customers the right way," InterContinental senior vice president Tom Seddon told reporters yesterday, adding the hotel giant doesn't want a partner that "doesn't have our same core values."

InterContinental is flexing its muscles as the travel business continues to improve – while putting pressure on Internet travel agents like Expedia.

Yesterday, InterContinental execs said they have a number of beefs with Expedia. *They claim to be bothered by the online giant's policy of saying a hotel's rooms are "sold out" when spots are still available through other venues like the hotel's own Web site.*

And InterContinental execs say Expedia doesn't do a good enough job explaining to customers the fees it collects on each transaction.

An Expedia spokesman said its customers do get the information on fees, though not in the initial stages of their online purchase.

While InterContinental came down hard on Expedia yesterday, not all of its franchisees are expected to pull out of the site, said Legg Mason analyst Thomas Underwood.

*But an InterContinental spokeswoman said the hotel giant's franchisees voted unanimously to support the pullout.*

106. Throughout the Relevant Period, while IAC's stock price was driven up on defendants' positive statements, reaching a high of over $42 per share on July 7, 2003, certain Company insiders illegally profited on their own personal sales of the Company's common stock, selling over 7.73 million shares of their own IAC stock at inflated prices for over $257.2 million in proceeds and registering 4.4 million shares of the Company's common stock for sale by certain insiders in a secondary offering. The Company's stock fell to below $22 per share on news of the Company's dismal Q2 2004 performance, analyst downgrades, and news of InterContinental's decision, erasing billions of dollars in market capitalization.

107. In addition, the Company's travel business continues to be extremely disappointing and will be spun off. In May 2005, Diller admitted that as to Hotels.com, "for a period of time it lost its supply advantage and its price advantage."

108.    On February 16, 2005, *TheStreet.com* wrote that:

IAC/InterActiveCorp's travel business is on a journey, but Wall Street is increasingly unsure about its final destination.

While $218 million in writedowns caught attention at Barry Diller's ecommerce giant in the fourth quarter, sell-side analysts appeared more concerned Wednesday about weaker-than-expected sales growth in IAC's travel operations. IAC is planning to spin those businesses off into a separate company later this year.

Additionally, IAC indicated that its Hotels.com lodging business, which disappointed investors with its performance in prior 2004 quarters, is in the midst of a fundamental repositioning. In place of its tradition of presenting itself to consumers as a source for discounted hotel stays – a strategy that's increasingly difficult to follow through on given the challenges of competition and inventory acquisition – Hotels.com is now in the process of emphasizing its role as a trusted, objective adviser for travelers in the market for a hotel room.

## REASONS THE STATEMENTS WERE IMPROPER

109.    The Individual Defendants' statements made in connection with the announcement of these acquisitions and with the Company's financial reports and other statements made throughout the Relevant Period were materially false and misleading because they did not disclose that:

(a)    Certain of the Company's online customers were being double-billed for hotel rooms purchased on the Company's websites because the Company was not timely and/or accurately reporting hotel room sales to the chain hotels and as a result, certain customers were being charged the room rates that the Company had already collected, leading to great customer dissatisfaction;

(b)    Certain hotel chains were contesting the Company's slow payment for hotel room sales made on its website and were threatening to make less hotel rooms available to the Company and/or to stop doing business with the Company altogether;

(c)    Certain of the Company's website customers were being charged rates for their hotel rooms that exceeded the hotel's public prices, and thus, rather than providing a discount, the Company was actually charging a premium for rooms, leading to further customer dissatisfaction and causing customers to choose other online reservation providers or to buy directly from the hotel Web sites;

(d)     Certain IAC hotel customers were dissatisfied with the Company's practice of displaying a message on its websites that all of a particular hotel's rooms were sold out when the hotel was not actually sold out, which had the effect of diverting potential sales to other hotels, causing certain hotel customers to threaten to stop doing business with the Company altogether;

(e)     There were a great number of unhappy consumers who believed they had been overcharged in one way or another;

(f)     It has been alleged that for telephone reservations, approximately 30% of any given month's sales figures would result in cancellations, typically occurring in the month after the reservation was booked.  In the third month of a quarter, this would result in quarterly sales figures being inflated, since the cancellation would not be recorded until the next quarter.  The loss rate for telephone sales for overbilling refunds (10%-15%) and cancellations (30%) reportedly totaled 40%-45%;

(g)     These practices caused hotel chains to be increasingly unhappy with IAC and caused IAC to lose market share to the competition, including Travelocity, which did not engage in such practices;

(h)     Hotels.com's business was changing in 2003 because hotel operators had become resentful of having to pay Hotels.com for the benefit of using the Hotels.com on-line registration system.  Many of the chains were intentionally decreasing the number of rooms available to Expedia and Hotels customers.  Furthermore, by 2003, many chains were starting their own direct booking sites which would by-pass the Company's websites, thus seriously adversely effecting the Company's market share of web-based travel services;

(i)     To conceal deterioration in the hotel business, after the acquisitions of Expedia and Hotels.com, IAC began to provide only three data points on the business: total revenues, OIBA (Operating Income Before Amortization, which excluded numerous expenses–later criticized as an "iffy" accounting practice by *Fortune* magazine) and operating profits, which reporting made it possible for IAC to distort this important segment's results;

(j)     It has been alleged that according to a former employee of IAC, IAC's cash position was not nearly as strong as represented but was overstated by the Company's practice of

holding up payments to hotel chains that it otherwise owed, thereby eroding any remaining goodwill between the Company and its suppliers;

(k)     It has also been alleged that former employees have revealed that refunds to customers for overbilling took as long as two months, and that these refunds accounted for 10%-15% of telephone sales figures.  IAC's cash position was overstated by this practice as well;

(l)     Reportedly, IAC was also seeing disappointing international bookings, particularly in the Spring of 2004, due to its cut-back in marketing spending, as described by analysts subsequent to the Relevant Period;

(m)     The Company had previously been selling a large number of hotel rooms and airline seats through more than 24,000 affiliate websites, such as websites operated by the travel industry in certain cities, but since October 2002, many of these websites were either privately threatening and/or actually pursuing litigation against the Company, alleging among other things copyright infringement and predatory advertising, claiming that Hotels.com was using special software to deprive these affiliate websites of the portion of its fee that it had promised to pay them and that as a result, certain of the affiliate websites had refuted their otherwise exclusive, multi-year contracts with the Company and certain of these affiliate websites were instead transacting their purchases of hotel rooms directly with the hotel chains;

(n)     It has been alleged that according to former employees, Hotels.com manipulated its results by overstating its accounts receivables.  Specifically, Hotels.com would either accidentally or deliberately overbook customers for hotel rooms.  For example, if a customer first asked for a one-week-stay at a hotel, then later sought only a three-night-stay, Hotels.com would, nonetheless, charge the customer for the full week.  Hotels.com would also pay the hotel for the full week's stay.  Hotels.com then booked revenue on the full week the customer had been billed for and refuse to refund the money back to the customer once the discrepancy was detected.  At the same time, Hotels.com would claim that the hotel also owed Hotels.com a refund for the amount that Hotels.com had refunded back to the customer.  Reportedly, the scheme allowed Hotels.com to initially report revenue on the full week stay, but when they refunded the money back to the customer they would have generated income with an associate receivable for that amount.  While

-55-

Hotels.com was sometimes able to collect the money supposedly owed by hotels, the Company's internal controls and systems were so insufficient that potentially tens of millions of dollars of such purportedly owed refunds receivables were in danger of bing uncollectible;

(o)     Hotels were vastly improving their own online capabilities, which in conjunction with hotel's increasing unwillingness to provide discounted to rooms to IAC, meant that many consumers were using IAC travel websites to check for the lowest room rates and then going directly to the hotels' Web sites to book the rooms, as confirmed by analysis and media coverage during the Relevant Period;

(p)     One substantial business partner of Hotels.com, Metroguide, had commenced a lawsuit against Hotels.com and Diener alleging violations of federal copyright law and unfair business practices in January 2003 in the Southern District of Florida.  Defendants did not disclose the pendency of this litigation or the rift with what Diener had described in October 2002 as one of Hotels.com's "larger affiliates, proving [Hotels.com] a great deal of traffic";

(q)     Hotels.com had extremely poor controls and systems which made accounting manipulations not only possible but also likely.  It has been alleged that former employees reported payments of at least $1.5 million to various foreign hotels utilizing the personal American Express card of one of the officers.  This was reflective of how Hotels.com had grown much faster than its infrastructure.  Reconciling these payments was problematic.  Hotels.com had claimed they were owed something like $1.5 million worth of refunds from the hotels (which had also been reported as receivables on the balance sheet and had been reported on the Income Statements), but were never going to be able to collect it.  However, Hotels.com management knew they needed to write off this $1.5 million in receivables supposedly owed by the foreign hotels, but did not do so until after the Company's stock had fallen in August 2004;

(r)     Hotwire did not have long-term agreements with airlines, and when airlines began liquidating their investments in Hotwire it would have an adverse effect on IAC, as noted in statements by IAC and analysts at the end of the Relevant Period;

(s)     The defendants were causing the Company to under-report its state and local sales tax expenses for some locations because defendants were causing the Company to pay state

and local occupancy taxes based on the wholesale rate at which the Company rented blocks of rooms from hotel operators, rather than the higher retail rates charged customers; and

(t)     IAC's minority interests reported on its balance sheet as of December 31, 2003 were understated.  Instead of the $110.8 million reported by the Company in February 2004, the minority interest as of December 31, 2003 was actually $211.7 million.  IAC subsequently restated its financial results to correct this misstatement.

(u)     IAC's purportedly strong Home Shopping Network Results were in fact boosted by the Company's increasing use of its Flexpay program by which customers of certain products were not charged on their credit cards for several months.  The increasing use of this program was not disclosed until IAC filed its Form 10-K for 2003 in March 2004.

(v)     Although the Company was able to report overall growth through numerous acquisitions, IAC's business was not growing and its future was not nearly as bright as represented by defendant.

110.    As a result of the Individual Defendants' actions, IAC's market capitalization has been damaged by over $10 billion.  At the same time that the defendants were causing IAC to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over 7.73 million shares of their personally held stock.

## ILLEGAL INSIDER SELLING

111.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of IAC stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Barry Diller | 05/07/2003 | 4,500,000 | $32.7223 | $147,250,350 |
|  | 06/03/2003 | 775,000 | $37.0000 | $28,675,000 |
|  |  | **5,275,000** |  | **$175,925,35** |
|  |  |  |  | **0** |
|  |  |  |  |  |
| Dara Khosrowshahi | 05/29/2003 | 4,600 | $37.5600 | $172,776 |
|  | 05/29/2003 | 2,100 | $37.0000 | $77,700 |
|  | 05/29/2003 | 5,000 | $37.0200 | $185,100 |
|  | 05/29/2003 | 14,400 | $37.6000 | $541,440 |
|  | 05/29/2003 | 10,000 | $37.0800 | $370,800 |
|  | 05/29/2003 | 5,000 | $37.1500 | $185,750 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 05/29/2003 | 2,600 | $36.9600 | $96,096 |
| | 05/29/2003 | 4,000 | $37.5700 | $150,280 |
| | 05/29/2003 | 800 | $37.5800 | $30,064 |
| | 05/29/2003 | 200 | $37.5900 | $7,518 |
| | 05/29/2003 | 1,000 | $37.6600 | $37,660 |
| | 05/29/2003 | 300 | $36.9700 | $11,091 |
| | 11/20/2003 | 200 | $31.7400 | $6,348 |
| | 11/20/2003 | 4,076 | $31.7300 | $129,331 |
| | 11/20/2003 | 724 | $31.7100 | $22,958 |
| | 11/21/2003 | 2,500 | $31.4000 | $78,500 |
| | 11/21/2003 | 2,500 | $31.5300 | $78,825 |
| | 11/24/2003 | 5,000 | $32.0424 | $160,212 |
| | 11/25/2003 | 2,500 | $32.4000 | $81,000 |
| | 11/25/2003 | 2,500 | $32.7000 | $81,750 |
| | 11/25/2003 | 2,500 | $32.8800 | $82,200 |
| | 11/26/2003 | 5,000 | $32.6970 | $163,485 |
| | 11/28/2003 | 2,500 | $32.3300 | $80,825 |
| | 11/28/2003 | 2,400 | $32.6500 | $78,360 |
| | 11/28/2003 | 100 | $32.6600 | $3,266 |
| | 12/01/2003 | 250 | $32.5000 | $8,125 |
| | 12/01/2003 | 3,050 | $33.0700 | $100,864 |
| | 12/01/2003 | 550 | $33.0500 | $18,178 |
| | 12/01/2003 | 1,350 | $32.9900 | $44,537 |
| | 12/01/2003 | 50 | $33.0100 | $1,651 |
| | 12/01/2003 | 2,250 | $32.4500 | $73,013 |
| | 12/01/2003 | 1,150 | $32.3200 | $37,168 |
| | 12/02/2003 | 1,750 | $32.3000 | $56,525 |
| | 12/02/2003 | 2,500 | $32.2900 | $80,725 |
| | 12/02/2003 | 750 | $32.4400 | $24,330 |
| | 12/03/2003 | 3,000 | $32.0000 | $96,000 |
| | 12/03/2003 | 950 | $32.1500 | $30,543 |
| | 12/03/2003 | 50 | $32.1800 | $1,609 |
| | 12/03/2003 | 1,000 | $32.2200 | $32,220 |
| | 12/04/2003 | 300 | $30.7310 | $9,219 |
| | 12/04/2003 | 214 | $30.7220 | $6,575 |
| | 12/19/2003 | 4,200 | $32.8800 | $138,096 |
| | 12/19/2003 | 800 | $32.9000 | $26,320 |
| | 12/22/2003 | 1,401 | $32.9900 | $46,219 |
| | 12/22/2003 | 634 | $32.9100 | $20,865 |
| | 12/22/2003 | 2,965 | $32.9000 | $97,549 |
| | 12/23/2003 | 1,671 | $33.3000 | $55,644 |
| | 12/23/2003 | 1,658 | $33.7000 | $55,875 |
| | 12/23/2003 | 1,671 | $33.5000 | $55,979 |
| | 12/24/2003 | 1,667 | $33.4000 | $55,678 |
| | 12/24/2003 | 1,667 | $33.2000 | $55,344 |
| | 12/24/2003 | 516 | $33.1100 | $17,085 |
| | | **120,514** | | **$4,159,267** |
| Julius Genachowski | 05/07/2003 | 750 | $34.0300 | $25,523 |
| | 05/07/2003 | 12,500 | $34.0200 | $425,250 |
| | 05/07/2003 | 11,391 | $34.0000 | $387,294 |
| | 05/07/2003 | 22,609 | $33.7500 | $763,054 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 05/07/2003 | 5,500 | $33.7800 | $185,790 |
| | 05/07/2003 | 9,250 | $34.0100 | $314,593 |
| | 05/07/2003 | 5,500 | $34.0600 | $187,330 |
| | 05/07/2003 | 5,000 | $33.8500 | $169,250 |
| | 05/15/2003 | 20,000 | $35.5500 | $711,000 |
| | 05/16/2003 | 20,000 | $36.0000 | $720,000 |
| | 05/29/2003 | 10,000 | $37.7500 | $377,500 |
| | 05/29/2003 | 10,000 | $37.8000 | $378,000 |
| | 05/30/2003 | 21,666 | $37.5000 | $812,475 |
| | 12/18/2003 | 5,000 | $32.0000 | $160,000 |
| | 12/19/2003 | 2,500 | $32.0100 | $80,025 |
| | 12/19/2003 | 1,000 | $32.5000 | $32,500 |
| | 12/19/2003 | 5,000 | $33.0200 | $165,100 |
| | 12/19/2003 | 1,500 | $32.8500 | $49,275 |
| | 12/22/2003 | 5,000 | $33.0000 | $165,000 |
| | 12/22/2003 | 1,398 | $32.9900 | $46,120 |
| | 12/22/2003 | 2,969 | $32.9000 | $97,680 |
| | 12/22/2003 | 633 | $32.9100 | $20,832 |
| | 12/23/2003 | 1,667 | $33.5000 | $55,845 |
| | 12/23/2003 | 1,666 | $33.3000 | $55,478 |
| | 12/23/2003 | 1,667 | $33.7000 | $56,178 |
| | 12/24/2003 | 1,667 | $33.2000 | $55,344 |
| | 12/24/2003 | 1,667 | $33.1100 | $55,194 |
| | 12/24/2003 | 1,666 | $33.4000 | $55,644 |
| | 12/26/2003 | 33 | $33.2400 | $1,097 |
| | 12/26/2003 | 1,632 | $33.2300 | $54,231 |
| | 12/26/2003 | 6,668 | $33.0300 | $220,244 |
| | 12/26/2003 | 1,667 | $33.2900 | $55,494 |
| | 12/29/2003 | 1,000 | $32.9900 | $32,990 |
| | 12/29/2003 | 200 | $32.8200 | $6,564 |
| | 12/29/2003 | 1,000 | $32.9000 | $32,900 |
| | 12/29/2003 | 850 | $33.1000 | $28,135 |
| | 12/29/2003 | 1,000 | $33.3000 | $33,300 |
| | 12/29/2003 | 2,150 | $33.0000 | $70,950 |
| | 12/29/2003 | 1,000 | $33.2000 | $33,200 |
| | 12/29/2003 | 2,000 | $32.6900 | $65,380 |
| | 12/29/2003 | 800 | $32.8000 | $26,240 |
| | 12/30/2003 | 663 | $33.6900 | $22,336 |
| | 12/30/2003 | 133 | $33.4400 | $4,448 |
| | 12/30/2003 | 267 | $33.6000 | $8,971 |
| | 12/30/2003 | 166 | $33.4800 | $5,558 |
| | 12/30/2003 | 333 | $33.4600 | $11,142 |
| | 12/30/2003 | 165 | $33.6100 | $5,546 |
| | 12/30/2003 | 33 | $33.4500 | $1,104 |
| | 12/30/2003 | 233 | $33.6200 | $7,833 |
| | 12/30/2003 | 100 | $33.8600 | $3,386 |
| | 12/30/2003 | 332 | $33.5000 | $11,122 |
| | 12/30/2003 | 2,008 | $33.6700 | $67,609 |
| | 12/30/2003 | 567 | $33.8700 | $19,204 |
| | 12/31/2003 | 792 | $33.8600 | $26,817 |
| | 12/31/2003 | 1,647 | $34.2300 | $56,377 |
| | 12/31/2003 | 55 | $34.2500 | $1,884 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 12/31/2003 | 1,308 | $34.0000 | $44,472 |
| | 12/31/2003 | 1,102 | $34.0000 | $37,468 |
| | 12/31/2003 | 1,098 | $34.1800 | $37,530 |
| | 12/31/2003 | 1,098 | $34.1400 | $37,486 |
| | 12/31/2003 | 60 | $33.8900 | $2,033 |
| | 12/31/2003 | 340 | $33.7900 | $11,489 |
| | 01/02/2004 | 3,802 | $34.0000 | $129,268 |
| | 01/02/2004 | 799 | $34.0500 | $27,206 |
| | 01/02/2004 | 66 | $34.2500 | $2,261 |
| | 01/02/2004 | 333 | $34.0900 | $11,352 |
| | 01/05/2004 | 625 | $34.0200 | $21,263 |
| | 01/05/2004 | 1,877 | $34.0000 | $63,818 |
| | 01/06/2004 | 1,498 | $34.0000 | $50,932 |
| | 01/14/2004 | 6,833 | $34.0000 | $232,322 |
| | | **237,499** | | **$8,230,235** |
| Richard N. Barton | 08/14/2003 | 20,000 | $35.7259 | $714,518 |
| | 08/21/2003 | 20,000 | $37.4231 | $748,462 |
| | 08/28/2003 | 20,000 | $36.4027 | $728,054 |
| | 09/04/2003 | 20,000 | $35.0816 | $701,632 |
| | 09/11/2003 | 20,000 | $33.9745 | $679,490 |
| | 09/18/2003 | 20,000 | $35.3970 | $707,940 |
| | 09/25/2003 | 20,000 | $35.4723 | $709,446 |
| | 10/02/2003 | 20,000 | $33.8830 | $677,660 |
| | 10/09/2003 | 20,000 | $38.3046 | $766,092 |
| | 10/16/2003 | 20,000 | $38.1061 | $762,122 |
| | 10/23/2003 | 20,000 | $37.1535 | $743,070 |
| | 10/30/2003 | 20,000 | $38.4966 | $769,932 |
| | 11/06/2003 | 20,000 | $32.6771 | $653,542 |
| | 11/13/2003 | 20,000 | $33.3596 | $667,192 |
| | 11/20/2003 | 20,000 | $31.3376 | $626,752 |
| | 11/26/2003 | 20,000 | $32.2896 | $645,792 |
| | 12/04/2003 | 20,000 | $30.3246 | $606,492 |
| | 12/11/2003 | 20,000 | $29.8909 | $597,818 |
| | 12/18/2003 | 20,000 | $31.8057 | $636,114 |
| | 12/24/2003 | 20,000 | $33.1532 | $663,064 |
| | 12/31/2003 | 20,000 | $33.9133 | $678,266 |
| | 01/08/2004 | 20,000 | $32.7267 | $654,534 |
| | 01/15/2004 | 28,150 | $34.0202 | $957,669 |
| | 01/22/2004 | 28,150 | $34.0514 | $958,547 |
| | 01/29/2004 | 28,150 | $31.7501 | $893,765 |
| | 02/05/2004 | 28,150 | $31.3414 | $882,260 |
| | 02/12/2004 | 28,150 | $32.5420 | $916,057 |
| | 02/19/2004 | 28,150 | $32.9212 | $926,732 |
| | 02/26/2004 | 28,150 | $30.9255 | $870,553 |
| | 03/04/2004 | 28,150 | $32.4845 | $914,439 |
| | 03/11/2004 | 28,150 | $31.0259 | $873,379 |
| | 03/18/2004 | 28,150 | $29.8804 | $841,133 |
| | 03/25/2004 | 28,150 | $29.7252 | $836,764 |
| | 04/01/2004 | 28,150 | $32.8992 | $926,112 |
| | 04/08/2004 | 28,150 | $33.2400 | $935,706 |
| | 04/15/2004 | 28,150 | $32.0150 | $901,222 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 04/22/2004 | 28,150 | $33.7516 | $950,108 |
| | 04/29/2004 | 28,150 | $32.9615 | $927,866 |
| | 05/06/2004 | 4,794 | $31.4628 | $150,833 |
| | 05/06/2004 | 23,356 | $31.4628 | $734,845 |
| | 05/13/2004 | 20,935 | $29.7606 | $623,038 |
| | 05/13/2004 | 7,215 | $29.7606 | $214,723 |
| | 05/20/2004 | 28,150 | $30.0128 | $844,860 |
| | 05/27/2004 | 28,150 | $31.4836 | $886,263 |
| | 06/03/2004 | 28,150 | $30.7364 | $865,230 |
| | 06/10/2004 | 28,150 | $30.2799 | $852,379 |
| | 06/17/2004 | 11,871 | $29.8950 | $354,884 |
| | 06/17/2004 | 16,279 | $29.8950 | $486,661 |
| | 06/24/2004 | 28,150 | $30.8612 | $868,743 |
| | 07/01/2004 | 28,150 | $29.9975 | $844,430 |
| | 07/08/2004 | 28,150 | $29.9762 | $843,830 |
| | 07/15/2004 | 28,150 | $29.2418 | $823,157 |
| | 07/22/2004 | 28,150 | $28.3643 | $798,455 |
| | 07/29/2004 | 28,150 | $27.8565 | $784,160 |
| | | **1,256,350** | | **$40,626,787** |
| | | | | |
| Victor Kaufman | 05/07/2003 | 41,200 | $34.1800 | $1,408,216 |
| | 05/07/2003 | 5,500 | $34.0600 | $187,330 |
| | 05/07/2003 | 1,000 | $34.2600 | $34,260 |
| | 05/07/2003 | 5,500 | $33.7800 | $185,790 |
| | 05/07/2003 | 14,500 | $34.2300 | $496,335 |
| | 05/07/2003 | 25,000 | $33.5000 | $837,500 |
| | 05/07/2003 | 25,000 | $33.4800 | $837,000 |
| | 05/07/2003 | 4,200 | $33.6300 | $141,246 |
| | 05/07/2003 | 100 | $34.2700 | $3,427 |
| | 05/07/2003 | 200 | $33.7600 | $6,752 |
| | 05/07/2003 | 100 | $34.1700 | $3,417 |
| | 05/07/2003 | 2,000 | $34.2900 | $68,580 |
| | 05/07/2003 | 25,000 | $34.3000 | $857,500 |
| | 05/07/2003 | 25,000 | $34.2400 | $856,000 |
| | 05/07/2003 | 20,000 | $34.0500 | $681,000 |
| | 05/07/2003 | 18,860 | $34.2500 | $645,955 |
| | 05/07/2003 | 200 | $33.7900 | $6,758 |
| | 05/07/2003 | 45,000 | $33.6200 | $1,512,900 |
| | 05/07/2003 | 24,900 | $34.1500 | $850,335 |
| | 05/07/2003 | 9,250 | $34.0100 | $314,593 |
| | 05/07/2003 | 750 | $34.0300 | $25,523 |
| | 05/07/2003 | 32,500 | $34.0200 | $1,105,650 |
| | 05/07/2003 | 61,991 | $33.7500 | $2,092,196 |
| | 05/07/2003 | 25,000 | $34.1000 | $852,500 |
| | 05/07/2003 | 14,900 | $34.3100 | $511,219 |
| | 05/07/2003 | 11,609 | $34.0000 | $394,706 |
| | 05/07/2003 | 5,000 | $33.8500 | $169,250 |
| | 05/07/2003 | 25,000 | $33.5700 | $839,250 |
| | 11/21/2003 | 2,500 | $32.0000 | $80,000 |
| | 11/24/2003 | 7,500 | $32.1452 | $241,089 |
| | 11/25/2003 | 2,500 | $32.4000 | $81,000 |
| | 11/25/2003 | 2,500 | $32.7000 | $81,750 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 11/26/2003 | 5,000 | $32.6970 | $163,485 |
| | 11/28/2003 | 100 | $32.6600 | $3,266 |
| | 11/28/2003 | 2,400 | $32.6500 | $78,360 |
| | 11/28/2003 | 2,500 | $32.3300 | $80,825 |
| | 12/01/2003 | 250 | $32.5000 | $8,125 |
| | 12/01/2003 | 1,350 | $32.9900 | $44,537 |
| | 12/01/2003 | 50 | $33.0100 | $1,651 |
| | 12/01/2003 | 2,250 | $32.4500 | $73,013 |
| | 12/01/2003 | 550 | $33.0500 | $18,178 |
| | 12/01/2003 | 1,150 | $32.3200 | $37,168 |
| | 12/01/2003 | 3,050 | $33.0700 | $100,864 |
| | 12/02/2003 | 1,750 | $32.3000 | $56,525 |
| | 12/02/2003 | 2,500 | $32.2900 | $80,725 |
| | 12/02/2003 | 750 | $32.4400 | $24,330 |
| | 12/03/2003 | 3,000 | $32.0000 | $96,000 |
| | 12/03/2003 | 50 | $32.1800 | $1,609 |
| | 12/03/2003 | 1,000 | $32.2200 | $32,220 |
| | 12/03/2003 | 950 | $32.1500 | $30,543 |
| | 12/18/2003 | 5,000 | $32.0000 | $160,000 |
| | 12/19/2003 | 2,500 | $32.0100 | $80,025 |
| | 12/19/2003 | 1,500 | $32.8500 | $49,275 |
| | 12/19/2003 | 1,000 | $32.5000 | $32,500 |
| | 12/19/2003 | 9,750 | $33.0000 | $321,750 |
| | 12/19/2003 | 6,600 | $33.0200 | $217,932 |
| | 12/22/2003 | 633 | $32.9100 | $20,832 |
| | 12/22/2003 | 1,401 | $32.9900 | $46,219 |
| | 12/22/2003 | 10,000 | $33.0000 | $330,000 |
| | 12/22/2003 | 2,966 | $32.9000 | $97,581 |
| | 12/23/2003 | 1,675 | $33.7000 | $56,448 |
| | 12/23/2003 | 2,500 | $33.9000 | $84,750 |
| | 12/23/2003 | 1,662 | $33.5000 | $55,677 |
| | 12/23/2003 | 1,663 | $33.3000 | $55,378 |
| | 12/23/2003 | 2,500 | $33.4600 | $83,650 |
| | 12/24/2003 | 1,666 | $33.1100 | $55,161 |
| | 12/24/2003 | 1,667 | $33.2000 | $55,344 |
| | 12/24/2003 | 1,667 | $33.4000 | $55,678 |
| | 12/24/2003 | 5,000 | $33.0600 | $165,300 |
| | 12/26/2003 | 11,668 | $33.0300 | $385,394 |
| | 12/26/2003 | 1,633 | $33.2300 | $54,265 |
| | 12/26/2003 | 1,666 | $33.2900 | $55,461 |
| | 12/26/2003 | 33 | $33.2400 | $1,097 |
| | 12/29/2003 | 800 | $32.8000 | $26,240 |
| | 12/29/2003 | 850 | $33.1000 | $28,135 |
| | 12/29/2003 | 1,000 | $32.9000 | $32,900 |
| | 12/29/2003 | 1,000 | $32.9900 | $32,990 |
| | 12/29/2003 | 2,000 | $32.6900 | $65,380 |
| | 12/29/2003 | 4,150 | $33.0000 | $136,950 |
| | 12/29/2003 | 200 | $32.8200 | $6,564 |
| | 12/29/2003 | 1,000 | $33.2000 | $33,200 |
| | 12/29/2003 | 4,000 | $33.3000 | $133,200 |
| | 12/30/2003 | 334 | $33.4800 | $11,182 |
| | 12/30/2003 | 667 | $33.4600 | $22,318 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 12/30/2003 | 1,133 | $33.8700 | $38,375 |
| | 12/30/2003 | 200 | $33.8600 | $6,772 |
| | 12/30/2003 | 267 | $33.4400 | $8,928 |
| | 12/30/2003 | 467 | $33.6200 | $15,701 |
| | 12/30/2003 | 3,992 | $33.6700 | $134,411 |
| | 12/30/2003 | 668 | $33.5000 | $22,378 |
| | 12/30/2003 | 335 | $33.6100 | $11,259 |
| | 12/30/2003 | 1,337 | $33.6900 | $45,044 |
| | 12/30/2003 | 533 | $33.6000 | $17,909 |
| | 12/30/2003 | 67 | $33.4500 | $2,241 |
| | 12/31/2003 | 1,353 | $34.2300 | $46,313 |
| | 12/31/2003 | 45 | $34.2500 | $1,541 |
| | 12/31/2003 | 1,360 | $33.7900 | $45,954 |
| | 12/31/2003 | 902 | $34.1800 | $30,830 |
| | 12/31/2003 | 902 | $34.1400 | $30,794 |
| | 12/31/2003 | 3,208 | $33.8600 | $108,623 |
| | 12/31/2003 | 1,990 | $34.0000 | $67,660 |
| | 12/31/2003 | 240 | $33.8900 | $8,134 |
| | 01/02/2004 | 667 | $34.0900 | $22,738 |
| | 01/02/2004 | 100 | $33.5300 | $3,353 |
| | 01/02/2004 | 3,000 | $33.3000 | $99,900 |
| | 01/02/2004 | 1,000 | $33.6000 | $33,600 |
| | 01/02/2004 | 1,000 | $33.5500 | $33,550 |
| | 01/02/2004 | 1,000 | $33.8000 | $33,800 |
| | 01/02/2004 | 134 | $34.2500 | $4,590 |
| | 01/02/2004 | 100 | $33.9900 | $3,399 |
| | 01/02/2004 | 1,601 | $34.0500 | $54,514 |
| | 01/05/2004 | 2 | $33.8400 | $68 |
| | 01/05/2004 | 2,000 | $33.7100 | $67,420 |
| | 01/05/2004 | 1,123 | $34.0000 | $38,182 |
| | 01/05/2004 | 2,000 | $33.7000 | $67,400 |
| | 01/05/2004 | 1,000 | $33.8500 | $33,850 |
| | 01/05/2004 | 1,500 | $33.8800 | $50,820 |
| | 01/05/2004 | 2,000 | $33.6400 | $67,280 |
| | 01/05/2004 | 375 | $34.0200 | $12,758 |
| | 01/06/2004 | 2,002 | $34.0000 | $68,068 |
| | 01/06/2004 | 998 | $33.3300 | $33,263 |
| | 01/06/2004 | 2,000 | $33.1400 | $66,280 |
| | 01/06/2004 | 1,000 | $33.2800 | $33,280 |
| | 01/06/2004 | 1,000 | $33.3500 | $33,350 |
| | 01/06/2004 | 1,000 | $33.3700 | $33,370 |
| | 01/06/2004 | 2,000 | $33.3800 | $66,760 |
| | 01/07/2004 | 400 | $33.1400 | $13,256 |
| | 01/07/2004 | 1,000 | $33.0400 | $33,040 |
| | 01/07/2004 | 5,000 | $33.0600 | $165,300 |
| | 01/07/2004 | 2,000 | $33.1200 | $66,240 |
| | 01/07/2004 | 1,000 | $33.0000 | $33,000 |
| | 01/07/2004 | 600 | $33.1500 | $19,890 |
| | 01/08/2004 | 1,000 | $33.2000 | $33,200 |
| | 01/08/2004 | 2,000 | $33.0000 | $66,000 |
| | 01/09/2004 | 1,000 | $32.4000 | $32,400 |
| | 01/09/2004 | 2,000 | $32.5000 | $65,000 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 01/09/2004 | 1,000 | $32.3600 | $32,360 |
| | 01/09/2004 | 1,000 | $32.6000 | $32,600 |
| | 01/12/2004 | 1,000 | $32.0500 | $32,050 |
| | 01/12/2004 | 1,000 | $32.7000 | $32,700 |
| | 01/12/2004 | 2,000 | $32.2000 | $64,400 |
| | 01/12/2004 | 1,000 | $32.4500 | $32,450 |
| | 01/13/2004 | 500 | $32.9100 | $16,455 |
| | 01/13/2004 | 1,000 | $32.4000 | $32,400 |
| | 01/13/2004 | 3,500 | $32.9000 | $115,150 |
| | 01/13/2004 | 3,000 | $33.0000 | $99,000 |
| | 01/14/2004 | 1,000 | $32.9000 | $32,900 |
| | 01/14/2004 | 200 | $32.6900 | $6,538 |
| | 01/14/2004 | 4,000 | $33.1000 | $132,400 |
| | 01/14/2004 | 1,000 | $33.9600 | $33,960 |
| | 01/14/2004 | 1,000 | $32.8000 | $32,800 |
| | 01/14/2004 | 3,000 | $33.2000 | $99,600 |
| | 01/14/2004 | 1,000 | $33.4000 | $33,400 |
| | 01/14/2004 | 800 | $32.7100 | $26,168 |
| | 01/14/2004 | 1,000 | $32.9900 | $32,990 |
| | 01/14/2004 | 1,000 | $33.6200 | $33,620 |
| | 01/14/2004 | 1,000 | $33.8000 | $33,800 |
| | 01/14/2004 | 1,000 | $32.7000 | $32,700 |
| | 01/14/2004 | 2,000 | $33.9000 | $67,800 |
| | 01/14/2004 | 1,000 | $33.5000 | $33,500 |
| | 01/14/2004 | 10,000 | $33.0000 | $330,000 |
| | 01/15/2004 | 1,000 | $34.2000 | $34,200 |
| | 01/15/2004 | 300 | $33.5300 | $10,059 |
| | 01/15/2004 | 200 | $33.5000 | $6,700 |
| | 01/15/2004 | 1,000 | $34.5500 | $34,550 |
| | 01/15/2004 | 1,000 | $34.3000 | $34,300 |
| | 01/15/2004 | 1,000 | $33.7500 | $33,750 |
| | 01/15/2004 | 2,000 | $34.1000 | $68,200 |
| | 01/15/2004 | 2,000 | $34.0000 | $68,000 |
| | 01/15/2004 | 500 | $33.5100 | $16,755 |
| | 01/15/2004 | 1,000 | $34.4000 | $34,400 |
| | 01/16/2004 | 2,000 | $34.8000 | $69,600 |
| | 01/16/2004 | 2,000 | $34.7000 | $69,400 |
| | 01/16/2004 | 1,900 | $34.6900 | $65,911 |
| | 01/16/2004 | 1,000 | $34.4100 | $34,410 |
| | 01/16/2004 | 100 | $34.7400 | $3,474 |
| | 01/16/2004 | 1,000 | $34.5000 | $34,500 |
| | 01/16/2004 | 1,000 | $34.0000 | $34,000 |
| | 01/16/2004 | 1,000 | $34.4200 | $34,420 |
| | 01/20/2004 | 1,000 | $34.4600 | $34,460 |
| | 01/20/2004 | 200 | $34.4000 | $6,880 |
| | 01/20/2004 | 1,800 | $34.3800 | $61,884 |
| | 01/20/2004 | 400 | $34.9000 | $13,960 |
| | 01/20/2004 | 1,000 | $34.4200 | $34,420 |
| | 01/20/2004 | 1,600 | $34.8000 | $55,680 |
| | 01/20/2004 | 2,000 | $34.6000 | $69,200 |
| | 01/20/2004 | 2,000 | $34.8500 | $69,700 |
| | 01/21/2004 | 1,000 | $33.6000 | $33,600 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 01/21/2004 | 1,000 | $34.0200 | $34,020 |
| | 01/21/2004 | 1,000 | $34.2500 | $34,250 |
| | 01/21/2004 | 1,000 | $33.5100 | $33,510 |
| | 01/21/2004 | 900 | $33.9900 | $30,591 |
| | 01/21/2004 | 1,000 | $34.4000 | $34,400 |
| | 01/21/2004 | 1,100 | $34.0100 | $37,411 |
| | 01/21/2004 | 1,000 | $33.9000 | $33,900 |
| | 01/21/2004 | 1,000 | $34.0000 | $34,000 |
| | 01/21/2004 | 1,000 | $34.0500 | $34,050 |
| | 01/22/2004 | 1,000 | $34.2000 | $34,200 |
| | 01/22/2004 | 1,000 | $34.4000 | $34,400 |
| | 01/22/2004 | 2,000 | $34.1500 | $68,300 |
| | 01/22/2004 | 3,000 | $34.0000 | $102,000 |
| | 01/22/2004 | 1,000 | $34.3000 | $34,300 |
| | 01/22/2004 | 1,000 | $34.1000 | $34,100 |
| | 01/22/2004 | 1,000 | $34.3600 | $34,360 |
| | 01/23/2004 | 2,000 | $34.0000 | $68,000 |
| | 01/23/2004 | 1,000 | $34.3000 | $34,300 |
| | 01/23/2004 | 1,000 | $34.0500 | $34,050 |
| | 01/23/2004 | 1,500 | $33.9000 | $50,850 |
| | 01/23/2004 | 1,000 | $34.5000 | $34,500 |
| | 01/23/2004 | 1,500 | $33.7500 | $50,625 |
| | 01/23/2004 | 1,000 | $34.2500 | $34,250 |
| | 01/23/2004 | 500 | $33.8000 | $16,900 |
| | 01/23/2004 | 500 | $33.8500 | $16,925 |
| | 01/26/2004 | 1,000 | $33.4000 | $33,400 |
| | 01/26/2004 | 1,000 | $33.3000 | $33,300 |
| | 01/26/2004 | 500 | $33.8500 | $16,925 |
| | 01/26/2004 | 2,500 | $34.0000 | $85,000 |
| | 01/26/2004 | 1,000 | $33.8000 | $33,800 |
| | 01/26/2004 | 1,000 | $33.9000 | $33,900 |
| | 01/26/2004 | 1,000 | $33.7000 | $33,700 |
| | 01/26/2004 | 2,000 | $33.5000 | $67,000 |
| | 01/27/2004 | 1,000 | $33.3500 | $33,350 |
| | 01/27/2004 | 1,000 | $33.4000 | $33,400 |
| | 01/27/2004 | 1,000 | $33.2200 | $33,220 |
| | 01/27/2004 | 100 | $33.0800 | $3,308 |
| | 01/27/2004 | 1,000 | $33.3000 | $33,300 |
| | 01/27/2004 | 1,700 | $33.5800 | $57,086 |
| | 01/27/2004 | 400 | $33.0400 | $13,216 |
| | 01/27/2004 | 300 | $33.5810 | $10,074 |
| | 01/27/2004 | 1,000 | $33.1500 | $33,150 |
| | 01/27/2004 | 100 | $33.1000 | $3,310 |
| | 01/27/2004 | 1,000 | $33.0500 | $33,050 |
| | 01/27/2004 | 1,000 | $34.1500 | $34,150 |
| | 01/27/2004 | 400 | $33.0700 | $13,228 |
| | 01/28/2004 | 500 | $33.0000 | $16,500 |
| | 01/29/2004 | 700 | $32.0200 | $22,414 |
| | 01/29/2004 | 3,300 | $32.0000 | $105,600 |
| | 01/29/2004 | 300 | $32.0400 | $9,612 |
| | 01/29/2004 | 700 | $32.0500 | $22,435 |
| | 01/30/2004 | 2,000 | $32.0000 | $64,000 |

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| | 01/30/2004 | 500 | $32.2000 | $16,100 |
| | 01/30/2004 | 500 | $32.5100 | $16,255 |
| | 01/30/2004 | 1,000 | $32.2000 | $32,200 |
| | 01/30/2004 | 1,000 | $32.1000 | $32,100 |
| | 02/02/2004 | 500 | $32.1000 | $16,050 |
| | 02/02/2004 | 500 | $32.2000 | $16,100 |
| | 02/02/2004 | 500 | $32.0500 | $16,025 |
| | 02/02/2004 | 3,000 | $32.0000 | $96,000 |
| | 02/03/2004 | 500 | $32.1000 | $16,050 |
| | 02/03/2004 | 2,000 | $32.0000 | $64,000 |
| | 02/06/2004 | 7,000 | $32.0000 | $224,000 |
| | 02/06/2004 | 1,000 | $32.0500 | $32,050 |
| | 02/09/2004 | 1,000 | $34.0000 | $34,000 |
| | 02/09/2004 | 100 | $33.0900 | $3,309 |
| | 02/09/2004 | 2,400 | $33.1700 | $79,608 |
| | 02/09/2004 | 1,000 | $33.5500 | $33,550 |
| | 02/09/2004 | 500 | $33.1100 | $16,555 |
| | 02/09/2004 | 500 | $33.6000 | $16,800 |
| | 02/09/2004 | 4,000 | $33.0000 | $132,000 |
| | 02/09/2004 | 2,100 | $33.1800 | $69,678 |
| | 02/09/2004 | 1,000 | $33.4000 | $33,400 |
| | 02/09/2004 | 1,000 | $33.2500 | $33,250 |
| | 02/09/2004 | 100 | $33.1000 | $3,310 |
| | 02/09/2004 | 4,900 | $33.0800 | $162,092 |
| | 02/09/2004 | 900 | $33.0200 | $29,718 |
| | 02/10/2004 | 500 | $33.2000 | $16,600 |
| | 02/10/2004 | 500 | $33.3700 | $16,685 |
| | 02/10/2004 | 500 | $33.0000 | $16,500 |
| | 02/10/2004 | 1,000 | $33.1500 | $33,150 |
| | 02/10/2004 | 1,000 | $33.4000 | $33,400 |
| | 02/10/2004 | 1,000 | $32.9200 | $32,920 |
| | 02/10/2004 | 500 | $33.0950 | $16,548 |
| | | **842,862** | | **$28,328,785** |
| | **TOTAL** | **7,732,225** | | **$257,270,42** |
| | | | | **4** |

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

112.   Plaintiff brings this action derivatively, in the right and for the benefit of IAC, to redress injuries suffered, and to be suffered, by IAC, as a direct result of the breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting therefor, by the Individual Defendants.  IAC is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction by this Court.

113. Plaintiffs are and were owners of the stock of IAC at all times relevant to the defendants' wrongful conduct alleged herein and remain shareholders of the Company. In this capacity, Plaintiffs will adequately and fairly represent the interests of IAC in enforcing and prosecuting the Company's rights.

114. At present, IAC's Board is made up of defendants Bronfman, Diller, Kaufman, Keough, Kravis, Rattner, Schwarzkopf, Spoon, Furstenberg and Lourd. As of the date of commencement of this Action, the Board was comprised of defendants Bronfman, Diller, Kaufman, Keough, Kravis, Rattner, Schwarzkopf, Spoon, Furstenberg and Barton. As demonstrated below, owing to the myriad social and business interrelationships amongst the current and past Board members and officers as well as other factors enumerated herein, Plaintiffs have not made a formal demand on the Board of IAC to institute this action since such a demand would be futile.

115. As an initial matter, requesting that the other members of the Company's Board of Directors act independently of Diller's influence would, itself, constitute a waste of time and resources and would be futile. Diller presently owns approximately 239,000,000 shares of IAC common stock, which represents 60% of the voting rights of the Company. As such, he exerts a virtual control and domination over the Board since, with his vote, he could replace any other member of the highly compensated Board and/or other Company executives.

116. During the period between March of 2003 and November of 2004, certain of the Defendants, with the knowledge and passive approval of the remaining members of the Board, executed several significant sales of Company securities. These included the sale of over 5.2 million shares of IAC stock worth $175,925,350 by Diller, the sale of 1.2 million shares of Company stock worth over $40.6 million by former Director Barton (who resigned as of February, 2005), the sale of 237,499 shares of IAC stock worth over $8.2 million by Genaschowski, the sale of 120,514 shares of IAC common stock worth over $4.1 million by Khosrowshahi and the sale of 842,862 shares of IAC stock worth over $28.3 million by Kaufman. Each of these sales were undertaken under suspicious circumstances which bore investigation by the Board and/or a special committee of the Board in order to assure itself that these sales were not made on the basis of inside information. Nevertheless, in derogation of their respective duties, the remaining Board members have done and

continue to do nothing relative to this activity notwithstanding the filing of multiple securities class action lawsuits against the Company.  Therefore, requesting that the members of the Board institute this action would be hopelessly futile since they would be asked to implicate themselves and their own wrongdoing.

117.    Additionally, as detailed above, between March of 2003 and November of 2004, the value of IAC stock was artificially manipulated through the issuance of inaccurate and misleading statements which have resulted in a succession of securities class actions being maintained against the Company and certain of its officers.  Some of the erroneous statements were submitted to the Securities & Exchange Commission through various regulatory filings, including proxies dated April 30, 2003 and April 29, 2004, signed by one or more of the defendant members of the Board.  In signing these statements and/or failing to prevent their dissemination to the investing public, the various members of the Board breached their respective fiduciary duties.  In addition, the failure to disclose material facts in those filings enabled the Individual Defendants to win reelection in those proxies.  Because those elections were based on proxy statements that misled investors about the Company's business prospects, Plaintiffs seek to void those elections.  Since defendants may not have gotten elected absent the misleading proxy statements and because Plaintiffs seek to void those elections due to the misleading proxy statements, defendants are inherently interested and demand upon them is futile.

118.    At all times enumerated herein, both Diller and Kaufman had extensive experience with the Company.  Kaufman has been a director of IAC (and its predecessors) since December 1996 and has been Vice Chairman of IAC since October 1999.  Previously, Mr. Kaufman served in the Office of the Chairman from January 1997 to November 1997 and as Chief Financial Officer of IAC from November 1997 to October 1999.  Diller has been a director and the Chairman and Chief Executive Officer of IAC (and its predecessors) since August 1995.  As a result of their extensive experiences within the Company, both of these individuals possess a thorough familiarity with the operations and internal controls of the Company, including its legal and regulatory compliance policies and procedures.  Furthermore, neither Diller nor Kaufman could be expected to act independently because a substantial amount of their income is derived directly through their business

dealings with IAC as executives of the Company.  In particular, during 2003, IAC paid Diller $5,219,299 in salary and other forms of compensation.  Similarly, Kaufman was paid $3,656,000 in salary and compensation with an additional $2,777,913 in restricted stock awards for the same period. Therefore, notwithstanding their intimate knowledge of the Company's operations and legal obligations, both of these individuals would be hard-pressed to seek compensation from Keough, Schwarzkopf and Spoon (the current members of the Compensation Committee[1]) or Spoon, Rattner, Keough or Schwarzkopf (in their past and/or present capacities with the Audit Committee) for their own respective acts of malfeasance and lack of oversight over the Company's affairs since making such requests would potentially run contrary to Diller and Kaufman's financial interests.

119.    At all relevant times, the Audit Committee of the Board of Directors was and is authorized to a) discuss with management and the Company's independent auditor significant financial reporting issues and judgments, b) discuss with management the Company's earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies and c) review disclosures made to the Audit Committee by the Company's CEO and CFO during the certification process of the Company's yearly and quarterly reports with the Securities and Exchange Commission.  Additionally, the Audit Committee has at all times been charged with the responsibility of monitoring "the compliance by the Company with all legal and regulatory requirements."  During 2004, the Audit Committee met 13 times.

120.    During the Relevant Period, the members of the Audit Committee could not have been unaware of the continuing threat of allegations of patterns of self-dealing and breaches of fiduciary relationships on the part of Company executives and/or certain directors.  Indeed, since 2004, both IAC and its business partner and eventual subsidiary, Hotels.com, were the object of numerous lawsuits derived from various breaches of fiduciary duties.  For instance, on September 20, 2004, *Steven Malasky v. IAC/InterActiveCorp et al.*, No. 04 Civ. 7447, the first of twelve

---

[1] At all relevant times, the Compensation/Benefits Committee of the Board of Directors was and is authorized to recommend and set the compensation and benefits (including salary, incentives, bonuses, stock compensation, investments programs and insurance plans) for the Company's top executives and Board members.

shareholder class action, was commenced in the United States District Court for the Southern District of New York against IAC.  These complaints alleged that certain of the Company's officers, and one outside director had participated in violations of the federal securities laws.  Thereafter, eleven other such lawsuits containing substantially similar allegations were filed in the same court.  The complaints in these cases generally alleged that the value of the Company's stock was artificially inflated by statements about its financial results and forecasts made prior to its August 4, 2004 announcement of its earnings for the second quarter of 2004, that were false and misleading due to the defendants' alleged failure to disclose various problems faced by the Company's travel businesses.  Additionally, on April 10, 2003, at the time that Hotels.com merger with IAC was announced, the first of two class actions were filed in the Delaware Chancery Court on behalf of Hotels.com shareholders against Hotels.com, IAC, and members of the board of directors of Hotels.com.  *See Michael Garvey v. Jonathan F. Miller et al.*, No. 20248-NC (New Castle County).  These complaints alleged, in essence, that the defendants conspired to breach their fiduciary duties to Hotels.com's public shareholders by entering into and/or approving the merger agreement, which allegedly does not reflect the true value of Hotels.com. The complaints sought to enjoin consummation of the transaction or, in the alternative, to rescind the transaction, as well as damages in an unspecified amount. Moreover, on January 10, 2003, a securities class action, *Daniel Taubenfeld v. Hotels.com, et al.*, No. 3:03-CV-0069-N, was filed in the United States District Court for the Northern District of Texas, arising out of Hotels.com's downward revision of its guidance for the fourth quarter of 2002.  This lawsuit alleges that the defendants, Hotels.com and three of its former executives, violated the federal securities laws during the period from October 23, 2002 to January 6, 2003 (the "Class Period").  The defendants are alleged to have knowingly (i) made certain materially false and misleading public statements with respect to the anticipated performance of Hotels.com during the fourth quarter of 2002, and (ii) concealed from the investing public certain material events and developments that were likely to render that anticipated performance unattainable. The individual defendants are further alleged to have profited from the rise in Hotels.com's share price caused by their public statements through sales of Hotels.com stock during the Class Period.  The lawsuit further alleges that as a result of Hotels.com's announcement, on

January 6, 2003, of a downward revision of its guidance for the fourth quarter of 2002, its share price declined by 25%. Given the above-referenced litigation history of both IAC and its' later-acquired merger partners, the members of the Audit Committee were under a heightened duty to monitor the Company's operations and the actions of the Company's officers and directors in order to avoid the both the appearance and existence of improprieties on the part of IAC as well as the Company's partners, employees and directors. Nevertheless, as described herein, this duty was not met due to the conduct of the various defendants, on behalf of themselves and the Company.

121.    Additionally, neither Spoon nor Keough could claim to have been unaware of the activities within the Company. Not only were Keough and Spoon successive chairmen of the Audit Committee of the Board of Directors of the Company, their individual experiences outside of the Company provided them with unique insight and expertise regarding the operations and legal obligations of the Company. Indeed, Spoon as has been designated as an auditing committee "financial expert" by the Company. In this regard, it is significant to note that Spoon also served as a member of the Audit Committee of The Human Genome Sciences, Inc. and Keough has served on the Audit and Compensation Committees of The Washington Post Company as well as the Compensation Committee of McDonald's Corporation. Due to their respective heightened experiences and expertise, these defendants had a heightened duty to insure the accuracy and fairness of the Company's various public disclosures. Nevertheless, they breached their respective duties by causing and/or allowing the improper disclosures and misleading information described herein to be disseminated to the investing public. As a result of these breaches, any demand upon them must be deemed futile.

122.    Throughout and prior to the Relevant Period, Diller and other members on the Board of IAC have publicly acknowledged having cultivated a policy of stocking IAC's Board of Directors with individual's hand-picked by Diller, regardless of their capabilities or apparent conflicts of interest. For instance, although Malone and Bennet were officers and/or directors of Liberty Media Corporation - a business which, since September of 2003, owned QVC, the main rival of IAC's flagship Home Shopping Network - these individuals were allowed to remain on IAC's Board until their voluntary resignations from their repsective IAC director positions in September of 2004.

Responding to this criticism, Diller was quoted in the November 14, 2003 edition of *TheStreet.com* as stating that, "[t]here has been some criticisms about this -- about our "cozy" board, so to speak, and the fact that I have relationships with them.  Well, the truth is, I have relationships with almost everybody 'cause I've been in business a long time. ... So, there are very few people, actually, that I don't know.  Now maybe it would be great if I went out and found some dumb strangers to put on our board. But I don't think it would be the most effective way to manage the company."

123.     In fact, owing to Diller's express policies of selecting IAC Board members who have numerous social and business interrelationships with Diller and amongst each other, the Individual Defendants suffer from a succession of debilitating conflicts of interest that have and will prevent them from taking all proper and necessary actions in order to protect IAC's interests, to wit:

(a)     ***Personal and Financial Interrelationships between Diller and Furstenberg:*** Diller and Furstenberg have known each other for approximately twenty-six (26) years and were married in February of 2001.  In addition to the marital relationship, Furstenberg and Diller-controlled enterprises (including IAC) are involved in on-going business relationships.  For example, during 2003, one IAC subsidiary - Home Shopping Network - paid to a Furstenberg controlled business - Diane Von Furstenberg Studio L.P. - the sum of $263,000 from the sales of Furstenberg's fashion merchandise.  This professional relationship has continued and, during 2004, Home Shopping Network paid Furstenberg's company $330,500 for the sale of fashion merchandise.

(b)     ***Relationships between Diller, IAC and Kaufman:***  Aside from his relationship with Furstenberg, Diller - as the controlling shareholder of IAC - has authorized at least one other significant business relationship with Vice-Chairman of the Board Kaufman.  During December of 2004, at the behest of and with the approval of Diller, IAC invested $200,000 in convertible preferred stock in an on-line start-up business which is controlled by Kaufman, with an additional commitment to invest up to an additional $1.5 million in the business venture.  Significantly, this deal was specifically approved by IAC's Audit Committee (Defendants Spoon, Rattner and Schwazkopf).

(c)   ***Relationship between Dillar and Spoon:***  The description of the business background of Defendant Alan Spoon contained both the 2005 Proxy and 10-K statements is as follows:

> Alan Spoon, age 54, has been a director of IAC since February 2003.  Since May 2000, Mr. Spoon has been Managing General Partner at Polaris Venture Partners, a private investment firm that provides venture capital and management assistance to development-stage information technology and life sciences companies.  Mr. Spoon was Chief Operating Officer and a director of The Washington Post Company from March 1991 through May 2000 and served as President from September 1993 through May 2000.  Prior to that, he held a wide variety of positions at The Washington Post Company, including President of Newsweek from September 1989 to May 1991.  Mr. Spoon is currently a member of the board of directors of Danaher Corporation.  In his not-for-profit affiliations, Mr. Spoon is a Regent of the Smithsonian Institution and a member of the MIT Corporation.

The above-referenced description *does not* reveal that, in his capacity with Polaris Venture Partners, Spoon was made a director of Ticketmaster in 1999, effectively serving at the direction and pleasure of Diller.  This relationship appears to have been reciprocal since, in 2000, Diller was placed on the Board of the Washington Post Company, where Spoon at one time had acted as President and Chief Operating Officer.

(d)   ***Relationship Between Keough/Allen & Company and Diller:***  Similarly, a review of the 2005 Proxy from IAC describes Keough's business background in the most inconspicuous of terms:

> Donald R. Keough, age 78, has been a director of IAC since September 1998.  He currently serves as Chairman (in a non-executive capacity) of Allen & Company LLC (and its predecessors), a New York investment banking firm. He was appointed to this position in April 1993.  Mr. Keough is currently a member of the boards of directors of Berkshire Hathaway, Inc., The Coca-Cola Company and Convera.  He is a past Chairman of the board of trustees of the University of Notre Dame and a trustee of several other educational institutions.  He also serves on the boards of a number of national charitable and civic organizations.

Nevertheless, in the same Proxy statement, IAC included the following statement:

> From time to time, IAC has retained the services of Allen & Company, LLC, a New York investment banking firm.  Mr. Keough, a member of the board of Directors of IAC, currently serves as Chairman (in a non-executive capacity) of Allen & Company, LLC.

On further examination, the interrelationship between IAC, Allen & Company, Diller and Keough is both lengthy and extensive.  For example, an August 10, 2003 article in *The New York*

*Times*, in which various shareholders criticized a deal involving IAC and Vivendi, Patrick McGurn special counsel at Institutional Shareholder Services, noted that Keough was, at that time, the Chairman of the Audit Committee of IAC, which raised considerable suspicions given the admission in IAC's various proxy statements that Allen & Company had earned unquantified fees as part of its involvement in the IAC acquisitions of Ticketmaster, Hotels.com and Expedia.com.  In response to these criticisms, the article closed with the following tacit admission from Diller as to Keough's lack of independence:

> Mr. Diller said that on audit committee matters requiring a *fully independent director as chairman, Alan Spoon, former chief operating officer of the Washington Post Company, would take over.  Mr. Dillar said he did not know why Allen & Company's fees were not disclosed in the proxy filing.  "I would prefer that everything is disclosed," he said.*

As indicated above, to this day, IAC has not posted the nature and extent of the monies delivered to Allen & Company as a result of its operations with Diller and Diller-controlled business entities.

It should be noted that once Diller was appointed to the Board of Directors of The Coca-Cola Company (where Keough's partner, Herb Allen, was also a director), Diller served on the Board of Directors Committee, where he was responsible for finding further candidates for Coca-Cola's Board.  Unsurprisingly, within two years of his appointment, with the approval and participation of Diller, Keough was also placed on Coca-Cola's Board of Directors notwithstanding his having retired from Coca-Cola Company as the business' president in 1993.  In their respective capacities with Coca-Cola, both Diller and Keough earn a *minimum* of $125,000 per year in cash and/or securities. Additionally, Keough was a director of *The Washington Post Company*, serving on the Company's Audit and Compensation Committees, when Diller was also elected onto the Washington Post's Board of Directors.  In this regard, Diller now earns $60,000 per year, plus other benefits, as a result of his position with the Washington Post.

(e)   ***Relationship between Lourd and Diller:***  Although relatively new to the IAC Board of Directors, Lourd, like Spoon has been affiliated with Diller as a director of Ticketmaster since at least 2000.  More to the point, Lourd has enjoyed numerous social and business contacts

with Diller both in Diller's capacity with Paramount and other entertainment entities, as well as in Lourd's various positions with entertainment behemoth Creative Artists Agency (the entertainment agency formerly run by Michael Ovitz) and in his current position with IAC.  Moreover, Diller and Lourd have enjoyed numerous social ties, attending various movie picture functions as well as the Davos Economic Forum in Switzerland, the Allen & Company-sponsored annual Media & Technology Conference in Sun Valley, Idaho as well as functions at the Metropolitan Museum of Art.

(f)    ***Relationship Among Diller, Khosrowshahi, Keough, Bennet, Malone, Kravis, Rattner and Bronfman:***  Since approximately 1993, Diller, Bennet, Malone, Kravis, Rattner and Bronfman have been involved in varying capacities in a number of joint corporate ventures which have left them highly interdependent on both an economic and social level.  Initially, former Director Bennet was President and CEO of Liberty Media Corporation, where fellow former Director Malone was chairman of the Board.  Both Malone and Bennet, in their capacities with Liberty, attempted to assist Diller in his 1993 bid for Paramount Studios.  Both during and after this process, Diller was assisted by Keough and Khosrowshahi, through their respective affiliations with Allen and Company.  During this process, Paramount was being represented by Rattner, who was affiliated with the banking house of Lazard Freres.  Along the same lines several years later, Diller functioned as the Chief Executive Officer of Vivendi Universal (where Kravis has acted as a director and Fourtou has acted as Chairman and CEO).  Additionally,  Bronfman has acted as Executive Vice Chairman of Vivendi and was a director of Vivendi.  In this regard, it is asserted that given these various business interrelationships, all of the above-referenced individuals have been compromised by their various close and continuing working relationships with each other.

(g)    ***Relationships between Schwarzkopt, Diller and other Directors:***  Despite having virtually no media or entertainment background whatsoever, Diller arranged for defendant Schwarzkopf to be placed on the Board of the HSN and IAC in 1996.  Having served in Diller-controlled companies continuously since that time, during 2003 and 2004, Schwarzkopf received yearly compensation from the Company, $30,000 and $7,500 shares of IAC stock worth up to a maximum value of $250,000.  Additionally, Schwarzkopf has maintained an on-going relationship

with former IAC director Malone to the extent that Schwarzkopf has served on the President's Conservation Counsel and Board of Governors of The Nature Conservancy at the same time that Malone was serving on the Board of governors of that same organization.

124.    Given the compensation provided to each of the defendants, each of them at all times knew and/or directly benefitted from the wrongdoings complained of herein. Therefore, having actively and/or passively ratified the behavior which has resulted to damages to the Company, each of the directors of IAC would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do despite the fact that they are prohibited from ratifying such behavior.

125.    Any suit by the current directors of IAC to remedy these wrongs would likely expose the Individual Defendants and IAC to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

126.    IAC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for IAC any part of the damages IAC suffered and will suffer thereby.

127.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile.

128.    If IAC's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of IAC.

However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by IAC against these defendants, known as, inter alia, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of IAC, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate  recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause IAC to sue them, since they will face a large uninsured liability.

129.    Plaintiffs have not made any demand on shareholders of IAC to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    IAC is a publicly held company with approximately 696 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**(Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information)**

130.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

131.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold IAC common stock on the basis of such information.

132.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset

belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold IAC common stock.

133.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's prospects were materially overstated.  The Insider Selling Defendants' sales of IAC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

134.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### (Against All Defendants for Breach of Fiduciary Duty)

135.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

136.    The Individual Defendants owed and owe IAC fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe IAC the highest obligation of good faith, fair dealing, loyalty and due care.

137.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

138.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial prospects of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, IAC has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiffs on behalf of IAC have no adequate remedy at law.

## COUNT III

### (Against All Defendants for Abuse of Control)

141.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

142.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence IAC, for which they are legally responsible.

143.    As a direct and proximate result of the Individual Defendants' abuse of control, IAC has sustained significant damages.

144.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

145.    Plaintiffs on behalf of IAC have no adequate remedy at law.

## COUNT IV

### (Against All Defendants for Gross Mismanagement)

146.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

147.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of IAC in a manner consistent with the operations of a publicly held corporation.

148.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, IAC has sustained significant damages in excess of hundreds of millions of dollars.

149.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

150.    Plaintiffs on behalf of IAC have no adequate remedy at law.

## COUNT V

### (Against All Defendants for Waste of Corporate Assets)

151.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

152.     As a result of the improper statements, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused IAC to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

153.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

154.     Plaintiffs on behalf of IAC have no adequate remedy at law.

## COUNT VI

### (Against All Defendants for Unjust Enrichment)

155.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

156.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of IAC.

157.     Plaintiffs, as  shareholders and representatives of IAC, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII

### (Derivative Claim For Violation of Section 14(a) of the Securities Exchange Act of 1934 Against All Defendants)

158.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

159.    The defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders that were contained in Proxy Statements that misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct alleged herein, each defendant violated §14(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, IAC misled and/or deceived its shareholders by failing to disclose material facts regarding its business prospects.

160.    This information would have been material to IAC's shareholders in determining whether to elect directors to manage their company.

161.    Plaintiffs, on behalf of IAC, thereby seek to void the election of the current Board defendants based upon the misleading and incomplete proxy materials.

### COUNT VIII

### (Against All Defendants For Contribution And Indemnification)

162.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

163.    IAC is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Director and Officer Defendants' liability to IAC.

164.    IAC's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Director and Officer Defendants as alleged above, and IAC is entitled to contribution and indemnification from each of the Director and Officer Defendants in connection with all such claims that have been, are or may in the future be asserted against IAC by virtue of defendants' misconduct.

165.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.      Declaring and decreeing that the Defendants caused the Company to act in violation of §14(a) of the Exchange Act, thereby voiding the elections of the Current Board defendants based upon the misleading and incomplete proxy materials.

B.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs, on behalf of IAC, have an effective remedy;

D.      Awarding to IAC restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 5, 2004                    FARUQI & FARUQI, LLP
                                       NADEEM FARUQI ( NF-1184)
                                       BETH A. KELLER (BK-9421)


                                        /s/ Beth A. Keller
                                             BETH A. KELLER

                                       320 East 39th Street
                                       New York, NY  10016
                                       Telephone: 212/983 9330
                                       Facsimile: 212/983 9331

                                       Attorneys for Plaintiff Lisa Butler

BULL & LIFSHITZ, LLP
PETER D. BULL

 /s/ Peter D. Bull
               PETER D. BULL

18 East 41st Street
New York, NY 10017
Telephone: 212/213-6222

Attorneys for Plaintiff Stuart Garber