UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/22/07

IN RE IAC/INTERACTIVECORP
SECURITIES LITIGATION

04 Civ. 7447 (RJH)

**MEMORANDUM
OPINION AND ORDER**

## INTRODUCTION

Pending before the Court are three related suits brought against

IAC/InterActiveCorp ("IAC" or the "Company") and certain directors and high-ranking

officers. Plaintiffs in the first suit represent an uncertified class of investors who

purchased or otherwise acquired IAC publicly traded securities between March 31, 2003,

to August 3, 2004 ("class period"), including former shareholders of companies whose

stock was exchanged for IAC stock. The other two suits are shareholder derivative

actions that the Court has consolidated with the class action suit for pretrial purposes.

The gravamen of both the Consolidated Amended Class Complaint ("Class Complaint"

or "CC") and the Verified Consolidated Shareholder Derivative Complaint ("Derivative

Complaint" or "DC") is that, during the class period, defendants inflated the price of

IAC's stock by making materially false and misleading statements or omissions regarding

the health of IAC's travel business, thus enabling IAC to maximize the value of its stock

in the stock-for-stock acquisitions of LendingTree, Expedia, and Hotels.com, and

permitting certain individual defendants to benefit by selling 7.78 million shares of their

IAC stock for proceeds of $258.9 million.[1]  Following the release of IAC's second-quarter 2004 earnings, IAC's stock price dropped by sixteen percent or $4.23 per share, from $27.03 per share at close on August 3, 2004 to $22.80 at close on August 4, 2004.

Defendants have moved to dismiss the Class Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and have moved to dismiss the Derivative Complaint pursuant to Rule 23.1 for failure to make demand on IAC's board of directors. For the reasons set forth below, the Court grants defendants' motions [68] and [69], thereby dismissing both Complaints in their entirety.

## BACKGROUND

### 1.   *The Parties*

Class plaintiffs are IAC shareholders who purport to bring claims on behalf of a putative class of shareholders who purchased or otherwise acquired shares of IAC between March 31, 2003 and August 3, 2004.  (CC ¶¶ 14–19.)  Derivative plaintiffs Lisa Butler and Stuart Garber likewise allege to be owners and holders of IAC common stock. (DC ¶¶ 21–22.)  Derivative plaintiffs assert factual allegations identical to those made in the Class Complaint. (*Compare* CC ¶¶ 40–94 *with* DC ¶¶ 56–108.)

IAC, a Delaware corporation headquartered in New York City, sells goods and services over the internet.  (CC ¶¶ 20, 32; DC ¶ 6.)  IAC's strategy during the class period was to become a multi-brand interactive commerce company.  (CC ¶¶ 2, 45; DC ¶¶ 23, 60.)  IAC was organized into eight divisions, namely Travel (Expedia, Hotels.com, Hotwire, Interval International, and TV Travel Shop), Electronic Retailing (HSN, a home

---

[1] The Derivative Complaint extends the relevant period to cover "violations of law that occurred between March 2003 and the present" (DC ¶ 1), but all of the alleged wrongdoing described in the Derivative Complaint took place during the class period. (*Id.* ¶ 55.)

2

shopping service), Ticketing (Ticketmaster and ReserveAmerica), Personals (Match.com), Financial Services and Real Estate (LendingTree.com), Teleservices (Precision Response Corporation), Local and Media Services (Citysearch, Evite, Entertainment Publications, Inc. and TripAdvisor, Inc.), and Interactive Development (ZeroDegrees).  (CC ¶¶ 2, 32; DC ¶ 6.)  Prior to being spun off into a separate public company in August of 2005, the travel business was IAC's largest operating segment. (CC ¶ 32 ; DC ¶ 6.)  In fiscal year 2003, IAC sold over $10 billion in travel services, and Travel alone provided seventy percent of the Company's net income during the first six months of 2004.  (CC ¶ 32; DC ¶ 6.)

The following are the officers and directors who are named as individual defendants in the Class Complaint:  Barry Diller, Victor A. Kaufman, Dara Khosrowshahi, Julius Genachowski, Richard N. Barton, Erik C. Blachford, Robert R. Bennett, Edgar Bronfman, Jr., Donald R. Keough, Mariee-Josée Kravis, John C. Malone, Gen. H. Norman Schwarzkopf, Alan Spoon, and Diane von Furstenberg.  (CC ¶¶ 21–31.) The Class Complaint alleges that all of the individual defendants, with the exception of Genachowski and Blachford, signed allegedly false and misleading registration statements pursuant to IAC's acquisitions during the class period.  (*Id.* ¶¶ 30–31.)  Barry Diller is the chief executive and chairman of the Company.  (*Id.* ¶ 21.)  Victor A. Kaufman is vice chairman "of the Board of Directors,"[2] and he served previously as chairman of the Company and as its chief financial officer.  (*Id.* ¶ 26.)  At the time that the Class Complaint was filed, Dara Khosrowshahi was IAC's chief financial officer and

---

[2] The Court assumes that plaintiffs intended to state that Kaufman is a member of the board of directors and is also vice chairman of the Company (not the board), as IAC denotes him as such on their website, *www.iac.com/management.html*, and in their public filings, *see, e.g.,* 2003 Form 10-K, at 153 (Mar. 15, 2004).

an Executive Vice President. Julius Genachowski was Chief of Business Operations and an Executive Vice President. (*Id.* ¶ 22.) Bennett, Bronfman, Keough, Kravis, Malone, Schwarzkopf, Spoon, and von Furstenberg were directors of IAC at the time of the acquisitions (collectively, "Director Defendants"). (*Id.* ¶ 30.) Richard N. Barton became a member of IAC's board of directors in February 2003. (CC ¶ 24.) Barton founded Expedia and served as its president and chief executive, and as a director, from September 1999 to March 2003, when IAC announced that it would acquire the rest of the shares of Expedia that it did not already own. (*Id.* ¶¶ 24, 37.) The Class Complaint also names as defendant Erik C. Blachford, who became the new Chief Executive Officer of Expedia following Barton's resignation, and, after Expedia merged with IAC, served as president and chief executive of IAC Travel until January 1, 2005. (*Id.* ¶¶ 25, 40.)

The Derivative Complaint names all of the individuals described above, with the exception of Blachford, and in addition names the following individuals as defendants: Steven Rattner, a director of IAC since April 2004; Anne M. Busquet, a director of IAC at all relevant times until May 2003; and Jean-Renee Fourtou, a director of IAC at all relevant times until June 2003. (DC ¶¶ 24–40.)

## II. *Allegations of Wrongdoing*

The following allegations are set forth in the Complaints and are accepted as true for purposes of these motions to dismiss. *Cooper v. Parksy*, 140 F.3d 433, 440 (2d Cir. 1998).

During the class period, IAC's goal was to become the world's largest and most profitable interactive commerce company by pursuing a multi-brand strategy. (CC ¶ 45; DC ¶ 60.) IAC grew through acquisitions. (CC ¶ 35; DC ¶ 9.) Prior to the class period,

4

the Company purchased controlling interests in Ticketmaster and Expedia and acquired substantially all of the assets of the two entities that operated Hotels.com's websites. *Id.* During the class period, IAC acquired LendingTree as well as the shares that IAC did not already own in Expedia and Hotels.com in stock-for-stock transactions. (CC ¶¶ 40, 44, 48 ; DC ¶¶ 56, 59, 63.) On September 22, 2003, IAC announced the purchase of Hotwire, a discount travel website founded by Texas Pacific Group and American Airlines, America West Airlines, Continental Airlines, Northwest Airlines, United Airlines, and USAirways. (CC ¶¶ 65–67; DC ¶¶ 79–82.) The Company also announced the formation of a single travel division, IAC Travel, that would include Expedia, Hotels.com, Interval International, TV Travel Shop, and Hotwire. (CC ¶¶ 2, 25; DC ¶ 6.)

On November 5, 2003, IAC announced in its Form 8-K filed with the Securities and Exchange Commission ("SEC") that its earnings projection for full-year 2004— measured as Operating Income Before Amortization ("OIBA"), IAC's principal profitability metric—was "in the range of $1.0 billion to $1.2 billion." (Form 8-K, Exhibit 99.3 (Nov. 5, 2003) (Defs.' Mot. to Dismiss the Class Complaint ("Mot. Dismiss CC"), DiPrima Aff. Ex. 6); CC ¶ 69; DC ¶ 83). On the quarterly analyst call following this earnings release, Diller stated that "we believe we will continue to have strong growth over the next years" and that "we do know at least enough about next year to tell you that our best guess is that our operating income, before amortization . . . ought to be between $1 billion and $1.2 billion." (CC ¶ 70; DC ¶ 84.) Management repeated this projection at its November 11 "Investors Day" conference. (CC ¶¶ 74–76; DC ¶¶ 88–90.)

5

## A. Supplier and Customer Problems

During the class period, IAC Travel's subsidiaries acted primarily as intermediaries between suppliers and consumers by aggregating travel-related products such as hotel rooms and airline tickets and selling them over the internet. (CC ¶ 32; DC ¶¶ 6, 23.) For example, Hotels.com contracted with major hotel chains for nonexclusive rights to sell hotel room bookings for the hotel chains in exchange for a fee. (CC ¶ 33; DC ¶ 7.) A customer reserving a hotel room on Hotels.com's website paid Hotels.com directly; Hotels.com then paid a pre-negotiated price to the hotel chain for that room. Hotwire worked similarly: the hotel and airline partners permitted Hotwire to access their unsold inventory of hotel rooms and airline seats for sale at discounted prices. Expedia, on the other hand, bought rooms wholesale and then marked them up for sale at retail prices. (*Id.*)

Because of IAC Travel's role as an intermediary, its business model depended on the ability of its subsidiaries to obtain a favorable supply of hotel rooms and airline seats. Plaintiffs allege, however, that during the class period, IAC concealed significant supply problems within its travel business. (CC ¶¶ 9(a), 97(a); DC ¶¶ 15, 109.) Specifically, class plaintiffs allege that "defendants made false statements . . . affirmatively misrepresenting and concealing that (i) IAC lacked long-term contracts with airlines; (ii) the supply of hotel rooms for IAC was being reduced due to disputes with hotel chains, the hotel chains' improved on-line offerings and the hotel chains' increasing ability to fill rooms; and (iii) customer demand for IAC's hotel rooms was shrinking because of overbilling disputes and the ability to get the same rates by going directly to the hotel

6

chains' sites." (CC ¶ 3.) The Court now sets forth plaintiffs' allegations in more detail, treating the alleged dissatisfaction of hotel chains and customers together.

### 1.   *Airplane Seats*

During the class period, Hotwire had difficulty obtaining access to airlines' unsold inventory of airplane seats at discounted prices—a problem that defendants allegedly failed to disclose until the close of the class period. (CC ¶¶ 87–89; DC ¶¶ 101–103.) Plaintiffs conclude from this fact that Hotwire lacked enforceable, long-term volume and pricing agreements with Hotwire's founding airlines. (CC ¶ 9(k); DC ¶ 109(k).) Such agreements were necessary, plaintiffs argue, to ensure that the airlines continued to provide an ample supply of discounted seats to Hotwire after IAC's acquisition of Hotwire in 2003. (CC ¶ 67; DC ¶ 82.) "This was particularly true since American Airlines, Continental Airlines, Northwest Airlines, United Airlines, and Delta Airlines operated Orbitz," a competing discount travel site established in 2001. (*Id.*) Because IAC lacked such agreements, Hotwire's founding airlines were able to shift business away from IAC Travel by selling tickets through their own websites, or through Orbitz and other discount websites. (Pls.' Opp'n to Mot. Dismiss CC ("CC Opp'n") 4.)

### 2.   *Hotel Rooms*

IAC's hotel business, like its air travel business, depended on obtaining access to unsold inventory at discounted prices. As reported by "former IAC employees," however, during the class period IAC experienced infrastructure problems and engaged in a variety of "bad business practices" that damaged its relationships with suppliers and customers and eventually caused a decline in its supply of hotel rooms. (CC ¶¶ 9(a), 97(a); DC ¶ 109.)

7

For example, plaintiffs allege that certain customers were double-billed for hotel rooms purchased on the Company's websites because the Company failed to report hotel room sales to the chain hotels in a timely or accurate manner. (CC ¶¶ 9(a)(i), 97(a)(i); DC ¶¶ 58(a), 109(a).) IAC also allegedly reserved hotel rooms for longer terms than customers requested, necessitating refunds. (CC ¶ 9(g), 97(g); DC ¶ 109(n).) According to former IAC employees, refunds to customers for overbilling took as long as two months, and such refunds represented ten to fifteen percent of telephone sales figures, creating customer dissatisfaction and causing IAC's cash position to be overstated. (CC ¶¶ 9(d), 97(d); DC ¶ 109(k)) Plaintiffs also allege that, instead of receiving a discounted rate on hotel rooms purchased through Company websites, some customers were actually being charged rates above the hotel's public prices. (CC ¶¶ 9(a)(iii), 43(c), 97(a)(iii); DC ¶¶ 58(d), 109(c).) These problems purportedly led customers to choose other online reservation providers or to buy directly from hotel websites. (*Id.*)

According to plaintiffs, hotel chains were equally unhappy. (CC ¶¶ 9(a)(i)–(iv), 97(a)(i)–(iv); DC ¶¶ 58(a)–(d), 109(a)–(d).) Hotel chains were dissatisfied with the Company's practice of representing on its websites that a particular hotel's rooms were sold out when in fact rooms were still available through other venues, such as the hotel's own website. (*Id.*) Plaintiffs also allege, based on information obtained from unidentified "former employees," that IAC held up payments to hotel chains in order to overstate its cash position, "thereby eroding any remaining goodwill between the Company and its suppliers." (CC ¶¶ 9(c), 43(i), 97(c); DC ¶¶ 58(c), 109(j).) Exacerbating supply problems was the fact that many hotel chains had launched their own websites where customers could book rooms. (CC ¶¶ 9(h), 97(h); DC ¶ 109(o).)

These factors, together with customer dissatisfaction, allegedly led hotel chains to limit the supply of rooms that they made available to the IAC Travel's subsidiaries, or to abandon their relationships with IAC altogether.

Most of plaintiffs' allegations regarding hotel and customer dissatisfaction are described generally, but they do provide one specific example of a hotel chain that was dissatisfied with IAC. In early 2003, IAC's subsidiary Expedia entered an agreement to promote hotels owned by the InterContinental Hotels Group, which owns the hotel brands InterContinental Hotels and Resorts, Crowne Plaza, and Holiday Inn, among others. (CC ¶ 39.) By April 2004, however, InterContinental was displeased with IAC primarily because Expedia and Hotels.com: failed to clearly present fees to customers, instead lumping together fees and taxes; showed InterContinental's rooms as "sold out" when the websites had merely exhausted their allocation of discount rooms, diverting potential sales to other hotels; and transmitted reservations via fax that had to be reentered manually into the hotel's reservation system. (CC ¶¶ 80, 90; DC ¶¶ 75, 94.) Following the close of the class period, on August 16, 2004, InterContinental announced that it would be terminating its relationship with IAC Travel. (CC ¶ 90; DC ¶ 104.)

Finally, the Complaints allege that the Company understated its tax liabilities by paying state and local occupancy taxes based on the wholesale rate remitted to the hotel chains rather than at the higher retail rates paid by customers. (*See* CC ¶¶ 60–64; DC ¶¶ 75–78.)

### 3.   *Accounting Practices*

The Complaints also allege in the most general terms that the Company's manipulations of revenues and cash flows—resulting, for example, from overbilling and

cancellations—rendered IAC's reported financial results false and misleading. (*See, e.g.*, CC ¶ 9(b) and DC ¶ 109(i) ("To conceal deterioration in the hotel business . . . IAC began to provide only three data points on the business: total revenues, OIBA [Operating Income Before Amortization] . . . and operating profits . . . ."); CC ¶ 9(c) and DC ¶ 109(k) ("IAC's cash position . . . was overstated by the Company's practice of holding up payments to hotel chains that it otherwise owed . . . ."); CC ¶ 9(g) and DC ¶ 109(n) ("Hotels.com manipulated its results by overstating its accounts receivables."); CC ¶ 9(j) and DC ¶ 109(q) ("Hotels.com had extremely poor controls and systems which made accounting manipulations not only possible but also likely."); CC ¶ 101 ("Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting earnings"); CC ¶ 105 (stating that IAC engaged in a "scheme to inflate reported earnings").)

Despite these allegations, class plaintiffs devoted only a single footnote in their opposing papers to this issue (*see* CC Opp'n 7 n.4), and at oral argument, counsel for class plaintiffs stated that they are not asserting a claim that the financial statements were false or that the Company failed to comply with GAAP [Generally Accepted Accounting Principles] (*see* Oral Argument Tr. 10, Oct. 12, 2006.). Accordingly, the Court considers any claims regarding the truthfulness of the Company's reported financial statements to have been abandoned by class plaintiffs.

## C. Defendants' Trades

Plaintiffs allege that IAC concealed its supply problems during the class period, causing IAC's stock to trade at artificially inflated levels. (CC ¶¶ 4, 95; DC ¶¶ 11, 50, 52.) In early 2003 IAC was trading below \$25 per share, but on July 7, 2003 IAC's share

10

price reached a class-period high above $40 per share. (CC ¶¶ 6, 10, 92; DC ¶¶ 17, 55, 106.) The inflated share price allegedly benefited IAC by permitting it to maximize the value of its stock in the stock-for-stock acquisitions of LendingTree, Expedia, and Hotels.com. (CC ¶¶ 4, 95; DC ¶¶ 11, 52.) In addition, certain individual defendants allegedly benefited from the inflated share price by selling 7.78 million shares of their IAC stock for proceeds of $258.9 million. (CC ¶¶ 10, 29, 95; DC ¶¶ 55, 111.) Specifically, defendant Diller sold 5,329,000 shares worth $177,649,570 in three transactions dated May 7, 2003, June 3, 2003, and February 13, 2004. (CC ¶ 95; DC ¶ 111.) The largest of these transactions by far was the May 7, 2003 transaction, in which Diller sold 4,500,000 shares worth $147,250,350. *Id.* Barton sold 1,256,350 shares worth $40,626,787 in regularly scheduled transactions of 20,000 or 28,150 shares per week between August 14, 2003 and July 29, 2004. *Id.* Genachowski sold 327,499 shares worth $8,230,235 between May 7, 2003 and January 14, 2004; Kaufman sold 842,862 shares for $28,328,785 between May 7, 2003 and February 10, 2004; and Khosrowshahi sold 120,514 shares worth $4,159,267 between May 29, 2003 and December 24, 2003. *Id.* Defendants also caused IAC to repurchase 62 million shares of its stock on the open market. (CC ¶ 4; DC ¶ 11.)[3]

## D.   Alleged Disclosures at the Close of the Class Period

Plaintiffs allege that defendants made a number of disclosures at the close of the class period. On August 3, 2004, IAC issued its second quarter 2004 earnings release in which it disclosed that its quarterly net income had fallen twenty-five percent ($23 million) from the same quarter in 2003. (CC ¶ 86; DC ¶ 100.) On the conference call on

---

[3] The Derivative Complaint states that IAC repurchased "over 47 million shares" of its stock rather than 62 million, but this discrepancy is not relevant to the instant motions.

11

August 3, Roger Clark, Vice President of Investor Relations, discussing these results,

stated:

> [I]f you dig deep into this of course, *there are some supply issues*, and, of
> course, the second quarter was probably the deepest cut of it. Certainly
> internationally where all travel was down and is beginning I think to
> rebound. But other than that and other than Hotwire, which is definitely a
> significant issue, we don't think, again, it's structural. We don't think it's
> long term. We think that *the supply issues that we have had that have
> given us a lesser discounts as the year progresses*, we don't think it's
> going to come back fast, but we definitely think it will come back.

(CC ¶ 87 (emphasis added); DC ¶ 101.) Plaintiffs allege that this statement and the

announcement that "revenues were well short of analyst expectations" made "it evident

that the defendants' prior statements that the Travel business was 'on track' were false."

(CC ¶ 88; DC ¶ 102.) Defendants also announced that 2004 earnings were expected to

come in at $1.0 billion, the low end of the projected range.[4]

IAC's stock price declined on this news by sixteen percent or $4.23 per share,

from $27.03 per share at close on August 3, 2004 to $22.80 at close on August 4, 2004.

(CC ¶ 88; DC ¶ 102.) On August 5, Diller sent an e-mail to IAC employees in which he

recognized that the announcement that IAC expected earnings for 2004 to come in at the

lower end of the range projected in November 2003 had disappointed the market, causing

the stock to drop:

> We said on the call that it was a good quarter, and it was. What wasn't
> good is that we, your management, raised expectations too high at our

---

[4] Although plaintiffs quote a Company press release issued on August 3, 2004 and the
analyst conference call following the earnings release, they fail to mention that IAC
revised its earnings guidance on the call and in its SEC filing that day. *See* Form 8-K, at
6 (Aug. 3, 2004) ("IAC forecasts full year 2004 Operating Income Before Amortization
of approximately $1 billion, the low end of our original range of $1.0 to $1.2 billion, and
expects operating income of approximately $430 million."); (Tr. of Q2 2004 Earnings
Call, at 3 (Aug. 3, 2004) (DiPrima Aff. Ex. 15)). Under *Rothman v. Gregor*, 220 F.3d 81,
88 (2d Cir. 2000), the Court deems the Complaint to include this SEC filing and the full
transcript of the conference call.

12

Investor Day last November and are now paying the price. Added to that, and I do believe inappropriately, I was far too defensive in replying to analysts' questions . . . . All of these are true but the higher truth is we did disappoint the estimates for growth set by our own hands and by not lowering them earlier in the year as the strain became clear we mightily exacerbated the problem. That, and the extremely jittery markets of the last months did the rest . . . . [T]he responsibility for this, allowing the bar to be set unreasonably high, and then not having the proper patient focus on our conference call, is fully mine.

(CC ¶ 7; DC ¶ 18.) Plaintiffs argue that in this e-mail "Diller conceded he had overstated the Company's then-existing business operations and status in earlier statements and gave too bullish guidance at an investor and analyst conference in November 2003, which he admitted misled investors." (*Id.*) The final alleged disclosure was InterContinental's announcement that it would be terminating its relationship with IAC Travel. (CC ¶ 90; DC ¶ 104.)

Ultimately, IAC met its earnings projection for 2004, reporting earnings of $1.02 billion, within the range of $1.0 to $1.2 billion forecasted in November 2003. (*See* Form 8-K, Ex. 99.1, at 1 (Feb. 16, 2005) (DiPrima Aff. Ex. 18).) However, within weeks of the disclosures of August 3, 2004, multiple class action lawsuits alleging securities fraud were filed. The consolidated class action at issue here asserts claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), Rule 10b-5 promulgated thereunder, Section 11 of the Securities Act of 1933 ("Securities Act"), Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), and Section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15"). The allegations of wrongdoing in the consolidated derivative suits mirror those in the class action, and derivative plaintiffs assert claims of breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, contribution and indemnification, and violation of Section 14(a) of the Exchange Act.

13

## DISCUSSION

### I.   *Defendants' Motion To Dismiss The Class Complaint*

#### A.   Section 10(b) and Rule 10b-5 Claim Against All Class Action Defendants

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent activities in connection with securities transactions. Section 10(b) prohibits the use of "manipulative or deceptive" practices in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b-5 presents specific practices that are considered "manipulative or deceptive" and provides that "it shall be unlawful . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, "a plaintiff must allege that the defendant knowingly or recklessly made a false or misleading statement of material fact in connection with the purchase or sale of a security, upon which plaintiff reasonably relied, proximately causing his injury." *Kowal v. MCI*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (footnote omitted); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005) (holding that the basic elements of Section 10(b) and Rule 10b-5 claims are "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,'; (5) economic loss; and (6) 'loss causation,' i.e.,

14

a causal connection between the material misrepresentation and the loss" (internal citations omitted)).

A court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bernheim v. Litt*, 79 F.3d 318 (2d Cir. 1996) (internal quotation marks omitted). At the motion-to-dismiss stage, the proper question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184 (2005) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). A court "must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *SEC v. Pimpco Advisors Fund Mgmt., LLC*, 341 F. Supp. 2d 454, 463 (S.D.N.Y. 2004) (citing *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir. 2000)). However, the court will not credit conclusory statements unsupported by factual allegations or legal conclusions presented as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *J.S. Serv. Ctr. Corp. v. General Elec. Tech. Servs. Co.*, 937 F. Supp. 216, 219 (S.D.N.Y. 1996). Nor should a court accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court. *MaDonna v. United States*, 878 F.2d 62, 65-66 (2d Cir. 1989); *Alusit Ltd. v. Aluglas of Pa.*, No. 89 Civ. 3849 (CSH), 1990 U.S. Dist. LEXIS 16755, 1990 WL 209422 at *11 & n.1 (S.D.N.Y. Dec. 4, 1990). Materials that a court may properly consider on a motion to dismiss include

> any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public

15

disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

*Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989), *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)).[5]

While the rules of pleading in federal court usually require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. Proc. 8, averments of fraud must be "stated with particularity," Fed. R. Civ. Proc. 9(b). In securities cases where the plaintiff alleges that a defendant made an untrue statement of a material fact or omitted to state a material fact, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional pleading requirements: the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "The Second Circuit evaluates a securities complaint's compliance with Rule 9(b) and the PSLRA by means of a common formulation. 'A complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, No. 04 Civ. 8144 (SWK), 2006 U.S. Dist. LEXIS 49525, 2006 WL 2057194, at *8 (S.D.N.Y. July 20, 2006) (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d

---

[5] Defendants, citing *Rothman*, argue that the Court in deciding the motion to dismiss may consider various contracts between Hotwire and airline companies. Class plaintiffs argue that the Court may not consider these contracts because the contracts are not integral to the Class Complaint and are not incorporated by reference. The Court resolves this dispute *infra* at note 8.

Cir. 1999)). Additionally, where "proof that the defendant acted with a particular state of mind" is at issue, the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[C]laims that fail to satisfy these PSLRA pleading requirements must be dismissed." *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 213 (S.D.N.Y. 2004); *see* 15 U.S.C. § 78u-4(b)(3)(A). The PSLRA also imposes a mandatory stay on discovery pending judicial determination of the legal sufficiency of the claims. *See* 15 U.S.C. §78u-4(b)(3)(B).

### 1. *False and Misleading Statements*

As an initial matter, the Court rejects any claim that IAC's earnings projection for 2004 of "$1.0 billion to $1.2 billion" was false or misleading or that defendants are liable because IAC failed to meet earnings projections. Although plaintiffs do not squarely allege that IAC's earnings guidance was fraudulent, plaintiffs complain that IAC "gave too bullish guidance at an investor and analyst conference in November 2003" (CC ¶ 7) and attempted "to assure investors of IAC's value and performance and continued substantial growth" while at the same time concealing adverse information (CC ¶ 112). However, IAC's statements about its prospective performance were accompanied by cautionary language. "Such language brings into play the 'bespeaks caution' doctrine. Under the 'bespeaks caution' doctrine, 'courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial.'" *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 U.S. Dist. LEXIS 21319, 2003 WL 22801416, at *5 (S.D.N.Y. Nov. 25, 2003) (quoting *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)). The PSLRA also provides safe harbor protection

17

to a forward-looking statement if it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(1)(A). "The only exception to this rule is that there may be liability where (1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts." *Duane Reade*, 2003 WL 22801416, at *5 (citing I*n re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999)); *see In re International Business Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("Statements regarding projections of future performance may be actionable . . . if the speaker [did] not genuinely or reasonably believe them" at the time they were made. (citations omitted)).

Plaintiffs have not alleged that defendants issued the earnings guidance with actual knowledge that it was false or that the guidance itself misrepresented present facts. *See Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759 (S.D.N.Y. 2006) ("Plaintiffs must show that defendants knew or should have known that the fourth quarter projections were misleading when made.") Accordingly, the projection may benefit from the PSLRA safe harbor for forward-looking statements so long as defendants also "point[ed] to the principal contingencies that could cause actual results to depart from the projection." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (cited in *In re Gilat Satellite Networks, Ltd.*, No. 02 Civ. 1510 (CPS), 2005 U.S. Dist. LEXIS 41996, 2005 WL 2277476, at *12 (E.D.N.Y. Sept. 19, 2005))). IAC did, in fact, couch its earnings projection with specific cautionary language. In the same Form 8-K in which IAC announced its earnings forecast, it disclosed to investors various risk factors, including

"competition from others" and "the risk that IAC's businesses will not be integrated

successfully." (DiPrima Aff. Ex. 6, at 20.) In the conference call following this earnings

projection, Diller specifically warned that IAC was

> feeling more competition from hotel chains, large, medium-sized, and
> from other online travel sites trying to replicate our success. Travelocity,
> Orbitz, and from the hotels themselves, are all being competitive, getting
> smarter about using the Internet, and it's resulted in, of course, more more
> [sic] aggressive pricing online and more aggressive marketing trends.

(DiPrima Aff. Ex. 7, at 3.) Similarly, when IAC reconfirmed its earning guidance in an

analyst conference call on February 9, 2004, Diller said:

> [W]e are here to reconfirm our range of 1 billion to 1.2 billion in
> OIBA. We've told you our goal is to deliver almost 3 billion by 2008,
> which is growth of nearly 30% a year. We can't tell you what's going to
> happen in any particular quarter or year, but we do think it's going to
> range between 25 and 35%.
>
> Now, these crystal ballings aren't, of course, worth the air they're
> written on. No one can predict the future. But it is our honest guess,
> based upon everything we know.

(Tr. Q4 2003 Earnings Call, at 2 (Feb. 9, 2004) (DiPrima Aff. Ex. 11)). The Court finds,

therefore, that the cautionary language used in connection with IAC's earnings guidance

renders it inactionable. "The securities laws do not require that investors be treated like

children . . . investors know that the stock market is a risky business and that when a

company's officer makes predictions . . . they are not issuing guarantees." *Duane Reade*,

2003 WL 22801416, at *6 (citations and internal quotation marks omitted); *see Shields v.*

*Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not

a cause of action, and does not support an inference of fraud. We have rejected the

legitimacy of alleging 'fraud by hindsight.'"); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d

259, 269 (2d Cir. 1993) ("There is no suggestion that the factual assertions contained in

any of these statements were false when the statements were made. As to the expressions

19

of opinion and the projections contained in the statements, while not beyond the reach of the securities laws, . . . the complaint contains no allegations to support the inference that the defendants either did not have these favorable opinions on future prospects when they made the statements or that the favorable opinions were without a basis of fact."). Even if these cautionary statements were insufficient to render the earnings projection immaterial as a matter of law, the fact that IAC reported earnings of $1.02 billion— within the projected range—largely eviscerates any unstated claim that the earnings projection was false or misleading.

The Court now turns to the core allegation of the Complaint, which presents the more nuanced claim that the sixteen-percent drop in share price is attributable, not to IAC's revised earnings projection,[6] but to the disclosure on August 3, 2004, that IAC Travel was having "supply issues." (CC ¶ 87; *see* CC Opp'n 13; Oral Argument Tr. 9, Oct. 12, 2006.) Specifically, plaintiffs allege that defendants violated the federal securities laws by misrepresenting current facts, including "IAC's supply of airplane seats and hotel rooms, [and] its relationships with its suppliers and customers . . . ." (CC ¶ 3; CC Opp'n 13.) Under Rule 9(b) and the PSLRA pleading standards, plaintiffs must do more than allege that various statements made by defendants were false or misleading: "they must demonstrate with specificity why and how that is so." *In re Open Joint Stock Co. "Vimpel-Communications" Sec. Litig.*, No. 04 Civ. 9742 (NRB), 2006 U.S. Dist. LEXIS 10256, 2006 WL 647981, at \*5 (S.D.N.Y. Mar. 14, 2006); *see Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("To succeed on this claim, plaintiffs must do

---

[6] IAC's earnings projection was "revised" in the limited sense that IAC stated in the press release on August 3, 2004, that it expected 2004 earnings to come in at the low end of the projected range announced in November 2003 of $1.0 to $1.2 billion.

more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so."). Further, the complaint must establish the materiality of the omissions or misstatements. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("In order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."). An alleged misrepresentation or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (citations omitted). The Court now examines each category of false and misleading statement to determine whether plaintiffs have satisfied this standard.

a.      Airplane Seats

The first category of false or misleading statements alleged by plaintiffs concerns the duration of the founding airlines' contracts with Hotwire. On September 22, 2003, IAC announced that it would acquire Hotwire for $665 million in cash, but the press release omitted any mention of the type of contracts that Hotwire had with its founding airlines. (CC ¶¶ 65–68.) On November 5, 2003, IAC completed the acquisition. (*See* Press Release, IAC/InterActiveCorp, IAC Reports Q3 2003 Results (Nov. 5, 2003) (cited by CC ¶ 69).) On the earnings conference call that same day, an analyst asked Diller what effect the purchase of Hotwire would have on contracts between Hotwire and its founding airlines. The following exchange took place:

> DARYL SMITH, ANALYST, JP MORGAN: Good morning. On the Hotwire side of the equation, traditionally [sic] benefited from preferential

21

pricing associated with their close connection with airline suppliers. With airlines now liquidating their investment when can we anticipate that their existing pricing contracts roll off and when do you think you'd expect financial impact of that on the business? I have a follow-up question as well.

BARRY DILLER: I'm sorry, forgive me. If you just repeat the last part of your questions, cross talk here and I couldn't hear it.

DARYL SMITH, ANALYST, JP MORGAN: If you look at the airlines now liquidating their investment what's the potential impact on the roll off of that pricing contracts and then what's the impact on your business and when can we anticipate that happening?

BARRY DILLER: I don't know if there's any. I think our agreements with airlines are long-term. And, so, I don't think that it will have any effect. Anybody else here have anything to comment on it? So that's the answer to that.

(DiPrima Aff. Ex. 7, at 11; CC ¶¶ 69–72.) Plaintiffs allege that Diller's statement that the

"agreements with airlines are long-term" was materially false and misleading because

"Hotwire did not have the long-term pricing arrangements represented and the

subsequent decline in Hotwire's business would be a major contributing factor in IAC's

declining travel prospects in 2004." (CC ¶ 73.)

Courts in this district require plaintiffs to sufficiently identify the sources of their

information and belief "so as to allow each defendant and the Court to review the sources

and determine, at the pleading stage, whether an inference of fraud may be fairly drawn

from the information contained therein." *G-I Holdings v. Baron & Budd*, No. 01 Civ.

0216 (RWS), 2004 U.S. Dist. LEXIS 10534, 2004 WL 1277870, at *2 (S.D.N.Y. June

10, 2004) (quoting *Crystal v. Foy*, No. 80 Civ. 446 (LWP), 1981 U.S. Dist. LEXIS

13242, 1981 WL 1648, at *3 (S.D.N.Y. June 30, 1981)) (collecting cases requiring

disclosure of the sources of information for fraud pleadings). Therefore, for the instant

claim to survive a motion to dismiss, plaintiffs must plead, *with particularity*, sufficient

22

facts to support plaintiffs' belief that Hotwire's pricing arrangements with airlines were
not long-term. With seeming indifference to this requirement, plaintiffs have proffered
no facts to support this conclusory allegation. Plaintiffs do not purport to possess
firsthand knowledge of the terms of the Hotwire contracts; in fact, plaintiffs have
disavowed accessing or relying on the contracts, which are not publicly available, in
bringing this Complaint. (Mot. Strike 2, 6.) Instead, plaintiffs attempt to support their
allegation by citing Clark's statement on August 3, 2004:

> [I]f you dig deep into this of course, *there are some supply issues*, and, of
> course, the second quarter was probably the deepest cut of it. Certainly
> internationally where all travel was down and is beginning I think to
> rebound. But other than that and other than Hotwire, which is definitely a
> significant issue, we don't think, again, it's structural. We don't think it's
> long term. We think that *the supply issues that we have had that have
> given us a lesser discounts as the year progresses*, we don't think it's
> going to come back fast, but we definitely think it will come back.

(CC ¶ 87 (emphasis added).) Although plaintiffs argue that Clark's statement is an
admission that IAC did not have long-term pricing agreements with airlines, Clark never
mentioned the Hotwire contracts, let alone discussed the terms of those contracts. The
most that can be inferred from Clark's statement is that Hotwire was not getting the same
discounts on airline seats that it had previously enjoyed and, as a result, consumers were
not making as many airline reservations through Hotwire. Plaintiffs also quote an analyst
from Oppenheimer & Co. who said following the conference call that IAC's "longer-term
issues are that they are not getting extra inventory or discounted rates from the airlines."
(*Id.* ¶ 89.) However, this statement provides plaintiffs with no more evidence of the
terms of the Hotwire contracts than Clark's statement.[7] As the Complaint provides no

---

[7] In strenuously arguing that defendants admitted at the end of the class period that IAC
lacked long-term contracts with airlines, plaintiffs implicitly acknowledge that simply
stating that they expect discovery to confirm their belief regarding the terms of the airline

facts to support plaintiff's allegation that defendants "affirmatively misrepresent[ed] and conceal[ed] that IAC lacked long-term contracts with airlines" (*id.* ¶ 3), the claim does not comply with the pleading standards set forth in Rule 9(b) and the PSLRA and must be dismissed. *See Acito v. IMCERA Group*, 47 F.3d 47, 53 (2d Cir. 1995) ("[C]onclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b)." (citing *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990))).[8]

### b.   Hotel Rooms

Plaintiffs also allege that certain statements regarding IAC's relationships with hotel chains and customers were misleading because those statements cast IAC's hotel business in a positive light, when in fact the "entire supply and demand structure of that segment [was] evaporating." (CC Opp'n 23–24.) Although the Class Complaint complies with the first three requirements of the PSLRA by specifying the statements that plaintiffs contend were fraudulent, identifying the speaker, and stating where and when the statements were made, the Complaint fails to comply with the fourth requirement of the PSLRA, that the complaint "explain why the statements were fraudulent." *Stevelman*, 174 F.3d at 84.

---

contracts is not sufficiently particularized to satisfy the requirements of the PSLRA. Other courts have specifically so held. *See In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1356 (N.D. Ga. 2000) (collecting cases); *see also* Kathryn B. McKenna, *Pleading Securities Fraud Using Confidential Sources under the Private Securities Litigation Reform Act of 1995: It's All in the Details*, 55 Rutgers L. Rev. 205, 235 (2002) (discussing need for particularized facts at the time that the complaint is filed).
[8] On January 6, 2006, defendants moved for leave to file the Hotwire contracts with the airlines under seal. Class plaintiffs opposed this motion, arguing that, because the Complaint does not rely on the contracts, considering them at the motion-to-dismiss stage is inappropriate. Because the Court finds that the Complaint does not allege particularized facts to support the allegation that the contracts were not long-term, the Court need not consider the actual terms of the Hotwire contracts to resolve this aspect of defendants' motion.

Plaintiffs argue that two statements made by defendants regarding IAC's hotel

business were false and misleading. The first statement was made in IAC's 2002 Form

10-K filed with the SEC on March 31, 2003:

> Although Hotels.com contracts in advance for volume room commitments,
> its supply contracts often allow it to return unsold rooms without penalty
> within a specified period of time. In addition, because Hotels.com
> contracts to purchase rooms in advance, it is able to manage billing
> procedures for the rooms it sells and thereby maintains direct relationships
> with its customers. Hotels.com has developed proprietary revenue
> management and reservation systems software that is integrated with its
> websites and call center operations. These systems and software enable
> Hotels.com to accurately monitor its room inventory and provide prompt,
> efficient customer service. Hotels.com believes that its supply contracts
> and revenue management capabilities differentiate it from retail travel
> agencies and other commission-based resellers of accommodations.[9]

(CC ¶ 42.) Plaintiffs likewise claim that the following statement made by Diller on the

earnings release conference call on February 9, 2004, was false and misleading:

> [W]e believe we can [grow] travel at our stated rates while being good
> partners to our suppliers and giving the best experience and service to our
> consumers. It's really true that we [bring] new customers to our suppliers.
> And one of our big objectives this year is to have all of our supply partners
> realize that and for us to really work to smooth out every working
> relationship that we have. We've announced an agreement with Marriott
> last week to distribute their hotels through our merchant program on both
> Expedia and hotels.com. We now have deals with the five major hotel
> chains, as well as thousands of different independent hotels and smaller
> chain operators.

(CC ¶ 78.) The first statement expresses defendants' belief that its supply contracts and

software helped it "accurately monitor its room inventory and provide prompt, efficient

customer service," and the second expresses defendants' hope that they can continue to

grow the travel business "while being good partners to our suppliers and giving the best

---

[9] Plaintiffs also argue that because this statement was incorporated by reference into the
registration statements filed with the SEC for the Hotels.com, LendingTree, and Expedia
mergers, those registration statements were rendered materially false and misleading as
well. *See infra at* I.D.

experience and service to our consumers." Plaintiffs do not argue that these "'[s]oft,' 'puffing' statements,'" *Raab v. General Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993), are actionable by themselves. *See Shields*, 25 F.3d at 1129–30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." (quoted in *Rombach*, 355 F.3d at 174)). Instead, plaintiffs argue that by making positive, albeit true, statements regarding Hotels.com, defendants assumed an obligation to disclose negative information about supplier and customer dissatisfaction as well. (Oral Argument Tr. 31– 32, Oct. 12, 2006; CC ¶¶ 9(a), 97(a) ("The Company's entire travel sector was in jeopardy and experiencing multiple negative trends that were clearly contrary to defendants' statements about the direction of the business . . . .")).

There is ample authority for the proposition that otherwise true, positive statements are rendered misleading when a corporation withholds negative information that would be material to an investor. *See, e.g., Rombach*, 355 F.3d at 173 ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." (quoting *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)); *McMahan & Co. v. Wherehouse Entm't., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[S]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not

by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact."). It is not enough, however, for plaintiffs to merely allege that defendants withheld negative information from the market; as discussed above, "whenever plaintiffs allege, on information and belief, that defendants made material misstatements or omissions, the complaint must 'state with particularity all facts on which that belief is formed.'" *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting the PSLRA, 15 U.S.C. § 78u-4(b)(1)). Here, the Class Complaint sets forth allegations regarding the "bad business practices" (CC ¶¶ 9(a), 97(a)) described above,[10] such as double-billing and overcharging customers, holding up payment to hotel chains, and representing hotels as "sold out" when they were not. In order to survive at this stage, the Class Complaint must state with particularity sufficient facts to support the belief that these practices were in fact placing the "entire travel sector . . . in jeopardy" (*id.*), and accordingly that defendants' positive public statements concerning IAC's relationships with hotel chains and customers were false and misleading. *See Novak*, 216 F.3d at 312. The Second Circuit has stated that the PSLRA does not require a plaintiff to reveal confidential sources at the pleading stage, so long as the complaint describes the documentary or personal sources on which it relies with enough detail for a court to determine whether the plaintiff has "an adequate basis for believing that defendants' statements were false." *Novak*, 216 F.3d at 314; *cf. In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 478–480 (S.D.N.Y. 2004) (rejecting efforts by district courts to read

---

[10] *See supra* Background at II.A.2.

the PSLRA "as importing an evidentiary requirement into securities fraud complaints,"
approving instead "an evaluation, inter alia, of the level of detail provided by the
confidential sources, the corroborative nature of the other facts alleged (including from
other sources), the coherence and plausibility of the allegations, the number of sources,
the reliability of the sources, and similar indicia" (quotation omitted)).

Here, the Class Complaint does not provide specific facts concerning the majority
of the alleged bad business practices for the Court to ascertain whether plaintiffs have an
adequate basis for alleging that "IAC's relationship with its hotel suppliers—and thus its
ability to secure a supply of hotel rooms to sell—completely fell apart before and during
the Class Period." (CC Opp'n 5.) The Complaint states that information regarding the
bad business practices was gathered from unidentified "former IAC employees" and
"plaintiffs' counsel's investigation." (CC ¶¶ 9(a), 9(c), 43(i), 97(a), 97(c).) The
allegations attributed to former employees are stated in the most general of terms (*see,
e.g., id.* ¶¶ 9(a) ("online customers were being double-billed," "[c]ertain hotel chains
were contesting the Company's slow payment," "there were large numbers of unhappy
consumers who felt they had been overbilled in one way or another")), without names,
dates, places, or other details that might help the Court evaluate whether these employees
were actually in a position to know the status of IAC Travel's relationships with hotel
chains and customers. Moreover, the bulk of the allegations are uncorroborated by other
facts. For example, plaintiffs have alleged no facts that might corroborate the statements
of unidentified former employees that defendants double-billed and overcharged
customers, held up payment to hotel chains, or charged rates for hotel rooms that
exceeded the hotel's public prices. (*See id.* ¶¶ 9, 43, 97.)

28

The one specified allegation of bad business practices related to the termination of IAC's relationship with InterContinental Hotels Group. InterContinental publicly complained that Expedia and Hotels.com represented hotels as "sold out" when they were not, and that Expedia and Hotels.com transmitted reservations via fax rather than "guarantee[ing] through an automated and common confirmation process." (*Compare id.* ¶¶ 80, 90 (InterContinental's complaints) *with id.* ¶¶ 9, 43, 97 (bad business practices).) The discontent of one hotel chain, however, is hardly evidence that the "entire supply and demand structure of that segment [was] evaporating." Significantly, plaintiffs have not attempted to quantify the impact that InterContinental's dissatisfaction had on IAC Travel's profitability during the class period. Further, the Class Complaint itself acknowledges that at the same time that IAC was losing InterContinental's business, it was forging relationships with new suppliers, such as Marriott and Hyatt. (*See id.* ¶¶ 78, 81.) The loss of one hotel chain, without more, is "consistent with unremarkable circumstances short of financial peril or instability." *Rombach*, 355 F.3d at 173-74. "A company that operates . . . nationwide is bound to have problems assimilating this or that property, to have disputes over payments with vendors and landlords, and to have some bills unpaid by reason of contested amounts or spot episodes of illiquidity; the allegations in the complaint are consistent with unremarkable circumstances short of financial peril or instability." *Id.* at 173 (affirming dismissal of Sections 10(b), 11, and 12 claims); *see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 625–26 (S.D.N.Y. 2005) ("[T]he materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion").

The Class Complaint also alleges that Diller minimized the significance of the occupancy tax issue, and its affect on IAC's relationships with hotel suppliers, by making two false and misleading statements. (CC ¶ 101; *see also id.* ¶¶ 60–64.) First, in a press release issued on August 11, 2003—shortly after an article about the occupancy tax issue appeared in the *New York Times*, and nearly a year before the close of the class period—Diller said that "while a limited number of jurisdictions have raised this issue (and the companies are engaged in ongoing dialogue with those jurisdictions), there is simply no basis for the supposition that the companies will face liability in all jurisdictions." (*id.* ¶ 61.) Second, an article in the *Calgary Herald* quoted Diller as saying that IAC "has investigated every aspect" of the tax issue and has "taken an appropriate reserve of $12 million. We think that's adequate." (CC ¶ 62.) According to plaintiffs, however, the situation was much more dire, because, "[a]s opposed to the 'limited number of jurisdictions' which IAC claimed had raised the issue, IAC was facing the issue nationally." (CC ¶ 64.)

Given IAC's regular, meaningful, and specific warnings regarding the issue, however, no reasonable investor could have been misled by Diller's two statements. For example, IAC's Form 10-K for 2002 gave a detailed, multi-paragraph warning to investors, stating in part:

> Some tax authorities may assert that in some circumstances USA [IAC's previous name] or its subsidiaries should collect and remit taxes on that part of their charges to customers which represents compensation for booking services. The amount of any tax liability to USA and its subsidiaries on account of this issue would depend on the number of jurisdictions that prevail in assessing such additional tax. Expedia and Hotels.com have not paid nor agreed to pay such taxes and intend to defend their positions vigorously. Should a jurisdiction prevail on such a claim, USA's subsidiaries may consider limiting liability for future transactions in that jurisdiction by passing on such taxes to the consumer.

30

(Form 10-K, at 28 (Mar. 31, 2003) (DiPrima Aff. Ex. 10).)  Similarly, IAC's Form 10-K

for 2003 included an even more explicit warning, that stated in part:

> A variety of factors could affect the amount of the liability (both past and
> future) . . . . IAC notes that there are more than 7,000 taxing jurisdictions,
> and it is not feasible to analyze the statutes, regulations and judicial and
> administrative rulings in every jurisdiction. Rather, IACT has obtained the
> advice of state and local tax experts with respect to tax laws of certain
> states and local jurisdictions that represent a large portion of IACT's hotel
> revenue. In addition, IACT continues to engage in a dialog with and
> receive feedback from certain state and local tax authorities. IAC will
> continue to monitor the issue closely and provide additional disclosure, as
> well as adjust the level of reserves, as developments warrant. The reserve
> balance at December 31, 2003 is $13.2 million as compared to $10.4
> million at December 31, 2002.

(Form 10-K, at 69 (Mar. 15, 2004).)  Because IAC repeatedly warned the public that

taxing authorities could force IAC to pay back taxes or pay more taxes in the future,

further disclosure would not have "significantly altered the total mix of information made

available." *Acito*, 47 F.3d at 52 (quotation omitted).  Moreover, the Class Complaint is

silent as to how IAC's decision to remit tax on the wholesale price it paid for rooms,

rather than on the full retail price paid by customers, contributed to the deterioration of its

relationships with hotel chains or customers.

Although the Complaint advances other alleged misstatements (CC ¶¶ 44–48, 53,

56, 57–59, 74), none of these are accompanied by particularized facts explaining why

plaintiffs believe that the statements were fraudulent. *See, e.g.,* CC ¶ 44 ("We are

convinced that this merger [with IAC] will enhance the growth prospects for Hotels.com .

. . ."); CC ¶ 45 ("[W]e had a great quarter.  Travel revenue was up 93% and EBITDA for

travel was up 86% over last year.  This is despite the war which affected bookings in

March and early April."); CC ¶ 57 ("Our quarter was really very strong, led by the travel

and electronic retail.  Travel continues to be our big growth engine."); CC ¶ 75 ("We are

31

investing very aggressively into the growth of the business."); CC ¶ 78 ("We think that nothing can replace a broad travel site omnibus choice, convenience, and ability to sell packages and multiple components."). In this respect, the Class Complaint clearly fails to plead with the particularity required by Rule 9(b) and the PSLRA. Moreover, many of the statements merely cite historical facts or express optimism regarding IAC's future performance and as such are not actionable under the securities laws. *See Rombach*, 355 F.3d at 174 (holding that "expressions of puffery and corporate optimism do not give rise to securities violations"); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (holding that puffery is not actionable under the securities laws); *Duane Reade*, 2003 WL 22801416, at *6, *aff'd Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (holding that accurate statements about past performance are not actionable under the securities laws).

Finally, it is worth noting that IAC Travel's financial results are in tension with the allegation that the supply structure was "evaporating." The Class Complaint itself quotes from a press release summarizing the growth of both IAC and its travel division in the second quarter of 2004, as reported by IAC in its Form 8-K filed on August 3, 2004: *"IAC Travel ("IACT") increased revenue* on a comparable net basis by 34% to $556 million, operating income by 46% to $129 million *and Operating Income Before Amortization by 29% to $171 million . . . ."* (CC ¶ 86 (emphasis added).) IAC Travel enjoyed steady growth after the class period, reporting OIBA growth of 27% in third quarter of 2004, compared to third quarter of 2003 (*see* Form 8-K, Ex. 99.1, at 2 (Nov. 3, 2004)); 3% in fourth quarter of 2004, compared to fourth quarter of 2003 (*see* Form 8-K, Ex. 99.1, at 2 (Feb. 16, 2005) (DiPrima Aff. Ex. 18)); and 32% in first quarter of 2005,

32

compared to first quarter of 2004 (*see* Form 8-K, Ex. 99.1, at 2 (May 4, 2005)). Given these financial results, it is perhaps not surprising that plaintiffs were unable to muster particularized facts in the Class Complaint to support their theory that the "entire travel sector was in jeopardy."

In sum, the Court finds that plaintiffs' allegations do not sufficiently explain how any of the statements made by defendants were misleading. Accordingly, plaintiffs' Section 10(b) claim is dismissed for failure to state a claim.

## C.   Section 20(a) Claim

Plaintiffs also assert claims under Section 20(a) of the Exchange Act against IAC and the individual defendants. Section 20(a) claims are necessarily predicated on a primary violation of securities law and impose "control person" liability on individual defendants. *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (stating elements of Section 20(a) claim). Because plaintiffs have failed to state a claim for a primary violation of Section 10(b) of the Exchange Act, their Section 20(a) claim must be dismissed against all defendants.

## D.   Section 11 and Section 15 Claims Against IAC, Diller, Khosrowshahi, Barton, Kaufman, and the Director Defendants

Plaintiffs also allege that defendants IAC, Diller, Khosrowshahi, Barton, Kaufman, and the Director Defendants violated Section 11 of the Securities Act in connection with the registration statements filed with the SEC for the Hotels.com, LendingTree, and Expedia mergers. Section 11(a) provides in part,

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such

33

untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted . . . .

15 U.S.C. § 77k(a). A Section 11 violation is established when "material facts have been omitted or presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991) (citation, internal quotation marks, and alterations omitted); *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."). In *Rombach*, the Second Circuit noted that although fraud "is not an element or a requisite to a claim under Section 11 or Section 12(a)(2)," those claims "may be—and often are—predicated on fraud." 355 F.3d at 171. In such cases, the considerations for applying Rule 9(b) to a conventional fraud claim "apply with equal force." *Id.* (citation omitted).

Here, plaintiffs allege that the registration statements filed with the SEC for the Hotels.com, LendingTree, and Expedia mergers contained "untrue statements of material fact or omitted to state facts required to be stated therein or necessary to make the statements therein not misleading" (CC ¶ 123) because these registration statements incorporated by reference IAC's Form 10-K for 2002, which contained the allegedly false and misleading statement regarding Hotels.com analyzed above. (*See* CC ¶ 42 (excerpt from Form 10-K); *id.* ¶¶ 50, 51, 54 (describing registration statements).) This Section 11 claim plainly sounds in fraud, and, accordingly, Rule 9(b) applies. *See Rombach*, 355

34

F.3d at 172 (applying Rule 9(b) where "the wording and imputations of the complaint are classically associated with fraud"); *In re Ultrafem Sec. Litig.*, 91 F. Supp. 2d 678, 290 (S.D.N.Y. 2000) (applying Rule 9(b) where "plaintiffs [made] little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint."). However, because the Court has already found, in connection with the Section 10(b) claim, that those underlying allegations are not sufficiently pleaded to satisfy Rule 9(b) and the PSLRA, the Court likewise finds here that plaintiff's Section 11 claim is not sufficiently pled. Defendants' motion to dismiss the Section 11 claims is therefore granted. Moreover, because Section 15 liability is premised on a primary violation of Section 11, *see* 15 U.S.C. § 78o, plaintiffs have also failed to plead a violation of Section 15.

## E. Leave to Amend

It is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiffs leave to file an amended complaint. *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003). "[A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Id.* (internal quotation marks omitted). In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint." *Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) (citing *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986)). While the Court is uncertain whether class plaintiffs can readily cure the deficiencies in their Complaint, they are granted leave to attempt to do so.

35

## II.   *Defendants' Motion To Dismiss The Derivative Complaint*

The derivative complaint, based on state corporate law, makes two alternative

arguments about the various defendants. First, plaintiffs allege that the defendants who

sold shares of IAC stock during the class period were in possession of material,

nonpublic information and traded to their personal advantage using that information.

(DC ¶¶ 130–134.) Specifically, these defendants allegedly knew that IAC's financial

prospects were materially overstated, enabling defendants to sell stock at artificially

inflated profits to unsuspecting buyers. Second, plaintiffs allege that all of the defendants

breached their fiduciary duty to IAC by "caus[ing] the Company to improperly

misrepresent the financial prospects of the Company and failed to correct the Company's

publicly reported financial results and guidance." (*Id.* ¶¶ 135–40). Based on the same

alleged wrongdoing, derivative plaintiffs also bring claims for abuse of control (*id.* ¶¶

141–45), gross mismanagement (*id.* ¶¶ 146–150), waste of corporate assets (*id.* ¶¶ 151–

54), unjust enrichment (*id.* ¶¶ 155–57), and violation of Section 14(a) of the Exchange

Act (*id.* ¶¶ 159–61).

Defendants argue that if the Court finds, as it has, that the claims in the Class

Complaint are not actionable under the federal securities laws, then the Court must

dismiss the claims in the Derivative Complaint because they are premised on a failure-to-

supervise theory and thus necessarily fail. (Mot. Dismiss DC 3.) Defendants are largely

correct. *In re Digimarc Corp. Derivative Litig.*, No. 05 Civ. 1324 (HA), 2006 U.S. Dist.

LEXIS 56134, 2006 WL 2345497, at *5 (D. Or. Aug. 11, 2006) (stating as additional

support for dismissal of a derivative suit the fact that a parallel class action securities

fraud case was dismissed). The Court notes, however, that although the allegations of

wrongdoing in the Derivative Complaint are identical to those in the Class Complaint, derivative plaintiffs—unlike class plaintiffs—have not abandoned their allegations regarding improper accounting practices. (DC ¶ 138.) The Court therefore will address the question of demand futility.

## A.   Plaintiffs' Allegations of Demand Futility

Plaintiffs concede that they did not make any demand on the board to institute this action, and allege that such a demand would have been futile. (DC ¶ 111) Plaintiffs allege that demand would have been futile because of the "myriad social and business interrelationships amongst the current and past board members and officers." (*Id.* ¶ 114.) In particular, plaintiffs emphasize Diller's influence over the board: "Diller presently owns approximately 239,000,000 shares of IAC common stock, which represents 60% of the voting rights of the Company. As such, he exerts a virtual control and domination over the Board since, with his vote, he could replace any other member of the highly compensated Board and/or other Company executives." (*Id.* ¶ 115.) In addition, plaintiffs claim that the Directors face a substantial likelihood of liability on the underlying claims because they (1) permitted Diller, Barton, Genachowski, and Khosrowshahi to sell their IAC stock "under suspicious circumstances which bore investigation by the Board and/or a special committee of the Board" (*Id.* ¶ 116); (2) signed misleading proxy statements that resulted in their election to the Board (*Id.* ¶ 117); and (3) "knew and/or directly benefited from the wrongdoings complained of herein," including violations of the securities laws (*Id.* ¶¶ 124–27). Finally, plaintiffs allege that the directors would not initiate a lawsuit against themselves because any insurance policy

37

indemnifying them would not cover their liability were the corporation itself to bring suit against them. (*Id.* ¶ 128.)

## B. Applicable Legal Standards

Plaintiffs' claims are brought in derivative form on behalf of IAC, of which plaintiffs are shareholders. When shareholders bring "a derivative suit on behalf of the corporation against the directors based on their actions or failure to act, there is a threshold question of standing as to whether the shareholders have made a demand on the board of directors." *Fink v. Weill*, No. 02 Civ. 10250 (LTS), 2005 U.S. Dist. LEXIS 20659, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005) (applying Delaware law) (citing Fed. R. Civ. P. 23.1). The Federal Rules of Civil Procedure impose heightened pleading requirements for shareholder derivative suits, including that

[t]he complaint shall . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Fed. R. Civ. P. 23.1. Because Rule 23.1 requires particularized allegations, the pleading standard is higher than the standard applicable to a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6). *See Fink*, 2005 U.S. Dist. LEXIS 20659, 2005 WL 2298224, at *3 (citing *In re Trump Hotels S'holder Derivative Litig.*, No. 96 Civ. 7820 (DAB), No. 96 Civ. 8527 (DAB), 2000 U.S. Dist. LEXIS 13550, 2000 WL 1371317, at *6 (S.D.N.Y. Sept. 21, 2000)); *see also Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426, 429 (S.D.N.Y. 2005) (applying Delaware law) (quoting *Burghart v. Landau*, 821 F. Supp. 173, 179 (S.D.N.Y. 1993)) (stating that demand shall be excused "'only if the complaining stockholder, in his complaint, makes well pleaded allegations that demand

38

on the corporation is futile.'"). When considering a motion to dismiss for failure to satisfy Rule 23.1's particularity requirement, the Court accepts as true all well-pleaded allegations and all reasonable inferences drawn therefrom. *Halpert*, 362 F. Supp. 2d at 430 (citing *Levner v. Saud*, 903 F. Supp. 452, 456 (S.D.N.Y. 1994)).

The demand requirements for a derivative suit are determined by the law of the state of incorporation. *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 99 (1991). The parties agree that Delaware law applies here. Under Delaware law the decision to bring a lawsuit on behalf of a corporation is ordinarily at the discretion of its board of directors. *See* Del. Code Ann. Tit. 8 § 141(a). As noted, plaintiffs concede that no demand was made on the IAC board of directors. (DC ¶ 111.) Demand may be excused as futile, however, "where a reasonable doubt exists that the board has the ability to exercise its managerial power, in relation to the decision to prosecute, within the strictures of its fiduciary obligations." *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992). Where, as here, plaintiffs do not challenge a particular business decision made by the board as a whole, the Court applies the test for demand futility as set forth in *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). *See also Guttman v. Huang*, 823 A.2d 492, 499 (Del. Ch. 2003) (applying *Rales* test where plaintiffs alleged that the defendant-directors individually breached their fiduciary duties by purposely trading in their individual capacities while in possession of material, adverse, and nonpublic information); *Fink*, 2005 U.S. Dist. LEXIS 20659, 2005 WL 2298224, at *3 (applying *Rales* test where plaintiff accuses directors of failure to act). Under the *Rales* test, a plaintiff must provide particularized allegations that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent

and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.

"Thus, in examining 'whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations,' the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand." *Rattner v. Bidzos*, C.A. No. 19700, 2003 Del. Ch. LEXIS 103, 2003 WL 22284323, at *8 (Del. Ch. Sept. 30, 2003).

Here, the Complaint alleges that a majority of the board either lacked independence or were interested. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984). Directors are entitled to a presumption that they were faithful to their fiduciary duties, thus the burden is upon the plaintiff to allege particularized facts to rebut the presumption at the pleading stage. "[A] plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Rales*, 634 A.2d at 936; *Beam ex rel. M. Stewart Living v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (explaining that independence is a fact-specific determination made in the context of a particular case); *see also In re Compucom Sys. Inc. S'holders Litig.*, No. Civ. A. 499-N, 2005 Del. Ch. LEXIS 145, 2005 WL 2481325, at * 8 (Del. Ch. Sept. 29, 2005). A plaintiff can establish a director's lack of independence by showing that the director is "beholden" to an interested director or officer, "or so under their influence that their discretion would be sterilized." *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 815). A director is considered "interested"

40

where the director is in a position to receive a personal financial benefit from a transaction that would not be equally shared by the corporation or shareholders, or where a transaction would be materially detrimental to the director but not to the corporation or shareholders. *Rales*, 634 A.2d at 936. The Delaware courts have said that the "mere threat" of personal liability is not a disabling interest for a director considering a derivative plaintiff's demand. *Guttman,* 823 A.2d at 500. "However, a 'substantial likelihood' of personal liability prevents a director from impartially considering a demand." *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del. Ch. 1995) (quoting *Rales*, 634 A.2d at 936); *accord Rattner*, 2003 Del. Ch. LEXIS 103, 2003 WL 22284323, at \*9.

Where, as here, the board consists of an even number of members, demand is excused when half of the board is properly alleged to be interested or lacking independence. *In re Walt Disney Co. Der. Litig.*, 731 A.2d 342, 354 (Del. Ch. 1998), *aff'd in part and rev'd in part sub nom., Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("[F]or demand to be futile, the Plaintiffs must show a reasonable doubt as to the disinterest of at least half of the directors"); *In re The Limited, Inc., S'holders Litig.*, No. 17148-NC, 2002 WL 537692 (Del. Ch. 2002) ("[W]here the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent"). Thus, for demand to be excused, the particularized facts of the Derivative Complaint must create a reasonable doubt that five of the ten directors on the board could have exercised their independent and disinterested business judgment in considering a demand. At the time plaintiffs filed the complaint in this action, IAC's board of directors consisted of the following ten directors: defendants

41

Diller, Kaufman, von Furstenberg, Barton, Bronfman, Keogh, Kravis, Rattner,

Schwarzkopf, and Spoon. (Mot. Dismiss DC 6–7; Pls.' Opp'n to Mot. Dismiss DC ("DC Opp'n") 2.)[11] The Court assumes, for purposes of this motion only, that Inside Directors Diller and Kaufman as well as Diller's wife, Diane von Furstenberg, are interested and will focus its inquiry on the alleged lack of independence and interestedness of the remaining seven directors.[12]

## C.   Independence

"Independence is a fact-specific determination made in the context of a particular case." *Stewart*, 845 A.2d at 1049. To satisfy *Rales*, plaintiffs must point to a relationship that is so substantial that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Id* at 1052. "This doubt may arise either because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act nonindependently vis à vis an interested director." *Id.* at 1051; *see also Aronson*, 473 A.2d at 816 (holding that to rebut presumption,

---

[11] The Derivative Complaint describes Diller's relationship with defendants Khosrowshahi, Bennett, and Malone (DC ¶ 123(f)), but none of these individuals was serving on the Board at the time plaintiffs filed their Complaint, and thus Diller's relationships to them are not relevant to the issue of demand futility. (*See id.* ¶ 114); *see Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144, 2002 WL 31888343, at *5 (Del. Ch. Dec. 18, 2002) ((holding that the board as constituted on the date that the original complaint was filed is the board for purposes of evaluating whether demand is required or excused); *see also Haseotes v. Bentas*, C.A. No. 19155 NC, 2002 Del. Ch. LEXIS 106 (Del. Ch. Sept. 3, 2002) ("The focus of the demand futility analysis is whether the complaint creates a reasonable doubt that, *as of the time the complaint was filed*, the Board could have properly exercised its independent and disinterested business judgment in responding to a demand." (emphasis added)).

[12] The Court refers to these seven directors (Barton, Bronfman, Keogh, Kravis, Rattner, Schwarzkopf, and Spoon) as "Outside Directors." The Court uses this term merely for simplicity's sake and does not mean to imply by its use of this term that von Furstenberg is not also an outside director.

plaintiff need only allege specific facts, not plead evidence). Plaintiffs argue that all

seven Outside Directors lack independence because Diller, by virtue of his sixty-percent

voting power, dominates IAC's board. (DC ¶ 115.) Diller himself was quoted in the

November 14, 2003 edition of *TheStreet.com* as stating that

> "[t]here has been some criticisms about this—about our "cozy" board, so
> to speak, and the fact that I have relationships with them. Well, the truth
> is, I have relationships with almost everybody 'cause I've been in business
> a long time. . . . So, there are very few people, actually, that I don't know.
> Now maybe it would be great if I went out and found some dumb
> strangers to put on our board. But I don't think it would be the most
> effective way to manage the company."

(DC ¶ 122.) Plaintiffs argue that the "myriad social and business interrelationships

amongst the current and past Board members and officers" render the directors incapable

of independently and disinterestedly evaluating the claims asserted in the Complaint.

Delaware courts have repeatedly held that majority voting power, without more,

is not enough to "strip the directors of the presumptions of independence, and that their

acts have been taken in good faith and in the best interests of the corporation." *Aronson*,

473 A.2d at 815–16; *see Stewart*, 845 A.2d at 1051 (finding 94% voting power

insufficient to rebut presumption of outside directors' independence); *see also*

*Zimmerman v. Braddock*, No. 18473-NC, 2005 Del. Ch. LEXIS 135, 2005 WL 2266566,

at *8 (Del. Ch. Sept. 8, 2005) (finding that 48% stock ownership alone is not sufficient

proof of domination of control of the board). The Court, therefore, will make a director-

by-director inquiry into the specific, substantive allegations and the reasonable inferences

that flow from them to determine whether a reasonable doubt of independence exists.[13]

---

[13] The Complaint alleges that defendant Barton is interested because he sold stock during
the class period, but does not allege that Diller dominates or controls Barton's decisions.
The Court therefore considers Barton's independence from Diller to be conceded by
plaintiffs.

43

### 1.    *Bronfman, Kravis, and Rattner*

Plaintiffs allege that Kravis, Rattner, and Bronfman have been "compromised" by their involvement in "a number of joint corporate ventures" with Diller "which have left them highly interdependent on both an economic and social level." (DC ¶ 123(f).)  For instance, Diller made a bid to acquire Paramount Studios in 1993, at which time Rattner represented Paramount through his affiliation with the banking house Lazard Frères & Co.  Several years later, Diller functioned as chief executive of Vivendi Universal, where Bronfman and Kravis served on the board of directors and Bronfman also served as executive vice chairman.

These skeletal allegations do not give rise to an inference that the Kravis's, Rattner's, or Bronfman's independence was compromised.  In *Stewart*, 845 A.2d at 1051, the Delaware Supreme Court rejected such an inference based on similar ties the directors were said to have with chief executive Martha Stewart, who wielded supermajority voting power in the company.  The court held that "[a]llegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' *even when coupled with Stewart's 94% voting power*, are insufficient, without more, to rebut the presumption of independence." *Id.* (emphasis added).  The court said that to rebut the presumption of independence, "a plaintiff must plead facts that would support the inference that . . . the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Id.* at 1052.

Like the complaint in *Stewart*, the Complaint here "does not give a single example of any action by [Bronfman, Kravis, and Rattner] that might be construed as

44

evidence of even a slight inclination to disregard [their] duties as a fiduciary for any reason." *Id.* at 1047 (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 980 (Del. Ch. 2003)). Rattner's only outside link to Diller is the fact that he represented a party opposite Diller in a business dealing more than ten years prior to the filing of the Complaint in this case. Bronfman and Kravis are merely alleged to have worked for the same company as Diller prior to their service on the IAC board. It is not even clear from the Complaint whether Diller was still chief executive of Vivendi at the time that Bronfman and Kravis served on the board there. It would be unreasonable, based on these facts alone, to conclude that Rattner, Bronfman, and Kravis would risk their reputations to preserve their relationship with Diller.[14]

## 2. *Spoon and Schwarzkopf*

Plaintiffs allege that Spoon lacks independence because Diller named Spoon as a director of Ticketmaster.com and Spoon in turn secured Diller a position on the board of the Washington Post. (DC ¶ 123(c).) Plaintiffs allege that Schwarzkopf lacks independence because Diller arranged for Schwarzkopf to be placed on Home Shopping Network's board and IAC's board in 1996. In addition, plaintiffs claim that Schwarzkopf is not independent because he has maintained ties with Malone, a former director of IAC,

---

[14] Plaintiffs cite *In re New Valley Corp.*, No. Civ. A. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) for the proposition that even if "the actual extent of these relationships is not altogether clear" at the pleading stage, "the existence of these interests and relationships is enough to defeat a motion to dismiss." *Id.* at *8. However, the relationships found to be disqualifying in *New Valley* are distinguishable from those in this case. The New Valley board, which approved a purchase of real property from its controlling shareholder, was comprised of eight members. Of those eight, three "had direct financial or employment relationships with one or more of the parties to the transaction," and another two had received $30,000 each from the controlling shareholder for agreeing to be a director nominee in an unrelated proxy bid. *Id.* at *7. As a result of the multiple intertwining relationships between the parties to the transaction, the court found that demand was futile. *Id.* at *8.

45

in that Schwarzkopf served on the President's Conservation Counsel and the Board of Governors of The Nature Conservancy at the same time that Malone was serving on the Board of Governors of The Nature Conservancy. (*Id.* ¶ 123(g).)

Allegations that "several of the Board members sit together, in various configurations, on other boards do not call into question the ability of the board members to exercise proper business judgment." *Halpert Enters.*, 362 F. Supp. 2d at 433 (citing *Langner v. Brown*, 913 F. Supp. 260, 266 (S.D.N.Y. 1996) (applying Delaware law) ("The fact that several director defendants sat on the same boards of directors of other companies does not in itself establish lack of independence.")); *J.P. Morgan Chase & Co.*, 906 A.2d 808, 824 (Del. Ch. 2005) (finding that the chief executive of the United Negro College Fund ("UNCF") was an independent director of J.P. Morgan Chase ("JPMC"), despite the fact that JPMC had matched millions of dollars in contributions to UNCF and an interested director of JPMC also served as treasurer of UNCF). Any argument that the directors were "nominated by or elected at the behest" of the controlling person adds nothing. *See Aronson*, 473 A.2d at 816. "That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence." *Id.* Furthermore, "the receipt of directors' fees does not constitute a disqualifying interest for the purposes of the demand requirement." *Langner*, 913 F. Supp. at 266 (citing *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988)). Even if directors' fees comprised such an interest, plaintiffs have not pled that Spoon or Schwarzkopf is beholden to Diller for his livelihood or a material portion of his income. *See id.*

### 3. *Keough*

The Complaint alleges that Keough lacks independence because (a) he and Diller served together on the boards of The Coca-Cola Company and the Washington Post (*id.* ¶ 123(f)), and (b) because Keough has served as a non-executive chairman of Allen & Company LLC, an investment banking firm, since 1993, during which time Allen & Co. provided services to IAC in connection with IAC's acquisition of Ticketmaster, Hotels.com, and Expedia (*id* ¶ 123(d)). The Complaint alleges that the fees that Allen & Co. earned in this capacity have not been disclosed.

As noted above, the fact that Diller and Keough have sat together on the boards of other companies does not compromise Keough's independence. *Halpert Enters.*, 362 F. Supp. 2d at 433. Nor do the allegations regarding fees paid to Allen & Co. demonstrate that Keough is beholden to Diller. Plaintiffs do not allege that Keough personally shared in any fees paid by IAC to Allen & Co. Although the Delaware chancery court has held that a director whose small law firm received $1,000,000 in legal fees from the corporation was potentially beholden to its chief executive officer, *Steiner v. Meyerson*, C.A. No. 13139, 1995 Del. Ch. LEXIS 95, 1995 WL 441999, at *210 (Del. Ch. July 19, 1995), other Delaware courts have rejected such inferences where the plaintiff has failed to allege with particularity facts indicating that the fees paid to the outside director or the director's firm were so material as to taint the director's judgment. *See, e.g., Khanna v. McMinn*, C.A. No. 20545-NC, 2006 Del. Ch. LEXIS 86, 2006 WL 1388744, at *17 (Del. Ch. May 9, 2006) (finding no lack of independence where Complaint alleged that director also sat on the board of a software vendor that received over $2.2 million in revenue from the subject corporation, as plaintiffs failed to allege that $2.2 million was material to the

vendor or that the transaction might otherwise have influenced the director's decisions); *White v. Panic*, 793 A.2d 356, 366 (Del. Ch. 2000) (rejecting claim of director's lack of independence where the plaintiff did not allege particular facts indicating that \$33,440 allegedly paid to director or his firm was so material as to taint the director's judgment); *Disney*, 731 A.2d at 360 (holding that allegation that company paid a director \$50,000 in consulting fees was not enough to demonstrate that the director lacked independence, as plaintiffs had failed to allege that \$50,000 was material to the director). Here, the Court cannot ascertain whether the revenue from IAC is material to either Allen & Co. or to Keough because of his relationship with Allen & Co. Moreover, no allegation has been made that Keough's responsibilities to Allen & Co. include managing the firm's relationship with IAC; nor could the Court conclude that Keough has a financial interest in Allen & Co., other than his unspecified salary, which might influence his decisions. *See Khanna*, 2006 WL 1388744, at \*17. The Court therefore finds that plaintiffs have not alleged particularized facts sufficient to demonstrate that Keough's independent discretion would be compromised. *See Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, C.A. No. 18473-NC, 2002 Del. Ch. LEXIS 145, 2002 WL 31926608, at \*10 (Del. Ch. Dec. 20, 2002) (rejecting a similar challenge to a director of Priceline.com, Inc. who served in an *executive* position at Allen & Co., which received consulting fees from Priceline.com).[15]

---

[15] Plaintiffs cite a *New York Times* article published August 10, 2003 as proof that Diller has admitted that Keough was not "independent." (*See* DC ¶ 122(d).) The article stated, "Mr. Diller said that on Audit committee matters requiring a *fully independent director* as chairman, Alan Spoon, former chief operating officer of the Washington Post Company, would take over." (*Id.*) However, in the context in which he was speaking, it is clear that Diller was referring to the SEC requirement that audit committee members be "independent." The SEC definition of "independence," unlike the definition of

## D. Disinterestedness

Having rejected derivative plaintiffs' claims that Diller controlled the seven

Outside Directors, the inquiry now turns to the disinterestedness of the Outside Directors

at the time this action was filed.

### 1. *Plaintiffs' Insider Trading Claims*

Directors are considered interested for purposes of determining demand futility

when they "appear on both sides of a transaction [or] expect to derive any personal

financial benefit from it in the sense of self-dealing, as opposed to a benefit which

devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812;

*see also Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002). "Cursory allegations that a

director made sales of company stock in the market at a time when he possessed material,

nonpublic information are not sufficient to find a director interested for demand-futility

purposes," *In re Forest Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 389 (S.D.N.Y.

2006) (applying Delaware law) (quoting *Guttman*, 823 A.2d at 502 (noting that corporate

insiders sell company stock as a matter of course, and that such sales "are not quite as

suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting

at both sides of the negotiating table")); *accord Rattner*, 2003 Del. Ch. LEXIS 103, 2003

WL 22284323, at *11. Nevertheless, a court may find that directors are interested where

"plaintiffs have pled particularized facts regarding the directors that create a sufficient

likelihood of personal liability because they have engaged in material trading activity at a

time when (one can infer from particularized pled facts that) they knew material,

---

"independence" in the demand context, prohibits board members from accepting
"directly or indirectly any consulting, advisory, or other compensatory fee from the issuer
or any subsidiary thereof." 17 C.F.R. 240.10A-3(b).

nonpublic information about the company's financial condition." *Guttman*, 823 A.2d at 502; *see Zimmerman*, 2005 Del. Ch. LEXIS 135, 2005 WL 2266566, at *7 (finding demand futility excused where the plaintiff has "gone beyond mere cursory allegations of insider trading" (quoting *Guttman*)).

Here, Barton is the only Outside Director who traded IAC stock during the relevant period.[16] Plaintiffs argue that Barton is disabled from considering a demand because he sold "1.2 million shares of Company stock worth over \$40.6 million" without disclosing "his intimate knowledge of the problems Expedia experienced, both before and after IAC's acquisition." (DC Opp'n 12 (citing DC ¶¶ 58, 67, 111).) Barton sold 20,000 shares each week from August 2003 to January 2004, and 28,150 shares every seven days from January 2004 to July 2004. (DC ¶¶ 60–61.)

"While unusual insider trading activity during the class period may permit and inference of bad faith and scienter," plaintiffs have failed to establish that Barton's stock sales were "unusual." *Acito*, 47 F.3d at 54. Although derivative plaintiffs do not acknowledge the fact, Barton's trades were part of a 10b5-1 sales plan entered into on May 30, 2003. (*See, e.g.,* Form 4 (Aug. 18, 2003) (reporting to the SEC that Barton's trades on August 14, 2003, were "effected pursuant to the terms of a 10b5-1 sales plan adopted by the reporting person on May 30, 2003"); *see also* CC ¶ 24 ("Defendant Barton purportedly entered into a 10b5-1 sales plan on May 30, 2003, but at this point in time Barton was already in possession of material, non-public information concerning the adverse information described herein.").) Because Barton's sales were part of a periodic

---

[16] Plaintiffs also allege that Diller's and Kaufman's trades are disabling interests. Because the Court has already assumed that Diller and Kaufman are interested directors, these claims are not analyzed further here.

divestment plan, the timing and amount of the sales do not raise a strong inference of scienter. *See Fishbaum v. Liz Claiborne, Inc.*, 1999 U.S. App. LEXIS 18155, 1999 WL 568023, at *4 (2d Cir. July 27, 1999); *In re Immucor Inc. Sec. Litig.*, No. 05 Civ. 2276 (WSD), 2006 U.S. Dist. LEXIS 72335, 2006 WL 3000133, at *18 n.8 (D. Ga. Aug. 4, 2006) ("A valid 10b5-1 plan serves as an affirmative defense to allegations of insider trading."); *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (stating that use of 10b5-1 trading plan "could raise an inference that the sales were pre-scheduled and not suspicious"). In addition, plaintiffs have failed to plead particularized facts to support their allegation that Barton was in possession of "material, nonpublic information about the company's financial condition," *Guttman*, 823 A.2d at 502, during the time he sold IAC stock. Instead, plaintiffs ask the Court to infer Barton's knowledge of material, nonpublic information from the fact that Barton founded Expedia and the fact that IAC's acquisition of Expedia was "fraught with undisclosed problems," "including the failure to pay or reserve the proper state and local taxes." (DC Opp'n 12– 13.) However, Barton's alleged knowledge that Expedia was underpaying occupancy taxes cannot form the basis of an insider trading claim because the Court has held above that IAC's thorough and repeated disclosures on the subject rendered any omissions immaterial. The Court also has found that plaintiffs' vague allegations of "bad business practices" are not sufficiently particularized to state a claim under the securities laws. For the same reasons, the Court finds that those allegations also fail to satisfy Rule 23.1's particularity requirement. Furthermore, assuming, for the sake of argument, that plaintiffs' vague, generalized allegations of false financial statements could withstand a motion to dismiss, the Court must also reject plaintiffs' attempt to impute knowledge of

51

material, nonpublic information to Barton merely because he held a position on IAC's
board. *See Fink*, 2005 U.S. Dist. LEXIS 20659, 2005 WL 2298224, at *6 (finding that
trades did not create reasonable doubt that directors were interested where plaintiff
merely alleged "that their membership on the Board and their positions at executive
levels of Merrill Lynch provided [director defendants] with adverse, non-public
information"); *Rattner*, 2003 Del. Ch. LEXIS 103, 2003 WL 22284323, at *10 n. 53 and
*11 (finding same where complaint "charge[d] directors, solely upon the basis of their
status as directors, with knowledge of alleged corporate activity").

### 2. *Plaintiffs'* Caremark *Claims*

Plaintiffs also seek demand excusal on the grounds that the Outside Directors
faced a substantial likelihood of liability for their failure to institute sufficient internal
controls to monitor the condition of IAC's businesses and its accounting practices. (DC
Opp'n 17.) A failure-of-oversight claim against a corporation's directors "is possibly the
most difficult theory in corporation law upon which a plaintiff might hope to win a
judgment." *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).
Delaware courts recognize that no rationally designed system of information and
reporting "will remove the possibility that the corporation will violate laws or
regulations." *Id.* at 970. As a result, "only a sustained or systematic failure of the board
to exercise oversight—such as an utter failure to attempt to assure a reasonable
information and reporting system exits—will establish the lack of good faith that is a
necessary condition to liability." *Caremark*, 698 A.2d at 971. A necessary predicate for
a failure-of-oversight claim is "subjective bad faith" on the part of the directors,
*Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 798 n.80 (Del.

Ch. 2004), and bad faith cannot be averred generally in the demand excusal context, but most be supported by particularized factual pleading, *see Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1114 (D. Del. 1985), *aff'd* 782 F.2d 1026 (3d Cir. 1985).

Here, plaintiffs' attempt to plead a *Caremark* claim fails because it is not supported by particularized factual pleading. First, plaintiffs attempt to argue that Keough, Schwarzkopf, and Spoon, as members of the audit committee, "knew that IAC was only paying state and local sales and occupancy taxes based upon the wholesale price IAC paid for hotel rooms, not the full amount paid by customers." However, Keough, Schwarzkopf, Spoon, and the other directors cannot be said to face "substantial liability" on the occupancy tax issue because the Court has already found the alleged nondisclosures immaterial. Moreover, plaintiffs' allege accounting irregularities only in the most general terms and do not even allege that defendants violated GAAP. *See also Novak*, 216 F.3d at 309 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." (internal citations and quotation marks omitted)).

The Delaware courts rejected a similar claim in *Guttman*, 823 A.2d 492. There, the plaintiff brought a derivative action against all of NVIDIA Corporation's directors and officers, alleging that the board "failed to oversee the process by which [the company] prepared its financial statements so as to ensure that the resulting statements had integrity and met legal standards." *Id.* at 505. The court noted that the complaint did not address "either at all or only in cursory terms":

- The actual effect of the restatements on NVIDIA's bottom line;
- The reasons why particular defendants should have been on notice of

the accounting irregularities that are alleged. . . . ;

- The status of the company's financial controls during the Contested Period, including whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices. Relatedly, the complaint is devoid of any pleading regarding the full board's involvement in the preparation and approval of the company's financial statements.

- The relationship of the defendant's trades—particularly those of the outside directors—to permitted trading periods. . . .

*Id.* at 498. Because the complaint contained no "well-pled factual allegations—as opposed to wholly conclusory statements—that the NVIDIA independent directors committed any culpable failure of oversight under the *Caremark* standard," the plaintiffs' *Caremark* claim failed. *Id.* at 507. Plaintiffs here have likewise "failed to 'plead with particularity what obvious danger signs were ignored or what additional measures the directors should have taken." *Halpert Enters. v. Harrison*, No. 02 Civ. 9501 (SHS), 2005 U.S. Dist. LEXIS 15022, 2005 WL 1773686, at *2 (S.D.N.Y. July 6, 2005) (applying Delaware law) (quoting *In re Baxter Int'l Inc. Sec. Litig.*, 654 A.2d 1268, 1271 (Del. Ch. 1995)); *see also Guttman*, 823 A.2d at 506–07 ("[Plaintiffs'] conclusory complaint is empty of the kind of fact pleading that is critical to a *Caremark* claim, such as contentions that . . . the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."). Plaintiffs do not, for instance, allege that the directors' purported failure of oversight resulted in inaccurate financial statements that necessitated later restatements. Indeed, plaintiffs acknowledge the existence of an audit committee, which was "at all times . . . charged with the responsibility of monitoring the 'compliance by the Company with all legal and regulatory requirements.'" (DC ¶ 119.) Because plaintiffs

54

fail to plead facts suggesting that a majority of the IAC board faces a sufficient threat of liability to compromise their ability to act impartially on a demand, the complaint must be dismissed.[17]

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Class Complaint [68] is granted and the Class Complaint is dismissed without prejudice. Plaintiffs' motion to strike the Hotwire contracts [85] is rendered moot. Class plaintiffs have thirty days from the date of this Memorandum Opinion and Order to file a second amended consolidated complaint consistent with this opinion.

Defendants' motion to dismiss the Derivative Complaint [69] is also granted. The Clerk of the Court is directed to close the cases *Butler v. Diller*, 04 Civ. 9067, and *Garber v. Diller*, 05 Civ. 1145.

SO ORDERED.

Dated: New York, New York
March 21, 2007

Richard J. Holwell
United States District Judge

---

[17] Because derivative plaintiffs' claim pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), is premised on the same allegations of wrongdoing, it is also dismissed for failure to plead demand futility with adequate particularity. *See Halpert Enters.*, 2005 U.S. Dist. LEXIS 15022, 2005 WL 1773686, at *3.

55