UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE IAC/INTERACTIVECORP
SECURITIES LITIGATION

04 Civ. 7447 (RJH)

**MEMORANDUM
OPINION AND ORDER**

Richard J. Holwell, District Judge:

This is a securities class action brought on behalf of the class of individuals who bought

shares in IAC/InterActiveCorp ("IAC") between March 13, 2003, and August 3, 2004. In their

First Amended Complaint, (the "First Complaint"), plaintiffs brought claims under Sections 11

and 15 of the Securities Act of 1933 (the "Securities Act"), Sections 10(b) and 20(a) of the

Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5. The Court dismissed all claims

but granted plaintiffs leave to amend. *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d

574, 606–07 (S.D.N.Y. 2007) ("*IAC I*"). The plaintiffs accepted that invitation with their Second

Amended Complaint (the "Second Complaint"), which defendants have now moved to dismiss.

For the reasons stated below, the Court grants defendants' motion and dismisses the Second

Complaint in its entirety.

## BACKGROUND

For purposes of this motion, all allegations in the Second Complaint are taken as true.

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 151 (2d Cir. 2007). Many of the Second

Complaint's allegations simply repeat allegations contained in the First Complaint; the interested

reader is directed to *IAC I* for a fuller recitation of the factual background.  *See IAC I*, 478 F.

Supp. 2d at 578–84.

## I.      Parties

The plaintiffs allege that they are shareholders of IAC.  (Second Compl. ¶¶ 5–8.)  They

purport to bring claims on behalf of a putative class of shareholders who bought or otherwise

acquired shares of IAC between March 13, 2003 and August 3, 2004.  (*Id.*)  The defendants

include IAC and several of its executives.[1]

IAC describes itself as "a leading internet company with more than 50 fast-growing,

highly-related brands."  *See* About IAC, http://www.iac.com/About-IAC/.  During the class

period, the company was organized into eight divisions, of which Travel was the largest.

(Second Compl. ¶ 23.)  IAC Travel consisted of several subsidiaries, including Hotwire,

Expedia, and Hotels.com.  (*Id.*)  Hotwire was originally a partnership with American Airlines,

America West, Continental, Northwest, United, and USAirways.  (*Id.* ¶ 60.)  These and other

airlines agreed to provide discounted airline seats for sale through Hotwire's website.  (*Id.*)

IAC's hotel-related businesses, Expedia and Hotels.com, worked similarly: hotels provided

discounted hotel rooms for resale over the Internet through the Expedia and Hotels.com

websites.  (*Id.* ¶ 71.)

IAC grew partly through acquisitions.  (*Id.* ¶ 25.)  In early 2003, for example, it

announced that it would acquire the shares it did not already own of Expedia and Hotels.com.

---

[1] The individual defendants include Barry Diller, IAC's CEO; Dara Khosrowshahi, IAC's CFO and Executive Vice President; Julius Genachowski, IAC's Executive Vice President and Chief of Business Operations; Richard Barton, an IAC director; Erik Blachford, former President and CEO of IAC Travel; and Victor Kaufman, Vice Chairman of IAC's Board of Directors.  (Second Compl. ¶¶ 10–15.)  The Court will refer to these defendants collectively as the "Individual Defendants."

(*Id.*)  In May 2003, the company said that it would buy LendingTree.  (*Id.*)  And on September 22, 2003, IAC announced that it had agreed to acquire Hotwire for cash.  (*Id.* ¶¶ 25, 65.)

## II.    Allegations

IAC Travel's subsidiaries acted primarily as intermediaries between suppliers and consumers by aggregating and selling large blocks of consumer goods and services, like hotel rooms and airline tickets.  (*Id.* ¶ 23.)  The success of the company's travel segment thus depended on its ability to obtain a favorable supply of discounted airline seats and hotel rooms.  (*Id.* ¶¶ 24, 59, 71.)  Despite all this, plaintiffs allege that, during the class period, IAC failed to disclose significant supply problems that plagued its travel division.  (*Id.* ¶ 30.)

### A.    Hotel Business

First, plaintiffs allege that IAC failed to disclose unfavorable "trends" or "changes" in IAC's hotel business during 2003.  (*Id.* ¶¶ 29, 36, 57.)  They point to increased competition from IAC's suppliers, who "were vastly improving their own online capabilities."  (*Id.* ¶¶ 32, 75(b).)  As a result, hotels provided IAC with fewer rooms and limited its ability to mark up rates for the rooms they did provide.  (*Id.* ¶ 34.)  Plaintiffs also claim that the company's hotel business was adversely affected by supplier and customer dissatisfaction.  (*Id.* ¶¶ 33, 37.)  In particular, plaintiffs allege, citing several "Confidential Informants," that Hotels.com and Expedia made late payments to suppliers for hotel rooms; often displayed a message on their websites that a particular hotel's rooms were sold out when they were not; and routinely overbooked their supply of hotel rooms.  (*Id.* ¶¶ 31, 33, 38.)  These bad business practices, plaintiffs say, made unhappy hotel chains threaten to stop doing business with IAC.  (*Id.* ¶ 31.)  Their lone example is that, in 2004, InterContinental Hotels Group PLC ("InterContinental") announced that it would

3

stop working with Expedia because the company did not meet InterContinental's customer service standards.  (*Id.* ¶¶ 33, 79.)

The plaintiffs say that IAC failed to disclose these problems in an amended Form S-4 the company filed with the SEC in connection with the merger deal it made with LendingTree in May 2003.  (*Id.* ¶ 27.)  A Form S-4 is a streamlined registration statement that certain qualifying issuers are allowed to file; it allows issuers to incorporate by reference prior periodic filings like Forms 10-K and 10-Q.  (*Id.*)  An issuer using Form S-4 is required to describe "any and all material changes in the registrant's affairs that have occurred since the end of the latest fiscal year for which audited financial statements were included in the latest annual report to security holders and that have not been described in a report on [Form 10-Q] or [Form 8-K]."  U.S. Securities and Exchange Commission Form S-4, at 8–9, *available at* http://www.sec.gov/about/forms/forms-4.pdf.  Among other things, this requires that the Form S-4 include "known trends and uncertainties" with respect to "net sales or revenues or income from continuing operations" that have not already been disclosed in the company's Forms 10-Q or 8-K.  *See* Item 303(a) of Regulation S-K, 17 C.F.R. § 229.303(a).  Plaintiffs allege that the problems in IAC's hotel business were "known trends and uncertainties" within the meaning of Item 303(a) of Regulation S-K.  (Second Compl. ¶ 29.)

In addition, plaintiffs allege that IAC's 2002 Form 10-K, which was incorporated by reference into the LendingTree Form S-4, misrepresented Hotels.com's relationships with suppliers and its customer service:

> Hotels.com has room supply relationships with a wide range of independent hotel operators and lodging properties, as well as hotels associated with national chains, including Hilton, Sheraton, Wyndham, Hyatt, Radisson, Best Western, Loews, Doubletree, La Quinta, Courtyard by Marriott and Hampton Inn.  **Hotels.com believes that these suppliers view it as an efficient distribution channel to help maximize their overall revenues and occupancy levels.**  Although Hotels.com contracts in

advance for volume room commitments, its supply contracts often allow it to return unsold rooms without penalty within a specified period of time.  In addition, because Hotels.com contracts to purchase rooms in advance, it is able to manage billing procedures for the rooms it sells and thereby maintain direct relationships with its customers.  **Hotels.com has developed proprietary revenue management and reservation systems software that is integrated with its websites and call center operations.  These systems and software enable Hotels.com to accurately monitor its room inventory and provide prompt, efficient customer service.**  Hotels.com believes that its supply contracts and revenue management capabilities differentiate it from retail travel agencies and other commission-based resellers of accommodations.

(*Id.* ¶ 44 (emphasis in original).)  The plaintiffs argue that Hotels.com could not possibly have believed its suppliers viewed it as an "efficient distribution channel to help maximize their overall revenues and occupancy levels," given the ongoing erosion of its relationships with those same suppliers.  (*Id.*)  They also say that it was misleading for IAC to suggest that Hotels.com's computer systems allowed it to provide "prompt, efficient customer service," given that Hotels.com was at that time experiencing "customer service issues" that were "substantially eroding its customer service levels."  (*Id.*)

### B.    Airline Business

Second, plaintiffs allege that IAC issued misleading guidance about Hotwire's arrangements with major airlines.  Specifically, they say that during a November 5, 2003 conference call, IAC chief executive Barry Diller inaccurately represented to investors that "Hotwire's airline suppliers were contractually obligated to supply Hotwire" with the "same number of airline seats" "at the same pricing" provided to Hotwire prior to IAC's acquisition of it.  (*Id.* ¶ 67.)  The relevant exchange on that conference call was as follows:

[DARYL SMITH, ANALYST, JP MORGAN]:  Good morning.  On the Hotwire side of the equation, [it] traditionally benefited from preferential pricing associated with their close connection with airline suppliers.  With airlines now liquidating their investment, when can we anticipate that their existing pricing contracts roll off and when do you think you'd expect the financial impact of that on the business?  I have a follow-up question as well.

> DILLER:  I'm sorry, forgive.  If you just repeat the last part of your questions, cross talk here and I couldn't hear it.
>
> SMITH:  If you look at the airlines now liquidating their investment what's the potential impact on the roll off of that pricing contracts and then what's the impact on your business and when can we anticipate that happening?
>
> DILLER:  I don't know if there's any.  I think our agreements with airline are long-term.  And, so, I don't think that it will have any effect.  Anybody else here have anything to comment on it?  So that's the answer to that.

(*Id.* ¶ 66.)  Plaintiffs say that Diller's answer led investors to think that Hotwire's suppliers had contracted to supply Hotwire with the same number of seats for the same prices after the acquisition as before it.  (*Id.* ¶ 67.)  In reality, the suppliers had no such obligation.  (*Id.* ¶ 68.)

## C.    **Stock Drop and Subsequent Disclosures**

IAC's failure to disclose material information allegedly caused its stock to trade at inflated prices.  (*Id.* ¶ 80.)  During the class period, the company's stock price rose as high as $42.74 per share on July 7, 2003.  Plaintiffs allege that, during this period, several of the Individual Defendants sold millions of shares of inflated IAC stock.  (*Id.* ¶ 83.)  On August 3, 2004, IAC issued a press release announcing poor results for the second quarter of the year.  (*Id.* ¶ 68.)  Plaintiffs say the company followed that news by making disclosures that revealed its earlier misstatements and omissions and caused IAC's stock price to plummet by $5 a share to close, on August 4, 2004, at $22.80 per share.  (*Id.* ¶ 69.)  They cite two such disclosures.  First, on a conference call on August 3, Roger Clark, IAC's Vice President of Investor Relations, said of IAC's worse-than-expected earnings for the quarter,

> [I]f you dig deep into this of course, there are some supply issues, and, of course, the second quarter was probably the deepest cut of it.  Certainly internationally where all travel was down and is beginning I think to rebound.  But other than that and other than Hotwire, which is definitely a significant issue, we don't think, again, it's structural.  We don't think it's long term.  We think that the supply issues that we have had that have

given us a lesser discounts as the year progresses, we don't think it's going to come back
fast, but we definitely think it will come back.

(*Id.* ¶ 68.)  In addition, a *Bloomberg News* article, whose date the Second Complaint does not

provide, reported that IAC "said that hotel chains and airlines are providing fewer rooms and

seats to sell."  (*Id.* ¶ 70.)

## STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Starr

v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atlantic Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949 (2009).

"If the factual averments permit no reasonable inference stronger than the 'mere possibility of

misconduct,' the complaint should be dismissed."  *Yu v. State St. Corp.*, --- F. Supp. 2d ----, ----,

2010 WL 668645, at *3 (S.D.N.Y. Feb. 25, 2010) (quoting *Iqbal*, 129 S.Ct. at 1950).  The Court

accepts as true all factual allegations in the complaint and draws all reasonable inferences in the

plaintiff's favor, *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 692 (2d Cir.

2009), but it does not credit "mere conclusory statements" or "threadbare recitals of the elements

of a cause of action," *Iqbal*, 129 S.Ct. at 1949.  On a motion to dismiss, the Court may consider

documents referenced in or integral to the complaint, as well as public filings with the Securities

and Exchange Commission ("SEC").  *IAC I*, 478 F. Supp. 2d at 585.

Securities complaints are "subject to the heightened pleading standards imposed by Rule

9(b) to the extent that they make allegations sounding in fraud."  *SEC v. Espuelas*, 579 F. Supp.

7

2d 461, 469 (S.D.N.Y. 2008); *see SEC v. Kelly*, No. 08-4612, 2009 WL 3241548, at *5 (S.D.N.Y. Sept. 30, 2009).  Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Although intent may be alleged generally, *id.*, a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent."  *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995).

## DISCUSSION

### I.        Securities Act Claims

Section 11 of the Securities Act creates liability for a company that holds a registered securities offering, along with its executive officers, where the registration statement "contain[ed] material misstatements or omissions" when it became effective.  *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)).  Section 15 creates derivative liability for persons who control a Section 11 violator.  *In re Morgan Stanley*, 592 F.3d at 358 (citing 15 U.S.C. § 77o).  The plaintiffs' Section 11 claim is premised on the allegation that the defendants' LendingTree registration statement was materially false or misleading.

### A.        Rule 9(b)'s Application

As an initial matter, the Court must decide whether this claim sounds in fraud.  If it does, Rule 9(b)'s heightened pleading standard applies.  In *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), the Second Circuit held that "Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."  *Id.* at 171.  Whether fraud is alleged depends on the "conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  *Id.*  The touchstone

inquiry is whether "the gravamen of the complaint is plainly fraud." *Id.* at 172 (quotation marks and citation omitted). Even if a complaint adds boilerplate language disclaiming fraud for its Securities Act claims, its gravamen is fraud if it alleges a unified "fraudulent scheme." *In re Ultrafem, Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690 (S.D.N.Y. 2000). On that logic, this Court found that Rule 9(b) did apply to the Securities Act claims in plaintiffs' First Complaint. *IAC I*, 478 F. Supp. 2d at 596. Those claims were quite clearly grounded in a single course of fraudulent conduct. The First Complaint began with what it called a "BACKGROUND AND OVERVIEW OF THE SCHEME." (First Compl. ¶¶ 32–97.) It then itemized specific causes of action pursuant to the Exchange Act and the Securities Act, for each cause of action "repeat[ing] and realleg[ing] the allegations" that came before. (*See, e.g.*, First Compl. ¶ 123.) Its Section 11 and Section 15 causes of action were different only in that the First Complaint summarily stated that "[t]he Section 11 Plaintiffs, for purposes of this claim, disclaim any allegations of fraud." (*Id.* ¶¶ 123, 130.) As in *Ultrafem*, the "plaintiffs [made] little, if any, effort to differentiate their asserted negligence claims from the fraud claims which permeate the Complaint," notwithstanding their boilerplate disclaimer. *Ultrafem*, 91 F. Supp. 2d at 690; *see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness").

This complaint is different. The Second Complaint presents no grand overview of defendants' misdeeds, and it reverses the order of its causes of action, now pleading the Section 11 claim first. After alleging that the defendants were negligent in preparing the LendingTree registration statement, the Second Complaint turns to allege Section 10(b) fraud in connection with other misrepresentations that defendants made. Despite these changes, defendants press for

the application of Rule 9(b) to plaintiffs' Section 11 claim.  They say that the allegations

supporting plaintiffs' Section 11 claim are the same as those supporting their Section 10(b)

claim.  (Defs.' Mem. 27.)  While that is true, it is not dispositive.  The Second Complaint simply

pleads Section 10(b) fraud and Section 11 negligence as alternatives, and nothing in *Rombach* or

Rule 9(b) forecloses that pleading strategy.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611,

632 (S.D.N.Y. 2007) (Lynch, J.) (even if defendants "were engaged in a massive fraud[, t]his

fact . . . does not take away plaintiffs' right to plead in the alternative that defendants violated a

provision requiring only negligence").  What *is* foreclosed is pleading fraud and non-fraud

claims in the alternative so poorly that a court is unable to figure out which allegations are

intended to support which claim.  In *In re Alstom SA*, 406 F. Supp. 2d 402 (S.D.N.Y. 2005), for

example, the complaint first set up a "massive edifice designed to demonstrate Defendants'

integrated fraudulent purpose," and only later sought to "disassemble the structure, disaggregate

it into discrete compartments and then sanitize the parts [plaintiffs] previously heavily tainted

with charges of fraud."  *Id.* at 410.  The court rejected this attempt to gain a "tactical pleading

advantage," primarily because it was too difficult to decipher which allegations were supposed to

support which claim.  *Id.* at 411.  The court did suggest, however, that the result might have been

different had plaintiffs "draft[ed] two-part complaints, each portion sufficient to stand alone for

its respective pleading purposes, though essentially duplicating and overlapping large

components of the other."  *Id.* at 411 n.3.  Because this is precisely what plaintiffs have done

here, their Section 11 claims do not sound in fraud.

**B.      Merits of the Claims**

     Even without Rule 9(b), plaintiffs are not free of their obligation to plead enough facts to

state a facially plausible claim for relief under Section 11 and Section 15.  *See Twombly*, 550

U.S. at 570.  To state a Section 11 claim, a plaintiff must allege "that a statement was either false or misleading (in light of omitted information), and that that same statement was material."  *Yu*, --- F. Supp. 2d ----, ----, 2010 WL 668645, at *4.  A misrepresentation is material if there is a substantial likelihood that a reasonable investor would "consider it important" in making an investment decision.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citations and alterations omitted).  An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Id.* (citation omitted).  Materiality, then, is fact-specific; it "turns on context."  *Yu*, --- F. Supp. 2d ----, ----, 2010 WL 668645, at *4.  Statements in a prospectus, for example, should be read in the context of the whole document.  *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000).  And they should be judged based on "the facts as they existed when the applicable registration statement became effective."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 320 (S.D.N.Y. 2009).  "[T]he central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the [investment]."  *Id.* at 300 (citations, quotations, and alterations omitted).

Here, plaintiffs allege that the LendingTree registration statement failed to comply with Item 303 of Regulation S-K.  (Second Compl. ¶ 27.)  That regulation requires a stock issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation."  17 C.F.R. 229.303(a)(3)(ii).  Plaintiffs argue that the registration

statement omitted information about, and affirmatively misrepresented, two "known trends" that adversely affected its business: hotel suppliers' own increasing online capabilities, and IAC's poor business practices.[2]  These trends are said to have shrunk IAC's supply of and profits from hotel rooms and contributed to growing dissatisfaction among its customers and suppliers. (Pltfs.' Opp. 12–16.)

### 1.      Hotel Suppliers' Improved Online Capabilities

Plaintiffs contend that the S-4 did not disclose the hit IAC's business had taken after hotel suppliers began "vastly improving their own online capabilities."  (Second Compl. ¶ 32.) This claim fails for a few reasons.  First, IAC had already disclosed this fact.  In its 2002 10-K, IAC stated that

> [i]ncreasingly, major hotels are offering travel products and services directly to consumers through their own websites.  Hotels.com believes that this trend will continue. . . . As demand for online travel products and services grows, Hotels.com believes that . . . traditional travel suppliers and travel agencies[] will increase their efforts to develop services that more closely resemble its online products and services.

(Naftalis Aff. Ex. 7, at 33.)  Plaintiffs do not try to explain why this disclosure was deficient. Second, to the extent plaintiffs allege that IAC should have disclosed "conditions in the market generally"—i.e., that hotel companies, like many other companies in the early 2000s, were improving their online presences—"such omissions are not actionable."  *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545 (S.D.N.Y. 2009); *see In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 212 (S.D.N.Y. 2004) (defendants were not required to disclose "publicly available information" concerning a downward trend in advertising rates

---

[2] The Second Complaint also claimed that the LendingTree S-4 failed to disclose the fact that a major business partner of Hotels.com, Metroguide, had sued it in January 2003.  (Second Compl. ¶¶ 42–43.)  In their opening brief, defendants pointed out that this litigation *had* been disclosed, in Hotels.com's 2002 10-K and its first-quarter 2003 10-Q.  (Defs.' Mem. 16.)  Plaintiffs' opposition papers do not mention the lawsuit, and the Court considers the claim abandoned.

resulting from increased competition); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) ("Sections 11 and 12(a)(2) do not require the disclosure of publicly available information.").  The omission of publicly available information about general market trends is not material because it is already part of the total mix of information available to investors.  *See Landmen*, 659 F. Supp. 2d at 545 (defendant need not have pointed out that a real estate market was "in the midst of a prolonged decline," because reasonable investors would already know that); *cf. Elliott Assocs., L.P. v. Covance, Inc.*, No. 00-4115, 2000 WL 1752848, at \*9 n.12 (S.D.N.Y. Nov.28, 2000) ("[T]he securities laws do not require that investors be treated like children.").  Third, to the extent plaintiffs assert that IAC failed to disclose non-public information about trends of its hotel suppliers that are distinct from the trend disclosed in IAC's 2002 10-K, they have not identified that information.  Nor have they alleged that IAC had knowledge of such information.  Defendants' actual knowledge of the trend is "an essential allegation for purposes of a claim based on Item 303." *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, No. 07-10528, 2010 WL 148617, at \*9 (S.D.N.Y. Jan. 14, 2010); *Landmen*, 659 F. Supp. 2d at 539–40 (plaintiff must plead "that the trends were known to the registrant who fails to disclose them"); *Garber v. Legg Mason, Inc.*, 537 F.Supp.2d 597, 614 (S.D.N.Y. 2008) (Chin, J.) (same).

## 2.     IAC's Bad Business Practices

Plaintiffs also argue that IAC failed to disclose that its travel subsidiaries engaged in bad business practices that contributed to dissatisfaction among their suppliers and customers.  But beyond citing "confidential informants" as support, the Second Complaint's allegations are no more specific than the First Complaint's.  According to two confidential informants, Hotels.com was operating in a way that "erod[ed] its supply of hotel rooms."  (Second Compl. ¶ 31.)  Both

Hotels.com and Expedia allegedly made late payments to suppliers for hotel rooms.  (*Id.*)  Both sites also frequently displayed a message that a hotel's rooms were sold out when they were not. (*Id.* ¶ 33.)  And Hotels.com "routinely overbook[ed] its supply of hotel rooms."  (*Id.* ¶ 38.) Sketchy at best, these allegations do not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible.  *See Twombly*, 550 U.S. at 570.  What was true of plaintiffs' First Complaint is true here: the allegations of mismanagement "are stated in the most general of terms" and without any "facts that might corroborate the statements of unidentified former employees."  *IAC I*, 478 F. Supp. 2d at 592; *see San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996) (an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales is insufficient to survive a motion to dismiss"); *cf. In re IPO Sec. Litig.*, 358 F. Supp. 2d at 212 (plaintiffs stated a Section 11 claim where they alleged "specific and factual" omissions regarding the expiration of 75 percent of defendants' advertising contracts in one month).

    Even if IAC's poor business practices had been pled in enough detail to be plausible, they would not be actionable under the federal securities laws absent an affirmative misrepresentation or the omission of a material fact stemming from the mismanagement.  *See In re Duke Energy Sec. Litig.*, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1206 (1st Cir. 1996), *superseded on other grounds by* 15 U.S.C. § 78u-4(b)(2) ("To the extent that the claim comprises allegations of mismanagement, it is not cognizable under the securities laws."); *Milman v. Box Hill Systems Corp.*, 72 F. Supp. 2d 220, 233 (S.D.N.Y. 1999) ("There is no affirmative duty to disclose managerial incompetence," just "to disclose any specific material consequence of that incompetence.").  Here, plaintiffs allege little more than

mismanagement.  Most of the omissions they cite are about the general contours of IAC's

business mistakes—late payments, overbooking hotel rooms, and the like—and, as such, do not

provide a basis for securities claims.  *Cf. Milman*, 72 F. Supp. 2d at 233 (company's failures to

disclose that its sales force was understaffed and ineffective and that its office "was in disarray"

were non-actionable mismanagement claims).  Plaintiffs also point to omissions about the *effects*

of the mismanagement—discontent among suppliers and customers.  These could be actionable

if adequately pled.  But here, plaintiffs supply only one concrete example of the effects these

"trends" had on IAC's business.  One of IAC's suppliers, InterContinental, announced in August

2004 that it would stop working with IAC's travel websites.  (Second Compl. ¶ 33.)  "The

discontent of one hotel chain, however, is hardly evidence that the entire supply and demand

structure of that segment [was] evaporating," *IAC I*, 478 F. Supp. 2d at 592 (internal quotation

marks omitted), or that it "was beset with problems" as plaintiffs claim (Pltfs.' Opp. 3).  "The

loss of one hotel chain, without more, is 'consistent with unremarkable circumstances short of

financial peril or instability.'"[3]  *IAC I*, 478 F. Supp. 2d at 593 (quoting *Rombach*, 355 F.3d at

173–74); *see Rombach*, 355 F.3d at 173 ("A company that operates . . . nationwide is bound to

have problems assimilating this or that property, to have disputes over payments with vendors

and landlords, and to have some bills unpaid by reason of contested amounts or spot episodes of

illiquidity.").

  Plaintiffs have been unable to allege concrete facts supporting their assertion that

widespread dissatisfaction was doing damage to IAC's business.[4]  IAC may have faced the

---

[3] It also bears noting that InterContinental's announcement came close to a year *after* the misstatements and omissions that the LendingTree S-4 allegedly contained.  The state of IAC's relationships with its suppliers in mid-2004 is hardly relevant to a Section 11 claim about a misstatement in mid-2003.  *See Landmen*, 659 F. Supp. 2d at 539 ("The veracity of a registration statement is determined by assessing the facts as they existed when the statement became effective.").

[4] That makes this case different from *Milman v. Box Hill Systems Corp.*, 72 F. Supp. 2d 220 (S.D.N.Y. 1999), on which plaintiffs rely.  There, the court found that the plaintiff stated a Section 11 claim for defendant's failure to

occasional disgruntled customer or supplier, but that makes it no different from most companies, for whom some level of customer discontent is a fact of life.  It would "bury[] the shareholders in an avalanche of trivial information," *San Leandro*, 75 F.3d at 810, to require IAC to disclose every instance of dissatisfaction.  Taken alone, a complaint from a customer or supplier is trivial information; it does not show that a business's fortunes are actually declining.  *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994) ("subject to what current data indicates, [companies] can be expected to be confident about their stewardship and the prospects of the business that they manage").

Plaintiffs allege affirmative misstatements too, but these allegations fall short of facial plausibility.  Plaintiffs say that a paragraph from IAC's 2002 10-K, which was incorporated by reference into the LendingTree Form S-4, misrepresented Hotels.com's relationships with suppliers and its customer service:

> Hotels.com believes that these suppliers view it as an efficient distribution channel to help maximize their overall revenues and occupancy levels. . . . Hotels.com has developed proprietary revenue management and reservation systems software that is integrated with its websites and call center operations.  These systems and software enable Hotels.com to accurately monitor its room inventory and provide prompt, efficient customer service.

(*Id.* ¶ 44 (emphasis in original).)  This was misleading, say plaintiffs, because Hotels.com could not have believed its suppliers viewed it as an efficient distribution channel, or that it provided prompt, efficient service, given its "deteriorating relationships with many of its suppliers." (Pltfs.' Opp. 17.)  But the deteriorating relationships plaintiffs allude to are only described in vague terms, never spelled out.  The Second Complaint cites "confidential informants," but even these anonymous witnesses have offered no concrete facts that would demonstrate—or even hint,

---

disclose declining sales trends.  *Id.* at 231-32.  But in *Milman*, the defendant allegedly "had lost several key customers to its competitors," which caused its sales to "materially decline[e]."  *Id.* at 231.  Nearly the opposite is true here, where plaintiffs allege only the loss of a single supplier—a loss that postdated the allegedly misleading registration statement by nearly a year.

really—that IAC's business was in fact "eroding" (Second Compl. ¶ 44) or "deteriorating"

(Pltfs.' Opp. 17) in 2003.

Actually, IAC's financial results from 2003 belie any such claim.  Those results, whose

accuracy plaintiffs have not disputed, reflect strong growth in IAC's travel division[5] during the

2003 fiscal year.  (Naftalis Aff. Ex. 6, IAC Form 10-K for 2003 fiscal year, at 46.)  The

following year was no different.  As the Court noted in *IAC I*, the company's SEC filings reveal

that the travel division "enjoyed steady growth" throughout 2004.  *IAC I*, 478 F. Supp. 2d at

594–95.  Plaintiffs call defendants' allusion to these strong results "engag[ing] in inappropriate

factual disputation."  (Pltfs.' Opp. 14 n.7.)  But there is no question that the Court may consider

public SEC filings on this motion.  *See IAC I*, 478 F. Supp. 2d at 585.  And plaintiffs have been

unable to explain why IAC's travel division performed so well in 2003 and 2004 if, as they say,

the travel division was reeling from dissatisfied customers and suppliers who quit using its

services.  *See In re Aribnet-thexchange, Inc.*, 2006 WL 3831396, at *2 n.5 (D.N.J. Dec. 28,

2006) (dismissing claims that "trends had a materially adverse impact on [defendant's] financial

performance" because they were "clearly contradicted by the financial documents referenced in

Plaintiffs' complaint and submitted by the parties").[6]

---

[5] According to the Second Complaint, IAC Travel included not only Expedia, Hotels.com, and Hotwire, but also Interval International and TV Travel Shop.  (Second Compl. ¶ 23.)  Still, the parties do not suggest that IAC Travel could have seen good financial results without solid performances from its hotel businesses.  The Second Complaint indicates that these businesses were integral to IAC Travel's financial success.  (*See id.* ¶ 24.)

[6] Plaintiffs apparently rely on a comment an IAC executive made on a conference call to investors on August 3, 2004, the same day IAC issued a press release announcing poor results for the second quarter of 2004.  (*See* Second Compl. ¶ 68.)  But all that the executive said on that call was that "there are some supply issues, and, of course, the second quarter was probably the deepest cut of it. . . . We think that the supply issues that we have had that have given us [] lesser discounts as the year progresses, we don't think it's going to come back fast, but we definitely think it will come back."  (*Id.*)  This says nothing about what the defendants knew during the class period, and it says nothing about whether the LendingTree S-4 was misleading when it was issued more than a year earlier than that conference call.

Given these myriad insufficiencies, plaintiffs' Section 11 claims cannot survive this motion.  Because Section 15 liability can only exist alongside a primary violation of Section 11, plaintiffs' Section 15 claims are also dismissed.

## II.        Exchange Act Claims

Plaintiffs also bring claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.  Section 10(b) bars the use of "manipulative or deceptive" practices "in connection with the purchase or sale of any security," 15 U.S.C. § 78(b), including making material misstatements or omissions, 17 C.F.R. § 240.10b-5.  Section 20(a) imposes derivative liability on individuals who control a Section 10(b) violator.  15 U.S.C. § 78t(a).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).  The allegations must be pled with particularity.  Fed. R. Civ. P. 9(b).  Under the Private Securities Litigation Reform Act (the "PSLRA"), which has expanded on Rule 9(b), the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see In re Refco*, 609 F. Supp. 2d at 311.  The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A strong inference exists where "a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Plaintiffs make two principal Section 10(b) claims.  First, as an alternative to their Section 11 claim based on negligence, they claim that the defendants fraudulently misrepresented the deterioration of IAC's hotel business.  But the allegations of material misstatements and omissions supporting plaintiffs' Section 10(b) claim are substantially identical to those supporting their Section 11 claim.[7]  Having already found these allegations deficient under normal pleading standards, *see supra* Part I, the Court has no trouble finding them deficient under the heightened pleading standards that Rule 9(b) and the PSLRA establish.

The plaintiffs' other Section 10(b) claim relates to Hotwire's arrangement with airlines. On September 23, 2003, IAC announced that it had agreed to acquire Hotwire for $665 million in cash.  (Second Compl. ¶¶ 60, 65.)  Plaintiffs say it was misleading for IAC to represent that Hotwire's airline suppliers were contractually obligated to supply Hotwire with the same number of airline seats, and at the same price, as they had before the acquisition.  (*Id.* ¶ 67.)  In reality, plaintiffs claim, Hotwire was only valuable to carriers during periods of excess seat supply (*id.*

---

[7] The plaintiffs' Exchange Act claim adds one allegation.  On a conference call to investors following IAC's disclosure of its results in the fourth quarter of 2003, IAC's CEO, Barry Diller, said:

> We can g[r]o[w] travel at our stated rates while being good partners to our suppliers and giving the best experience and service to our consumers.  It's really true that we bring new customers to our suppliers. And one of our big objectives this year is to have all of our supply partners realize that and for us to really work to smooth out every working relationship that we have.

(Second Compl. ¶ 74.)  The plaintiffs evidently believe that this statement was misleading, though the Second Complaint does not say why, and plaintiffs' opposition papers never mention the statement.  In any event, the plaintiffs have offered no concrete factual allegations to support their conclusory claims that IAC's relationships with its hotel suppliers were "eroding," "deteriorating," or otherwise drying up in late 2003 or early 2004. Moreover, to the extent IAC did face supply issues later in 2004, it disclosed them.  Two months after Diller's comment, IAC's Form 10-Q for the first quarter of 2004 stated that IAC expected "a more challenging supply environment resulting from recent increases in hotel occupancy rates.  These factors may negatively impact gross bookings."  (Naftalis Aff. Ex. 8, at 25.)

¶¶ 63, 64), and Hotwire's contracts did not "guarantee" it a certain supply of seats at a specific discount (*see id.* ¶¶ 61, 62).  Perhaps, but IAC never said otherwise.

Although plaintiffs believe that the press release announcing IAC's acquisition of Hotwire contained misleading statements, they have not identified which statements were wrong and why.  The press release said nothing about the content of Hotwire's contracts with airlines, and what it did say was unremarkable and entirely benign.  It described Hotwire as an "industry leader in opaque travel, a service that enables online consumers to see and choose a specific fare or rate without knowing the brand of the supplier until after the item is purchased."  (*Id.* ¶ 65.) And it said that Hotwire is able to "offer discounts of up to 45 percent on airfares, and up to 75 percent on hotel rooms," and that the "value proposition" for suppliers was that they "can drive incremental and profitable business by providing discounted inventory without harming their published prices or impacting their brands."  (*Id.*)  No reasonable investor would take this to mean that Hotwire had *locked in* 45-percent discounts on all airfares, or that Hotwire's contracts contained seat or rate guarantees at all.  In fact, other portions of the press release make it clear that Hotwire must "negotiate[]" discounts from suppliers to "sell their excess inventory"—i.e., inventory the airlines could not unload themselves.[8]  (Naftalis Aff. Ex. 9.)  It is hard to imagine how the press release could have led investors to believe that Hotwire's discounts were fixed when it disclosed that Hotwire has to *negotiate* those discounts.

The other supposedly misleading statement is also benign.  On a November 5, 2003 conference call with investors, IAC's CEO, Barry Diller, fielded a question about what effect the Hotwire purchase would have on contracts between Hotwire and its founding airlines:

---

[8] The Court may consider the full contents of the press release because plaintiffs reference it in their complaint and because the Court may take judicial notice of it as a matter of public record.  *See In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008); *Mitchell v. Home*, 377 F. Supp. 2d 361, 367 n.1 (S.D.N.Y. 2005).

> [DARYL SMITH, ANALYST, JP MORGAN]:  Good morning.  On the Hotwire side of the equation, [Hotwire] traditionally benefited from preferential pricing associated with their close connection with airline suppliers.  With airlines now liquidating their investment, when can we anticipate that their existing pricing contracts roll off and when do you think you'd expect the financial impact of that on the business?  I have a follow-up question as well.
>
> DILLER:  I'm sorry, forgive.  If you just repeat the last part of your questions, cross talk here and I couldn't hear it.
>
> SMITH:  If you look at the airlines now liquidating their investment what's the potential impact on the roll off of that pricing contracts and then what's the impact on your business and when can we anticipate that happening?
>
> DILLER:  *I don't know if there's any.  I think our agreements with airline[s] are long-term.  And, so, I don't think that it will have any effect.*  Anybody else here have anything to comment on it?  So that's the answer to that.

(Second Compl. ¶ 66 (emphasis added).)  Plaintiffs have made several attempts to turn Diller's two-line answer into securities fraud, but each of their arguments fails to show that he said anything false—much less that he intended to.  In the First Complaint, they charged that Diller's statement was misleading because he said the contracts were long-term when they were not. (First Compl. ¶ 73.)  The Court dismissed that claim because plaintiffs "proffered no facts to support" it.  *IAC I*, 478 F. Supp. 2d at 589.  The Second Complaint tweaks the allegation: it is no longer that IAC lacked long-term deals with airlines, but instead that IAC lacked *good* long-term deals with airlines.  Diller's answer is said to be misleading because it "affirmative[ly] misrepresent[ed]" that Hotwire's suppliers had promised to give Hotwire the same number of airline seats and at the same prices after the acquisition as before it.  (Second Compl. ¶ 67.)  But Diller did not make that representation.  All he said was that he thought IAC's acquisition would not affect Hotwire's business because Hotwire's contracts with airline suppliers were long-term.  Diller did not say what the price or supply terms of the contracts were.

Plaintiffs try out yet another argument in their opposition papers.  They contend that Diller's answer was misleading because it implied "that the airlines had been, and continued to be, contractually obligated to give Hotwire 'preferential' treatment over competing travel services even after the airlines had liquidated their investment."  (Pltfs.' Opp. 22.)  This argument relies on allegations that plaintiffs never made in their Second Complaint.[9]  "It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs."  *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005); *see Islam v. Goord*, No. 05-7502, 2006 WL 2819651, at *1 n.2 (S.D.N.Y. Sept. 29, 2006) (Holwell, J.) (calling it "axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss" (quotation marks and citation omitted)).  But even if the Court were to consider the newest set of allegations on the merits, it would find that plaintiffs fail to state a claim.  Just as Diller never said that the contracts guaranteed seats and prices, he never said that airlines gave preferential treatment to Hotwire, either before or after the acquisition.[10]  Even so, the plaintiffs suggest that Diller's answer was misleading in that it "did not dispute" anything the analyst said.  Prefacing the question he posed to Diller, the analyst mentioned that Hotwire "traditionally benefited from preferential pricing associated with their close connection with airline suppliers."  (Second Compl. ¶ 66.)  But the analyst said nothing about whether Hotwire had contractual rights to preferential pricing, or about whether Hotwire enjoyed contractual

---

[9] Plaintiffs state, for example, that unnamed "[a]nalysts believed that Hotwire's primary competitive advantage prior to the IAC acquisition was the preferential treatment that the airlines—as direct owners of Hotwire—granted Hotwire."  (Pltfs.' Opp. 4.)  They also say that the same unnamed "[a]nalysts further recognized that termination of this preferential treatment after the acquisition of Hotwire by IAC would have a disastrous impact on Hotwire's business and, in turn, on the Company."  (*Id.*)  These allegations did not appear in the Second Complaint.  Even if they had, they are too unparticularized to satisfy Rule 9(b) and the PSLRA.  They fail to "describe[] the documentary or personal sources on which [plaintiffs] rel[y] with enough detail for a court to determine" whether plaintiffs' claims have an adequate basis.  *IAC I*, 478 F. Supp. 2d at 592 (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[10] Plaintiffs say that Diller "further asserted that 'I don't think that it [the airlines divestiture] will have any effect' on the preferential treatment that Hotwire enjoyed."  (Pltfs.' Opp. 22.)  Of course, Diller never used the words "preferential treatment," and it would be unnatural to import that phrase into his answer.

benefits that its competitors did not.  Plaintiffs take too big a leap when they say that the

analyst's loosely phrased comment gave rise to a duty for Diller to disclose the true terms of the

Hotwire contracts.

       None of plaintiffs' interpretations of Diller's remark work.  Diller did not say that

Hotwire got guaranteed price and supply terms, and he did not say that Hotwire got better terms

than its competitors got.  Nor is there anything in the acquisition press release that suggests

guaranteed or preferential terms.  Far from it; the press release discloses that IAC has to

negotiate its discounts, and that what it buys is excess inventory, not a designated number of

seats on a plane.  Plaintiffs' Section 10(b) and Rule 10b-5 allegations are thin—too thin to

survive dismissal.  Because the Section 20(a) claim depends on finding a primary Section 10(b)

violation first, it too is dismissed.

## CONCLUSION

For the reasons stated, defendants' motion to dismiss the Second Complaint [**108**] is granted. Because plaintiffs have amended their complaint once already, and because the Court views amendment as futile, the claims are dismissed with prejudice. *See Landmen*, 659 F. Supp. 2d at 547 (*citing Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 372 (E.D.N.Y. 2005) ("A court . . . has discretion to dismiss with prejudice if it believes that [the] amendment would be futile or would unnecessarily expend judicial resources.")). The Clerk of the Court is requested to close this case.

SO ORDERED.

Dated: New York, New York
     March 19 , 2010

Richard J. Holwell
United States District Judge

24